Lyndel Anne Vargas
State Bar No. 24058913
CAVAZOS HENDRICKS POIROT, P.C.
Suite 570, Founders Square
900 Jackson Street
Dallas, TX 75202
Phone: (214) 573-7344
Fax: (214) 573-7399
Email: LVargas@chfirm.com

Attorneys for Attorneys for Milestone Capital CRE 1, LLC
and Otisco RDX, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| | § | |
| In Re: | § | Chapter 11 |
| | § | |
| RIC (LAVERNIA), LLC | § | Case No. 24-51195-mmp |
| | § | |
| Debtor. | § | |
| | § | |

## EMERGENCY MOTION TO DISQUALIFY LUTTRELL & CARMODY LAW GROUP AS ATTORNEYS FOR TRAVIS VARGO

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THE MOVANT HAS REQUESTED EMERGENCY CONSIDERATION OF THIS MOTION AND HAS REQUESTED THAT A HEARING BE HELD ON THIS MOTION AT THE COURT'S EARLIEST CONVENIENCE ON OR BEFORE SEPTEMBER 4, 2025. IF THE COURT IN FACT SETS THIS MOTION FOR AN EXPEDITED HEARING, THEN ONLY ATTENDANCE AT THE HEARING IS NECESSARY TO PRESERVE YOUR RIGHTS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COMES NOW, Ali Choudhri ("Movant" and/or "Choudhri"), individually and as managing member of Milestone Capital CRE 1, LLC and Otisco RDX, LLC and submits this his *Emergency Motion to Disqualify Luttrell & Carmody Law Group as Attorneys for Travis Vargo* (the "Motion") for violation of Texas Disciplinary Rules of Professional Conduct 1.06(f) 1.09(b) as Luttrell & Carmody Law Group (the "Firm") has a disqualifying conflict of interest arising from an attorney associated with the Firm, Mr. Trey White's prior representation

of Mr. Choudhri's single-member limited liability company, NIA ATX, LLC ("NIA"). Mr. White represented NIA in or about 2022 in relation to a sales transaction whereby NIA sought to purchase one or more assets out of a bankruptcy proceeding. Attorney Trey White is now of counsel with the Firm and thus both he, and the Firm, are barred by the Texas Rules of Professional Conduct from accepting representation of Receiver, Travis Vargo, with interests directly adverse to the interests of Choudhri. Thus, Choudhri respectfully states as follows:[1]

## I.  JURISDICITON, VENUE AND STATUTORY PREDICATES

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference on Bankruptcy Cases and Proceedings from the United States District Court for the Western District of Texas, dated as of October 4, 2013. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.      Venue of this case is proper in this District pursuant to 28 U.S.C. § 1408.

3.      The predicates for the relief requested by this Motion are Section 105(a) and Texas Disciplinary Rules of Professional Conduct.

## II.  FACTUAL BACKGROUND

4.      Mr. Choudhri is a judgment debtor of Mokaram-Latif West Loop, Ltd. and Osama Abdullatif arising from a judgement in Cause No. 2012-27197-A styled <u>Mokaram-Latif West Loop, Ltd. and Osama Abdullatif v. Ali Choudhri</u>, issued in the 333rd Judicial District Court of Harris County, Texas (the "A-Case"). Mr. Choudhri is also a judgment debtor of Ali Mokaram in Cause No. 2012-27197-D styled <u>Mokaram-Latif West Loop, Ltd. v. Ali Choudhri and Angel Valle</u>, issued in the 333rd Judicial District Court of Harris County, Texas (the "D-Case").

---

[1] As used the terms "Section" and "Chapter" refer to the section and chapter of the 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"). The term "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure.

5.      Although the District Court of Harris County entered an Order Granting Turnover, Charging Order, and Appointment of Receiver Against Judgment Debtors and an Amended Order Granting Turnover, Charging Order, and Appointment of Receiver Against Choudhri as a Judgment Debtor, a **Supercedeas With Alternative Security** valued at least at $4,025,000 was filed **August 11, 2025** (A true copy of the same is attached hereto) and, as a matter of law, became effective on that date. Tex. R. App. Proc. 24.2 (e).

6.      Travis Vargo was appointed the receiver to act pursuant to the D-Case Receivership Order and the A-Case Receivership Order. Mr. Vargo has retained the Firm to represent him in collection and liquidation of Mr. Choudhri's assets to satisfy the judgments entered against Mr. Choudhri.

7.      The Debtor, RIC (LaVernia), LLC filed the above-captioned Chapter 11 bankruptcy petition, and its managing member is Movant, Mr. Choudhri.

8.      In this case and others, Mr. Vargo has begun taking actions, through the Firm, such as filings on behalf of Travis Vargo, Court Appointed Receiver, for Relief from Stay Pursuant to 11 11 U.S.C. § 362(d)(1).

9.      The Firm's lead attorney and counsel of record, Lesli Luttrell, was notified by former counsel of Choudhri of the Firm's conflict of interest that disqualifies it from representing Mr. Vargo.  This conflict of interest arises from the association of the Firm with Trey White, who previously represented Mr. Choudhri's single-member LLC, NIA ATX, LLC ("NIA"). Mr. White represented NIA in or about 2022 in relation to a sales transaction whereby Nia sought to purchase one or more assets out of a bankruptcy proceeding. Throughout this representation, Mr. White (and the Firm) obtained confidential information regarding NIA and the assets of Mr. Choudhri. NIA is wholly- owned by Mr. Choudhri and Mr. Choudhri did not consent to the Firm representing an opposing party against him.

10. This Motion was brought on an emergency basis because the Motion for Relief from Stay of Receiver Vargos has been permitted to proceed on an expedited basis in direct violation of the Firm's ethical duties, which harm Mr. Choudhri.

## III. ARGUMENT

11. In the Fifth Circuit, "disqualification cases are governed by state and national ethical standards adopted by the court." *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992). "Motions to disqualify are substantive motions. Therefore, they are decided under federal law." *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995). Texas Disciplinary Rules of Professional Conduct have been adopted by the Western District of Texas to govern the conduct of attorneys before it. (Local Rules, Western District of Texas, Rule AT-7). Furthermore, the Fifth Circuit has held that "In reviewing a motion to disqualify, 'we consider the motion governed by the ethical rules announced by the national profession in light of the public interest and the litigants' rights.'" *In re American Airlines*, 972 F.2d at 609.

12. Texas Rule of Professional Conduct 1.06 (e) requires that when a lawyer accepted representation in violation of this Rule or if such representation becomes improper, the lawyer must withdraw. Ms. Luttrell, however, has refused to do so.

13. Rule 1.09 of the Texas Rules of Professional Conduct also provides in relevant part:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client:

    (1) whose interests are materially adverse to that person; and

    (2) about whom the lawyer had acquired information protected by Rules 1.05 and 1.09(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

14.     Rule 1.10 also makes it clear that the conflicts of interest of any lawyer associated with a firm are imputed to the rest of the lawyers in that law firm.

15.     A motion to disqualify counsel is the proper procedural vehicle to challenge an attorney's representation under these circumstances. *See NCNB Texas Nat'l Bank v. Coker*, 765 S.W.2d 398, 399 (Tex. 1989).

16.     Here, the Firm, through Mr. White, represented NIA, which is wholly- owned by Mr. Choudhri. The representation, while limited to a sales transaction, allowed Mr. White (and the Firm) to obtain information regarding NIA, an asset of Mr. Choudhri. Now, Mr. Vargo has retained the Firm to represent him and take actions on his behalf in the 1001WL Bankruptcy. These actions are taken with the goal to ignore the Supercedeas and attempt to liquidate Mr. Choudhri's assets and are thus adverse to Mr. Choudhri. The Firm, through its representation of NIA, acquired confidential information to the detriment of Mr. Choudhri and the detriment of NIA. For these reasons, the Firm's representation of Mr. Vargo is adverse to Mr. Choudhri and not permitted under Rule 1.09. Accordingly, the Firm must be disqualified and cannot take any action on behalf of Mr. Vargo in these proceedings or any other proceeding in which the interest is adverse to Mr. Choudhri.

**IV.     CONCLUSION**

WHEREFORE, Movant respectfully requests that the Court grant this Motion, enter an order disqualifying Luttrell & Carmody Law Group from representing Travis Vargo in this case, and grant such different and further relief as the Court deems just and proper.

Dated: September 3, 2025

Respectfully submitted,

*/s/ Lyndel Anne Vargas*_____
Lyndel Anne Vargas
State Bar No. 24058913
CAVAZOS HENDRICKS POIROT, P.C.
Suite 570, Founders Square
900 Jackson Street
Dallas, TX 75202
Direct Dial: (214) 573-7344
Fax: (214) 573-7399
Email: LVargas@chfirm.com

**Attorneys for Milestone Capital CRE 1, LLC
and Otisco RDX, LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served this 3rd day of September 2025 by electronic transmission through the Court's automated Case Management and Electronic Docketing System for the U. S. Bankruptcy Court for the Western District of Texas on all parties-in-interest submitting to service of papers in this case by said means.

*/s/ Lyndel Anne Vargas*_____
Lyndel Anne Vargas

8/13/2025 5:54 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 104351243
By: Joshua Herrington
Filed: 8/13/2025 5:54 PM

## CAUSE NO. 2012-27197-D

| | |
|---|---|
| **MOKARAM-LATIF WEST LOOP, LTD.** § | **IN THE DISTRICT COURT** |
| *Plaintiff,* § | |
| § | |
| **vs.** § | **HARRIS COUNTY, TEXAS** |
| § | |
| **ALI CHOUDHRI,** § | |
| *Defendant.* § | **333RD JUDICIAL DISTRICT** |

## ALI CHOUDHRI'S AND/OR THE DALIO ENTITIES' SUPERSEDEAS WITH ALTERNATIVE SECURITY

TO THE HON. RANDY WILSON:

Defendants Ali Choudhri ("Choudhri"), Dalio I, LLC, and Dalio II, LLC (the "Dalio Entities") file this supersedeas using alternative security valued at least $4,025,000 to stay all enforcement of this case, including to stay all authority of the court appointed receiver to take any action or to attempt to stop any action by Choudhri and/or the Dalio Entities. The amount to supersede per the Court is $3,387,263.13, which includes interest into 2028.

## I.    FACTUAL BACKGROUND

***Phase I Final Judgment* orders Defendants to pay Choudhri more than $600,000 and turn over 50% of Beal Bank Building, but they ignore the order.**

1.    On January 13, 2016, the Court signs *Phase I Final Judgment* in cause 2012-27197 that includes the following[1]:

a.    Defendant Ali Mokaram ("Mokaram") owes Choudhri $50,000 in damages plus 5% prejudgment simple interest for about 3 years = $57,500 *

---

[1] Exhibit 1 *Phase I Final Judgment* as if set out here.

5% post-judgment interest compounded annually = at least $89,201 plus 5% post-judgment interest compounded annually = at least $132,000.

b. Mokaram and Defendant Osama Abdullatif ("Abdullatif") jointly and severally owe Choudhri $413,879 in attorney fees and costs * 5% post-judgment interest compounded annually = at least $642,062.

c. Mokaram and Abdullatif jointly and severally owe Choudhri $150,000 in attorney fees and costs for Chaudhri winning the appeal * 5% post-judgment interest = at least $232,699.

d. Since October 29, 2010, Choudhri owns 49.5% of Mokaram Latiff West Loop, Ltd., including all "beneficial rights and interest in the Beal Bank entities that flow from such interest."

e. Since October 29, 2010, Choudhri owns 50% of Mokaram Latiff General, LLC, including all "beneficial rights and interest in the Beal Bank entities that flow from such interest."

f. The "only other owner of interest" is Osama Abdullatif "whose ownership interest in these entities is equal to that of Choudhri from and after October 29, 2010."

g. To date nobody has paid Choudhri one dime of the money ordered to be paid to Choudhri, which continues to accrue at 5% compounded annually.

**Beal Bank Building is appraised for $23,000,000.[2]**

---

[2] Exhibit 2 Beal Bank Building appraisal as if set out here.

2.      That same day, Jack W. Bass II, MAI, values the Beal Bank Building at $23,000,000. At a minimum per the Phase I Final Judgment, Choudhri owns an $11,385,000 interest in the Beal Bank Building either directly or through Mokaram Latif West loop, Ltd., or Mokaram Latif General, LLC.

3.      Besides owning half of the $23,000,000 Beal Bank Building, Abdullatif owes Choudhri half of accrued net rents since at least October 29, 2010. Net rents of about $2.50 a foot * about 80,000 square feet = $2,400,000 in likely collected net rents per year. Nearly 15 years * $2,400,000 = $36,000,000 in likely collected rents.

4.      But Abdullatif has not paid Choudhri one dime of his share, which would be about $18,000,000 ($36,000,000 * .5). Therefore, sans accruing interest on unpaid moneys owed Choudhri, Abdullatif owes Choudhri $36,000,000 plus accruing interest.

*Final Judgment* **orders Chaudhri and/or the Dalio Entities to pay damages to Plaintiffs.[3]**

5.      On November 7, 2023, the Court signs a *Final Judgment* in cause 2012-27197-D.

**Court signs order setting supersedeas amount at $3,387,263.13.[4]**

6.      On March 6, 2025, the Court signs an order denying Choudhri's prior supersedeas in cause 2012-27197-D and finds that Choudhri and/ or the Dalio Entities must pay $3,387,263.13 to supersede the judgment.

---

[3] Exhibit 3 *Final Judgement* signed 11-7-2023 as if set out here.
[4] Exhibit 4 *Supersedeas* order signed 3-6-25 as if set out here.

7.     That does not take into effect the supersedeas amount may not be required to exceed one-half Choudhri's net worth or that the Court may lower the amount to avoid causing substantial economic harm to Choudhri and/or the Dalio Entities.

**Alternative security exceeds court-ordered supersedeas amount.**

8.     On August 13, 2025, Choudhri will assign the following asset as alternative security: 35% of Choudhri's 49.5% interest in Mokaram Latiff West Loop, Ltd., including all "beneficial rights and interest in the Beal Bank entities that flow from such interest" and Choudhri's 50% interest in Mokaram Latiff General, LLC, including all "beneficial rights and interest in the Beal Bank entities that flow from such interest."

9.     The Beal Bank Building asset is worth at least $11,500,000.

10.    Thirty-five percent * $11,500,000 = $4,025,000.

11.    Therefore, Choudhri's alternative security's value is at least $4,025,000, which significantly exceeds the required supersedeas amount.

12.    Despite the above assets, Choudhri's total net worth is less than $10,000,000 based on debts and other litigation.

13.    The alternative security is supported by an appraisal establishing the Beal Bank Building's estimated value.

14.    The alternative security may only be distributed to Plaintiffs proportionate to the judgment if the following events occur on appeal: (1) The appellate or, if necessary, the Supreme Court of Texas affirms the trial court's *Final*

*Judgment*, and 2) Choudhri does not pay in cash the amount ordered by the highest court.

15.     Any cash that Choudhri pays Abdullatif per the final order of the highest court, will reduce the amount of the alternative supersedeas to be distributed to Abdullatif.

16.     In no event, may Abdullatif receive more value between the alternative security, the cash security, and additional cash paid to reduce the judgment.

## II.     ARGUMENT AND AUTHORITIES

**Choudhri's supersedeas is effective upon filing; it stops all collections.**

17.     Upon filing this supersedeas, the supersedeas is effective. Tex. R. App. P. 24.1(b)(2).

18.     That means all collections efforts, including receivership authority, stop: "Enforcement of a judgment must be suspended if the judgment is superseded." Tex. R. App. P. 24.1(f). "Enforcement begun before the judgment is superseded must cease when the judgment is superseded." *Id*.

19.     The amount of the supersedeas here must "equal the sum of compensatory damages awarded in the judgment, interest for the estimated duration of the appeal, and costs awarded in the judgment." Tex. R. App. P. 24.2(a)(1).

**Amount must be lowered to not cause Choudhri substantial economic harm.**

20.     "The trial court must lower the amount of security required by (a) to an amount that will not cause the judgment debtor substantial economic harm if, after notice to all parties and a hearing, the court finds that posting a bond, deposit, or

security in the amount required by (a) is likely to cause the judgment debtor substantial economic harm." Tex. R. App. P. 24.2(b); see also Tex. Civ. P. & Rem. Code § 52.006(c).

21.     The Court should significantly lower the supersedeas amount because Choudhri and/or the Dalio Entities do not have the assets to liquidate because virtually all their assets are illiquid, tied up in litigation, or are currently being administered in federal bankruptcy court, which also make them illiquid.

22.     Choudhri and/or the Dalio Entities also do not have the ability to borrow substantial funds based on the bankruptcy, litigation, or illiquid assets.

23.     So to liquidate assets to pay the current supersedeas amount would cause Choudhri and/or the Dalio Entities substantial economic harm.

24.     Therefore, the amount should be lowered to no more than $1,000.

**At least two rules or statutes support Choudhri and/or the Dalio Entities using alternative security.**

25.     Notwithstanding, Choudhri's need to lower the supersedeas amount as discussed above, Choudhri and/or the Dalio Entities are willing to post alternative security that exceeds the amount the Court has ordered.

26.     Appellate courts recognize that trial courts retain discretion to approve alternative security arrangements regardless of the net worth of the judgment debtor. *In re Kay*, 715 S.W.3d 747, 749 (Tex. 2025).[5]

**Option 1**

---

[5] Exhibit 5 *In re Kay*, 715 S.W.3d 747 (Tex. 2025) as if set out here.

27.     If a judgment debtor has a net worth of less than $10,000,000, and posting the amount necessary to otherwise supersede the appealed judgment "would require the judgment debtor to substantially liquidate the judgment debtor's interests in real or personal property necessary to the normal course of the judgment debtor's business, the trial court shall allow the judgment debtor to post alternative security with a value sufficient to secure the judgment." Tex. Civ. P. & Rem. Code § 52.007(a-b).

28.     Ali and/or the Dalio Entities have a net worth of less than $10,000,000.

29.     They do not have the ability to liquidate assets to post a supersedeas of more than $5,000,000—or even $500,000.

30.     But assuming they had the ability to liquidate substantial assets, those assets are necessary for the normal course of his or the entities' real estate business.

31.     Therefore, the Court should accept his alternative security that exceeds what he should be required to post in cash or by bond.

**Option 2**

32.     "[A] judgment debtor may supersede the judgment" in multiple ways, including "providing alternate security under Rule 24.2(e) or ordered by the court." Tex. R. App. P. 24.1(a)(4).

33.     A judgment debtor under Texas Rules of Appellate Procedure 24.2 using alternative security is not limited by his net worth: "We therefore hold the court of appeals erred in concluding that the alternative-security option was categorically unavailable to Kay." *In re Kay*, 715 S.W.3d 747, 751 (Tex. 2025).

34.     Kay said he had a net worth of $754,373, but the 334th District Court in Harris County and the 14th Court of Appeals said his net worth was $147,000,000. *In re Kay*, 715 S.W.3d 747, 749 (Tex. 2025). The appellate court affirmed the trial court by holding that alternative security is only available to judgment debtors with a net worth under $10,000,000. *Id.* at 750.

35.     Here, Choudhri may use alternative security regardless of his net worth.

36.     Therefore, Choudhri is tendering, pledging, and assigning to the Harris County District Clerk for the benefit of Judgment Creditors, on behalf of Judgment Debtors, at least $4,025,000 in assets directly related a Court order that orders Mokaram and Abdullatif to pay Choudhri nearly $1 million with accumulating interest of unpaid funds plus part of the approximately $18 million in unpaid rental income due Choudhri from that same order plus part of the approximately $11.5 million of the Beal Bank Building that Choudhri owns per that same order.

## III.    Conclusion

Choudhri has complied with the applicable rules for posting alternative security and files this supersedeas to stop all collection and enforcement efforts in this cause, including to stop the receiver from all related efforts during the pendency of the appeal.

This supersedeas is effective to stop all enforcement upon filing today, August 13, 2025.


Respectfully submitted,

**YABLON LAW PLLC**

*CHOUDHRI SUPERSEDEAS WITH ALTERNATIVE SECURITY*  Page 8 of 10

_/s/ Mark P, Yablon_
Mark P. Yablon
Texas Bar No. 24100688
2777 Allen Parkway, Floor 10
Houston, Texas 77019
Office: 281-310-5813
service@yablonlaw.com
www.yablonlaw.com

and

By: _/s/ Justin Rayome_

JUSTIN RAYOME
SBN: 24130709
1001 West Loop South, Suite 700
Houston, Texas 77027
214-934-9345
justin.rayome.law@gmail.com

**ATTORNEYS FOR ALI CHOUDHRI**

## Unsworn Declaration[6]

"The allegations and facts stated in the preceding document are true, correct, and within my personal knowledge. My name is Ali Choudhri. I am of sound mind and capable of making this declaration. I have reviewed this statement and related documents and exhibits, if any. I was born January 24, 1980. My address is 4521 San Felipe Street, Unit 3201, Houston, Texas 77027. I declare under penalty of perjury that the statements and facts in this unsworn declaration are true and correct."

Executed in Harris County, Texas, on August 13, 2025,

*/s/ Ali Choudhri*

Ali Choudhri

## CERTIFICATE OF SERVICE

I certify that I served this document on all counsel of record and known *pro se* parties via the E-Filing Manager or email on August 13, 2025, per Texas Rules of Civil Procedure 21a.

*/s/ Justin Rayome*
Justin Rayome

---

[6] "[A]n unsworn declaration may be used in lieu of a written sworn declaration, verification, certification, oath, or affidavit required by statute or required by a rule, order, or requirement adopted as provided by law" Tex. Civ. P. & Rem. Code § 132.001(a). This "does not apply to a lien required to be filed with a county clerk, an instrument concerning real or personal property required to be filed with a county clerk, or an oath of office or an oath required to be taken before a specified official other than a notary public." *Id*. at § 132.001(b).

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Justin  Rayome  on behalf of Justin  Rayome
Bar No. 24130709
justin.r@jetallcompanies.com
Envelope ID: 104351243
Filing Code Description: Notice
Filing Description: Notice of Supersedeas with Alternative Security
Status as of 8/14/2025 4:05 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Azhar Chaudhary | | chaudharylawfirm@gmail.com | 8/13/2025 5:54:58 PM | SENT |
| James Pope | | jamesp@thepopelawfirm.com | 8/13/2025 5:54:58 PM | SENT |
| Jennifer LMacGeorge | | jmac@jlm-law.com | 8/13/2025 5:54:58 PM | SENT |
| Travis Vargo | | tvargo@vargolawfirm.com | 8/13/2025 5:54:58 PM | SENT |
| Brandi RWilliams | | brwilliams@akingump.com | 8/13/2025 5:54:58 PM | SENT |
| Averyll  Mauch | | amauch@Mccathernlaw.com | 8/13/2025 5:54:58 PM | SENT |
| Sharon D.Jones | | sdjones@grayreed.com | 8/13/2025 5:54:58 PM | SENT |
| Michael Poynter | | mpoynter@vargolawfirm.com | 8/13/2025 5:54:58 PM | SENT |
| Scott Funk | | sfunk@grayreed.com | 8/13/2025 5:54:58 PM | SENT |
| Leigh Malinowski | | lmalinowski@grayreed.com | 8/13/2025 5:54:58 PM | SENT |
| Preston Kamin | | pkamin@grayreed.com | 8/13/2025 5:54:58 PM | SENT |
| Simone Nunez | | snunez@mccathernlaw.com | 8/13/2025 5:54:58 PM | SENT |
| MacGeorge Law Firm Admin | | service@jlm-law.com | 8/13/2025 5:54:58 PM | SENT |
| Azhar M.  Chaudhary | | attorney@Chaudharyjd.com | 8/13/2025 5:54:58 PM | SENT |
| Rodney Drinnon | | rdrinnon@mccathernlaw.com | 8/13/2025 5:54:58 PM | SENT |
| Andy Taylor | | ataylor@andytaylorlaw.com | 8/13/2025 5:54:58 PM | SENT |
| Joe Sibley | | sibley@camarasibley.com | 8/13/2025 5:54:58 PM | SENT |
| David Thornton | | david@thorntonlawfirm.com | 8/13/2025 5:54:58 PM | SENT |
| Jennifer MacGeorge | | jmac@jlm-law.com | 8/13/2025 5:54:58 PM | SENT |
| Jim Wetwiska | | jwetwiska@akingump.com | 8/13/2025 5:54:58 PM | SENT |
| Danielle Chester | | dchester@mccathernlaw.com | 8/13/2025 5:54:58 PM | SENT |
| David Clark | | dclark@mccathernlaw.com | 8/13/2025 5:54:58 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Justin  Rayome  on behalf of Justin  Rayome
Bar No. 24130709
justin.r@jetallcompanies.com
Envelope ID: 104351243
Filing Code Description: Notice
Filing Description: Notice of Supersedeas with Alternative Security
Status as of 8/14/2025 4:05 PM CST

Case Contacts

| David Clark | | dclark@mccathernlaw.com | 8/13/2025 5:54:58 PM | SENT |
|---|---|---|---|---|
| Tammy Massa | | tmassa@mccathernlaw.com | 8/13/2025 5:54:58 PM | SENT |
| Ali Choudhri | | ali@jetallcpapital.com | 8/13/2025 5:54:58 PM | SENT |
| Osama Abdullatif | | osama1966@sbcglobal.net | 8/13/2025 5:54:58 PM | SENT |
| Beth Mendez | | pbmendez@sbcglobal.net | 8/13/2025 5:54:58 PM | SENT |
| T. Michael Ballases | | Ballases@hooverslovacek.com | 8/13/2025 5:54:58 PM | SENT |
| Cameron Roth | | croth@akingump.com | 8/13/2025 5:54:58 PM | ERROR |
| Ali Choudhri | | ali@jetallcompanies.com | 8/13/2025 5:54:58 PM | ERROR |
| Brice B.Beale | | Beale@hooverslovacek.com | 8/13/2025 5:54:58 PM | SENT |
| Ali Choudhri | | ali@jetallcapital.com | 8/13/2025 5:54:58 PM | SENT |
| Justin Rayome | | justin.rayome.law@gmail.com | 8/13/2025 5:54:58 PM | SENT |
| Justin  Rayome | | justin.r@jetallcapital.com | 8/13/2025 5:54:58 PM | SENT |
| Mark Yablon | | service@yablonlaw.com | 8/13/2025 5:54:58 PM | SENT |
| Dalio Holdings | | legal@jetallcompanies.com | 8/13/2025 5:54:58 PM | ERROR |
| Linda Graham | | Graham@hooverslovacek.com | 8/13/2025 5:54:58 PM | SENT |
| Ali Choudhri | | ali@jetallcapital.com | 8/13/2025 5:54:58 PM | SENT |
| Douglas Zimmerer | | doug@yablonlaw.com | 8/13/2025 5:54:58 PM | SENT |
| stanford scottboyd | | ssboyd@pattersonboyd.com | 8/13/2025 5:54:58 PM | SENT |

**Choudhri Exhibit 1**

P. S
DC
7

Cause No. 2012-27197

| | | |
|---|---|---|
| MOKARAM-LATIF WEST LOOP, LTD., | § | IN THE DISTRICT COURT OF ATFEX |
| Nominal Plaintiff, | § | **F I L E D** |
| | § | **Chris Daniel** |
| v. | § | **District Clerk** |
| | § | JAN 1 3 2016 |
| ALI CHOUDHRI, | § | Time:_____4:00p |
| Plaintiff, Cross-Defendant, | § | Harris County, Texas |
| | § | By_____ AS |
| v. | § | Deputy |
| | § | |
| OSAMA ABDULLATIF, | § | HARRIS COUNTY, TEXAS |
| Cross-Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| ALI MOKARAM, | § | |
| Intervenor, Cross-Defendant. | § | 190TH JUDICIAL DISTRICT |

### PHASE I FINAL JUDGMENT

On January 8, 2015, the Court entered an Interlocutory Judgment on those issues submitted to a jury in a trial which commenced on the Phase I issues in this case on the 25th day of June 2014. Thereafter, Defendant Ali Mokaram ("Mokaram") and Defendant Osama Abdullatif ("Abdullatif") requested that the Phase I issues be severed and that it become a separate final judgment. Plaintiff Ali Choudhri ("Choudhri") opposed the request for severance. At a hearing on August 11, 2015, the Court considered the Severance Motion and the parties reached a Rule 11 agreement in open court and on the record. On December 1, 2015, the Court granted Ali Choudhri's Motion to Enforce the Rule 11 Agreement or, Alternatively, Motion for Summary Judgment on Claims Relating to August 11, 2015 Rule 11 Agreement. The Court hereby enforces the Rule 11 Agreement. Under the Rule 11 Agreement, (i) a final judgment will be entered on the Phase I issues tried to the jury and made the subject of the January 8, 2015 Interlocutory Judgment, (ii) the severed Final Judgment will address Choudhri's request for Phase I attorneys' fees and expenses and deny all other parties' requests for Phase I attorneys' fees and expenses and (iii) all

1

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging

remaining claims in this case will be severed into a separate action. Based on the August 11, 2015 Agreement of the parties on severance, the Court heard evidence on Choudhri's requested Phase I attorneys' fees and expenses on September 29, 2015. The Court now enters the following Final Phase I Judgment.

It is therefore ORDERED, ADJUDGED AND DECREED that Choudhri shall have and recover judgment from Mokaram the sum of $50,000.00 for Mokaram's failure to repay the 30-day loan Choudhri made to Mokaram on December 28, 2011, together with pre-judgment interest at the rate of 5% simple interest beginning on January 27, 2012 and running through the date this judgment entered.

It is further  ORDERED, ADJUDGED, DECLARED AND DECREED that since June 18, 2008, Choudhri has owned 15% Makaram Latif West Loop, Ltd., a Texas limited partnership, and 15% of Mokaram Latif General, LLC, and that as of October 29, 2010, Choudhri has owned a total (not additional) 49.5 % of Mokaram Latif West Loop, Ltd., and a total (not additional) 50% of Mokaram Latif General, LLC, with all beneficial rights and interest in the Beal Bank entities that flow from such ownership, including Choudhri's  status as a manager of Mokaram Latif General, LLC from and after October 10, 2010.  The only other owner of interest in Mokaram Latif West Loop, Ltd., and  Mokaram Latif General, LLC from and  after October 29, 2010 is  Osama Abdullatif, whose ownership interest in these entities is equal to that of Choudhri from and after October 29, 2010. The October 29, 2010 assignments of interest in these entities from Mokaram to Choudhri and Abdullatif's consent to any transfer of interest in these entities from Mokaram to Choudhri are valid and enforceable.

2

It is further ORDERED, ADJUDGED AND DECREED that Mokaram take nothing on his claims against Choudhri for fraud, violations of the Texas Securities Act, declaratory judgment and exemplary damages.

It is further ORDERED, ADJUDGED AND DECREED that Abdullatif take nothing on his claims against Choudhri for fraud, fraud by non-disclosure, negligent misrepresentation, statutory fraud and exemplary damages.

It is further ORDERED, ADJUDGED AND DECREED that Choudhri's Motion to Disregard Question No.3 is GRANTED.

It is further ORDERED, ADJUDGED AND DECREED THAT Abdullatif's Motion for Directed Verdict is DENIED.

It is further ORDERED, ADJUDGED AND DECREED THAT Choudhri shall have and recover judgment against Defendants Ali Mokaram and Osama Abdullatif, jointly and severally, for Phase I attorneys' fees and expenses in the trial court in the amount of $413,879.00, and conditionally against Defendants Ali Mokaram and Osama Abdullatif, jointly and severally, in the event they unsuccessfully appeal this Phase I Judgment, in the additional amounts as follows:

a.  The additional sum of $150,000.00 through the Court of Appeals (and appeal by Defendants is unsuccessful).

b.  The additional sum of $25,000.00 for pursuing or responding to a petition for review before the Texas Supreme Court (and petition is declined).

c.  The additional sum of $75,000.00 in the event the Texas Supreme Court requests briefing on the merits (and Defendants are ultimately unsuccessful before the Texas Supreme Court).

3

It is further ORDERED, ADJUDGED AND DECREED THAT attorney's fees relating to the receivership applications and the defense of same shall be reserved for a determination as part of Phase II of this case but, otherwise, any other relief requested by the parties in their Phase I pleadings identified in this Court's bifurcation orders not granted herein, is hereby DENIED.

It is further ORDERED, ADJUDGED AND DECREED THAT the Motion to Sever the Phase I issues addressed above from all further proceedings in this case is, pursuant to the Rule 11 agreement of the parties, granted in part. All remaining issues in this case, consistent with this Judgment, are hereby severed into a separate case, to be captioned the same as this case and assigned cause no. 2012-27197-A. Counsel for Mokaram, Abdullatif and Choudhri shall be responsible for filing a joint proposed order identifying any and all documents to be electronically transferred by the District Clerk to fully establish a separate case file for the severed action. Such order shall require the Clerk of the Court to transfer all pleadings previously filed in this case prior to this severance unless specifically excluded in the joint proposed order signed by the Court.

It is further ORDERED, ADJUDGED AND DECREED THAT all costs of court predating this Judgment shall be taxed to and payable by Defendants Ali Mokaram and Osama Abdullatif, jointly and severally, for which execution may issue.

It is further ORDERED, ADJUDGED AND DECREED THAT all damages awarded in this Judgment shall bear interest from this date at the post judgment rate of 5% per annum, compounded annually, as provided by the Texas Finance Code.

It is further ORDERED, ADJUDGED AND DECREED THAT this judgment is final in light of the severance ordered in this Judgment and that all damages and relief sought as part of the Phase I Claims that is not granted herein and not referred to herein to be decided hereafter in

4

the severed action, Cause no. 2012-27197-A, is denied and all writs and other process necessary or advisable to the enforcement of this Judgment may be issued.

Signed this _13_ day of _January_, 20_16_.

_____

Honorable Patricia J. Kerrigan

Choudhri Exhibit 2



**AN APPRAISAL REPORT OF**

**BEAL BANK POB**
**A MULTI-TENANT PROFESSIONAL OFFICE BUILDING**
**2500 WEST LOOP SOUTH**
**HOUSTON, HARRIS COUNTY, TX 77027**

**PREPARED FOR**

**MR. ALI CHOUDHRI**
**JETALL COMPANIES**
**2500 WEST LOOP SOUTH**
**SUITE 255**
**HOUSTON, TEXAS 77027**

*Date of Valuation: January 13, 2016*

*Date of Report: August 4, 2017*

**BY**

**BASSVAL**
**JACK W. BASS II, MAI**
**8606 ROYAL CAPE CT**
**HOUSTON, TEXAS 77095**



August 4, 2017

Mr. Ali Choudhri
Jetall Companies
2500 West Loop South
Suite 255
Houston, Texas 77027

Re:     Beal Bank POB
        2500 West Loop South
        Houston, Harris County, TX 77027

Dear Mr. Choudhri:

We have appraised the above referenced property, the conclusions of which are set forth in the attached Appraisal Report. The type and definition of value sought in the appraisal of the subject was the retrospective market value for the Leasehold interest and the equity value in the property as of January 13, 2016, subject to the extraordinary and general underlying assumptions and limiting conditions stated within the report.

This report is intended to be used by Ali Choudhri for internal decision making purposes. This appraisal was ordered by Ali Choudhri and Ali Choudhri is the intended user. The intent of this report is conformance with the Uniform Standards of Professional Appraisal Practice (USPAP) as set forth by the Appraisal Foundation, as well as the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.

The subject consists of a five-story, multi-tenant, Class B professional office building totaling 79,647 rentable square feet that was constructed in 1975. The subject's improvements are located on the northwest corner of Loop 610 and Westheimer Road, and situated on a 1.62 acre or 70,213 square foot site.  The site is ground leased from August 1, 1974 to July 31, 2073 for a rent of $1.00 per year.  There are approximately 57 years remaining.

In view of the facts and data in conjunction with the appraisal, it is our opinion that the retrospective market value as of January 13, 2016, subject to the extraordinary and general underlying assumptions and limiting conditions, is:

| RETROSPECTIVE MARKET VALUE CONCLUSIONS | | |
|---|---|---|
| Premise | Date | Conclusion |
| Leasehold | January 13, 2016 | $23,000,000 |
| Equity Value | January 13, 2016 | $19,594,820 |



Jack W. Bass II, MAI
8606 Royal Cape Ct
Houston, TX 77095
T 713.502.5690
jbass@bassval.com

Mr. Ali Choudhri
August 4, 2017
Page 2

**Extraordinary Assumptions**

A site survey was not furnished.

**Hypothetical Conditions**

This appraisal report does not contain any hypothetical conditions.

**Exposure Time/Marketing Period**

Based on exposure times of comparable sales and interviews with active participants in the local market, the above conclusion could be achieved with an exposure time of 12 months. Furthermore, it is our opinion that a sale could be consummated at the conclusion stated herein within a 12 month marketing period of the effective date of appraisal.

This letter is intended only to transmit the attached report. However, it is considered a permanent part of the report and, therefore, must remain attached to the same for the opinion of value cited therein to remain valid.

Our firm appreciates the opportunity to have performed this appraisal assignment on your behalf. If we may be of further service, please contact us.

Respectfully submitted,
**BASSVAL**

Jack W. Bass II, MAI
General Certified Appraiser
Texas License TX 1326152 G
 jbass@bassval.com

TABLE OF CONTENTS

SUBJECT AT A GLANCE ................................................................................................ 1

SUMMARY OF SALIENT FACTS .................................................................................... 2

CERTIFICATION ............................................................................................................ 3

INTRODUCTION ............................................................................................................ 5

ASSUMPTIONS AND LIMITING CONDITIONS ................................................................ 8

MARKET AREA  ANALYSIS ........................................................................................ 11

SITE ANALYSIS .......................................................................................................... 37

IMPROVEMENT ANALYSIS .......................................................................................... 41

HIGHEST AND BEST USE ANALYSIS .......................................................................... 44

PROPERTY TAX ANALYSIS ........................................................................................ 47

APPRAISAL PROCESS ................................................................................................ 48

SALES COMPARISON APPROACH .............................................................................. 49

INCOME CAPITALIZATION APPROACH........................................................................ 56

RECONCILIATION AND FINAL VALUE CONCLUSION .................................................. 62

EXHIBITS.................................................................................................................... 65

**SUBJECT AT A GLANCE**



**Aerial**



**Subject Photo**

## SUMMARY OF SALIENT FACTS

| SUMMARY OF SALIENT FACTS |
|---|

**Property Name** Beal Bank POB
**Location** 2500 West Loop South
Houston, TX 77027

**Property Rights Appraised** Leasehold interest

**Dates of Value**
    Date of Report August 4, 2017
    Date of Inspection June 15, 2017
    Date of As Is Value January 13, 2016

**Property Type** Multi-Tenant Professional Office

**Tax ID Number** 451400060244
**Land Area**
    Total Land Area 70,213 SF

**Improvements**
    Total Building Area (SF): 79,647 SF
    No of Buildings 1
    No of Stories 5
    Condition Average
    Year Built 1975
    Actual Age (Years) 41

**Highest & Best Use**
    As if Vacant Mixed commercial use
    As Improved Professional office use

**Est. Exposure Time (Months)** 12
**Est. Marketing Period (Months)** 12

**Retrospective Valuation**

| | **Total** | **$/SF** |
|---|---|---|
| Sales Comparison Approach | $23,900,000 | $300.07 |
| Income Capitalization Approach | $23,000,000 | $288.77 |
| **Concluded Retrospective Value** | **$23,000,000** | |
| **Equity Value** | **$19,594,820** | |

## CERTIFICATION

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- Jack W. Bass II, MAI has made a personal inspection of the exterior of the property that is the subject of this report on June 15, 2017.

- Significant real property appraisal assistance was provided by Jerel W. Bass who has not signed this certification.

- The undersigned has performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, Jack W. Bass II, MAI has completed the requirements of the continuing education program for Designated Members of the Appraisal Institute.

-   As of the date of this report, Jack W. Bass II, MAI has completed the appraiser licensing requirements of the state in which the property is located.

Jack W. Bass II, MAI

General Certified Appraiser
Texas License TX 1326152 G
jbass@BassValres.com

## Property Appraised

Beal Bank POB
An Existing 79,647 Square Foot Professional Office Building
2500 West Loop South
Houston, Harris County, TX 77027

## Property Identification

The subject consists of a five-story, multi-tenant, Class B professional office building totaling 79,647 rentable square feet that was constructed in 1975 and renovated in 1997. The subject's improvements and situated on a 1.62 acre or 70,213 square foot ground leased site.

## Legal Description

According to Harris County Appraisal District, legal description is TR 30D ABST 836 WHITE. The metes and bounds legal description is within the addenda.

## Intended User & Intended Use

This report is intended to be used by Ali Choudhri for internal decision making purposes. This appraisal was ordered by Ali Choudhri and Ali Choudhri is the intended user. Use by others is not intended by BassVal.

## Property Rights Appraised

We appraised the Leasehold interest of the subject.

## Purpose of Appraisal

The purpose of this appraisal is to estimate the retrospective market value and equity value of the subject as of January 13, 2016.

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

*The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:*

- *Buyer and seller are typically motivated;*

- *Both parties are well informed or well advised, and acting in what they consider their best interests;*

- *A reasonable time is allowed for exposure in the open market;*

- *Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*

- *The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.* [1]

## History of the Subject Property

According to Harris County Appraisal District public records, the subject's current owner is identified as Mokaram-Latif W Loop LTD. No sales and no other prior listings for the subject were found within the previous three years of the effective date.

This historical analysis is not intended as a guarantee to the chain of title, and a title search should be performed by a title company should a definitive abstract be desired.

## Scope of Appraisal/Extent of the Data Collection Process

To render a credible value opinion for the property, two of the three approaches to value were employed: 1) Sales Comparison Approach, and 2) Income Capitalization Approach.  The Cost Approach is most applicable for real estate consisting of land and a new, or like new, building.  This approach tends to lack reliability when there is a large degree of depreciation.  Since the subject structure is substantially depreciated, the cost approach was not developed in this appraisal.  The procedures and methodologies employed in these approaches are outlined in the Appraisal Process section of this report. Following is a summary of steps completed by the appraisers in this assignment.

1. Jack W. Bass II, MAI made an interior and exterior inspection of the property that is the subject of this report on June 15, 2017. An inspection of the property was made along with the general and immediate market areas.

2. Gathered information from various secondary data sources regarding regional and local economic and demographic data specifically relating to the region, city and market area analyses.

3. Analyzed trends in the office market utilizing data compiled by CoStar, as well as through confirmation of the comparable rents and sales. Real estate brokers active in this market were also interviewed relative to current market conditions.

4. Reviewed a tax plat involving the subject, and researched its flood plain status relative to the same.

5. Confirmed recent sales of similar buildings throughout the subject's immediate market area and other nearby areas. The specific unit of comparison analyzed to form a value indication for the subject was the Sales Price per Square Foot (SP/SF).

---

[1] (Interagency Appraisal and Evaluation Guidelines; December 10, 2010, Federal Register, Volume 75 Number 237, Page 77472)

6. Researched and analyzed comparable rentals in the subject's immediate market area by interviewing the leasing agents at each respective property. These data were utilized to form a market rent opinion in the Income Capitalization Approach.

7. Reconciled the results of the Sales Comparison Approaches and the Income Capitalization Approach into a probable range of value, and finally, an opinion for the retrospective market value and equity value as of January 13, 2016.

8. Opined to the exposure time and marketing period inherent in the opinion.

9. Prepared an Appraisal Report.

## Competency

The appraiser involved in this assignment has considerable experience in appraising this property type. The appraiser is actively engaged in appraisal work in the geographical area of the subject property, and the company maintains a database of comparable properties for this area. Further, we are versed in the analytical methods typically employed in appraising this property type. In summary, we believe we have adequate knowledge of the property type, geographical location and analytical methods necessary to comply with the competency requirements of USPAP.

## ASSUMPTIONS AND LIMITING CONDITIONS

1. Any legal description or plats reported herein are assumed to be accurate. Any sketches, surveys, plats, photographs, drawings or other exhibits are included only to assist the intended user to better understand and visualize the subject property, the environs, and the competitive data. We have made no survey of the property and assume no responsibility in connection with such matters.

2. The appraiser has not conducted any engineering or architectural surveys in connection with this appraisal assignment. Information reported pertaining to dimensions, sizes, and areas is either based on measurements taken by the appraiser or the appraiser's staff or was obtained or taken from referenced sources and is considered reliable. No responsibility is assumed for the costs of preparation or for arranging geotechnical engineering, architectural, or other types of studies, surveys, or inspections that require the expertise of a qualified professional.

3. No responsibility is assumed for matters legal in nature. Title is assumed to be good and marketable and in fee simple unless otherwise stated in the report. The property is considered to be free and clear of existing liens, easements, restrictions, and encumbrances, except as stated.

4. Unless otherwise stated herein, it is assumed there are no encroachments or violations of any zoning or other regulations affecting the subject property and the utilization of the land and improvements is within the boundaries or property lines of the property described and that there are no trespasses or encroachments.

5. BASSVAL assumes there are no private deed restrictions affecting the property which would limit the use of the subject property in any way.

6. It is assumed the subject property is not adversely affected by the potential of floods; unless otherwise stated herein.

7. It is assumed all water and sewer facilities (existing and proposed) are or will be in good working order and are or will be of sufficient size to adequately serve any proposed buildings.

8. Unless otherwise stated within the report, the depiction of the physical condition of the improvements described herein is based on visual inspection. No liability is assumed for the soundness of structural members since no engineering tests were conducted. No liability is assumed for the condition of mechanical equipment, plumbing, or electrical components, as complete tests were not made. No responsibility is assumed for hidden, unapparent or masked property conditions or characteristics that were not clearly apparent during our inspection.

9. If building improvements are present on the site, no significant evidence of termite damage or infestation was observed during our physical inspection, unless so stated in the report. No termite inspection report was available, unless so stated in the report. No responsibility is assumed for hidden damages or infestation.

10. Any proposed or incomplete improvements included in this report are assumed to be satisfactorily completed in a workmanlike manner or will be thus completed within a reasonable length of time according to plans and specifications submitted.

11. No responsibility is assumed for hidden defects or for conformity to specific governmental requirements, such as fire, building, safety, earthquake, or occupancy codes, except where specific professional or governmental inspections have been completed and reported in the appraisal report.

12. Responsible ownership and competent property management are assumed.

13. The appraisers assume no responsibility for any changes in economic or physical conditions which occur following the effective date of value within this report that would influence or potentially affect the analyses, opinions, or conclusions in the report. Any subsequent changes are beyond the scope of the report.

14. The value estimates reported herein apply to the entire property. Any proration or division of the total into fractional interests will invalidate the value estimates, unless such proration or division of interests is set forth in the report.

15. Any division of the land and improvement values estimated herein is applicable only under the program of utilization shown. These separate valuations are invalidated by any other application.

16. Unless otherwise stated in the report, only the real property is considered, so no consideration is given to the value of personal property or equipment located on the premises or the costs of moving or relocating such personal property or equipment.

17. Unless otherwise stated, it is assumed that there are no subsurface oil, gas or other mineral deposits or subsurface rights of value involved in this appraisal, whether they are gas, liquid, or solid. Nor are the rights associated with extraction or exploration of such elements considered; unless otherwise stated. Unless otherwise stated it is also assumed that there are no air or development rights of value that may be transferred.

18. Any projections of income and expenses, including the reversion at time of resale, are not predictions of the future. Rather, they are our best estimate of current market thinking of what future trends will be. No warranty or representation is made that these projections will materialize. The real estate market is constantly fluctuating and changing. It is not the task of an appraiser to estimate the conditions of a future real estate market, but rather to reflect what the investment community envisions for the future in terms of expectations of growth in rental rates, expenses, and supply and demand. The forecasts, projections, or operating estimates contained herein are based

on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

19. Unless subsoil opinions based upon engineering core borings were furnished, it is assumed there are no subsoil defects present, which would impair development of the land to its maximum permitted use or would render it more or less valuable. No responsibility would be assumed for such conditions or for engineering which may be required to discover them.

20. BASSVAL representatives are not experts in determining the presence or absence of hazardous substances, defined as all hazardous or toxic materials, wastes, pollutants or contaminants (including, but not limited to, asbestos, PCB, UFFI, or other raw materials or chemicals) used in construction or otherwise present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such substances or for loss as a result of the presence of such substances. Appraisers are not qualified to detect such substances. The client is urged to retain an expert in this field.

21. We are not experts in determining the habitat for protected or endangered species, including, but not limited to, animal or plant life (such as bald eagles, gophers, tortoises, etc.) that may be present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such species or for loss as a result of the presence of such species. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent endangered species impact studies, research, and investigation that may be provided.

22. No environmental impact studies were either requested or made in conjunction with this analysis. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent environmental impact studies, research, and investigation that may be provided.

23. The appraisal is based on the premise that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in the report; further, that all applicable zoning, building, and use regulations and restrictions of all types have been complied with unless otherwise stated in the report; further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate.

24. Neither all nor any part of the contents of this report or copy thereof, shall be conveyed to the public through advertising, public relations, news, sales, or any other media, without the prior written consent and approval of the appraisers. This limitation pertains to any valuation conclusions, the identity of the analyst or the firm and any reference to the professional organization of which the appraiser is affiliated or to the designations thereof.

25. Although the appraiser has made, insofar as is practical, every effort to verify as factual and true all information and data set forth in this report, no responsibility is assumed for the accuracy of any information furnished the appraiser either by the client or others. If for any reason, future investigations should prove any data to be in substantial variance with that presented in this report, the appraiser reserves the right to alter or change any or all analyses, opinions, or conclusions and/or estimates of value.

26. If this report has been prepared in a so-called "public non-disclosure" state, real estate sales prices and other data, such as rents, prices, and financing, are not a matter of public record. If this is such a "non-disclosure" state, although extensive effort has been expended to verify pertinent data with buyers, sellers, brokers, lenders, lessors, lessees, and other sources considered reliable, it has not always been possible to independently verify all significant facts. In these instances, the appraiser may have relied on verification obtained and reported by appraisers outside of our office. Also, as necessary, assumptions and adjustments have been made based on comparisons and analyses using data in the report and on interviews with market participants. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

27. The American Disabilities Act (ADA) became effective January 26, 1992. The appraiser has not made a specific compliance survey or analysis of the property to determine whether or not it is in conformity with the various detailed requirements of ADA. It is possible that a compliance survey of the property and a detailed analysis of the requirements of the ADA would reveal that the property is not in compliance with one or more of the requirements of the act. If so, this fact could have a negative impact upon the value of the property. Since the appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

28. This appraisal report has been prepared for the exclusive benefit of the client. It may not be used or relied upon by any other party. Any other party who is not the identified client within this report who uses or relies upon any information in this report does so at their own risk.

29. The dollar amount of any value opinion herein rendered is based upon the purchasing power and price of the United States Dollar as of the effective date of value. This appraisal is based on market conditions existing as of the date of this appraisal.

ASSUMPTIONS AND LIMITING CONDITIONS

30. The right is reserved by the appraiser to make adjustments to the analyses, opinions, and conclusions set forth in this report as may be required by consideration of additional or more reliable data that may become available. No change of this report shall be made by anyone other than the appraiser or appraisers. The appraiser(s) shall have no responsibility for any unauthorized change(s) to the report.

31. If the client instructions to the appraiser were to inspect only the exterior of the improvements in the appraisal process, the physical attributes of the property were observed from the street(s) as of the inspection date of the appraisal. Physical characteristics of the property were obtained from tax assessment records, available plans, if any, descriptive information, and interviewing the client and other knowledgeable persons. It is assumed the interior of the subject property is consistent with the exterior conditions as observed and that other information relied upon is accurate.

32. The submission of this report constitutes completion of the services authorized. It is submitted on the condition the client will provide reasonable notice and customary compensation, including expert witness fees, relating to any subsequent required attendance at conferences, depositions, and judicial or administrative proceedings. In the event the appraiser is subpoenaed for either an appearance or a request to produce documents, a best effort will be made to notify the client immediately. The client has the sole responsibility for obtaining a protective order, providing legal instruction not to appear with the appraisal report and related work files and will answer all questions pertaining to the assignment, the preparation of the report, and the reasoning used to formulate the estimate of value. Unless paid in whole or in part by the party issuing the subpoena or by another party of interest in the matter, the client is responsible for all unpaid fees resulting from the appearance or production of documents regardless of who orders the work.

33. Use of this appraisal report constitutes acknowledgement and acceptance of the general assumptions and limiting conditions, special assumptions (if any), extraordinary assumptions (if any), and hypothetical conditions (if any) on which this estimate of  is based.

34. If provided, the estimated insurable value is included at the request of the client and has not been performed by a qualified insurance agent or risk management underwriter. This cost estimate should not be solely relied upon for insurable value purposes. The appraisers are not familiar with the definition of insurable value from the insurance provider, the local governmental underwriting regulations, or the types of insurance coverage available. These factors can impact cost estimates and are beyond the scope of the intended use of this appraisal. The appraisers are not cost experts in cost estimating for insurance purposes.

## MARKET AREA ANALYSIS

### Introduction

The subject is located in the Houston Consolidated Metropolitan Area (CMSA), one of the major financial and population centers in the nation. Because the subject benefits from the strengths of this area, an overview of such is appropriate. The following forces interact to influence and affect property values: geographic, social, economic, governmental and environmental. The data and analyses relative to these forces are included in the following sections.



**Figure 1: Regional Area Map**

The area was impacted by the slowdown in the national economy, but Houston recovery is now under way. According to the Greater Houston Partnership's July 2014 release of "Houston - The Economy at a glance", The Houston-Sugar Land-Baytown Metro Area created 93,300 jobs in the 12 months ending May '14, according to the Texas Workforce Commission. Growth has accelerated recently. Houston grew at a 2.8 percent annual rate in December, 2.9 percent in March, 3.2 percent in April and 3.3 percent in May. Houston's job growth remains above the long-term trend. Over the past 10 years, nonfarm payroll employment has grown at a 2.4 percent compound annual growth rate.

Houston's 3.3 percent overall growth rate is second fastest among the nation's 20 most populous metro areas. The Dallas-Fort Worth Metro ranks first, growing at a 3.7 percent rate, and Miami-Fort Lauderdale third, with a 2.9 percent rate.

Since January '10, the bottom of the recession for Houston, the region has gained 407,300 jobs, or 2.6 jobs for every one lost in the recession. Put another way, Houston has created more jobs than currently exist in the Beaumont-Port Arthur, McAllen-Edinburg-Mission, and College Station-Bryan metro areas combined.

Total nonfarm payroll employment stands at 2,883,000 jobs, the highest point in Houston's history. Employment typically experiences a seasonal drop in the summer and then recoups the losses, usually 10,000 to 20,000 jobs, by early fall. The region should surpass 2.9 million jobs by October '14 and 3.0 million in late '15 or early '16.

The size of the Houston-Sugar Land-Baytown metro economy is projected to exceed $500 billion next year. That's the conclusion of two separate studies, one released in June, the other released in January.

Houston's economy is expected to grow at an average annual rate of 4.0 percent, reaching $532.2 billion in '15, according to a study prepared by IHS Global Insight on behalf of the U.S. Conference of Mayors and released at the organization's June meeting. IHS projects Houston to have the eighth fastest growing economy among the nation's 100 largest metro areas.

Waco-based The Perryman Group is more bullish and forecasts Houston's gross regional product to hit $627.9 billion in '15. The firm believes Houston already passed the half trillion dollar mark, with GRP hitting $532.9 billion in '13. The report, part of Perryman's semi-annual study of Texas' major metro areas, was released in January.

## Geographic Forces

The Houston-Galveston-Brazoria Consolidated Metropolitan Statistical Area (CMSA) consists of eight counties: Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery and Waller.



The Houston-Galveston-Brazoria CMSA consists of three Primary Metropolitan Statistical Areas (PMSAs): Houston PMSA (Chambers, Fort Bend, Harris, Liberty, Montgomery and Waller Counties); Galveston-Texas City PMSA (Galveston County); and Brazoria PMSA (Brazoria County).
For convenience, the longer titles are shortened to Houston CMSA, Houston PMSA, Galveston PMSA and Brazoria PMSA.

The city of Houston lies in three counties: Harris (583.450 mi2), Fort Bend (8.080 mi2), and Montgomery (2.598 mi2). Harris County contains part or all of 35 incorporated areas. Houston's ETJ encompasses 1,311.950 mi2, excluding the area of cities that lie within it. Houston has definite geographic advantages: (1) Central Time Zone – one hour behind East Coast and two hours ahead of West Coast, allowing for optimal communications with entire country; (2) Equidistant from East and West Coasts – 1,675 miles to New York and 1,556 miles to Los Angeles, allowing most metro areas in the country to be reached in less than 3 hours by air travel; and (3) Mild Climate – only 21 days per year with temperatures less than 32 degrees F, allowing for year round outdoor activities.

## Economy



**Federal Reserve Board Districts**

According to the Federal Reserve Board's Beige Book dated October 14, 2015, the Eleventh District economy grew at a moderate pace over the past six weeks. Manufacturing demand increased, and retail and auto sales grew. Demand for nonfinancial services held steady or improved, except for some transportation services. Real estate activity remained solid overall, and loan demand rose steadily. Demand for oil field services was still depressed, and lower oil prices dampened outlooks. Price pressures remained subdued and employment held steady or increased.

## Construction and Real Estate

Single-family housing activity generally remained strong. Overall, both new and existing-home sales increased, and demand was strongest for low- to mid-priced homes. Conditions in the multifamily market mostly remained solid, but one contact expects weakness in Houston's high-end apartment market in the medium term as numerous new units are delivered. Outlooks for the housing sector were generally positive through year end.

Demand for office space remained solid in Dallas-Fort Worth, while contacts in Houston noted rent concessions and further increases in sublease space, particularly for class A properties. Industrial leasing and construction remained active, characterized by single-digit vacancy rates in both metro areas. Financing for construction of new office and multifamily space in Houston remained extremely limited.

## Energy

Demand for oilfield services remained depressed as drilling activity declined. Firms were considering further cuts to 2016 capital expenditure plans, but not as large as the cuts made earlier in the year.

## Agriculture

Drought conditions worsened in East Texas and northern Louisiana over the reporting period. Texas wheat production was average this year, and wheat prices continued to slide, largely because of weak global demand. While the El Nino weather pattern that is expected this winter would be good for 2016 wheat crop production, prices are below breakeven for producers. The latest estimates for Texas cotton production came in lower than expected due to weak yields. Cotton export sales were weak, with demand from China--a major importer of Texas cotton--down year over year. Cattle prices dropped sharply over the last six weeks, causing Texas feedlots to lose money.

## Moody's Economy.com Metropolitan Summary

The subject is located in an area which is included within the Houston Metropolitan Statistical Area (MSA). The following pages are taken from Moody's Economy.com July 2015 (the most recent) Metropolitan Summary of the MSA.



## HOUSTON MSA ANALYSIS



### ECONOMIC HEALTH CHECK

3-MO MA

| | Jan 15 | Feb 15 | Mar 15 | Apr 15 | May 15 | Jun 15 |
|---|---|---|---|---|---|---|
| Employment, change, ths | 8.1 | 6.0 | 3.0 | 1.2 | -1.0 | -1.3 |
| Unemployment rate, % | 4.4 | 4.3 | 4.3 | 4.3 | 4.3 | 4.3 |
| Labor force participation rate, % | 66.8 | 66.7 | 66.5 | 66.3 | 66.1 | 65.8 |
| Employment-to-population ratio, % | 63.9 | 63.8 | 63.7 | 63.5 | 63.3 | 63.0 |
| Average weekly hours, # | 36.7 | 36.6 | 36.5 | 36.5 | 36.4 | 36.4 |
| Industrial production, 2007=100 | 106.2 | 106.2 | 106.1 | 106.1 | 105.7 | 105.7 |
| Residential permits, single-family, # | 40,556 | 38,812 | 36,013 | 35,051 | 34,005 | 35,157 |
| Residential permits, multifamily, # | 26,591 | 24,309 | 16,177 | 18,907 | 15,720 | 26,822 |

Better than prior 3-mo MA | Unchanged from prior 3-mo MA | Worse than prior 3-mo MA

Sources: BLS, Census Bureau, Moody's Analytics

### BUSINESS CYCLE INDEX

JAN 2002=100

Source: Moody's Analytics

### CURRENT EMPLOYMENT TRENDS

% CHANGE YR AGO

Government — Goods producing
Private services

Sources: BLS, Moody's Analytics

% CHANGE YR AGO, 3-MO MA

| | Oct 14 | Feb 15 | Jun 15 |
|---|---|---|---|
| Total | 3.7 | 3.6 | 2.1 |
| Construction | 7.8 | 6.8 | 1.4 |
| Manufacturing | 2.7 | 1.9 | -1.6 |
| Trade | 3.9 | 3.1 | 3.0 |
| Trans/Utilities | 2.2 | 2.5 | 1.1 |
| Information | -2.1 | -1.4 | 2.4 |
| Financial Activities | 1.9 | 1.5 | -0.6 |
| Prof & Business Svcs. | 3.9 | 3.8 | 1.7 |
| Edu & Health Svcs. | 3.5 | 4.3 | 4.2 |
| Leisure & Hospitality | 4.8 | 5.9 | 6.1 |
| Other Services | 4.3 | 2.6 | 0.3 |
| Government | 1.8 | 1.9 | 1.8 |

Sources: BLS, Moody's Analytics

### HOUSE PRICE

1998Q1=100, NSA

Sources: FHFA, Moody's Analytics

### RELATIVE EMPLOYMENT PERFORMANCE

JAN 2005=100

HOU — TX — U.S.

Sources: BLS, Moody's Analytics

### VACANCY RATES

HOMEOWNER, % HOUSES FOR SALE

RENTAL, % INVENTORY FOR RENT

HOU — TX — U.S.

Sources: Census Bureau, ACS, Moody's Analytics, 2013

### BUSINESS COSTS

U.S.=100

Total
Unit labor
Energy
State and local taxes
Office rent

2008 | 2013

Source: Moody's Analytics

### EDUCATIONAL ATTAINMENT

% OF ADULTS 25 AND OLDER

| | HOU | TX | U.S. |
|---|---|---|---|
| 100% | 11 | 9 | 11 |
| 80% | 20 | 18 | 18 |
| 60% | 27 | 29 | 29 |
| 40% | 24 | 25 | 28 |
| 20% | 18 | 18 | 13 |

< High school — High school
Some college — College
Graduate school

Sources: Census Bureau, Moody's Analytics, 2013

### POPULATION BY AGE, %

HOU — U.S.

Sources: Census Bureau, Moody's Analytics, 2013

## HOUSTON MSA ANALYSIS



### EMPLOYMENT & INDUSTRY

#### TOP EMPLOYERS

| | |
|---|---|
| Wal-Mart Stores Inc. | 28,780 |
| University of Texas | 22,441 |
| Insperity | 20,816 |
| H-E-B | 17,000 |
| National Oilwell Varco | 14,581 |
| Memorial Hermann Healthcare System | 13,847 |
| Exxon Mobil Corp. | 13,200 |
| Cameron International | 11,000 |
| The Methodist Hospital | 10,150 |
| Halliburton Co. | 8,600 |
| Hewlett-Packard Co. | 8,500 |
| Schlumberger | 8,400 |
| Baylor College of Medicine | 8,052 |
| Baker Hughes | 8,000 |
| Chevron Corp. | 7,000 |
| BP | 7,000 |
| JPMorgan Chase and Co. | 6,750 |
| Jacobs Engineering Group | 6,500 |
| Harris County Hospital District | 6,454 |
| University of Houston | 6,381 |

*Sources: Houston Business Journal, Book of Lists 2014, Houston Chronicle, April 2007*

#### PUBLIC

| | |
|---|---|
| Federal | 27,670 |
| State | 71,877 |
| Local | 275,177 |
| 2014 | |

#### INDUSTRIAL DIVERSITY

Most Diverse (U.S.)

0.60

Least Diverse

#### EMPLOYMENT VOLATILITY

Due to U.S. fluctuations — Relative to U.S.

89 — 118 — 100

Not due to U.S. / Due to U.S. — HOU / U.S.

### MIGRATION FLOWS

#### INTO HOUSTON TX

| | Number of Migrants |
|---|---|
| Dallas TX | 6,994 |
| Austin TX | 5,516 |
| San Antonio TX | 4,310 |
| Beaumont TX | 3,319 |
| Fort Worth TX | 3,067 |
| New York NY | 2,766 |
| Los Angeles CA | 2,612 |
| College Station TX | 2,259 |
| Atlanta GA | 2,184 |
| New Orleans LA | 2,114 |
| Total in-migration | 138,107 |

#### FROM HOUSTON TX

| | |
|---|---|
| Austin TX | 6,735 |
| Dallas TX | 6,722 |
| San Antonio TX | 4,644 |
| Beaumont TX | 3,027 |
| Fort Worth TX | 2,983 |
| New Orleans LA | 2,372 |
| New York NY | 1,895 |
| Los Angeles CA | 1,893 |
| College Station TX | 1,747 |
| McAllen TX | 1,533 |
| Total out-migration | 119,838 |
| **Net migration** | **18,269** |

#### NET MIGRATION, #

| | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| Domestic | 22,479 | 39,229 | 56,747 | 65,850 |
| Foreign | 30,627 | 28,914 | 31,910 | 32,283 |
| Total | 53,106 | 68,143 | 88,657 | 98,133 |

*Sources: IRS (top), 2011, Census Bureau, Moody's Analytics*

### COMPARATIVE EMPLOYMENT AND INCOME

| Sector | % of Total Employment | | | Average Annual Earnings | | |
|---|---|---|---|---|---|---|
| | HOU | TX | U.S. | HOU | TX | U.S. |
| Mining | 3.8% | 2.6% | 0.6% | $253,558 | $150,652 | $103,753 |
| Construction | 7.0% | 5.6% | 4.4% | $81,024 | $66,407 | $60,444 |
| Manufacturing | 8.7% | 7.7% | 8.8% | $105,870 | $87,152 | $77,051 |
| Durable | 68.6% | 66.4% | 63.1% | nd | $81,640 | $78,697 |
| Nondurable | 31.4% | 33.6% | 36.9% | nd | $97,578 | $74,316 |
| Transportation/Utilities | 4.6% | 4.1% | 3.7% | nd | $82,726 | $64,339 |
| Wholesale Trade | 5.8% | 5.0% | 4.2% | nd | $88,788 | $81,024 |
| Retail Trade | 10.1% | 10.9% | 11.1% | $35,704 | $34,000 | $33,130 |
| Information | 1.1% | 1.8% | 2.0% | nd | $80,523 | $102,915 |
| Financial Activities | 5.1% | 6.1% | 5.7% | $47,682 | $43,612 | $52,549 |
| Prof. and Bus. Services | 15.8% | 13.4% | 13.7% | nd | $60,225 | $64,345 |
| Educ. and Health Services | 12.0% | 13.2% | 15.4% | nd | $50,524 | $51,580 |
| Leisure and Hosp. Services | 9.8% | 10.3% | 10.6% | $24,329 | $23,019 | $24,893 |
| Other Services | 3.6% | 3.5% | 4.0% | $41,026 | $36,843 | $35,425 |
| Government | 12.8% | 15.8% | 15.7% | $66,672 | $63,644 | $72,104 |

*Sources: Percent of total employment — BLS, Moody's Analytics, 2014. Average annual earnings — BEA, Moody's Analytics, 2013*

### PER CAPITA INCOME

$THS

| 03 04 05 06 07 08 09 10 11 12 13 14 |
|---|
| 2014  HOU $53,612   TX $45,426   U.S. $46,129 |

*Sources: BEA, Moody's Analytics*

#### HIGH-TECH EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| HOU | 102.8 | 3.5 |
| U.S. | 6,553.6 | 4.7 |

#### HOUSING-RELATED EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| HOU | 325.0 | 11.1 |
| U.S. | 12,757.9 | 9.2 |

*Source: Moody's Analytics, 2014*

### LEADING INDUSTRIES BY WAGE TIER

| | NAICS | Industry | Location Quotient | Employees (ths) |
|---|---|---|---|---|
| **HIGH** | 5413 | Architectural, engineering & rel. srvcs. | 2.6 | 76.7 |
| | 2131 | Support activities for mining | 6.0 | 56.3 |
| | 2111 | Oil and gas extraction | 13.3 | 55.2 |
| | 6211 | Offices of physicians | 0.9 | 48.6 |
| **MID** | OVL | Local Government | 1.0 | 278.0 |
| | 5613 | Employment services | 1.3 | 81.7 |
| | OVS | State Government | 0.7 | 71.9 |
| | 6221 | General medical and surgical hospitals | 0.8 | 71.2 |
| **LOW** | 7225 | Restaurants and other eating places | 1.3 | 218.2 |
| | 4451 | Grocery stores | 1.0 | 53.1 |
| | 5617 | Services to buildings and dwellings | 1.2 | 49.0 |
| | 6216 | Home health care services | 1.8 | 48.6 |

*Source: Moody's Analytics, 2014*

## HOUSTON MSA ANALYSIS

### Labor Force

The following tables show a recent snapshot of labor statistics in terms of the Houston Metropolitan Divisions' employment, unemployment, and labor force.



## Local Economic Drivers

Houston is recognized worldwide for its energy industry—particularly for oil and natural gas—as well as for biomedical research and aeronautics. Renewable energy sources—wind and solar—are also growing economic bases in Houston. The ship channel is also a large part of Houston's economic base. Because of these strengths, Houston is designated as a global city by the Globalization and World Cities Study Group and Network and by global management consulting firm A.T. Kearney.

The Houston area is a leading center for building oilfield equipment. Much of Houston's success as a petrochemical complex is due to its busy man-made ship channel, the Port of Houston. The port ranks first in the United States in international commerce, and is the tenth-largest port in the world. Unlike most places, high oil and gasoline prices are beneficial for Houston's economy as many of its residents are employed in the energy industry.



The Houston–Sugar Land–Baytown MSA's gross domestic product (GDP) in 2012 was $449 billion, the fourth-largest of any metropolitan area in the United States. Only 26 nations other than the United States have a GDP exceeding Houston's GAP.  Mining, which in Houston is almost entirely oil and gas exploration and production, accounts for 11 percent of Houston's GAP. The reduced role of oil and gas in Houston's GAP reflects the rapid growth of other sectors, such as engineering services, health services, and manufacturing.

The University Of Houston System's annual impact on the Houston-area's economy equates to that of a major corporation: $1.1 billion in new funds attracted annually to the Houston area, $3.13 billion in total economic benefit, and 24,000 local jobs generated. This is in addition to the 12,500 new graduates the UH System produces every year who enter the workforce in Houston and throughout Texas. These degree-holders tend to stay in Houston. After five years, 80.5 percent of graduates are still living and working in the region.

In 2006, the Houston metropolitan area ranked first in Texas and third in the U.S. within the Category of "Best Places for Business and Careers" by Forbes magazine. Foreign governments have established 92 consular offices in metropolitan Houston, the third highest in the nation. Forty foreign governments maintain trade and commercial offices here and 23 active foreign chambers of commerce and trade associations. Twenty-five

foreign banks representing 13 nations operate in Houston, providing financial assistance to the international community.

In 2008, Houston received top ranking on Kiplinger's Personal Finance Best Cities of 2008 list which ranks cities on their local economy, employment opportunities, reasonable living costs and quality of life. The city ranked fourth for highest increase in the local technological innovation over the preceding 15 years, according to Forbes magazine. In the same year, the city ranked second on the annual Fortune 500 list of company headquarters, ranked first for Forbes Best Cities for College Graduates, and ranked first on Forbes list of Best Cities to Buy a Home. In 2010, the city was rated the best city for shopping, according to Forbes.

## Government

The City of Houston has a strong mayoral form of municipal government. Houston is a home rule city and all municipal elections in the state of Texas are nonpartisan. The City's elected officials are the mayor, city controller and 16 members of the city council. The current mayor of Houston is Annise Parker, a Democrat elected on a nonpartisan ballot. Houston's mayor serves as the city's chief administrator, executive officer, and official representative, and is responsible for the general management of the city and for seeing that all laws and ordinances are enforced.

The original city council line-up of 14 members (nine district-based and five at-large positions) was based on a U.S. Justice Department mandate which took effect in 1979. At-large council members represent the entire city. Under the city charter, once the population in the city limits exceeded 2.1 million residents, two additional districts were to be added. The City of Houston's official 2010 census count was 600 shy of the required number; however, as the city was expected to grow beyond 2.1 million shortly thereafter, the two additional districts were added and the positions filled during the August 2011 elections. The districts are labeled A through K while the at-large positions are numbered 1 through 5.

## Space Technology

NASA's Johnson Space Center (JSC) annually generates over $1.2 billion into the Houston economy. JSC employs approximately 15,000 people directly and its secondary economic effects, tourism and sub-contracting, are estimated to add $1.5 - $2.5 billion to the Houston economy. Over 47 large aerospace companies and a multitude of smaller companies are located in the Houston area. Larger companies include Boeing, McDonnell Douglas, Martin Marietta, Lorral and IBM.

## Port of Houston

The Port of Houston is a 25-mile-long complex of diversified public and private facilities located just a few hours sailing time from the Gulf of Mexico. The port is ranked first in the United States in foreign waterborne commerce, second in total tonnage, and sixth in the world. The Port of Houston is made up of the port authority and the 150-plus private industrial companies along the ship channel. Altogether, the port authority and its neighbors along the Houston Ship Channel are a large and vibrant component to the regional economy.

The Port of Houston has been instrumental in the City of Houston's development as a center of international trade. About 88 steamship lines offer service linking Houston with 1,053 ports in 203 countries. It is also home to a $15 billion petrochemical complex, the largest in the nation and second largest worldwide.

## Bayport Expansion

In November 1999, Harris County voters overwhelmingly approved a $387 million bond issue to build a container and cruise ship terminal complex. The Port of Houston Authority sponsored the bonds. The Bayport Container and Cruise Terminal construction is underway. The project broke ground in early June 2005 and Phase I of the project opened in February 2007. Phase I includes 2,000 linear feet of wharf, 60 acres of container yard and 23 acres of gate facilities. Total container capacity in Phase I is 7,420 cargo containers. Bayport is anticipated to generate almost 12,000 jobs during its first 10 years. Added economic impact to the

region means more than $1 billion in new business revenues and more than $40 million in new tax revenues each year.

## Heathcare

Houston is the seat of the internationally renowned Texas Medical Center, which contains the world's largest concentration of research and healthcare institutions. All 49 member institutions of the Texas Medical Center are non-profit organizations. Employing more than 75,000 people, institutions at the medical center include 13 hospitals and two specialty institutions, two medical schools, four nursing schools, and schools of dentistry, public health, pharmacy, and virtually all health-related careers. Noteworthy academic and research health institutions at the center include MD Anderson Cancer Center, Baylor College of Medicine, UT Health Science Center, Memorial Hermann Hospital, The Methodist Hospital, Texas Children's Hospital, Triumph Healthcare, The Menninger Clinic and University of Houston College of Pharmacy.

The Baylor College of Medicine has annually been considered within the top ten medical schools in the nation; likewise, the MD Anderson Cancer Center has consistently ranked as one of the top two U.S. hospitals specializing in cancer care by U.S. News & World Report since 1990. Triumph Healthcare hospital system, within locations nationwide and headquarters in Houston, is the third largest long term acute care provider nationally.

## Tourism & Conventions

Tourism and conventions is an industry that supports 70,000 jobs in Harris County. The state-of-the-art George R. Brown Convention Center opened in late 1987. Houston welcomes more than 8 million visitors per year who put an estimated $4.2 billion into Houston's economy.

The Texas Medical Center is a draw for national and international medical meetings, and the Johnson Space Center is second to Disney World for international tourism. NASA officials entertain over two million visitors annually at the Space Center Houston tourist facility. The addition of a 1,200-room convention hotel adjacent to the George R. Brown Convention Center will further boost Houston's position as a convention destination.

## Governmental Forces

### Zoning

Houston has no zoning laws and an ordinance to institute zoning was defeated by the electorate in 1993. Currently homeowners and developers protect their property values and homesites through deed restrictions. These restrictions prevent nonconforming development from occurring in specific areas and in some ways are more restrictive than zoning. Furthermore, deed restrictions supersede zoning and most properties in Harris County have same.

### Taxation

At this time, Houston and the State of Texas have no personal or corporate income taxes. Also, the State of Texas has no state property taxes. These qualities weigh heavily in decisions regarding in-migration and corporate relocation.

### Infrastructure

### Roadways

The predominant form of transportation in Houston is the automobile with 71.7 percent of residents driving alone to work. This is facilitated through Houston's freeway system, comprising 739.3 miles of freeways and expressways in a ten-county metropolitan area. However, the Texas Transportation Institute's annual Urban

Mobility Report found that Houston had the fourth-worst congestion in the country with commuters spending an average of 58 hours in traffic in 2009.

Houston's highway system has a hub-and-spoke freeway structure serviced by multiple loops. The innermost loop is Interstate 610, which encircles downtown, the medical center, and many core neighborhoods with around a 10-mile diameter. Beltway 8 and its freeway core, the Sam Houston Tollway, form the middle loop at a diameter of roughly 25 miles. A proposed highway project, State Highway 99 (Grand Parkway), would form a third loop outside of Houston. Currently, the completed portion of State Highway 99 runs from U.S. Highway 290, northwest of Houston, to U.S. Highway 59 in Sugar Land, southwest of Houston, and was completed in 2013. Houston is located along the route of the proposed Interstate 69 NAFTA superhighway that would link Canada, the U.S. industrial Midwest, Texas, and Mexico. Other spoke freeways either planned or under construction include the Fort Bend Parkway, Hardy Toll Road, Crosby Freeway, and the future Alvin Freeway.

## Bus & Light Rail

Integral to Houston transportation is its Metropolitan Transit System called METRO.



Over 900 air-conditioned buses serve about 1,300 square miles. Another 86 contract buses serve 21 Park & Ride locations. Houston's public transportation system was recently enhanced with the opening of a light rail system providing access from the Reliant Astrodome area to downtown Houston. Long term plans call for this section of rail to be a hub for a more extensive network of light rail.

## Rail Systems

The Metropolitan Transit Authority of Harris County (METRO) provides public transportation in the form of buses, light rail, and lift vans. METRO's various forms of public transportation still do not connect many of the suburbs to the greater city.

METRO began light rail service on January 1, 2004 with the inaugural track running about 8 miles from the University of Houston–Downtown (UHD), which traverses through the Texas Medical Center and terminates at Reliant Park. METRO is currently in the design phase of a 10-year expansion plan that will add five more lines to the existing system.

Amtrak, the national rail passenger system, provides service to Houston via the Sunset Limited, which stops at a train station on the north side of the downtown area.

## Air Transportation

Houston is served by three airports, two of which are commercial that served 52 million passengers in 2007 and managed by the Houston Airport System. The Federal Aviation Administration and the state of Texas selected the "Houston Airport System as Airport of the Year" for 2005, largely because of its multi-year, $3.1 billion airport improvement program for both major airports in Houston.

The primary city airport is George Bush Intercontinental Airport (IAH), the eleventh-busiest in the United States for total passengers, and sixteenth-busiest worldwide. Bush Intercontinental currently ranks second in the United States for non-stop domestic and international service with 221 destinations. In 2006, the United States Department of Transportation named George Bush Intercontinental Airport the fastest-growing of the top ten airports in the United States. The Houston Air Route Traffic Control Center stands on the George Bush Intercontinental Airport grounds.

Houston was the headquarters of Continental Airlines until its 2010 merger with United Airlines with head-quarters in Chicago; regulatory approval for the merger was granted in October of that year. Bush Intercontinental became United Airline's largest airline hub. The airline retained a significant operational presence in Houston while offering more than 700 daily departures from the city. In early 2007, Bush Intercontinental Airport was named a model "port of entry" for international travelers by U.S. Customs and Border Protection.

The second-largest commercial airport is William P. Hobby Airport (named Houston International Airport until 1967) which operates primarily small to medium-haul domestic flights. Houston's aviation history is show-cased in the 1940 Air Terminal Museum located in the old terminal building on the west side of the airport. Hobby Airport has been recognized with two awards for being one of the top five performing airports in the world and for customer service by Airports Council International.

Houston's third municipal airport is Ellington Airport (a former U.S. Air Force base) used by military, government, NASA, and general aviation sectors.

## Port of Houston

The Port of Houston is the fourth largest port in the United States. The Port is a 25-mile-long complex of diversified public and private facilities located a few hours' sailing time from the Gulf of Mexico. It is the busiest port in the United States in terms of foreign tonnage, second-busiest in the United States in terms of overall tonnage, and thirteenth-busiest in the world. Though originally the port's terminals were primarily within the Houston city limits, the port has expanded to such a degree that today it has facilities in multiple communities in the surrounding area. In particular the port's busiest terminal, the Barbours Cut Terminal, is located in Morgan's Point.

The Port of Houston is a cooperative entity consisting of both the port authority, which operates the major terminals along the Houston Ship Channel, and more than 150 private companies situated along Buffalo Bayou and Galveston Bay. Many petroleum corporations have built refineries along the channel where they are partially protected from the threat of major storms in the Gulf of Mexico. The petrochemical complex associated with the Port of Houston is one of the largest in the world.

## Climate

Houston's climate is classified as humid subtropical. While not necessarily part of "Tornado Alley" like much of the rest of Texas, Spring supercell thunderstorms do sometimes bring tornadoes to the area. Prevailing winds are from the south and southeast during most of the year, bringing heat across the continent from the deserts of Mexico and moisture from the Gulf of Mexico.

| Climate data for Houston (George Bush Intercontinental Airport (KIAH)), 1981-2010 normals | | | | | | | | | | | | | [hide] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year |
| Record high °F (°C) | 88 (31) | 91 (33) | 96 (36) | 96 (36) | 98 (37) | 105 (41) | 105 (41) | 109 (43) | 109 (43) | 99 (37) | 89 (32) | 86 (30) | 109 (43) |
| Average high °F (°C) | 62.9 (17.2) | 66.3 (19.1) | 73.0 (22.8) | 79.6 (26.4) | 85.9 (29.9) | 91.4 (33.0) | 93.7 (34.3) | 94.5 (34.7) | 89.7 (32.1) | 82.0 (27.8) | 72.6 (22.6) | 64.3 (17.9) | 79.65 (26.45) |
| Average low °F (°C) | 43.2 (6.2) | 46.6 (8.1) | 53.4 (11.9) | 59.4 (15.2) | 67.6 (19.8) | 73.6 (23.1) | 75.1 (23.9) | 74.8 (23.8) | 69.8 (21.0) | 60.1 (15.6) | 51.1 (10.6) | 45.0 (7.2) | 60.00 (15.56) |
| Record low °F (°C) | 5 (−15) | 6 (−14) | 21 (−6) | 31 (−1) | 44 (7) | 52 (11) | 62 (17) | 64 (18) | 46 (8) | 29 (−2) | 19 (−7) | 7 (−14) | 5 (−15) |
| Precipitation inches (mm) | 3.38 (85.9) | 3.23 (87.9) | 3.41 (86.6) | 3.31 (84.1) | 5.09 (129.3) | 5.93 (150.6) | 3.79 (96.3) | 3.78 (96.0) | 4.12 (104.6) | 5.70 (144.8) | 4.34 (110.2) | 3.74 (95) | 49.77 (1,264.2) |
| Avg. precipitation days (≥0.01 in) | 10 | 9 | 9 | 7 | 8 | 10 | 9 | 9 | 8 | 8 | 8 | 9 | 104 |
| Percent possible sunshine | 46 | 50 | 54 | 58 | 62 | 68 | 70 | 68 | 66 | 64 | 52 | 51 | 59 |
| Source no. 1: NOAA [38] | | | | | | | | | | | | | |
| Source no. 2: Average Precip Days [39] | | | | | | | | | | | | | |

During the summer months, it is common for the temperature to reach over 90 °F, with an average of 99 days per year above 90 °F. However, the humidity results in a heat index higher than the actual temperature. Summer mornings average over 90 percent relative humidity and approximately 60 percent in the afternoon. Winds are often light in the summer and offer little relief, except near the immediate coast. To cope with the heat, people use air conditioning in nearly every vehicle and building in the city; in 1980 Houston was described as the "most air-conditioned place on earth". Scattered afternoon showers and thunderstorms are common in the summer. The hottest temperature ever recorded in Houston was 109 °F on September 4, 2000 and August 28, 2011. On June 29, 2013, the temperature at George Bush Intercontinental Airport reached 107 °F (42 °C), the highest ever recorded in June.

Winters in Houston are mild. The average high in January, the coldest month, is 63 °F, while the average low is 43 °F. Snowfall is very rare. Recent snow events in Houston include a storm on December 24, 2004 when one inch fell and more recent snowfalls on December 10, 2008. This was the earliest snowfall ever recorded in Houston. In addition, it set another milestone marking the first time in recorded history that snowfall has occurred in two consecutive years, and was the third accumulating snowfall occurring in the decade of 2000–2010. The coldest temperature ever recorded in Houston was 5 °F on January 23, 1940. Houston receives a high amount of rainfall annually, averaging about 50 inches a year. These rains tend to cause floods over portions of the city.

Houston has excessive ozone levels and is ranked among the most ozone-polluted cities in the United States. Ground-level ozone, or smog, is Houston's predominant air pollution problem, with the American Lung Association rating the metropolitan area's ozone level as the 8th worst in the United States in 2011. The industries located along the ship channel are a major cause of the city's air pollution. Houston's air quality has been compared by the Citizens League for Environmental Action Now to Beijing and Los Angeles.

## Conclusion

According to Moody's Ecomony.com, Houston-The Woodlands-Sugar Land's economy has paused throughout the first half of 2015, with no gains in total employment, following many years of above-average performance. Because of the sharp decline in oil prices, payrolls in energy exploration, manufacturing and

construction have declined and average hourly earnings have leveled off. Although the state's active rig count appears to have bottomed out, the current level is nearly as low as the trough during the Great Recession. Private services are still advancing, but a disproportionate share of recent gains have been in low-wage hospitality. The reason that the unemployment rate has stayed at a cyclical low of 4.3% is that the labor force has declined. In the housing market, home sales and residential construction have fallen, and house prices have leveled off.

Low oil prices will limit growth in Houston-The Woodlands-Sugar Land, but the economy should narrowly avoid an outright downturn, supported by gains in a variety of other industries, including nonresidential construction, transportation, healthcare and local government. Gradual strengthening in the global recovery should boost demand for energy, stabilizing oil prices and exploration, though added production by Iran is a downside risk. Longer term, above-average population additions and expansion in energy, housing and distribution industries will help propel above-average gains for the metro area.

## OFFICE MARKET OVERVIEW

### Introduction

An overview of the national real estate market and the investment-grade market, as provided by 4th Q 2015 PwC Real Estate Investor Survey, is presented. Thereafter, we have presented data regarding the Houston office market and the subject's submarket relative to supply, demand, rental rates and occupancy rates, as well as construction and absorption; the 4th Q 2015 Houston Office Market report prepared by CoStar provided the basis for this part of the discussion.

### National Market Trends

### Investment Real Estate Market

The discussions presented in this section of the market overview have been excerpted from the 4Q 2015 PwC Real Estate Investor Survey.

### National Highlights

While acquiring U.S. commercial real estate (CRE) remains a priority for both domestic and international investors, a clear difference exists among many of them with regard to how they prepare cash flows and analyze the near-term performance of potential acquisitions. On one side of the fence sit investors who are using more aggressive cash flow assumptions now than they did at the start of the year due to improving CRE fundamentals, an ongoing economic recovery, and a deepening pool of well-capitalized buyers. "We are being more aggressive in our underwriting, or we're not able to compete and place funds," shares an investor. "If you want to buy quality and upside, you need to be aggressive," says another. On the other side of the fence, however, sit investors who are being more conservative in their underwriting now than they were at the start of the year given "uncertainty with interest rates and overall global volatility."

Looking at this division more closely shows many investors being more assertive in order to win bids in the warehouse sector, but less aggressive in the national power center and national regional all markets. "Strong investment demand and solid leasing trends dictate aggressive underwriting for many warehouse assets," states a participant. "Consolidations in the retail industry have us being a bit more conservative in our cash flow forecasts," reveals another. One exception in the retail sector could be the strip shopping center sector, where many surveyed investors remain upbeat and are seeing "increasing rents and slightly more aggressive pricing."

Interestingly, the Survey's average overall cap rate drops 43 basis points for the national strip shopping center market this quarter – the largest quarterly drop of the Survey's 34 markets. Scrutinizing cash flow assumptions on a more micro level has "become a necessity" for pursuing assets in the apartment sector, where "quality offerings have declined and opportunities for creating value have mostly diminished." In the Southeast apartment region, for example, some investors are incorporating a slowdown into their cash flow projections. "We are now using lower rent growth forecasts over the holding period," states a Southeast region apartment investor. In the Pacific region apartment market, a few participants are also opting to use lower rent growth assumptions, while others remain aggressive despite a growing supply pipeline. In the office sector, investors' desire for diversity and search for yield continue to intensify their need to closely examine cash flow assumptions, which vary greatly based on geography with many 18-hour cities, like Phoenix and Seattle, seeing more aggressive underwriting for office assets than "traditional" cities. A downward shift in space-per-employee ratios also has investors closely looking at cash flow assumptions. "Lease-up times and tenant retention rates all need to be reanalyzed in the wake of the 'less-is-more' space trend," comments an investor.

Deciding to be more or less aggressive in pursuit of acquisitions should not characterize the industry or its investors as unstable or uncertain, but rather as optimistic and mindful – remembering all too well what happened during the last peak of the cycle when both assumptions and pricing became extremely aggressive, perhaps unwarranted for some assets. Hopefully, the belief that "investing anywhere in the industry is good" is a thing of the past as micro valuation analyses replace macro ones.

## National Houston Office Market

The current instability in the Houston office market has made underwriting and pricing more complex.
"Trades have slowed, making it difficult to determine market movement," laments an investor. Houston remains challenged so pricing expectations are cautious," warns another. In the coming year, some investors foresee property value increases of up to 10.0% while others expect value decreases of as much as 25.0%. The average expectation is a value decline of 2.75% – the lowest among the Survey's 19 city-specific office markets.

PwC Real Estate Investor Survey of the Houston Office Market (4Q 2015) indicates an overall capitalization rate (OAR) range for investment grade product averaged of 7.01%, representing a change of +14 basis points from the previous quarter and +41 basis points from last year. This survey reflects investor grade product in a range of locations. The average market rent change rate of 0.25% is 400 points lower than the rate reported in 4th Q 2014, and 89 points lower from last quarter. The average expense change rate was 2.75%, which is 8 points below that of a year ago, and 4 points below the last quarter.

**Table 12**
**HOUSTON OFFICE MARKET**
Fourth Quarter 2015

| | CURRENT | LAST QUARTER | 1 YEAR AGO | 3 YEARS AGO | 5 YEARS AGO |
|---|---|---|---|---|---|
| **DISCOUNT RATE (IRR)[a]** | | | | | |
| Range | 6.50% – 11.50% | 6.50% – 11.50% | 6.50% – 12.00% | 7.00% – 14.00% | 7.75% – 14.00% |
| Average | 8.52% | 8.46% | 8.38% | 9.12% | 9.67% |
| Change (Basis Points) | | + 6 | + 14 | – 60 | – 115 |
| **OVERALL CAP RATE (OAR)[a]** | | | | | |
| Range | 5.50% – 10.00% | 5.50% – 10.00% | 5.00% – 10.00% | 5.00% – 12.00% | 6.75% – 12.50% |
| Average | 7.01% | 6.87% | 6.60% | 7.76% | 8.49% |
| Change (Basis Points) | | + 14 | + 41 | – 75 | – 148 |
| **RESIDUAL CAP RATE** | | | | | |
| Range | 6.00% – 10.75% | 5.50% – 10.75% | 5.50% – 11.00% | 5.00% – 11.00% | 7.00% – 11.00% |
| Average | 7.46% | 7.29% | 7.25% | 7.94% | 8.34% |
| Change (Basis Points) | | + 17 | + 21 | – 48 | – 88 |
| **MARKET RENT CHANGE[b]** | | | | | |
| Range | (4.00%) – 5.00% | (4.00%) – 5.00% | 2.00% – 8.00% | 2.00% – 7.00% | 0.00% – 3.00% |
| Average | 0.25% | 1.14% | 4.25% | 3.25% | 0.25% |
| Change (Basis Points) | | – 89 | – 400 | – 300 | 0 |
| **EXPENSE CHANGE[b]** | | | | | |
| Range | 2.00% – 3.00% | 2.00% – 3.00% | 2.00% – 3.00% | 2.00% – 3.00% | 2.00% – 3.00% |
| Average | 2.75% | 2.79% | 2.83% | 2.67% | 2.83% |
| Change (Basis Points) | | – 4 | – 8 | + 8 | – 8 |
| **MARKETING TIME[c]** | | | | | |
| Range | 3 – 13 | 3 – 12 | 2 – 12 | 3 – 12 | 3 – 12 |
| Average | 7.8 | 7.0 | 5.8 | 6.7 | 7.2 |
| Change (▼, ▲, =) | | ▲ | ▲ | ▲ | ▲ |

a. Rate on unleveraged, all-cash transactions    b. Initial rate of change    c. In months

## Costar Houston Office Market Overview

### Overview

The Houston office market experienced a slight improvement in market conditions in the fourth quarter 2015. The vacancy rate went from 12.9% in the previous quarter to 13.6% in the current quarter. Net absorption was positive 1,011,600 square feet, and vacant sublease space increased by 449,268 square feet. Quoted rental rates increased from third quarter 2015 levels, ending at $28.04 per square foot per year. A total of 18 office buildings with 3,606,137 square feet of office space were delivered to the market in the quarter, with 8,613,186 square feet still under construction at the end of the quarter. Cap rates have been lower in 2014 averaging 6.93% as compared to the 7.30% average in 2014.

## Vacancy Rates by Class  1999-2015



## Historical Deliveries  1982 - 2015



## Historical Construction Starts & Deliveries

Square Footage Per Quarter Starting and Completing Construction

Source: CoStar Property®

## Largest Lease Signings

The largest lease signings occurring in 2015 included: the 554,385 SF lease signed by WesternGeco at 10001 Richmond Ave in the Westchase market; the 355,506 SF deal signed by Apache corporation at post Oak Central One in the West Loop Market; and the 255,413 SF lease signed by Transocean, Inc. at Four Greenway Plaza in the Greenway Plaza market.

## Class A Market Statistics
Mid-Year 2015

| Market | Existing Inventory | | Vacancy | | | YTD Net Absorption | YTD Deliveries | Under Const SF | Quoted Rates |
|---|---|---|---|---|---|---|---|---|---|
| | # Blds | Total RBA | Direct SF | Total SF | Vac % | | | | |
| Austin County | 0 | 0 | 0 | 0 | 0.0% | 0 | 0 | 0 | $0.00 |
| Bellaire | 7 | 1,191,304 | 97,713 | 112,824 | 9.5% | 7,340 | 0 | 0 | $24.22 |
| Downtown | 39 | 33,467,488 | 2,663,218 | 3,264,844 | 9.8% | (84,108) | 0 | 1,745,820 | $43.71 |
| E Fort Bend Co/Sugar Land | 20 | 3,774,180 | 400,056 | 421,849 | 11.2% | 78,572 | 0 | 0 | $24.84 |
| FM 1960 | 24 | 4,710,512 | 452,639 | 491,106 | 10.4% | 764,433 | 770,000 | 200,000 | $27.06 |
| Greenway Plaza | 16 | 6,301,350 | 687,456 | 704,926 | 11.2% | (259,442) | 0 | 858,275 | $35.53 |
| Gulf Freeway/Pasadena | 1 | 22,706 | 526 | 526 | 2.3% | 0 | 0 | 0 | $27.59 |
| I-10 East | 0 | 0 | 0 | 0 | 0.0% | 0 | 0 | 0 | $0.00 |
| Katy Freeway | 96 | 22,314,702 | 2,530,319 | 3,008,018 | 13.5% | 303,292 | 2,226,483 | 2,950,931 | $35.37 |
| Kingwood/Humble | 2 | 131,665 | 48,217 | 48,217 | 36.6% | (14,642) | 0 | 0 | $29.24 |
| NASA/Clear Lake | 15 | 2,026,658 | 63,608 | 64,919 | 3.2% | 21,292 | 0 | 0 | $26.50 |
| North Belt | 24 | 5,440,831 | 1,573,202 | 1,821,410 | 33.5% | (707,429) | 0 | 0 | $26.99 |
| Northeast Near | 0 | 0 | 0 | 0 | 0.0% | 0 | 0 | 1,700,000 | $0.00 |
| Northwest | 29 | 5,581,129 | 1,362,095 | 1,434,404 | 25.7% | 431,056 | 1,353,641 | 0 | $26.04 |
| Richmond/Fountainview | 0 | 0 | 0 | 0 | 0.0% | 0 | 0 | 0 | $0.00 |
| San Felipe/Voss | 3 | 1,720,793 | 396,990 | 408,346 | 23.7% | (114,882) | 0 | 0 | $35.95 |
| San Jacinto County | 0 | 0 | 0 | 0 | 0.0% | 0 | 0 | 0 | $0.00 |
| South | 2 | 250,000 | 10,141 | 10,141 | 4.1% | (4,200) | 0 | 100,000 | $26.98 |
| South Hwy 35 | 0 | 0 | 0 | 0 | 0.0% | 0 | 0 | 0 | $0.00 |
| South Main/Medical Center | 15 | 4,560,992 | 244,302 | 244,302 | 5.4% | 31,010 | 0 | 0 | $28.92 |
| Southwest | 9 | 2,058,852 | 283,759 | 285,859 | 13.9% | 35,870 | 0 | 0 | $18.50 |
| West Loop | 44 | 16,564,567 | 1,726,504 | 1,955,391 | 11.8% | (287,580) | 0 | 1,237,021 | $36.00 |
| Westchase | 31 | 8,336,417 | 1,230,620 | 1,499,688 | 18.0% | (363,109) | 0 | 1,545,000 | $37.90 |
| Woodlands | 35 | 9,624,554 | 434,129 | 483,532 | 5.0% | 2,124,289 | 2,087,999 | 1,561,795 | $34.17 |
| Totals | 412 | 128,078,700 | 14,205,494 | 16,260,302 | 12.7% | 1,961,762 | 6,438,123 | 11,898,842 | $34.71 |

Source: CoStar Property®

## Class B Market Statistics
Mid-Year 2015

| Market | Existing Inventory | | Vacancy | | | YTD Net Absorption | YTD Deliveries | Under Const SF | Quoted Rates |
|---|---|---|---|---|---|---|---|---|---|
| | # Blds | Total RBA | Direct SF | Total SF | Vac % | | | | |
| Austin County | 5 | 41,075 | 0 | 0 | 0.0% | 0 | 0 | 0 | $0.00 |
| Bellaire | 32 | 3,023,265 | 167,124 | 169,448 | 5.6% | (19,513) | 0 | 0 | $26.39 |
| Downtown | 176 | 20,254,355 | 2,912,274 | 3,150,290 | 15.6% | (1,468,012) | 0 | 0 | $26.48 |
| E Fort Bend Co/Sugar Land | 238 | 4,718,005 | 537,296 | 567,326 | 12.0% | 110,245 | 11,648 | 143,624 | $23.62 |
| FM 1960 | 366 | 8,411,216 | 1,234,658 | 1,246,768 | 14.8% | 99,763 | 24,194 | 12,400 | $17.34 |
| Greenway Plaza | 51 | 4,200,570 | 235,222 | 245,206 | 5.8% | 37,161 | 0 | 0 | $25.36 |
| Gulf Freeway/Pasadena | 156 | 3,746,358 | 663,654 | 670,760 | 17.9% | 110,715 | 217,195 | 0 | $21.51 |
| I-10 East | 24 | 665,818 | 62,738 | 62,738 | 9.4% | 13,327 | 0 | 0 | $15.50 |
| Katy Freeway | 326 | 13,446,229 | 1,628,558 | 1,843,304 | 13.7% | (229,761) | 209,996 | 269,182 | $23.74 |
| Kingwood/Humble | 74 | 1,676,034 | 116,451 | 122,833 | 7.3% | 34,199 | 51,154 | 0 | $21.45 |
| NASA/Clear Lake | 212 | 5,857,184 | 1,149,751 | 1,157,635 | 19.8% | (35,712) | 12,059 | 25,041 | $19.99 |
| North Belt | 78 | 6,922,109 | 1,222,916 | 1,368,537 | 19.8% | (185,631) | 0 | 68,950 | $15.93 |
| Northeast Near | 28 | 665,458 | 85,835 | 85,835 | 12.9% | 8,268 | 0 | 0 | $19.37 |
| Northwest | 168 | 8,319,415 | 1,085,846 | 1,132,787 | 13.6% | 59,449 | 0 | 0 | $19.10 |
| Richmond/Fountainview | 27 | 955,028 | 192,174 | 192,174 | 20.1% | 7,635 | 0 | 0 | $17.70 |
| San Felipe/Voss | 38 | 3,576,086 | 311,261 | 320,373 | 9.0% | (36,759) | 0 | 0 | $23.66 |
| San Jacinto County | 1 | 27,261 | 0 | 0 | 0.0% | 0 | 0 | 0 | $0.00 |
| South | 82 | 1,594,406 | 189,540 | 189,540 | 11.9% | 18,546 | 7,700 | 0 | $27.08 |
| South Hwy 35 | 34 | 358,380 | 21,536 | 21,536 | 6.0% | (3,914) | 0 | 0 | $15.14 |
| South Main/Medical Center | 64 | 4,744,403 | 766,835 | 771,155 | 16.3% | (217,117) | 0 | 0 | $26.71 |
| Southwest | 144 | 7,672,006 | 1,409,682 | 1,409,682 | 18.4% | 388,386 | 0 | 0 | $15.88 |
| West Loop | 60 | 6,517,184 | 789,278 | 807,149 | 12.4% | (86,959) | 0 | 0 | $26.21 |
| Westchase | 73 | 7,799,801 | 790,872 | 800,362 | 10.3% | 130,488 | 0 | 0 | $20.42 |
| Woodlands | 318 | 7,505,387 | 655,747 | 692,465 | 9.2% | (79,192) | 41,300 | 18,100 | $25.60 |
| Totals | 2,775 | 122,697,033 | 16,229,248 | 17,027,903 | 13.9% | (1,346,388) | 575,246 | 537,297 | $21.65 |

Source: CoStar Property®

## Class C Market Statistics

Mid-Year 2015

| Market | Existing Inventory | | Vacancy | | | YTD Net Absorption | YTD Deliveries | Under Const SF | Quoted Rates |
|---|---|---|---|---|---|---|---|---|---|
| | # Blds | Total RBA | Direct SF | Total SF | Vac % | | | | |
| Austin County | 13 | 39,058 | 2,500 | 2,500 | 6.4% | 0 | 0 | 0 | $0.00 |
| Bellaire | 42 | 794,464 | 56,584 | 56,584 | 7.1% | 6,207 | 0 | 0 | $17.16 |
| Downtown | 431 | 4,938,460 | 742,475 | 747,844 | 15.1% | 12,811 | 0 | 0 | $20.44 |
| E Fort Bend Co/Sugar Land | 94 | 926,360 | 46,897 | 47,686 | 5.1% | (8,037) | 0 | 0 | $19.37 |
| FM 1960 | 318 | 2,848,624 | 270,533 | 270,533 | 9.5% | (41,592) | 0 | 0 | $15.33 |
| Greenway Plaza | 203 | 1,768,494 | 299,174 | 299,174 | 16.9% | (5,476) | 0 | 0 | $18.53 |
| Gulf Freeway/Pasadena | 382 | 3,429,972 | 280,602 | 284,017 | 8.3% | 49,589 | 0 | 0 | $16.31 |
| I-10 East | 84 | 653,610 | 126,601 | 126,601 | 19.4% | (8,633) | 0 | 0 | $14.69 |
| Katy Freeway | 251 | 3,583,501 | 137,281 | 138,721 | 3.9% | 4,751 | 0 | 0 | $18.04 |
| Kingwood/Humble | 96 | 757,328 | 63,330 | 63,330 | 8.4% | 10,281 | 0 | 0 | $17.89 |
| NASA/Clear Lake | 245 | 2,214,189 | 220,054 | 220,054 | 9.9% | (4,237) | 0 | 0 | $17.48 |
| North Belt | 81 | 2,014,128 | 344,959 | 344,959 | 17.1% | 37,140 | 0 | 0 | $12.65 |
| Northeast Near | 88 | 817,062 | 31,735 | 31,735 | 3.9% | 8,619 | 0 | 0 | $13.27 |
| Northwest | 319 | 3,239,633 | 165,033 | 165,033 | 5.1% | 16,113 | 0 | 0 | $14.43 |
| Richmond/Fountainview | 89 | 1,224,328 | 149,511 | 149,511 | 12.2% | (12,330) | 0 | 0 | $14.51 |
| San Felipe/Voss | 8 | 75,542 | 4,000 | 4,000 | 5.3% | 0 | 0 | 0 | $15.07 |
| San Jacinto County | 2 | 11,878 | 0 | 0 | 0.0% | 0 | 0 | 0 | $0.00 |
| South | 128 | 841,438 | 125,457 | 125,457 | 14.9% | (5,110) | 0 | 0 | $19.51 |
| South Hwy 35 | 98 | 379,134 | 23,519 | 23,519 | 6.2% | (370) | 0 | 0 | $15.20 |
| South Main/Medical Center | 138 | 2,927,357 | 91,220 | 91,790 | 3.1% | 16,400 | 0 | 0 | $19.48 |
| Southwest | 162 | 3,411,854 | 254,658 | 254,658 | 7.5% | 15,122 | 0 | 0 | $14.14 |
| West Loop | 29 | 531,002 | 4,804 | 4,804 | 0.9% | 765 | 0 | 0 | $26.04 |
| Westchase | 30 | 887,604 | 51,901 | 59,611 | 6.7% | 3,954 | 0 | 0 | $17.80 |
| Woodlands | 147 | 1,260,363 | 30,043 | 30,043 | 2.4% | 19,689 | 0 | 0 | $22.98 |
| Totals | 3,478 | 39,575,383 | 3,522,871 | 3,542,164 | 9.0% | 115,656 | 0 | 0 | $16.45 |

Source: CoStar Property®

## Total Office Market Statistics

Mid-Year 2015

| Market | Existing Inventory | | Vacancy | | | YTD Net Absorption | YTD Deliveries | Under Const SF | Quoted Rates |
|---|---|---|---|---|---|---|---|---|---|
| | # Blds | Total RBA | Direct SF | Total SF | Vac % | | | | |
| Austin County | 18 | 80,133 | 2,500 | 2,500 | 3.1% | 0 | 0 | 0 | $0.00 |
| Bellaire | 81 | 5,009,033 | 321,421 | 338,856 | 6.8% | (5,966) | 0 | 0 | $25.21 |
| Downtown | 646 | 58,660,303 | 6,317,967 | 7,162,978 | 12.2% | (1,539,309) | 0 | 1,745,820 | $37.82 |
| E Fort Bend Co/Sugar Land | 352 | 9,418,545 | 984,249 | 1,036,861 | 11.0% | 180,780 | 11,648 | 143,624 | $23.99 |
| FM 1960 | 708 | 15,970,352 | 1,957,830 | 2,008,407 | 12.6% | 820,604 | 794,194 | 212,400 | $19.36 |
| Greenway Plaza | 270 | 12,270,414 | 1,221,852 | 1,249,306 | 10.2% | (227,757) | 0 | 858,275 | $30.83 |
| Gulf Freeway/Pasadena | 539 | 7,199,036 | 944,782 | 955,303 | 13.3% | 160,304 | 217,195 | 0 | $19.85 |
| I-10 East | 108 | 1,319,428 | 189,339 | 189,339 | 14.4% | 4,694 | 0 | 0 | $15.26 |
| Katy Freeway | 673 | 39,344,432 | 4,296,158 | 4,990,043 | 12.7% | 78,282 | 2,436,479 | 3,220,113 | $30.49 |
| Kingwood/Humble | 172 | 2,565,027 | 227,998 | 234,380 | 9.1% | 29,838 | 51,154 | 0 | $21.96 |
| NASA/Clear Lake | 472 | 10,098,031 | 1,433,413 | 1,442,608 | 14.3% | (18,657) | 12,059 | 25,041 | $20.21 |
| North Belt | 183 | 14,377,068 | 3,141,077 | 3,534,906 | 24.6% | (855,920) | 0 | 68,950 | $22.33 |
| Northeast Near | 116 | 1,482,520 | 117,570 | 117,570 | 7.9% | 16,887 | 0 | 1,700,000 | $17.11 |
| Northwest | 516 | 17,140,177 | 2,612,974 | 2,732,224 | 15.7% | 506,618 | 1,353,641 | 0 | $21.85 |
| Richmond/Fountainview | 116 | 2,179,356 | 341,685 | 341,685 | 15.7% | (4,695) | 0 | 0 | $16.58 |
| San Felipe/Voss | 49 | 5,372,421 | 712,251 | 732,719 | 13.6% | (151,641) | 0 | 0 | $30.46 |
| San Jacinto County | 3 | 39,139 | 0 | 0 | 0.0% | 0 | 0 | 0 | $0.00 |
| South | 212 | 2,685,844 | 325,138 | 325,138 | 12.1% | 9,236 | 7,700 | 100,000 | $25.33 |
| South Hwy 35 | 132 | 737,514 | 45,055 | 45,055 | 6.1% | (4,284) | 0 | 0 | $15.16 |
| South Main/Medical Center | 217 | 12,232,752 | 1,102,357 | 1,107,247 | 9.1% | (169,707) | 0 | 0 | $26.65 |
| Southwest | 315 | 13,142,712 | 1,948,099 | 1,950,199 | 14.8% | 439,378 | 0 | 0 | $16.09 |
| West Loop | 133 | 23,612,753 | 2,520,586 | 2,767,344 | 11.7% | (373,774) | 0 | 1,237,021 | $33.44 |
| Westchase | 134 | 17,023,822 | 2,073,393 | 2,359,661 | 13.9% | (228,667) | 0 | 1,545,000 | $30.82 |
| Woodlands | 500 | 18,390,304 | 1,119,919 | 1,206,040 | 6.6% | 2,064,786 | 2,129,299 | 1,579,895 | $29.84 |
| Totals | 6,665 | 290,351,116 | 33,957,613 | 36,830,369 | 12.7% | 731,030 | 7,013,369 | 12,436,139 | $27.90 |

Source: CoStar Property®

## Summary

The Houston office market did not experience much change in market conditions in the fourth quarter 2015. The vacancy rate went from 12.9% in the previous quarter to 13.6% in the current quarter. Net absorption was positive 1,011,600 square feet, and vacant sublease space increased to 3,816,078 square feet vacant in the market from 3,316,810 SF at the end of the third quarter 2015.

Quoted rental rates increased from third quarter 2015 levels, ending at $28.04 per square foot per year. Based on the historical population trends and commercial growth, the outlook for the market is one of continued growth that is hampered by slow economic growth in the region and throughout the United States. Cap rates have been lower in 2015 averaging 6.93% as compared to the 7.30% average in 2014.

## Downtown Submarket Overview

The Downtown Office Submarket consists of an area situated in the Central Business District of Houston MSA. As of the fourth quarter 2015, the Downtown Submarket consisted of 652 projects with 59,148,644 SF of office space.  There were 7,761,619 SF of vacant space resulting in an overall vacancy of 13.1%. Absorption was negative at 3,406 SF as of the fourth quarter 2015. There were 167,562 SF delivered to market YTD, and 1,578,258 SF presently under construction. The overall quoted rental rate is $38.71/SF. This rate is higher than the overall Houston Office market which indicated an asking rate of $28.04/SF during the same time period.  A chart detailing the pertinent empirical and statistical data pertaining to the Downtown Office Market is shown on the following page.



## Deliveries, Absorption & Vacancy — Historical Analysis, All Classes

Source: CoStar Property®

## Vacant Space
Historical Analysis, All Classes



Source: CoStar Property®

## Quoted Rental Rates
Historical Analysis, All Classes



Source: CoStar Property®

| Period | Existing Inventory # Bldgs | Existing Inventory Total RBA | Vacancy Vacant SF | Vacancy Vacancy % | Net Absorption | Delivered Inventory # Bldgs | Delivered Inventory Total RBA | UC Inventory # Bldgs | UC Inventory Total RBA | Quoted Rates |
|---|---|---|---|---|---|---|---|---|---|---|
| 2015 2q | 646 | 58,660,303 | 7,162,978 | 12.2% | (577,633) | 0 | 0 | 4 | 1,745,820 | $37.82 |
| 2015 1q | 646 | 58,660,303 | 6,585,345 | 11.2% | (961,676) | 0 | 0 | 4 | 1,745,820 | $36.00 |
| 2014 4q | 646 | 58,660,303 | 5,623,669 | 9.6% | 185,343 | 1 | 1,930 | 4 | 1,745,820 | $36.78 |
| 2014 3q | 647 | 59,008,310 | 6,157,019 | 10.4% | (237,989) | 0 | 0 | 4 | 1,632,750 | $36.93 |
| 2014 2q | 647 | 59,008,310 | 5,919,030 | 10.0% | 695,830 | 1 | 80,000 | 4 | 1,632,750 | $36.81 |
| 2014 1q | 649 | 59,199,631 | 6,806,181 | 11.5% | (251,656) | 0 | 0 | 5 | 1,712,750 | $34.12 |
| 2013 4q | 650 | 59,609,631 | 6,964,525 | 11.7% | 138,226 | 0 | 0 | 1 | 80,000 | $32.14 |
| 2013 3q | 650 | 59,609,631 | 7,102,751 | 11.9% | 114,407 | 0 | 0 | 1 | 80,000 | $31.49 |
| 2013 2q | 650 | 59,609,631 | 7,217,158 | 12.1% | (115,305) | 0 | 0 | 1 | 80,000 | $31.92 |
| 2013 1q | 650 | 59,609,631 | 7,101,853 | 11.9% | (63,177) | 0 | 0 | 1 | 80,000 | $31.72 |
| 2012 4q | 651 | 59,712,276 | 7,141,321 | 12.0% | 145,799 | 0 | 0 | 0 | 0 | $31.99 |
| 2012 3q | 651 | 59,712,276 | 7,287,120 | 12.2% | 152,459 | 0 | 0 | 0 | 0 | $31.46 |
| 2012 2q | 651 | 59,712,276 | 7,439,579 | 12.5% | (6,910) | 0 | 0 | 0 | 0 | $31.54 |
| 2012 1q | 651 | 59,712,276 | 7,432,669 | 12.4% | 207,305 | 0 | 0 | 0 | 0 | $31.01 |
| 2011 4q | 652 | 59,716,676 | 7,644,374 | 12.8% | 247,297 | 0 | 0 | 0 | 0 | $30.10 |
| 2011 3q | 652 | 59,716,676 | 7,891,671 | 13.2% | 386,946 | 1 | 844,763 | 0 | 0 | $29.22 |

Source: CoStar Property®

# MARKET AREA ANALYSIS

## Introduction

A market area "the defined geographic area in which the subject property Completes for the attentions of market participants; the term broadly defines an area containing diverse land uses." Market area areas are defined by a combination of factors including physical features the demographic and socioeconomic characteristics of the residents or tenants, the condition of the improvements, and land use trends. Market area analysis focuses on the identification of a market area's boundaries and the social, economic, governmental and environmental influences that affect the value of real property within those boundaries. In conducting market area analysis, the competitive supply and demand for the subject property is more directly addressed.

The purpose of a market area analysis is to provide a bridge between the study of general influences on all property values and the analysis of a particular subject. Market area boundaries are identified by determining the area in which the four forces that affect value (social, economic, governmental and environmental) operate in the same way they affect the subject property. Interaction of the various components influencing these four forces often results in the dissimilarities regarding the length of time between the stages of a market area's life cycle.



**Figure 2:  Market Area Map (subject denoted by pin)**

## General Description

The market area boundaries are defined as Kirby Road to the east, US Highway south, South Voss Road to the west, and Interstate 10 to the north.

## Access And Major Roadways

Access to the market area is considered good. Loop 610 and US Highway 59 are the primary north/south traffic carriers for the market area. At the subject's location, Loop 610 forms a loop around the City of Houston.  Loop 610 provides easy access south to the Southwest Freeway (US 59) and north to US Highway 290 and IH 45. Additional north/south thoroughfares include Chimney Rock, and Kirby Road.

The major east/west traffic thoroughfares are Interstate 10, Westheimer Road and Westpark Tollway, which spans 19 miles between Houston's Galleria district and Katy and provides residents with access to US 59, the Galleria, the Sam Houston Tollway, and State Highway 6. Secondary east/west carriers include Memorial Drive, Richmond Avenue and Westpark Drive. The street paving consists of concrete with curbs and storm sewer drainage.

In addition to the major thoroughfares, the market area is well served by secondary roadways that provide access throughout the area.

## Land Use Patterns

The market area is approximately 95% developed with multi-family, retail, office, hospitality and vacant land uses:

| Demographic Analysis for Primary Trade Area | | | | | |
|---|---|---|---|---|---|
| Description | 1 Mile Radius Totals | 3 Mile Radius Totals | 5 Mile Radius Totals | Harris County Totals | Houston MSA Totals |
| **Population** | | | | | |
| 2020 Projection | 24,192 | 163,845 | 444,266 | 4,755,157 | 6,967,200 |
| 2015 Estimate | 21,797 | 152,366 | 419,716 | 4,433,476 | 6,467,776 |
| 2010 Census | 19,156 | 140,417 | 395,079 | 4,092,459 | 5,920,416 |
| 2000 Census | 14,120 | 124,816 | 369,480 | 3,400,577 | 4,693,140 |
| 2015 Est. Median Age | 36.60 | 37.60 | 36.60 | 33.30 | 34.30 |
| 2015 Est. Average Age | 38.50 | 39.50 | 38.40 | 34.80 | 35.40 |
| **Households** | | | | | |
| 2020 Projection | 13,002 | 89,104 | 206,372 | 1,661,312 | 2,422,620 |
| 2015 Estimate | 11,734 | 82,402 | 192,837 | 1,549,628 | 2,249,176 |
| 2010 Census | 10,343 | 75,183 | 178,281 | 1,435,155 | 2,062,529 |
| 2000 Census | 6,633 | 61,135 | 157,375 | 1,205,527 | 1,648,146 |
| **2015 Est. Average Household Size** | 1.83 | 1.82 | 2.05 | 2.83 | 2.84 |
| **2015 Est. Households by Household Income** | | | | | |
| Income Less than $15,000 | 8.4% | 10.3% | 13.2% | 12.3% | 11.1% |
| Income $15,000 - $24,999 | 6.1% | 7.3% | 9.2% | 10.8% | 9.8% |
| Income $25,000 - $34,999 | 6.5% | 8.0% | 8.5% | 10.8% | 9.9% |
| Income $35,000 - $49,999 | 7.1% | 10.0% | 10.5% | 13.6% | 12.9% |
| Income $50,000 - $74,999 | 13.9% | 14.5% | 14.9% | 17.1% | 17.1% |
| Income $75,000 - $99,999 | 11.1% | 11.6% | 10.5% | 11.2% | 11.8% |
| Income $100,000 - $124,999 | 10.8% | 9.7% | 8.2% | 7.9% | 8.7% |
| Income $125,000 - $149,999 | 6.4% | 6.3% | 5.4% | 4.9% | 5.6% |
| Income $150,000 - $199,999 | 9.4% | 7.9% | 6.5% | 5.2% | 6.1% |
| Income $200,000 - $249,999 | 5.1% | 3.9% | 3.3% | 2.1% | 2.4% |
| Income $250,000 - $499,999 | 9.4% | 6.8% | 6.0% | 2.9% | 3.2% |
| Income $500,000 and more | 5.7% | 3.8% | 3.8% | 1.3% | 1.4% |
| **2015 Est. Average Household Income** | $134,739 | $111,974 | $102,971 | $78,037 | $83,316 |
| **2015 Est. Median Household Income** | $92,925 | $74,852 | $64,312 | $53,677 | $59,128 |
| **2015 Est. Tenure of Occupied Housing Units** | | | | | |
| Owner Occupied | 53.09% | 44.34% | 45.00% | 56.90% | 62.68% |
| Renter Occupied | 46.90% | 55.66% | 55.00% | 43.10% | 37.32% |
| **2015 Est. Median All Owner-Occupied Housing Value** | $362,498 | $348,425 | $317,465 | $148,170 | $159,882 |
| Source: 2015 The Nielsen Co. | | | | | |

The three-mile radius around the subject has an estimated 2015 population of 152,366 people in 82,402 households with an average income of $111,974 and a median income of $74,852. The three-mile radius experienced an increase of 14,048 households from 2000 to 2010, or 2.3% per annum, and an increase of 7,219 households from 2010 to 2015, or 1.9% per annum. Over the next five years, Nielsen estimates the three-mile radius will experience an increase of 6,702 households, which represents an average annual growth rate of 1.6% compared to 1.4% for Harris County and 1.5% for the Houston MSA.

## Conclusion

The area is in the mature stage of its life cycle. Recent development activity has been intermittent. We anticipate that property values will continue to remain relatively stable in the near future.

## SITE ANALYSIS

### Physical Characteristics

#### General Description

The subject is located on the northwest corner of Interstate 610 and Westheimer Road. The subject's site consists of an rectangular shaped, 1.62 acre or 70,213 square foot, and adjacent to the Sheraton Suites Houston. The subject's civic address is 2500 West Loop South, Houston, Harris County, TX.



**Aerial Tax Map**

#### Size/Shape/Dimensions

The subject site is 70,213 SF (1.62 AC) and is basically rectangular in shape. The site has approximately 225 ft. of frontage on Loop 610 and 233 ft. of frontage on Westheimer Road.

### Access/Visibility

Access and visibility are considered good. Direct access to the site is provided via one curb cut from the Loop 610 frontage road and Westheimer road. Loop 610 is a ten lane, two-way major concrete paved thoroughfare which runs in an north/south direction at the subjects location. Westheimer Road is an major east/west eight lane that runs from Downtown Houston to the western suburbs of Houston. Drainage is provided via concrete curb and gutter to convey storm water run-off. Access and visibility of the site is good for the existing use of the subject property.

### Topography/Drainage

The topography of the site is generally level. Drainage of the site appears adequate. The site is at grade with the nearby roadways and surrounding properties.

### Floodplain

According to the Federal Emergency Management Agency, the subject is located on flood panel 48201C0855L dated June 18, 2007. According to the flood map, the subject is located within Flood Insurance Zone unshaded X, which is not a recognized flood hazard area.



**FEMA Flood Map**

## Soil/Subsoil Conditions

A geotechnical analysis describing the soil and subsoil conditions at the subject site was not furnished to BASSVAL, Inc. Based upon existing development in the area it is assumed that soil and subsoil conditions are adequate to support development with a wide range of uses. Observation of surrounding area improvements did not indicate any adverse soil conditions that would impact development of the subject site. The appraisers assume that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The appraisers assume no responsibility for such conditions, or for engineering which might be required to discover such factors.

## Utilities/Services

Utilities are sufficient to support any new development. In addition, traffic capacity appears adequate.

| Utility/Service Providers | |
|---|---|
| Water | City of Houston |
| Sewer | City of Houston |
| Electricity | CenterPoint Energy |
| Police/Fire Protection | City of Houstin Police/Fire Department |
| Education | Houston ISD |

## Hazards/Nuisances

No major nuisances such as noise, smoke or other nuisances were noted on or near the subject property. In this appraisal assignment, the existence of potentially hazardous material used in the construction or maintenance of the building, such as the presence of asbestos, urea-formaldehyde foam insulation, and/or the existence of toxic waste which may or may not be present on the property, was not observed by the appraisers; nor do we have any knowledge of the existence of such materials nor in the property. To the best of our knowledge, the presence of Radon or other gases has not been detected on this property or, if Radon or other gases has been detected, it has been determined that the level of Radon or other gases is considered safe according to the standards established by the Environmental Protection Agency. The appraisers, however, are not qualified to detect such substances and do not make any guarantees or warranties that the property has been tested for the presence of asbestos, urea-formaldehyde foam insulation, Radon or any potentially hazardous waste or building material or gases or, if tested, that the tests were conducted pursuant to EPA approved procedures. The existence of any potentially hazardous waste or building material or gases or, if tested, that the tests were conducted pursuant to EPA approved procedures. The existence of any potentially hazardous waste or building material or gases may have an effect on the value of the property. We urge the client to retain an expert in this field if desired.

## Legal-Government Factors

### *Development Restrictions/Easements*

Direct access to the site is provided via the Loop 610 frontage road and Westheimer Road. Although we were not provided a survey, based on our visual inspection, the subject property does not appear to be detrimentally impacted by easements or deed restrictions.

### *Zoning*

Zoning is the governmental power involving the supervision and control over the utilization of privately owned land for the general good of the community. The subject is located in Harris County, Houston TX, which does not utilize zoning restrictions.

## Locational Factors

### *Surrounding Land Uses*

The site is surrounded by primarily retail, restaurant, offices, and hotel uses. Land uses immediately surrounding the subject site include the following:

| SURROUNDING LAND USES | |
|---|---|
| North: | Hotel |
| East: | Loop 610 |
| South: | Gas Station/ Convenience Store |
| West: | Shopping Center |

## Conclusion

The subject benefits from its location near the Houston Galleria. There are no major influences that negatively impact value. Overall, the subject appears well suited for office-related development due to surrounding property uses. Topographical characteristics are conducive to development, and all utilities are available and of sufficient capacity for most uses. As previously detailed, the subject is not located in a designated flood hazard area. Furthermore, no easements, restrictions, nuisances, or hazards are known to exist that would limit development of the site to its highest and best use. For more information regarding the subject, please refer to the photographs presented in the Exhibits section of this report.

## IMPROVEMENT ANALYSIS

### General Description

The subject consists of a five-story, multi-tenant, Class B professional office building totaling 79,647 rentable square feet that was constructed in 1975, and renovated in 1997. The subject's improvements are located at the northwest corner of Loop 610 and Westheimer road.  The subject is situated on a 1.62 acre or 70,213 square foot ground leased site. The subject's civic address is 2500 West Loop South, Houston, TX.



**Subject Property**

### Legal Uses and Ratios

As noted, the improvements represent a legal conforming use. As per Harris County Property Appraiser, building improvements total 79,647 rentable square indicating an FAR of 1.13:1 based on a total site area of 70,213 square feet. The subject contains 250 spaces, with a parking ratio of 3.14/1000.  This provides adequate on-site parking for its current use. These ratios fall within norms for the local office market.

## Construction Components Of The Improvements

The following summary of the existing building's basic structural components is based on our inspection of the property and experience with similar properties throughout the region. The subject's basic construction components are outlined as follows.

## Exterior Description

| | |
|---|---|
| Class: | B |
| Foundation: | Reinforced concrete slab on concrete footings |
| Structural System: | Fire Resistant Steel |
| Exterior Walls: | Glass |
| Roof: | Flat built-up system |
| Exterior Doors: | Metal in steel frames |
| Stories: | 5 |

## Interior Description

| | |
|---|---|
| Typical Buildout: | The building contains a mix of carpet, and laminate flooring, painted drywall walls, painted drywall ceilings. Lighting is primarily provided by fluorescent fixtures. |
| Restrooms | Adequate for current use |
| HVAC: | Packaged HVAC |
| Electrical: | All electrical fixtures are designed and assumed to meet the required code specifications. |
| Sprinklered: | Yes |
| Elevators: | 2 |
| Amenities: | No amenities were noted |

## Site Improvements

| | |
|---|---|
| Parking: | The subject the subject contains 250 spaces consisting of surface and parking garage spaces. |
| Landscaping: | Minimal landscaping, which is typical of other similar office building properties within its market area. |

## Quality/Functional Utility

The subject is an multi-tenant professional office, from a market perspective, the subject improvements are of good overall quality and functional utility. Access and visibility of the building are rated as good. Overall, the subject improvements appear to be adequately designed and functional for their intended use as a professional office building.

## General Conditions Observed

The interior and exterior of the subject appears to be in good overall condition for its age. Based on our inspection deferred maintenance was not observed. The subject overall appears to be in good condition for its age.

## Conclusion

The functional utility and design of the subject are rated as good and suitable for market conditions within this rental sector. The layout and design of the improvements on the site are good. For more information, please refer to the photographs presented in the Exhibits section of this report.

## HIGHEST AND BEST USE ANALYSIS

In appraisal practice, the concept of highest and best use represents the premise upon which value is based. The four criteria the highest and best use must meet are:

- legal permissibility;
- physical possibility;
- financial feasibility; and
- maximum profitability.

The highest and best use analysis of the subject is discussed on the following pages. This analysis incorporates the information presented in the Market Analysis section, as well as any unique characteristics of the subject described previously.

### As Vacant

#### Legal Permissibility

The first step in determining what is legally permissible is to analyze private restrictions, zoning, building codes, historic district controls, and environmental regulations.

The subject property is situated within the limits of the City of Houston, which does not utilize zoning as a planning tool. As such, the subject site is largely unrestricted from a development standpoint with various forms of development legally permissible.

#### Physical Possibility

The physical characteristics of a site can affect the uses. These characteristics include: (1) size; (2) shape; (3) terrain or topography; (4) soil condition; (5) utilities; (6) access characteristics; and (7) surrounding land uses. Each of these site characteristics were described and discussed in the Site Analysis section of this report.

The 1.62-acre development site is generally level and at street grade with the fronting roadways. Soil and subsoil conditions appear adequate for development as evidenced by area construction. Surrounding land uses include commercial and retail uses. From a development standpoint, the location of the site is good for retail, hospitality and office. Public utilities and traffic carriers are provided and are adequate in capacity.

#### Financial Feasibility

In determining which uses are legally permissible and physically possible, an appraiser eliminates some uses from consideration. Then the uses that meet the first two criteria are analyzed further. If the uses are income-producing, the analysis will study which are likely to produce an income, or return equal to or greater than the amount needed to satisfy operating expenses, financial obligations, and capital amortization. All uses that are expected to produce a positive return are regarded as financially feasible.

There is adequate demand for high density mixed use commercial development, and a newly developed high density mixed use commercial development use on the site would have a value commensurate with its cost. Thus, mixed use commercial development is financially feasible.

### Maximally Productive

There does not appear to be any reasonably probable use of the site that would generate a higher residual land value than high density mixed use commercial development, and therefore the maximally productive use of the site is high density mixed use commercial development use.

### Conclusion:  Highest and Best Use As Vacant

The highest and best use of the site, as vacant, would be to develop for mixed use commercial development.

### As Improved

Two major questions must be answered throughout this analysis. When the value of land, as though vacant, exceeds the value of the land and building together, then the structure should be razed. Should the subject building be retained or demolished?  If the structure should be kept, is it economically viable to remodel, alter in size, renovate, repair, or convert it to an alternate use?

### Legal Permissibility

The existing subject structure fully complies with the building code. Therefore, its current use is deemed legal. The site has been improved with a structure that represents a legal conforming use, as previously discussed.

### Physical Possibility

The physical characteristics of the subject were discussed in detail in the improvements analysis. The subject's improvements are considered to be good in overall condition and functional utility, while the layout and positioning of the improvements are considered functional for an office building within its market area. The design of the improvements as a multi-tenant office building would be the most functional use.

### Financial Feasibility

Local costs, prices, and rents do not justify major building alterations or conversion to another use at this time. The financial feasibility of a property is based on the amount of rent which can be generated, less operating expenses required to generate that income; if a residual amount existing, then the land is being put to a productive use. Other similar nearby buildings are not being materially altered, expanded, or converted. This implies there are economic constraints precluding the financial viability of major alterations. Given current market rents and market occupancy levels, the continued utilization of its current use is considered financially feasible.

### Maximum Profitability

The maximally profitable use of the subject as improved should conform to neighborhood trends and be consistent with existing land uses. Although several uses may generate sufficient revenue to satisfy the required rate of return on investment and provide a return on the land, the single use that produces the highest price or value is typically the highest and best use. As shown in the applicable valuation sections, properties similar to the subject have been acquired for continued use as medical office buildings. These comparables would indicate that the maximally productive use of the property is consistent with the existing use. It would not be maximally profitable to alter the subject to an alternative use that would generate a higher return to the land. Therefore, the maximum profitability is for the continuation of its existing use.

### Conclusion: Highest and Best Use as Improved

Given the size and current configuration of the subject, the most likely buyer would be an investor. Based on the foregoing, the highest and best use of the property, as improved, is consistent with its existing use, as a multi-tenant office building.

The subject is located within the taxing jurisdiction of Harris County. Per the Harris County Property Appraiser's Office, the subject is assessed under account number 451400060244. According to the Harris County Tax Collector, there are no delinquent property taxes encumbering the subject.

Real estate taxes in this state and this jurisdiction represent as valorem taxes, meaning a tax applied in proportion to value. The real estate taxes for an individual property may be determined by multiplying the total assessed value by a millage rate of 2.67861.

The respective taxing authorities and tax rates per $100 of assessed valuation are similar to surrounding communities and not considered burdensome. The most current 2015 tax rates are shown in the chart below.

| 2015 Real Estate Taxes & Assessments | | | |
|---|---|---|---|
| Taxing Authority | Assessed Value | Rate | Taxes Levied |
| Houston ISD | $8,227,365 | 1.196700 | $98,456.88 |
| Harris County | $8,227,365 | 0.419230 | $34,491.58 |
| Harris Co Flood Control | $8,227,365 | 0.027330 | $2,248.54 |
| Port of Houston Authority | $8,227,365 | 0.013420 | $1,104.11 |
| Harris County Hospital District | $8,227,365 | 0.170000 | $13,986.52 |
| Harris County Education Department | $8,227,365 | 0.005422 | $446.09 |
| Houston Community College | $8,227,365 | 0.101942 | $8,387.14 |
| City of Houston | $8,227,365 | 0.601120 | $49,456.34 |
| HC UD 1 | $8,227,365 | 0.143450 | $11,802.16 |
| TOTAL RE TAXES & ASSESSMENTS | | 2.67861 | $220,379.35 |

## APPRAISAL PROCESS

### Overview

The three traditional approaches to valuing improved properties are:

- Sales Comparison Approach - a comparison of the property appraised with reasonable similar, recently conveyed properties for which the price, terms and conditions of sale are known;
- Income Capitalization Approach - the processing of a projected net income into a valuation estimate via one or more capitalization techniques; and
- Cost Approach - an estimate of the replacement cost of all structural improvements as if new, less loss in value attributable to depreciation from all causes plus the value of the land as if vacant.

The Sales Comparison Approach is founded upon the principle of substitution that holds that the cost to acquire an equally desirable substitute property without undue delay ordinarily sets the upper limit of value. At any given time, prices paid for comparable properties are construed by many to reflect the value of the property appraised. The validity of a value indication derived by this approach is heavily dependent upon the availability of data on recent sales of properties similar in location, size, and utility to the appraised property.

The Income Capitalization Approach is based on the principle of anticipation that recognizes the present value of the future income benefits to be derived from ownership in a particular property. The Income Capitalization Approach is most applicable to properties that are bought and sold for investment purposes, and is considered very reliable when adequate income and expense data are available. Since income producing real estate is most often purchased by investors, this approach is valid and is generally considered the most applicable when the property being appraised was designed for, or is easily capable of producing a rental income.

The Cost Approach is based on the premise that the value of a property can be indicated by the current cost to construct a reproduction or replacement for the improvements minus the amount of depreciation evident in the structures from all causes plus the value of the land and entrepreneurial profit. This approach to value is particularly useful for appraising new or nearly new improvements.

The Appraisal Process is concluded by a review and re-examination of each of the approaches to value that were employed. Consideration is given to the type and reliability of data used, the applicability of each approach to the type of property being appraised and the type and definition of value being sought.

### Subject Specific

This appraisal utilizes two of three accepted approaches to value: 1) Sales Comparison Approach, and 2) Income Capitalization Approach. The Cost Approach was not developed in this appraisal. Due to the age of the property, amount of depreciation present, the Cost Approach is not considered to provide a meaningful valuation analysis.

## SALES COMPARISON APPROACH

### Introduction

The Sales Comparison Approach is premised upon the Principle of Substitution - a valuation principle that states that a prudent purchaser would pay no more for real property than the cost of acquiring an equally desirable substitute on the open market. The principle of substitution presumes that the purchaser will consider the alternatives available to him, that he will act rationally or prudently on the basis of his information about those alternatives, and that time is not a significant factor. Substitution may assume the form of the purchase of an existing property with the same utility, or of acquiring an investment, which will produce an income stream of the same size with the same risk as that involved in the property in question.

The applicability of this approach is based upon the assemblage of similar market sales and offering for comparison to the subject. Considerations for such factors as market condition, location, size, quality, age-condition, and amenities, as well as the terms of the transaction, are all significant to the subject property. Any adjustments to the sale price of market sales to provide indications of  for the subject must be derived from the market; therefore, the actions of typical buyers and sellers are reflected in the comparison process.

There are various units of comparison available in the evaluation of sales data in this approach. We have employed the Sales Price per Square Foot (SP/SF) unit of comparison, which is derived by dividing the sales price by the net rentable area. The sales price per square foot involves a comparison of physical attributes where adjustments must be made for any differences that affect sales prices. These differences include financing conditions, date of sale, location, quality of construction, age/condition, land to building ratio, and other relevant attributes. This is a reliable unit of comparison assuming a high degree of comparability. However, when somewhat dissimilar properties are compared, the sales price per square foot does not directly differentiate between their respective income producing capabilities.

### Analysis of Comparable Land Sales

Research was targeted towards recent sales of vacant land similar to the subject. We have completed an extensive search for current sales of properties that are comparable to the subject property within its local market. The sales utilized in this appraisal are the most comparable current sales available.

In our analysis, we confirmed several recent transactions of similar sales in the subject's market area. These sales are mapped and summarized on the following page, while a detailed description is available in the Exhibits section of this report.



**Comparable Land Sales Map**

| | | Sale | Size | Sale | |
|---|---|---|---|---|---|
| **No.** | **Name / Location** | **Date** | **(SF)** | **Price** | **$/SF** |
| 1 | 1717 West loop South - Houston, TX | Mar-14 | 179,903 | $43,135,920 | $239.77 |
| 2 | Hidalgo Street - Houston, TX | Feb-15 | 168,142 | $30,265,560 | $180.00 |
| 3 | 1515-1525 Garretson - Houston, TX | Sep-14 | 84,924 | $15,700,000 | $184.87 |
| 4 | Westcreek Lane - Houston, TX | Aug-14 | 80,394 | $15,274,924 | $190.00 |
| | Minimum | Mar-14 | 80,394 | $15,274,924 | $180.00 |
| | Maximum | Feb-15 | 179,903 | $43,135,920 | $239.77 |
| | Average | Jul-14 | 128,341 | $29,502,465 | $198.66 |
| | Subject | - | 70,213 | - | - |

*Table title: SUMMARY OF COMPARABLE LAND SALES*

## Sales Price per SF Analysis

The sales were analyzed and adjusted for differences in physical characteristics. The adjustment categories considered and a brief explanation of each is as follows.

## Property Rights Conveyed

Property rights conveyed vary from fee simple to leased fee interest. Based on the comparable date there is no discernable difference in value between either property rights conveyed. No adjustments are therefore warranted.

## Financing Terms

The consideration of one property may differ significantly from that of an identical substitute property due to financing conditions. Below market financing must be identified and adjusted for in the sales data when applicable. Cash equivalency analysis is a procedure whereby comparable sales are adjusted for atypical financing based on market rates available for comparable properties at the time of sale. All the sales involved third party financing or cash transactions; therefore, no adjustments to the sales were required for this category of comparison.

## Conditions of Sale

The sales utilized are representative of arm's-length transactions without atypical motivations or sales conditions. Therefore, the comparable sales are not adjusted for conditions of sale.

## Market Conditions (Date of Sale)

The comparable sales sold between Mar-14 thru Feb-15. Market conditions have improved through this period and therefore we have adjusted all comparables upward 2.0% per year.

## Location

Each property was rated to the subject for locational aspects such as value growth potential, access, and general desirability. Those transactions with superior locations were adjusted downward and vice versa. No adjustments were made for location.

## Land Size

Lande size is an influential variable. Often an inverse relationship exists between price and size. That is, the larger the land size, the lower the price per SF, which is primarily based on the "economies of scale" premise. All comparables are considered inferior to the subject, and are adjusted upwards.

## Topography

Topography of land specifically involves the terrain, the three-dimensional quality of the surface and the identification of specific land forms. Properties with flat topography are more desirable as opposed to rolling or sloped topography, which can limit use of the entire site.

## Access/Exposure

Access to a site can enhance or limit its attractiveness to buyers in the market. No adjustments were made for access/exposure.

## Utilities

The availability of utilities and whether the site is connected to a municipal water and sewer system has a significant impact on market value. The subject property has access to a public water supply and public

sewer system. All of the comparable sales have similar available utilities as compared to the subject and are not adjusted for this factor.

## Flood Zone

No adjustments were made for flood zone.

## Zoning

Differences in zoning classifications are related to permitted uses. All of the comparable land sales have similar overall zoning classifications as compared to the subject and are not adjusted for this factor.

## Value Conclusion

After analysis, we have concluded to a value near the top of the range at $230.00/SF.

The indicated retrospective value as of January 13, 2016 via the Sales Comparison Approach is calculated in the table below:

| LAND VALUE CONCLUSION | | | | |
|---|---|---|---|---|
| Land Area | | $/SF | | Value |
| 70,213 | x | $230.00 | = | $16,148,990 |
| Retrospective Value (Rounded) | | | | $16,100,000 |

## Analysis of Improved Comparable Sales

Research was targeted towards recent sales of professional office buildings similar to the subject. We have completed an extensive search for current sales of properties that are comparable to the subject property within its local market. The sales utilized in this appraisal are the most comparable current sales available.

In our analysis, we confirmed several recent transactions of similar sales in the subject's market area. These sales are mapped and summarized on the following page, while a detailed description is available in the Exhibits section of this report.



**Comparable Sales Map**

SALES COMPARISON APPROACH

| No. | Name / Location | Sale Date | Bldg. Size (SF) | % Occ. | Year Built | LTB Ratio | Sale Price | $/SF | Cap Rate |
|---|---|---|---|---|---|---|---|---|---|
| | **SUMMARY OF COMPARABLE SALES** | | | | | | | | |
| 1 | 5420 West Loop S - Bellaire, TX | May-14 | 99,768 | - | 2005 | 0.93:1 | $28,376,011 | $284.42 | - |
| 2 | 3040 Post Oak - Houston, TX | Aug-14 | 427,486 | 80.0% | 1982 | 0.42:1 | $127,996,061 | $299.42 | 5.63% |
| 3 | 7789 Southwest Freeway - Houston, TX | Jun-15 | 131,806 | 89.0% | 2007 | 1.18:1 | $31,644,152 | $240.08 | 5.70% |
| 4 | 1433 West Loop South - Houston, TX | Dec-14 | 138,000 | 100.0% | 1972 | 0.47:1 | $36,166,108 | $262.07 | - |
| | Minimum | May-14 | 99,768 | 80.0% | 1972 | 0.42:1 | $28,376,011 | $240.08 | 5.6% |
| | Maximum | Jun-15 | 427,486 | 100.0% | 2007 | 1.18:1 | $127,996,061 | $299.42 | 5.7% |
| | Average | Nov-14 | 199,265 | 89.7% | 1992 | 0.75:1 | $56,045,583 | $271.50 | 5.7% |
| | Subject | - | 79,647 | 100.0% | 1975 | 0.88:1 | - | - | |

## Sales Price per SF Analysis

The sales were analyzed and adjusted for differences in physical characteristics. The adjustment categories considered and a brief explanation of each is as follows.

## Property Rights Conveyed

Property rights conveyed vary from fee simple to leased fee interest. Based on the comparable date there is no discernable difference in value between either property rights conveyed. No adjustments are therefore warranted. The subject is a leasehold interest; however, the ground lease payment is $1.00 per year and the remaining term is approximately 57 years. No property rights adjustment is considered appropriate.

## Financing Terms

The consideration of one property may differ significantly from that of an identical substitute property due to financing conditions. Below market financing must be identified and adjusted for in the sales data when applicable. Cash equivalency analysis is a procedure whereby comparable sales are adjusted for atypical financing based on market rates available for comparable properties at the time of sale. All the sales involved third party financing or cash transactions; therefore, no adjustments to the sales were required for this category of comparison.

## Conditions of Sale

The sales utilized are representative of arm's-length transactions without atypical motivations or sales conditions. Therefore, the comparable sales are not adjusted for conditions of sale.

## Market Conditions (Date of Sale)

The comparable sales sold between May-14 thru Jun-15. Market conditions have improved through this period and therefore we have adjusted all comparables upward 2.0% per year.

## Location

Comparable 3 is in a location that is inferior to the subject and adjusted upwards. Comparables 1, 2, and 4 are in a similar location as the subject and were not adjusted.

### Building Size

Building size is an influential variable. Often an inverse relationship exists between price and size. That is, the larger the building size, the lower the price per SF, which is primarily based on the "economies of scale" premise. Comparables 2, 3, and 4 are adjusted upward for their larger building size.   No adjustment was made to comparable 1.

### Age/Condition

Better maintained or more modern buildings obviously command higher prices. Each analyzed transaction was compared to the subject for age and physical condition. The subject is considered to be in average overall condition for its age and market area. Comparables 1 and 3 are superior in age and therefore adjusted downward.  No adjustments were made to comparables 2 and 4.

### Construction Quality

All comparables are similar to the subject in terms of construction quality.

### Land to Building Ratio

The land to building ratio (L:B) is an index that reflects land use intensity. A large index signals more land is available for building expansion, parking, green space, or storage, hence often contributes more to value than a small index. No adjustments are made for this factor.

### Tenancy

No discernable difference was observed between the subject and the sales comparables.

### Build-out

All comparables have office build out. No adjustments are made for this factor.

### Occupancy

Comparables 2 and 3 have below market occupancy and adjusted upward for occupancy.

### Adjustment Summary

The following table summarizes the previously discussed adjustments.

### Value Conclusion

The indicated "Retrospective" value as of January 13, 2016 via the Sales Comparison Approach is calculated in the table below:

| SALES COMPARISON APPROACH CONCLUSION "RETROSPECTIVE VALUE" | | | | |
|---|---|---|---|---|
| Building Size SF | | $ Per Building SF | | Value |
| 79,647 | x | $300.00 | = | $23,894,100 |
| Retrospective Value (Rounded) | | | | $23,900,000 |

## INCOME CAPITALIZATION APPROACH

### Introduction

The Income Capitalization Approach is a procedure in appraisal analysis whereby anticipated future economic benefits to be derived from a property are converted into a present value estimate through a capitalization process. This approach is based on the principle of anticipation and value is created by investor's expectations of benefits to be derived in the future. The process of estimating anticipated economic benefits from a particular property therefore requires estimates of potential income and expenses as well as debt costs (if applicable), and the selection of the most appropriate capitalization method.

The two most commonly utilized methods of processing net income into value are direct capitalization, where an overall rate is extracted directly from market sales in which the net income is known or can be closely estimated, and the Discounted Cash Flow (DCF) Analysis, whereby anticipated future income streams and a reversionary value are discounted to a net present value. Utilizing either method requires analysis of the subject property's income and expense flows relative to income and expenses found in similar properties in the marketplace.

We were furnished copies of the leases and a current rent roll.  The current rent roll is considered to be below market for rents.  We have analyzed the subject on an actual income and proforma basis and have applied only the direct capitalization method.

### Market Rental Analysis

The first step in the Income Capitalization Approach is to estimate economic or market rent for the subject property. Economic rent or the preference term, market rent, is defined as the rental income that a property would most probably command in the open market. Buildings proximate to the subject with similar space were the basis for estimating such. We have relied on a market rent survey prepared by Dave Hanusa with CBRE on February 24, 2016.  The market rent survey ranged from $29.00 to $32.00/SF on a full service basis.  We have concluded to a market rent of $31.00/SF on a full-service basis.

### Potential Gross Income

Our income projection is shown below.

| POTENTIAL GROSS INCOME | | | |
|---|---|---|---|
| Size SF | Rent | Rent $/SF | Annual Rent |
| 79,647 | Market | $31.00 | $2,469,057 |

### Operating Expense Analysis

Income is generated from pass thru of operating expenses including taxes, insurance, administrative, repairs and maintenance, utilities, janitorial, and management. Although we were not provided with subject

financial historicals, below are operating expense benchmarks based on the 2016 BOMA Experience Exchange Report.

| 2016 BOMA EXPERIENCE EXCHANGE REPORT<br>Suburban Office Buildings<br>50,000 - 99,999 SF - Houston, TX | | | |
|---|---|---|---|
| Category | Median | Low | High |
| Real Estate Taxes | $3.18 | $2.36 | $6.06 |
| Insurance | $0.22 | $0.17 | $0.33 |
| Utilities | $2.09 | $0.91 | $2.53 |
| Repairs/Maintenance | $0.80 | $0.64 | $1.78 |
| Cleaning/Janitorial | $1.11 | $0.72 | $1.18 |
| Grounds | $0.25 | $0.19 | $0.44 |
| Security | $0.16 | $0.06 | $0.35 |
| General/Administrative | $1.73 | $1.18 | $2.39 |
| Management | $0.52 | $0.43 | $0.63 |
| Total | $10.06 | $6.66 | $15.69 |

Buyers of real estate are most concerned about income and expenses they expect during their tenure of ownership, usually a 5 to 10-year span. In an appraisal, expenses should reflect upfront expectations of likely buyers during an ordinary ownership period, not the entire life cycle of the property.

Operating expenses for the subject property are estimated based on industry benchmarks as well as an analysis of the year ending 2015 income and operating statement for the subject.  Adjusting the expense statement for depreciation, interest and management, results in total expenses of $796,979 or $10.01/SF. Market rent is a full-service basis and we have estimated total expenses at $10.00/SF.

### Replacement Reserves
This account accrues funds for the eventual repair and replacement of building components. Such charges typically include capital expenditures for roof replacement, mechanical equipment, and other miscellaneous expenditures necessary to maintain the integrity of the structure. Based on the subject's size and tenancy, we have concluded a reserves expense at $0.20/SF.

## Capitalization Techniques
In the appraisal profession, capitalization is the process of converting income into value.  One method extracts a capitalization rate (also called a cap rate) from sales of similar property via the following formula.  An extracted rate is then divided into the subject's net operating income (NOI) resulting in a value indication for the real estate being appraised.

$$Net\ Operating\ Income\ \ /\ \ Sale\ Price\ \ =\ \ Cap\ Rate$$

Implicit within a cap rate are all investor expectations about risk, return, and change.  This methodology is simple to use, easy to explain, and directly reflects market behavior.  Its simplicity is also a weakness because implicit expectations may not be scrutinized.

The selection of an appropriate overall capitalization rate (Ro) can be accomplished by several methods. In this analysis, we have used the Band of Investment Technique and Market Extraction. Income and

expense information for the comparable sales was not made available and no overall capitalization rate could be derived.

## *Market Extracted Data*

The overall capitalization rates (OAR's) confirmed for the comparable sales analyzed in the sales comparison approach are as follows:

| No. | Location | Sale Date | Bldg. Size (SF) | Yr. Built | LTB Ratio | Property Type | Sale Price | $/SF | Cap Rate |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| 2 | 3040 Post Oak - Houston, TX | Aug-14 | 427486 | 1982 | 0.21:1 | Office | $127,996,061 | $299.42 | 5.63% |
| 3 | 7789 Southwest Freeway - Houston, TX | Jun-15 | 131806 | 2007 | 0.26:1 | Office | $31,644,152 | $240.08 | 5.70% |
| | Minimum | May-14 | 99,768 | 1972 | 0.21:1 | | $28,376,011 | $240.08 | 5.63% |
| | Maximum | Jun-15 | 427,486 | 2007 | 0.50:1 | | $127,996,061 | $299.42 | 5.70% |
| | Average | Nov-14 | 199,265 | 1992 | 0.32:1 | | $56,045,583 | $271.50 | 5.67% |

The comparable sales indicate a range in overall cap rates from 5.63% to 5.70% with an average of 5.67%.

Only two of the comparable sales were able to disclose capitalization rates.  We therefore extended our search to include all recent transactions of Office Buildings in Houston to determine the range of capitalization rates.

| No. | Location | Sale Date | Bldg. Size (SF) | Yr. Built | Property Type | Sale Price | $/SF | Cap Rate |
|---|---|---|---|---|---|---|---|---|
| 1 | 10111 Richmond Avenue - Houston, TX | Aug-14 | 184,259 | 1999 | Office | $55,277,700 | $300.00 | 7.15% |
| 2 | 2000 Bering Drive - Houston, TX | Nov-14 | 192,211 | 1981 | Office | $28,750,000 | $149.58 | 5.96% |
| 3 | 7700 San Felipe - Houston, TX | Feb-14 | 100,716 | 1978 | Office | $15,575,000 | $154.64 | 7.17% |
| 4 | 17270 Red Oak Drive - Houston, TX | Dec-15 | 49,868 | 1985 | Office | $6,300,000 | $126.33 | 7.20% |
| 5 | 15011 Katy Freeway - Houston, TX | Jul-14 | 327,404 | 2014 | Office | $100,000,000 | $305.43 | 5.90% |
| 6 | 1272 Featherwood Drive - Houston, TX | Dec-14 | 49,670 | 1985 | Office | $4,736,711 | $95.36 | 7.70% |
| 7 | 22710 Professional Drive - Houston, TX | Mar-15 | 43,000 | 2005 | Office | $14,949,000 | $347.65 | 7.23% |
| 8 | 2411 Fountainview Drive - Houston, TX | Jun-15 | 53,472 | 1974 | Office | $4,250,000 | $79.48 | 6.13% |
| 9 | 16055 Space Center Boulevard - Houston, TX | Dec-15 | 149,144 | 1985 | Office | $21,500,000 | $144.16 | 8.90% |
| 10 | 1250 West Sam Houston Parkway S. - Houston, TX | Feb-15 | 159,784 | 1985 | Office | $28,000,000 | $175.24 | 7.74% |
| | Minimum | Feb-14 | 49,670 | 1974 | | $4,250,000 | $126.33 | 5.90% |
| | Maximum | Dec-15 | 327,404 | 2014 | | $100,000,000 | $300.00 | 8.90% |
| | Average | Jan-15 | 131,764 | 1989 | | $27,933,841 | $182.64 | 7.11% |

The secondary comparables indicate a range of 5.90% to 8.90% with an average of 7.11%. Given the subject's excellent location, strong occupancy and a high land value to total value allocation, a rate below the average is appropriate.

## Investor Survey

As additional support, we have included the data for Houston Suburban Office Market from the Pricewater-House Coopers (PwC) Real Estate Investor Survey, 4th Quarter 2015. A summary of the overall rates for the market is located in the following table. This survey is for investment grade properties of which the subject would be included.

Key forward-looking investment criteria for this market highlight a guarded outlook for Houston. As shown in Table 12, this market's average initial-year market rent change rate slides 89 basis points to .25% while its average overall cap rate rises 14 basis points to 7.01%.

**Table 12**
## HOUSTON OFFICE MARKET
Fourth Quarter 2015

| | CURRENT | LAST QUARTER | 1 YEAR AGO | 3 YEARS AGO | 5 YEARS AGO |
|---|---|---|---|---|---|
| **DISCOUNT RATE (IRR)[a]** | | | | | |
| Range | 6.50% – 11.50% | 6.50% – 11.50% | 6.50% – 12.00% | 7.00% – 14.00% | 7.75% – 14.00% |
| Average | 8.52% | 8.46% | 8.38% | 9.12% | 9.67% |
| Change (Basis Points) | | + 6 | + 14 | – 60 | – 115 |
| **OVERALL CAP RATE (OAR)[a]** | | | | | |
| Range | 5.50% – 10.00% | 5.50% – 10.00% | 5.00% – 10.00% | 5.00% – 12.00% | 6.75% – 12.50% |
| Average | 7.01% | 6.87% | 6.60% | 7.76% | 8.49% |
| Change (Basis Points) | | + 14 | + 41 | – 75 | – 148 |
| **RESIDUAL CAP RATE** | | | | | |
| Range | 6.00% – 10.75% | 5.50% – 10.75% | 5.50% – 11.00% | 5.00% – 11.00% | 7.00% – 11.00% |
| Average | 7.46% | 7.29% | 7.25% | 7.94% | 8.34% |
| Change (Basis Points) | | + 17 | + 21 | – 48 | – 88 |
| **MARKET RENT CHANGE[b]** | | | | | |
| Range | (4.00%) – 5.00% | (4.00%) – 5.00% | 2.00% – 8.00% | 2.00% – 7.00% | 0.00% – 3.00% |
| Average | 0.25% | 1.14% | 4.25% | 3.25% | 0.25% |
| Change (Basis Points) | | – 89 | – 400 | – 300 | 0 |
| **EXPENSE CHANGE[b]** | | | | | |
| Range | 2.00% – 3.00% | 2.00% – 3.00% | 2.00% – 3.00% | 2.00% – 3.00% | 2.00% – 3.00% |
| Average | 2.75% | 2.79% | 2.83% | 2.67% | 2.83% |
| Change (Basis Points) | | – 4 | – 8 | + 8 | – 8 |
| **MARKETING TIME[c]** | | | | | |
| Range | 3 – 13 | 3 – 12 | 2 – 12 | 3 – 12 | 3 – 12 |
| Average | 7.8 | 7.0 | 5.8 | 6.7 | 7.2 |
| Change (▼, ▲, =) | | ▲ | ▲ | ▲ | ▲ |
| a. Rate on unleveraged, all-cash transactions | b. Initial rate of change | c. In months | | | |

## Conclusion

The direct capitalization analysis is summarized in the following pro forma. All issues necessary to produce a value indication via this approach have been presented and explained.  Since this is a pro forma valuation, we have adjusted the value for rent loss, leasing commissions and tenant improvements. After careful consideration of all factors pertaining to and influencing the income approach, the following capitalizes or converts net income into value:

| PRO FORMA RETROSPECTIVE | | | |
|---|---|---|---|
| **Item** | | **$/SF/Yr** | **Total** |
| **INCOME** | | | |
| Potential Rental Income | | $31.00 | $2,469,057 |
| Less Vacancy & Credit Loss | 10.0% | ($3.10) | ($246,906) |
| **Effective Rental Income** | | $27.90 | $2,222,151 |
| Exp Reimb Income | | $0.00 | $0 |
| Less Vacancy & Credit Loss | 10.0% | $0.00 | $0 |
| **Effective Gross Income** | | $27.90 | $2,222,151 |
| | | | |
| **EXPENSES** | | | |
| **Total  Expenses & Reserves** | | $10.20 | $812,399 |
| **Operating Expense Ratio** | | | 36.6% |
| **NET OPERATING INCOME** | | $17.70 | $1,409,752 |
| **OAR** | | | 5.50% |
| | | | |
| **Indicated Value** | | | $25,631,860 |
| **Less:  Tenant Improvements** | | | -$360,000 |
| **Less:  Leasing Commissions** | | | -$400,000 |
| **Less:  Rent Loss** | | | -$825,000 |
| **Retrospective Market Value** | | | $24,046,860 |
| **Rounded** | | **$301.33** | **$24,000,000** |

## Pro Forma Retrospective Market Value Conclusion

The subject's indicated "Retrospective Value" as of January 13, 2016 via the Income Approach is estimated to be.

| INCOME APPROACH CONCLUSION RETROSPECTIVE | |
|---|---|
| Indicated Value via Pro Forma Income Approach | $24,000,000 |

## As Is Potential Gross Income

Based on the January 13, 2016 rent roll, potential gross income, including expense reimbursement is:.

| POTENTIAL GROSS INCOME | | | |
|---|---|---|---|
| Size SF | Rent | Rent $/SF | Annual Rent |
| 79,647 | Actual | $20.45 | $1,629,456 |

We have concluded to an overall capitalization rate of 4.50%, which is 100 basis points lower than the pro forma rate utilized due to the below market rent that is present.

| AS IS RETROSPECTIVE | | | |
|---|---|---|---|
| Item | | $/SF/Yr | Total |
| **INCOME** | | | |
| Potential Rental Income | | $19.50 | $1,553,292 |
| Less Vacancy & Credit Loss | 0.0% | $0.00 | $0 |
| **Effective Rental Income** | | $19.50 | $1,553,292 |
| Exp Reimb Income | | $0.96 | $76,164 |
| Less Vacancy & Credit Loss | 0.0% | $0.00 | $0 |
| **Effective Gross Income** | | $20.46 | $1,629,456 |
| | | | |
| **EXPENSES** | | | |
| **Total  Expenses & Reserves** | | $10.20 | $812,399 |
| **Operating Expense Ratio** | | | 49.9% |
| **NET OPERATING INCOME** | | $10.26 | $817,057 |
| **OAR** | | | 4.50% |
| | | | |
| **Indicated Value** | | | $18,156,822 |
| **Retrospective Market Value** | | | $18,156,822 |
| **Rounded** | | **$228.51** | **$18,200,000** |

| INCOME APPROACH CONCLUSION RETROSPECTIVE | |
|---|---|
| Indicated Value via Income Approach | $18,200,000 |

## RECONCILIATION AND FINAL VALUE CONCLUSION

The "Retrospective Value" indications for the subject as of January 13, 2016 are summarized as follows:

| RETROSPECTIVE MARKET VALUE CONLUSIONS SUMMARY AS OF JANUARY 13, 2016 | |
|---|---|
| Sales Comparison Approach | $23,900,000 |
| Income Capitalization Approach - Pro Forma | $24,000,000 |
| Income Capitalization Approach - As Is | $18,200,000 |
| Reconciled Value | $23,000,000 |

The Cost Approach was not completed for this assignment based the difficulty in estimating accrued depreciation. In addition, buyers of similar properties to the subject typically do not consider the Cost Approach when making purchasing decisions.

In the Sales Comparison Approach, the subject is compared to similar properties that have been sold recently or for which listing prices or offers are known. The sales used in this analysis are considered highly comparable to the subject, and the required adjustments were based on reasonable and well-supported rationale. In addition, market participants are currently analyzing purchase prices on similar office properties as they relate to available substitutes in the market. The subject is a multi-tenant office building that is typically purchased for its income generating attributes. The Sales Comparison Approach is considered to provide a reliable value indication and has been secondary emphasis in the analysis.

The Direct Capitalization technique was used to obtain a value indication for the subject. Several comparable rentals from within the subject's market area were utilized in estimating a market rental rate for the subject. BOMA survey data was utilized in estimating operating expenses for the subject. An appropriate overall rate was analyzed based on market extracted cap rates. Primary emphasis is placed on the Income Approach, which best reflects the attitudes of a typical purchaser of a multi-tenant property such as the subject. Based on the foregoing, the of the subject has been concluded as follows:

| RETROSPECTIVE MARKET VALUE CONCLUSION | | |
|---|---|---|
| Premise | Date | Conclusion |
| Leasehold | January 13, 2016 | $23,000,000 |

### Exposure Time/Marketing Period

Per the Appraisal Standards Board (ASB) of the Appraisal Foundation, "reasonable marketing time" is an estimate of the amount of time it might take to sell a property interest at the estimated  during the period immediately after the effective date of the appraisal. It is not intended to be a prediction of a specific date of sale and, therefore, may be expressed as a range. Exposure time is defined as the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at  on the effective date of appraisal.

Based on exposure times of comparable sales and interviews with active participants in the local retail market, the above  conclusion could be achieved with an exposure time of 12 months. Furthermore, it is our opinion that a sale could be consummated at the  conclusion stated herein within a 12 month marketing period of the effective date of appraisal.

## Equity Value

The equity value in the subject is calculated at the market value of the subject property less net long term debt.  According to the January 13, 2016 Balance Sheet, the subject had long term debt of $4,609,233 and the subject had cash on hand of $1,204,053.  Therefore, net long term debt is $3,405,180 ($4,609,233 - $1,204,053).  The retrospective market value has been estimated to be $23,000,000 and the net long term debt has been calculated at $3,405,180; therefore, the equity value is $19,594,820 ($23,000,000 - $3,405,180).

GLOSSARY.................................................................................................................A

LETTER OF ENGAGEMENT................................................... ERROR! BOOKMARK NOT DEFINED.

SUBJECT PICTURES ................................................................................................B

COMPARABLE IMPROVED SALES.............................................................................H

COMPARABLE RENTALS...................................................... ERROR! BOOKMARK NOT DEFINED.

SUBJECT INFO.........................................................................................................V

PROFESSIONAL QUALIFICATIONS.........................................................................EE

# GLOSSARY

**Assessed Value:** The value of a property according to the tax rolls in ad valorem taxation; may be higher or lower than market value, or based on an assessment ratio that is a percentage of market value. [1]

**Asset:**
1. Generally, something that can be converted to cash or other economic equivalent
2. Any owned property that has economic value, including financial assets (cash or bonds), business interests, intangible assets (copyrights and trademarks), and physical assets (real and personal property).
3. In general business usage, something owned by a business and reflected in the owner's balance sheet. [1]

**Asset:** A resource controlled by the entity as a result of past events and from which future economic benefits are expected to flow to the entity. [2]

**Capital Expenditure:** Investments of cash (or the creation of liability) to acquire or improve an asset, e.g., land, buildings, building additions, site improvements, machinery, equipment; as distinguished from cash outflows for expense items that are normally considered part of the current period's operations. [1]

**Cash Equivalency:** An analytical process in which the sale price of a transaction with nonmarket financing or financing with unusual conditions or incentives is converted into a price expressed in terms of cash. [1]

**Client:** The party or parties who engage an appraiser (by employment or contract) in a specific assignment (USPAP). [1]

**Condominium Ownership:** A form of fee ownership of separate units or portions of multiunit buildings that provides for formal filing and recording of a divided interest in real property. [1]

**Cost Approach:** A set of procedures through which a value indication is derived for the fee simple interest in a property by estimating the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive, deducting depreciation from the total cost, and adding the estimated land value. Adjustments may then be made to the indicated fee simple value of the subject property to reflect the value of the property interest being appraised. [1]

**Credible:** Worthy of belief. Credible assignment results require support, by relevant evidence and logic, to the degree necessary for the intended use. (USPAP, 2010-2011 ed.) [1]

**Deferred Maintenance:** Needed repairs or replacement of items that should have taken place during the course of normal maintenance. [1]

**Disposition Value:** The most probable price that a specified interest in real property should bring under the following conditions: 1) Consummation of a sale within a future exposure time specified by the client. 2) The property is subjected to market conditions prevailing as of the date of valuation. 3) Both the buyer and seller are acting prudently and knowledgeably. 4) The seller is under compulsion to sell. 5) The buyer is typically motivated. 6) Both parties are acting in what they consider to be their best interests. 7) An adequate marketing effort will be made during the exposure time specified by the client. 8) Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto. 9) The price represents the normal consideration of the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. This definition can also be modified to provide for valuation with specified financing terms. [1]

**Economic Life:** The period over which improvements to real property contribute to property value. [1]

**Effective Date:** 1) The date on which the analyses, opinions, and advice in an appraisal, review, or consulting service apply. 2) In a lease document, the date upon which the lease goes into effect. [1]

**Effective Gross Income Multiplier (EGIM):** The ratio between the sale price (or value) of a property and its effective gross income. [1]

**Effective Rent:** The rental rate net of financial concessions such as periods of no rent during the lease term and above- or below- market tenant improvements (TIs). [1]

**Exposure Time:** 1) The time a property remains on the market. 2) The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market. [1]

**Extraordinary Assumptions:** An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2010-2011 ed.). [1]

**Fair Market Value:** According to U.S. Treasury Department regulations, Fair Market Value is defined as "The price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." [1]

**Fair Share:** That portion of total market supply accounted for by a subject property. For example, a 100-key hotel in 1,000-key market has a fair share of 10%. [1]

**Fair Value:** The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. (FASB). [1]

**Fair Value:** The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. [2]

**Fee Simple Estate:** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. [1]

**Floor Area Ratio (FAR):** The relationship between the above-ground floor area of a building, as described by the building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area; also called land-to-building ratio. [1]

**Going-Concern Value:** 1) The market value of all tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the market value of the going concern. 2) The value of an operating business enterprise. Goodwill may be separately measured but is an integral component of going concern value when it exists and is recognizable. [1]

**Gross Building Area (GBA):** The total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the region. [1]

**Highest and Best Use:** The reasonably probable and legal use of vacant land or an improved property, that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property-specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value. [1]

**Hypothetical Condition:** That which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2010-2011 ed.) [1]

**Income Capitalization Approach:** A set of procedures through which an appraiser derives a value indication for an income-producing property by converting its anticipated benefits (cash flows and reversion) into property

Glossary Page 1

value. This conversion can be accomplished in two ways. One year's income expectancy can be capitalized at a market-derived capitalization rate or at a capitalization rate that reflects a specified income pattern, return on investment, and change in the value of the investment. Alternatively, the annual cash flows for the holding period and the reversion can be discounted at a specified yield rate. [1]

**Inspection:** Personal observation of the exterior and/or interior of the real property that is the subject of an assignment. The purpose of an appraiser's inspection is to identify the property characteristics that are relevant to the assignment, such as amenities, general physical condition, and functional utility. [1]

**Insurable Value:** A type value for insurance purposes. [1]

**Intangible Assets:** Assets that manifest themselves by their economic properties; they do not have physical substance; they grant rights and privileges to their owner; and usually generate income for their owner. Intangible Assets can be categorized as arising from: Rights; Relationships; Grouped Intangibles; or Intellectual Property. In general, the accounting profession limits recognition of individual intangible assets to those than are: commonly recognizable; have a statutory or contractual remaining life; and/or must be individually transferrable and separable from the business. An identifiable non-monetary asset without physical substance. [1]

**Intangible property:** Nonphysical assets, including but not limited to franchises, trademarks, patents, copy-rights, goodwill, equities, securities, and contracts as distinguished from physical assets such as facilities and equipment. (USPAP, 2010-2011 ed.) [1]

**Intended Use:** The manner in which the intended user expect to employee the information contained in a report. [1]

**Intended User:** 1) The client and any other party as identified, by name or type, as users of the appraisal, appraisal review, or appraisal consulting report by the appraiser on the basis of communication with the client at the time of the assignment. (USPAP, 2010-2011 ed.) 2) A party who the appraiser intends will employ the information contained in a report. [1]

**Internal Rate of Return ("IRR"):** The annualized yield rate or rate of return on capital that is generated or capable of being generalized within an investment of portfolio over a period of ownership. Alternatively, the indicated return of capital associated with a projected or pro forma income stream. The discount rate that equates the present value of the net cash flows of a project with the present value of the capital investment. It is the rate at which the Net Present Value (NPV) equals zero. The IRR reflects both the return on invested capital and the return of the original investment, which are basic considerations of potential investors. Therefore, deriving the IRR from analysis of market transactions of similar properties having comparable income patterns is a proper method for developing market discount rates for use in valuations to arrive at Market Value. Used in discounted cash flow analysis to find the implied or expected rate of return of the project, the IRR is the rate of return which gives a zero net present value (NPV). See also equity yield rate (YE); financial management rate of return (FMRR); modified internal rate of return (MIRR), yield rate (Y). [1]

**Investment Value:** The value of a property interest to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. [1]

**Leasehold Interest:** The tenant's possessory interest created by a lease. See also negative leasehold; positive leasehold. [1]

**Leased Fee Interest:** A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord relationship (i.e., a lease). [1]

**Liquidation Value:** The most probable price that a specified interest in real property should bring under the following conditions: 1) Consummation of a sale within a short time period; 2) The property is subjected to market conditions prevailing as of the date of valuation; 3) Both the buyer and seller are acting prudently and knowledgeably; 4) The seller is under extreme compulsion to sell; 5) The buyer is typically motivated. 6) Both parties are acting in what they consider to be their best interests. 7) A normal marketing effort is not possible due to the brief exposure time 8) Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto. 9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. This definition can also be modified to provide for valuation with specified financing terms. [1]

**Load Factor:** A measure of the relationship of common area to usable area and therefore the quality and efficiency of building area layout, with higher load factors indicating a higher percentage of common area to overall rentable space than lower load factors; calculated by subtracting the amount of usable area from the rentable area and then dividing the difference by the usable area: [1]

Load Factor =

(Rentable Area – Useable Area)
Usable Area

**Market Value.** The major focus of most real property appraisal assignments. Both economic and legal definitions of market value have been developed and refined.*

1. The most widely accepted components of market value are incorporated in the following definition. The most probable price that the specified property interest should sell for in a competitive market after a reasonable exposure time, as of a specified date, in cash, or in terms equivalent to cash, under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, for self-interest, and assuming that neither is under duress.

2. Market value is described in the Uniform Standards of Professional Appraisal Practice (USPAP) as follows: A type of value, stated as an opinion, that presumes the transfer of a property (i.e., a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the definition of the term identified by the appraiser as applicable in an appraisal. (USPSP, 2010-2011 ed.) USPAP also requires that certain items be included in every appraisal report. Among these items, the following are directly related to the definition of market value:

- Identifications of the specific property rights to be appraised.
- Statement of the effective date of the value opinion.
- Specification as to whether cash, terms equivalent to cash, or other precisely described financing terms are assumed as the basis of the appraisal.
- If the appraisal is conditioned upon financing or other terms, specification as to whether the financing or terms are at, below, or above market interest rates and/or contain unusual conditions or incentives. The terms of above- or below-market interest rates and/or other special incentives must be clearly set forth; their contribution to, or negative influence on, value must be described and estimated; and the market data supporting the opinion of value must be described and explained.

3. The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

Buyer and seller are typically motivated;
Both parties are well informed or well advised, and each acting in what they consider their own best interests;
A reasonable time is allowed for exposure in the open market;
Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.(*Department of the Treasury, Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift*

Glossary Page 2

*Supervision and National Credit Union Administration under 12 CFR Part 34, Real Estate Appraisals and Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of*

*1989 ("FIRREA"); and the Interagency Appraisal and Evaluation Guidelines, Federal Register, Volume 75, No. 237, December 10, 2010.)*

4. The International Valuation Standards Council defines market value for the purpose of international standards as follows: The estimated amount for which a property should exchange on the date of valuation between a willing buyer and a willing seller in an arm's-length transaction after proper marketing wherein the parties had each acted knowledgeably, prudently, and without compulsion. (International Valuation Standards, 8th ed., 2007).

5. Market value is the amount in cash, or in terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of the appraisal, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the appraisal. (Uniform Standards for Federal Land Acquisitions) [1]

**Market Value "As If Complete" On The Appraisal Date:**

Market value as if complete on the effective date of the appraisal is an estimate of the market value of a property with all construction, conversion, or rehabilitation hypothetically completed, or under other specified hypothetical conditions as of the date of the appraisal. With regard to properties wherein anticipated market conditions indicate that stabilized occupancy is not likely as of the date of completion, this estimate of value should reflect the market value of the property as if complete and prepared for occupancy by tenants.

**Market Value "As Is" On The Appraisal Date:** Value As Is  The value of specific ownership rights to an identified parcel of real estate as of the effective date of the appraisal; relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical market conditions or possible rezoning. See also effective date; prospective value opinion.

**Market Value of the Total Assets of the Business:** The market value of the total assets of the business is the market value of all of the tangible and intangible assets of a business as if sold in aggregate as a going concern.  This assumes that the business is expected to continue operations well into the future. [4]

**Marketing Time:** An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal.  Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of The Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property Market Value Opinions" address the determination of reasonable exposure and marketing time.) [3]

**Net Lease:** A lease in which the landlord passes on all expenses to the tenant. Also called modified gross lease, single net lease. See also lease. [1]

**Net Rentable Area (NRA):** 1) The area on which rent is computed. 2) The Rentable Area of a floor shall be computed by measuring to the inside finished surface of the dominant portion of the permanent outer building walls, excluding any major vertical penetrations of the floor. No deductions shall be made for columns and projections necessary to the building. Include space such as mechanical room, janitorial room, restrooms, and lobby of the floor. [5]

**Penetration Ratio (Rate):** The rate at which stores obtain sales from within a trade area or sector relative to the number of potential sales generated; usually applied to existing facilities. Also called: penetration factor. [1]

**Prospective opinion of value.** A value opinion effective as of a specified future date. The term does not define a type of value. Instead it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy. [1]

**Reconciliation:** The process of reducing a range of value indications into an appropriate conclusion for that analysis, e.g., the derivation of a value

indication from the adjusted prices of two or more comparable sales in the sales comparison. [1]

**Reliable Measurement:**  [The IAS/IFRS framework requires that] neither an asset nor a liability is recognized in the financial statements unless it has a cost or value that can be measured reliably. [2]

**Remaining Economic Life:** The estimated period during which improvements will continue to represent the highest and best use of the property; an estimate of the number of years remaining in the economic life of the structure or structural components as of the date of the appraisal; used in the economic age-life method of estimating depreciation. [1]

**Replacement Cost:** The estimated cost to construct, at current prices as of the effective appraisal date, a substitute for the building being appraised, using modern materials and current standards, design, and layout. [1]

**Retrospective Value Opinion:** A value opinion effective as of a specified historical date.  The term does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date.  Values as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation.  Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion". [1]

**Sales Comparison Approach:** The process of deriving a value indication for the subject property by comparing market information for similar properties with the property  being appraised, identifying appropriate units of comparison, and making quantitative comparisons with or quantitative adjustments to the sales price (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison. [1]

**Scope of Work:** The type and extent of research and analysis in an assignment. (USPAP, 2010-2011 ed.). [1]

**Stabilized value:** A value opinion that excludes from consideration any abnormal relationship between supply and demand such as is experienced in boom periods when cost and sale price may exceed the long term value, or during periods of depression, when cost and sale price may fall short of long-term value. It is also a value opinion that excludes from consideration any transitory condition that may cause excessive construction costs, e.g., a premium paid due to a temporary shortage of supply.

**Substitution:** The principle of substitution states that when several similar or commensurate commodities, goods, services are available, the one with the lowest price will attract the greatest demand and widest distribution. This is the primary principle upon which the cost and sales comparison approaches are based. [3]

**Total Assets of a Business:**  Total assets of a business is defined by the Appraisal Institute as "the tangible property (real property and personal property, including inventory and furniture, fixtures and equipment) and intangible property (cash, workforce, contracts, name, patents, copyrights, and other residual intangible assets, to include capitalized economic profit)." [4]

**Use Value:**
In real estate appraisal, the value a specific property has for a specific use; may be the highest and best use of the property or some other use specified as a condition of the appraisal. [1]

[1]Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 5th ed. (Chicago: Appraisal Institute 2010). [2]Appraisal Institute, *International Financial Reporting Standards for Real Property Appraiser, IFRS Website, www.ifrs-ebooks.com/index.html*. [3]Appraisal Institute, *The Appraisal of Real Estate*, 13th ed. (Chicago: Appraisal Institute 2008). [4] This definition is taken from "Allocation of Business Assets into Tangible and Intangible Components: A New Lexicon," Journal of Real Estate Appraisal, January 2002, Volume LXX, Number 1.  This terminology is to replace former phrases such as: value of the going concern. [5]Financial Publishing Company, *The Real Estate Dictionary*, 7 ed. [6] U.S. Treasury Regulations

*Glossary Page 3*

# SUBJECT
# PICTURES



**Exterior View of Subject**



**Interior View of Subject**

2500 West Loop South



**Interior View of Subject**



**Interior View of Subject**

2500 West Loop South



**Interior View of Subject**



**Exterior View of Subject**

2500 West Loop South



**View of Parking Garage**



**Exterior View of Subject**

2500 West Loop South



**Street View**

2500 West Loop South

---

# COMPARABLE IMPROVED SALES

**5420 West Loop South Freeway**

**Office Building**

Sale Comparable #1

| PROPERTY INFORMATION |
|---|



| PROPERTY TYPE | |
|---|---|
| Property #: | **541200** |
| Property Type: | **Office Building** |
| Property Use: | **Medical/ Dental Office** |

| PROPERTY LOCATION | |
|---|---|
| Address: | **5420 West Loop South Freeway** |
| City, St., Zip: | **Bellaire, TX 77401** |
| County: | **Harris** |
| Tax Accounts: | **1249390000002** |
| Legal Description: | **RES B HOUSTON ORTHOPEDIC SURGICAL HOSPITAL** |

| PROPERTY SIZE | | | BUILDING ATTRIBUTES | |
|---|---|---|---|---|
| | Gross | Net | | |
| Land Area: | **2.33 Acres (101,551 SF)** | **2.33 Acres (101,551 SF)** | Year of Construction: | **2005** |
| Building Area: | **99,768 SF** | **99,768 SF** | | |
| Land/ Building Ratio: | **1.02 : 1** | | | |

| PROPERTY ATTRIBUTES |
|---|
| Site |

Floodplain: **48201C0855L 06/18/2007**

| Improvements |
|---|

Parking Facilities: **325 Total Spaces, 325 Open, SF/Parking Space: 307, ParkingRatio: 0.31**

7/31/2017 11:26:37 AM

**5420 West Loop South Freeway**

| SALE INFORMATION | |
|---|---|

| | | |
|---|---:|---|
| Consideration: | $28,376,011 | Grantor: Welltower, Inc |
| Adjustments: | $0 | c/o Justin Hill |
| Cash Equivalent Price: | $28,376,011 | 4500 Dorr St |
| 1st Mortgage: | $0 | Toledo, OH 43615 |
| 2nd Mortgage: | $0 | 419-247-2800 |
| Equity: | $0 | Grantee: CNL Healthcare Properties, Inc |
| | | c/o Andrew Ranieri |
| | | 450 S Orange Avenue |
| | | Orlando, FL 32801 |
| | | 407-650-1000 |
| | | Date of Sale: 05-23-14 |
| | | Sale Status: Closed |
| | | Record Info: |
| Sales Price ($/SF): | $284.42 | |

| SALE ATTRIBUTES |
|---|

| SALE TRANSACTION INFORMATION |
|---|

Verified On: **7/24/2017**
Verified By: **Verified through costar report/assessment information - JWB**
Comments:

### Lakes on Post Oak

#### Office Building

##### Sale Comparable #2

## PROPERTY INFORMATION



### PROPERTY TYPE

| | |
|---|---|
| Property #: | **289431** |
| Property Type: | **Office Building** |
| Property Use: | **Hi Rise (9+ Stories)** |

### PROPERTY LOCATION

| | |
|---|---|
| Address: | **3040 Post Oak Boulevard** |
| City, St., Zip: | **Houston, TX 77056** |
| County: | **Harris** |
| Tax Accounts: | **1345690010003** |
| Legal Description: | **RES A2 BLK 1 LAKES ON POST OAK** |

### PROPERTY SIZE

| | Gross | Net |
|---|---|---|
| Land Area: | **4.05 Acres (176,627 SF)** | **4.05 Acres (176,627 SF)** |
| Building Area: | **427,486 SF** | **427,486 SF** |
| Land/ Building Ratio: | **0.41 : 1** | |
| # of Stories: | **22** | |
| # of Buildings: | **1** | |

### BUILDING ATTRIBUTES

| | |
|---|---|
| Year of Construction: | **1982** |
| Quality: | **Average** |
| Condition: | **Average** |
| Year of Latest Remodel: | **2005** |

## PROPERTY ATTRIBUTES

### Site

| | |
|---|---|
| Road Frontage: | **Adequate along the south side of Hidalgo Street and along the west side of Transco Four Dr** |
| Terrain: | **Level** |
| Utilities: | **All to site** |
| Easements: | **None detrimental known** |
| Floodplain: | **Zone X, 48201C-0855L, 6/18/2007** |

### Improvements

| | |
|---|---|
| Parking Facilities: | **10 free surface spaces; 700 covered spaces; reserved spaces @ $100.00/MO** |
| Tenant Mix: | **Multi-Tenant** |
| Construction Date: | **1982/Renovated 2005** |
| Construction Details: | **Steel frame, glass exterior with a flat roof** |

7/31/2017 11:26:37 AM

**Lakes on Post Oak**

| SALE INFORMATION | |
|---|---|
| Consideration: | $125,000,000 |
| Adjustments: | $2,996,061 |
| Cash Equivalent Price: | $127,996,061 |
| 1st Mortgage: | $0 |
| 2nd Mortgage: | $0 |
| Equity: | $0 |
| Sales Price ($/SF): | $299.42 |

Grantor: Lopo LLC
Grantee: MCP 3040 Post Oak, LLC
Date of Sale: 08-19-14
Sale Status: Closed
Record Info: 20140370260

| SALE ATTRIBUTES |
|---|

Occupancy At Sale: **82%**

Terms of Sale: **Cash to seller**

## SALE INCOME SUMMARY - ACTUAL

| | Total | $/SF | $/Unit |
|---|---|---|---|
| Gross Rental Income | $0 | $0.00 | $0 |
| Other Income | $0 | $0.00 | $0 |
| Gross Annual Income | $0 | $0.00 | $0 |
| Vacancy Expense | $0 | $0.00 | $0 |
| Effective Gross Income | $12,741,068 | $29.80 | $0 |
| Expenses | $5,536,805 | $12.95 | $0 |
| Reserves | $0 | $0.00 | $0 |
| Net Operating Income | $7,204,263 | $16.85 | $0 |
| Debt Service | | | |
| Cash Flow | $7,204,263 | $16.85 | $0 |

| Indicators | |
|---|---|
| Effective Gross Income Multiplier | 10.05 |
| Gross Income Multiplier | 0.00 |
| Overall Rate | 5.63% |
| Equity Dividend Rate | 0% |
| Operating Expense Ratio | 43.46% |

## SALE TRANSACTION INFORMATION

Verified On: **9/19/2014**

Verified By: **Sale and property information verified through professional source and HCAD property information/ CJS**

Comments: **Income and expense data reflects Year 1 proforma.**

7/31/2017 11:26:37 AM

**Southwest Medical Plaza 4**

**Office Building**

**Sale Comparable #3**

| PROPERTY INFORMATION | |
|---|---|



### PROPERTY TYPE

| | |
|---|---|
| Property #: | **456606** |
| Property Type: | **Office Building** |
| Property Use: | **Medical/ Dental Office** |

### PROPERTY LOCATION

| | |
|---|---|
| Address: | **7789 Southwest Freeway** |
| City, St., Zip: | **Houston, TX 77074** |
| County: | **Harris** |
| Tax Accounts: | **132.361.001.0001** |

### PROPERTY SIZE

| | Gross | Net |
|---|---|---|
| Land Area: | **3.57 Acres (155,509 SF)** | **3.57 Acres (155,509 SF)** |
| Building Area: | **131,806 SF** | **131,806 SF** |
| Land/ Building Ratio: | **1.18 : 1** | |

### BUILDING ATTRIBUTES

Year of Construction:  **2007**

### PROPERTY ATTRIBUTES

#### Site

| | |
|---|---|
| Floodplain: | **X 48201C0835L 06/18/2007** |
| Terrain: | **Basically level** |
| Utilities: | **All reportedly available** |

#### Improvements

| | |
|---|---|
| Construction Details: | **Masonry** |
| Parking Facilities: | **200 surface with 500 covered space available** |
| Tenant Mix: | **Multi-tenant** |

7/31/2017 11:26:37 AM

**Southwest Medical Plaza 4**

| SALE INFORMATION | | |
|---|---|---|
| *Consideration:* | $31,644,152 | **Grantor: Memorial Hermann Health System** |
| *Adjustments:* | $0 | **Grantee: HCP Ventures V LLC** |
| *Cash Equivalent Price:* | $31,644,152 | **Date of Sale: 06-29-15** |
| *1st Mortgage:* | $0 | **Sale Status: Closed** |
| *2nd Mortgage:* | $0 | **Record Info: 06042** |
| *Equity:* | $0 | |
| *Sales Price ($/SF):* | $240.08 | |

| SALE ATTRIBUTES |
|---|

*Occupancy At Sale:* **89%**

| SALE TRANSACTION INFORMATION |
|---|

*Verified On:* **12/12/2016**
*Verified By:* **Professional Sources**
*Comments:* **This is one of 11 medical office buildings totaling over 1.2 million square feet located in Houston and The Woodlands, TX which sold for a total price of $225 million, under the condition of a triple-net master leases with 10-year initial lease terms and four 5-year renewal terms. The reported cap rate was 5.7%.**

7/31/2017 11:26:37 AM

**1433 West Loop South**

**Office Building**

**Sale Comparable #4**

## PROPERTY INFORMATION



### PROPERTY TYPE

| | |
|---|---|
| Property #: | **31389** |
| Property Type: | **Office Building** |
| Property Use: | **Mid Rise (4-8 Stories)** |

### PROPERTY LOCATION

| | |
|---|---|
| Address: | **1433 West Loop South Freeway** |
| City, St., Zip: | **Houston, TX 77027** |
| County: | **Harris** |
| Tax Accounts: | **0985730000006** |
| Legal Description: | **TR 1A BLK 3 POST OAK PARK SEC 1** |

### PROPERTY SIZE

| | Gross | Net |
|---|---|---|
| Land Area: | **1.48 Acres (64,475 SF)** | **1.48 Acres (64,475 SF)** |
| Building Area: | **142,074 SF** | **138,000 SF** |
| Land/ Building Ratio: | **0.45 : 1** | |
| # of Stories: | **6** | |
| # of Buildings: | **1** | |

### BUILDING ATTRIBUTES

| | |
|---|---|
| Year of Construction: | **1972** |
| Quality: | **Good** |
| Condition: | **Good** |
| Year of Latest Remodel: | **1996** |

## PROPERTY ATTRIBUTES

### Site

| | |
|---|---|
| Easements: | **None detrimental known** |
| Floodplain: | **X 48201C0665M 06/09/2014** |
| Road Frontage: | **370' on West Loop S** |
| Terrain: | **Level** |
| Utilities: | **All to site** |

### Improvements

| | |
|---|---|
| Construction Details: | **Steel frame, concrete exterior, flat roof** |
| Parking Facilities: | **450 Total Spaces, ParkingRatio: 0.31** |
| Tenant Mix: | **Multi** |
| Elevators: | **3 passenger, 1 freight** |

### Amenities

| | |
|---|---|
| Other Amenities: | **Energy efficient, the building features a compurterized building automation system that controls air conditioning, heating, security and life safety interior lighting.** |

### PROPERTY COMMENTS

| | |
|---|---|
| General: | **Will not give out info other than that they are at 100% occupancy and will be for 13 years.** |

7/31/2017 11:26:37 AM

**1433 West Loop South**

| SALE INFORMATION | |
|---|---|
| Consideration: $36,166,108 | Grantor: UrbanAmerica, L.P. |
| Adjustments: $0 | Grantee: Princeton Holdings LLC |
| Cash Equivalent Price: $36,166,108 | Date of Sale: 12-16-14 |
| 1st Mortgage: $0 | Sale Status: Closed |
| 2nd Mortgage: $0 | Record Info: 2015000616 |
| Equity: $0 | |
| Sales Price ($/SF): $262.07 | |

| SALE ATTRIBUTES |
|---|
| Occupancy At Sale: **100%** |

| SALE TRANSACTION INFORMATION |
|---|
| Verified On: **11/4/2016** |
| Verified By: **Professional Source/CJS** |
| Comments: |

# LAND
# SALES

# Land Sale Profile

## Location & Property Identification

| | |
|---|---|
| Property Name: | Former Micro Center |
| Sub-Property Type: | Commercial |
| Address: | 1717 West Loop South |
| City/State/Zip: | Houston, TX 77027 |
| County: | Harris |
| Market Orientation: | Urban |
| Property Location: | East side of West Loop South, North of San Felipe |
| IRR Event ID: | 1219839 |



## Sale Information

| | |
|---|---|
| Sale Price: | $43,135,920 |
| Eff. R.E. Sale Price: | $43,135,920 |
| Sale Date: | 03/19/2014 |
| Sale Status: | Closed |
| $/Acre(Gross): | $10,454,405 |
| $/Land SF(Gross): | $240.00 |
| $/Acre(Usable): | $10,454,405 |
| $/Land SF(Usable): | $240.00 |
| Grantor/Seller: | Micro Center Sales Corp |
| Grantee/Buyer: | Amegy Bank NA |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller |
| Document Type: | Deed |
| Recording No.: | 20140111081 |
| Verified By: | Joseph S. Wahlquist |
| Verification Date: | 9/18/15 |
| Verification Source: | Kristen McDade - Third Party Broker |
| Verification Type: | Confirmed-Other |

## Sale Analysis

| | |
|---|---|
| Current Use: | Micro Center |
| Proposed Use Change: | Yes |
| Proposed Use Desc.: | Amegy Bank Office Building |

## Improvement and Site Data

| | |
|---|---|
| Legal/Tax/Parcel ID: | 114-796-001-0003 |
| Acres(Usable/Gross): | 4.13/4.13 |
| Land-SF(Usable/Gross): | 179,732/179,732 |
| Usable/Gross Ratio: | 1.00 |
| Corner Lot: | No |
| Frontage Desc.: | Frontage along the east side o |
| Traffic Flow: | High |
| Utilities: | Electricity, Water Public, Sewer, Gas, Telephone, CableTV |
| Source of Land Info.: | Public Records |

## Comments

The property was improved with a 39,564 square foot Micro Center building at the time of sale. The buyer (Amegy Bank) plans to demolish the existing improvements and construct a 350,000 square foot office building which will serve as its new corporate office.

# Land Sale Profile

## Location & Property Identification

| | |
|---|---|
| Property Name: | Hidalgo Street |
| Sub-Property Type: | Residential, Multifamily |
| Address: | Hidalgo Street |
| City/State/Zip: | Houston, TX 77056 |
| County: | Harris |
| Market Orientation: | Urban |
| IRR Event ID: | 1219859 |



## Sale Information

| | |
|---|---|
| Sale Price: | $30,265,560 |
| Eff. R.E. Sale Price: | $30,265,560 |
| Sale Date: | 02/26/2015 |
| Sale Status: | Closed |
| $/Acre(Gross): | $7,840,819 |
| $/Land SF(Gross): | $180.00 |
| $/Acre(Usable): | $7,840,819 |
| $/Land SF(Usable): | $180.00 |
| Grantor/Seller: | LOPO, LLC |
| Grantee/Buyer: | CRP/Maple Hidalgo Owner, LP |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller |
| Document Type: | Deed |
| Recording No.: | 20150079014 |
| Verified By: | Joseph S. Wahlquist |
| Verification Date: | 9/18/15 |
| Verification Type: | Confirmed-Confidential |

| | |
|---|---|
| Corner Lot: | No |
| Zoning Code: | N/A |
| Easements: | No |
| Environmental Issues: | No |
| Flood Plain: | No |
| Flood Zone Designation: | X |
| Comm. Panel No.: | 48201C0855L |
| Date: | 06/18/2007 |
| Utilities: | Electricity, Water Public, Sewer, Gas, Telephone, CableTV |
| Source of Land Info.: | Broker |

## Comments

The site includes 3.86 acres along the south side of Hidalgo Street, approximately 350 feet east of Sage Road. The site is across the street from The Galleria. The site was vacant and ready for development at the time of sale. The property was previously improved with a two-story parking garage.

## Improvement and Site Data

| | |
|---|---|
| Legal/Tax/Parcel ID: | 134-569-001-0001 |
| Acres(Usable/Gross): | 3.86/3.86 |
| Land-SF(Usable/Gross): | 168,141/168,141 |
| Usable/Gross Ratio: | 1.00 |
| Shape: | Irregular |
| Topography: | Level |
| Vegetation: | Minimal |

# Land Sale Profile

## Location & Property Identification

| | |
|---|---|
| Property Name: | Garrettson Lane Condo Site |
| Sub-Property Type: | Commercial |
| Address: | 1515-1525 Garrettson |
| City/State/Zip: | Houston, TX 77056 |
| County: | Harris |
| Submarket: | Houston Primary |
| Market Orientation: | Urban |
| Property Location: | E side of Garrettson Lane approximately 70 ft S of Post Oak Blvd |
| IRR Event ID: | 1044331 |



## Sale Information

| | |
|---|---|
| Sale Price: | $15,500,000 |
| Eff. R.E. Sale Price: | $15,700,000 |
| Sale Date: | 09/03/2014 |
| Sale Status: | Closed |
| $/Acre(Gross): | $8,051,282 |
| $/Land SF(Gross): | $184.83 |
| Grantor/Seller: | Winhall Council of Co-Owners |
| Grantee/Buyer: | JLB Realty, LLC |
| Assets Sold: | Real estate only |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller |
| Document Type: | Deed |
| Recording No.: | 20140399666 |
| Verified By: | Michael L. Jones |
| Verification Source: | Scott Miller with Cushman and Wakefield (713) 963-2835 |
| Verification Type: | Confirmed-Seller Broker |

## Improvement and Site Data

| | |
|---|---|
| MSA: | Houston - Sugar Land - Baytown |

| | |
|---|---|
| Legal/Tax/Parcel ID: | Winhall Condo 2nd Amendment 115-009-XXX-XXXX |
| Acres(Gross): | 1.95 |
| Land-SF(Gross): | 84,942 |
| Shape: | Rectangular |
| Topography: | Level |
| Corner Lot: | No |
| Frontage Desc.: | 285 ft on Garrettson Ln |
| AccessibilityRating: | Average |
| Visibility Rating: | Average |
| Flood Plain: | No |
| Flood Zone Designation: | X |
| Comm. Panel No.: | 48201C0665M |
| Date: | 06/09/2014 |
| Utilities Desc.: | All available |
| Source of Land Info.: | Broker |

## Comments

This contract has been verified through multiple parties related to the transaction that indicate the contract price is between $180 and $190 per square foot. The initial contract was negotiated in September 2013 and was waiting on 75% approval from the condo owners. The site is currently improved with a condominium development from the 60's, which will cost approximately $200,000 to demolish. The site is expected to be developed into a high rise apartment complex.

# Land Sale Profile

## Location & Property Identification

| | |
|---|---|
| Property Name: | 1.8456 Acres |
| Sub-Property Type: | Residential, Multifamily |
| Address: | Westcreek Ln. |
| City/State/Zip: | Houston, TX 77027 |
| County: | Harris |
| Submarket: | Houston Primary |
| Market Orientation: | Urban |
| Property Location: | SEC of Westcreek Lane and San Felipe Drive |
| IRR Event ID: | 1254498 |



## Sale Information

| | |
|---|---|
| Sale Price: | $15,274,924 |
| Eff. R.E. Sale Price: | $15,274,924 |
| Sale Date: | 08/06/2014 |
| Sale Status: | Closed |
| $/Acre(Gross): | $8,276,400 |
| $/Land SF(Gross): | $190.00 |
| Grantor/Seller: | Westcreek HTX Real Estate Partners - G, L.P. |
| Grantee/Buyer: | Westcreek VP, LP |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller - buyer obtained financing |
| Document Type: | Warranty Deed |
| Recording No.: | 20140350165 |
| Verification Type: | Confirmed-Confidential |

## Sale Analysis

| | |
|---|---|
| Current Use: | Vacant Land |
| Proposed Use Change: | Yes |
| Proposed Use Desc.: | High-rise condos |

## Improvement and Site Data

| | |
|---|---|
| Legal/Tax/Parcel ID: | 134-929-002-0006 |
| Acres(Gross): | 1.85 |
| Land-SF(Gross): | 80,394 |
| Shape: | Rectangular |

| | |
|---|---|
| Topography: | Level |
| Vegetation: | Minimal |
| Corner Lot: | Yes |
| Frontage Feet: | 253 |
| Frontage Desc.: | Westcreek Lane |
| Frontage Type: | 2 way, 1 lane each way |
| Traffic Control at Entry: | None |
| Traffic Flow: | Moderate |
| AccessibilityRating: | Average |
| Visibility Rating: | Above average |
| Zoning Code: | N/A |
| Easements: | No |
| Environmental Issues: | No |
| Flood Plain: | No |
| Flood Zone Designation: | X |
| Comm. Panel No.: | 48201C0855L |
| Date: | 06/18/2007 |
| Utilities: | Electricity, Water Public, Sewer |
| Source of Land Info.: | Owner |

## Comments

Within the deed for the purchase of this land, there is a restrictive covenant. It states: if an improvement is to exceed 5,000 square feet, the improvement cannot be a hotel or motel, whether limited or full-service, or any other type of establishment which provides temporary lodging to the public. The site is being developed with a 33-story high-rise condominium tower called Arabella. It

# SUBJECT
# INFO

Print Details

HARRIS COUNTY APPRAISAL DISTRICT
REAL PROPERTY ACCOUNT INFORMATION
**0451400060244**

Tax Year: 2017

🖶 **Print**

| Owner and Property Information | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Owner Name & Mailing Address: | **MOKARAM-LATIF W LOOP LTD**<br>**% ALI MOKARAM**<br>**5445 ALMEDA RD STE 500**<br>**HOUSTON TX 77004-7450** | | | | | Legal Description:<br><br>Property Address: | **TR 30D**<br>**ABST 836 W WHITE**<br>**2500 W LOOP S**<br>**HOUSTON TX 77027** | | |
| State Class Code | Land Use Code | | Building Class | Total Units | Land Area | Building Area | Net Rentable Area | Neighborhood | Map Facet | Key Map® |
| F1 -- Real, Commercial | 8000 -- Land Neighborhood General Assignment | | E | 0 | 70,445 SF | 157,880 | 0 | 5906.01 | 5156B | 491V |

**Value Status Information**

| Value Status | Notice Date | Hearing Status | Shared CAD |
|---|---|---|---|
| Noticed | 3/31/2017 | Informal : 8/3/2017 10:30:00 AM<br>Formal : 8/16/2017 10:30:00 AM | No |

**Exemptions and Jurisdictions**

| Exemption Type | Districts | Jurisdictions | Exemption Value | ARB Status | 2016 Rate | 2017 Rate |
|---|---|---|---|---|---|---|
| **None** | 001 | HOUSTON ISD | | Not Certified | 1.206700 | |
| | 040 | HARRIS COUNTY | | Not Certified | 0.416560 | |
| | 041 | HARRIS CO FLOOD CNTRL | | Not Certified | 0.028290 | |
| | 042 | PORT OF HOUSTON AUTHY | | Not Certified | 0.013340 | |
| | 043 | HARRIS CO HOSP DIST | | Not Certified | 0.171790 | |
| | 044 | HARRIS CO EDUC DEPT | | Not Certified | 0.005200 | |
| | 048 | HOU COMMUNITY COLLEGE | | Not Certified | 0.100263 | |
| | 061 | CITY OF HOUSTON | | Not Certified | 0.586420 | |
| | 264 | HC ID 1 | | Not Certified | 0.143450 | |
| | 597 | UPTOWN TIRZ (061) | | Not Certified | | |
| | 978 | UPTOWN TIRZ (001) | | Not Certified | | |

Texas law prohibits us from displaying residential photographs, sketches, floor plans, or information indicating the age of a property owner on our website. You can inspect this information or get a copy at **HCAD's information center at 13013 NW Freeway**.

**Valuations**

| | Value as of January 1, 2016 | | | Value as of January 1, 2017 | |
|---|---|---|---|---|---|
| | Market | Appraised | | Market | Appraised |
| Land | 10,566,750 | | Land | 10,566,750 | |
| Improvement | 584,851 | | Improvement | 2,753,663 | |
| Total | 11,151,601 | 11,151,601 | Total | 13,320,413 | 13,320,413 |

7/31/2017                                                     Print Details

**Land**

**Market Value Land**

| Line | Description | Site Code | Unit Type | Units | Size Factor | Site Factor | Appr O/R Factor | Appr O/R Reason | Total Adj | Unit Price | Adj Unit Price | Value |
|------|-------------|-----------|-----------|-------|-------------|-------------|-----------------|-----------------|-----------|------------|----------------|-------|
| 1 | 8000 --- Land Neighborhood General Assignment | 4354 | SF | 70,445 | 1.00 | 1.00 | 1.00 | Corner or Alley | 1.00 | 150.00 | 150.00 | 10,566,750.00 |

**Building**

| Building | Year Built | Type | Style | Quality | Impr Sq Ft | Building Details |
|----------|-----------|------|-------|---------|-----------|------------------|
| 1 | 1976 | Office Bldgs. Hi-Rise (5+ Stories) | Office Building | Average | 80,378 | Displayed |
| 2 | 1976 | Parking Garage | Parking Structure | Low | 77,502 | **View** |

Building Details (1)

| Building Data | |
|---------------|--|
| Element | Detail |
| Cooling Type | Central / Forced |
| Construction Type | Fire Resistant Steel |
| Functional Utility | Fair |
| Heating Type | Hot Air |
| Partition Type | Normal |
| Physical Condition | Fair |
| Plumbing Type | Adequate |
| Sprinkler Type | None |
| Exterior Wall | Glass |
| Economic Obsolescence | Poor |
| Element | Units |
| Wall Height | 16 |
| Wall Height | 13 |
| Wall Height | 12 |
| Interior Finish Percent | 100 |
| Interior Finish Percent | 0 |
| Elev: Elect / Pass | 4 |

| Building Areas | |
|----------------|--|
| Description | Area |
| BASE AREA PRI | 80,378 |

**Extra Features**

| Line | Description | Quality | Condition | Units | Year Bulit |
|------|-------------|---------|-----------|-------|-----------|
| 1 | Penthouse, Mechanical Low Cost | Good | Average | 1,746.00 | 1976 |
| 2 | Basement,Parking Non Fireproofed | Good | Average | 25,834.00 | 1976 |

**CBRE**
CB RICHARD ELLIS

2800 Post Oak Blvd.
Suite 2300
Houston, TX 77056

713.577.1600 Tel
713.577.1677 Fax

February 24, 2016

Ali Choudri
President
Jetall Companies
2500 West Loop South
Houston, Texas 77056

**Re: Broker estimated full service gross market lease rate for 2500 West Loop South**

Dear Ali:

Based on the below comparables in the Galleria/Uptown and Post Oak submarkets of similar office properties relating to access, visibility, age, and other factors, we conclude that the 2500 West Loop South building's annual market full service lease rate is in the $30 - $32/sf range.

| Building | Avg. Annual (FSG) rate |
|---|---|
| 2100 West Loop South | $31.00/sf |
| 1700 West Loop South | $31.00/sf |
| 1455 West Loop South | $29.00/sf |
| 1717 St James Place | $31.00/sf |
| 5005 Riverway | $32.00/sf |

2500 West Loop South has excellent corner access and prime visibility and is an iconic fixture in the Galleria. It has maintained an historic occupancy of above 90%.

Sincerely,
CBRE

Dave Hanusa
Senior Vice President

<span style="color:red">**Exhibit A**</span>

**2500 West Loop South Rent Roll 1/13/16**

| Suite # | Tenant | Size (SF) | Lease Commence | Lease Expire | Monthly Rent | Rent Per SF | Month Exp. Income Rec. | Invoice Amt Total Monthly |
|---|---|---|---|---|---|---|---|---|
| 100 | Beal Service Corporation | 4,297 | 4/1/2008 | 3/31/2018 | $ 10,000.00 | $ 27.93 | $ 543.27 | $ 10,543.27 |
| 120 | Posh Group / WECR | 970 | 5/31/2015 | 9/30/2017 | $ 2,020.83 | $ 25.00 | | $ 2,020.83 |
| 130 | Staffmark Investments | 2,354 | 10/1/2004 | 11/30/2018 | $ 5,100.33 | $ 26.00 | $ 551.48 | $ 5,651.81 |
| 155 | Figaro | 2,376 | 2/1/2015 | 12/31/2020 | $ 5,000.00 | $ 25.25 | $ 237.60 | $ 5,237.60 |
| 150 | Dr. J Sheneq | 3,302 | 1/1/2014 | 9/30/2018 | $ 6,604.00 | $ 24.00 | $ 330.20 | $ 6,934.20 |
| 200 | Socure Mortgage Co | 6,788 | 1/1/2005 | | $ 11,313.00 | $ 20.00 | $ - | $ 11,313.00 |
| | Vacant | 450 | | | $ - | $ - | $ - | $ - |
| 210 | Texas General Insurance | 1,150 | 5/1/2012 | 4/30/2018 | $ 1,750.00 | $ 18.26 | $ - | $ 1,750.00 |
| 230 | SETX Conc | 1,499 | 8/1/2005 | 7/31/2018 | $ 2,800.00 | $ 22.41 | $ 189.52 | $ 2,989.52 |
| 255 | Jetall Companies | 3,544 | 2/1/2006 | | $ 5,906.00 | $ 20.00 | $ 480.00 | $ 6,386.00 |
| | Jetall Sign | | | | $ 150.00 | | $ - | $ 150.00 |
| | Jetall Extra Space | 300 | 4/1/2006 | | $ 500.00 | $ 20.00 | $ - | $ 500.00 |
| 271 | MRA Architect | 509 | 9/1/2007 | 8/31/2017 | $ 846.00 | $ 19.94 | $ 64.35 | $ 910.35 |
| 215 | Vacant | 450 | | | $ - | $ - | $ - | $ - |
| 300 | Sub-lease zco | 1,590 | 5/1/2010 | | $ 2,667.00 | $ 20.13 | $ 220.00 | $ 2,887.00 |
| 305 | Ecommerce Sourcing Sol | 1,469 | 8/11/2024 | 7/31/2017 | $ 2,450.00 | $ 20.01 | $ 146.90 | $ 2,596.90 |
| 310 | Johnson ATALA | 2,832 | 1/1/2007 | 12/31/2016 | $ 4,366.00 | $ 18.50 | $ 356.23 | $ 4,722.23 |
| 350 | Vacant | 2,280 | | | $ - | $ - | $ - | $ - |
| 320 | FX Funding | 900 | 8/1/2014 | 7/31/2007 | $ 1,500.00 | $ 20.00 | $ 113.00 | $ 1,613.00 |
| 318 | Landmark Architects / Texas Fueling | 900 | 1/1/2014 | 3/31/2015 | $ 1,500.00 | $ 20.00 | $ 113.00 | $ 1,613.00 |
| 340 | Texas Kidney | 2,486 | 1/1/2008 | 12/31/2018 | $ 4,088.00 | $ 19.73 | $ 310.45 | $ 4,398.45 |
| 360 | Permetica | 3,100 | 11/1/2013 | 10/31/2018 | $ 5,800.00 | $ 22.45 | $ 392.00 | $ 6,192.00 |
| 400 | Trensetter Realty | 1,530 | 8/1/2011 | 2/26/2019 | $ 2,805.00 | $ 22.00 | $ - | $ 2,805.00 |
| 450 | Mokaram & Associates | 3,482 | 2/1/2012 | 1/31/2017 | $ 6,093.00 | $ 21.00 | $ 437.98 | $ 6,530.98 |
| 480 | Net Sync | 10,381 | 4/1/2015 | 3/31/2018 | $ 17,358.33 | $ 20.07 | $ - | $ 17,358.33 |
| 500 | Ashley Patten | 6,628 | 9/1/2003 | 7/31/2020 | $ 12,151.33 | $ 22.00 | $ 837.90 | $ 12,989.23 |
| 515 | North American Const | 1,040 | 5/1/2010 | 4/30/2018 | $ 1,733.33 | $ 20.00 | $ 129.87 | $ 1,863.20 |
| 518 | Sheena Law Firm | 3,071 | 11/1/2012 | 10/31/2017 | $ 5,118.33 | $ 20.00 | $ 388.27 | $ 5,506.60 |
| | Sheena Law Firm - Sign | | | 10/31/2017 | $ 3,000.00 | | $ - | $ 3,000.00 |
| 519 | Net Sync incl in 480 | 450 | 1/1/2016 | 12/31/2018 | | $ - | $ - | $ - |
| 520 | Ubuldt Houston-Galleria | 1,533 | 9/15/2003 | 4/30/2018 | $ 2,657.20 | $ 20.80 | $ 191.44 | $ 2,848.64 |
| 522 | SLS Properties | 648 | 8/1/2013 | | $ 1,080.00 | $ 20.00 | $ 80.88 | $ 1,160.88 |
| 530 | CIVE | 1,850 | 11/11/2013 | | $ 3,083.33 | $ 20.00 | $ 233.00 | $ 3,316.33 |
| Bsmt | | 4,471 | | | $ - | $ - | $ - | $ - |
| **Leased** | | 78,630 | | | | $ - | $ - | $ - |
| | % Occupied | 90% | | | | $ - | $ - | $ - |
| | % Vacant | 10% | | | | $ - | $ - | $ - |
| | | | | | $ 129,441.01 | | $ 6,347.34 | $ 135,788.35 |

8:55 AM
08/02/17
Accrual Basis

**2016 - Mokaram Latif West Loop, LTD**
**Balance Sheet**
As of January 13, 2016

|  | Jan 13, 16 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Capital One Operating | 101,583.46 |
| Capital One Savings | 1,102,469.76 |
| **Total Checking/Savings** | 1,204,053.22 |
| **Accounts Receivable** | |
| Accounts Receivable | 228,711.58 |
| **Total Accounts Receivable** | 228,711.58 |
| **Other Current Assets** | |
| Other Deposits | 182,439.46 |
| Undeposited Funds | 13,140.17 |
| **Total Other Current Assets** | 195,579.63 |
| **Total Current Assets** | 1,628,344.43 |
| **Fixed Assets** | |
| 2500 West Loop | 7,051,570.00 |
| Accumulated Depreciation | -1,906,278.00 |
| Cap Improvement - TI Expense | 23,921.67 |
| Capital Imp - Common Area | 46,243.12 |
| Capital Improvements | 474,807.00 |
| **Total Fixed Assets** | 5,690,263.79 |
| **TOTAL ASSETS** | 7,318,608.22 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Tenant Security Deposits Held | 85,118.33 |
| **Total Other Current Liabilities** | 85,118.33 |
| **Total Current Liabilities** | 85,118.33 |
| **Long Term Liabilities** | |
| 2500 West Loop Notes Payable | 4,609,232.75 |
| **Total Long Term Liabilities** | 4,609,232.75 |
| **Total Liabilities** | 4,694,351.08 |
| **Equity** | |
| Partners' Capital | 2,359,040.00 |

Page 1

8:55 AM

08/02/17
Accrual Basis

**2016 - Mokaram Latif West Loop, LTD**
**Balance Sheet**
As of January 13, 2016

|  | Jan 13, 16 |
|---|---|
| Retained Earnings | 147,020.67 |
| Net Income | 118,196.47 |
| **Total Equity** | 2,624,257.14 |
| **TOTAL LIABILITIES & EQUITY** | 7,318,608.22 |

Page 2

2500 WEST LOOP SOUTH                    PAGE AA

### 2016 - Mokaram Latif West Loop, LTD
### Profit & Loss
January through December 2015

| | Jan - Dec 15 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Base Rent | 1,399,748.38 |
| Electricity Reimbursement | 61,963.95 |
| Interest Income - Savings Accou | 1,903.53 |
| Sign Income | 50,239.84 |
| Uncategorized Income | 150.00 |
| **Total Income** | 1,514,005.70 |
| **Gross Profit** | 1,514,005.70 |
| **Expense** | |
| Advertising and Promotions | 1,890.30 |
| Bank Service Charges | 50.00 |
| Contract Labor | 68,635.52 |
| Contribution | 200.00 |
| Depreciation Expense | 211,157.00 |
| Elevators | 12,627.82 |
| Insurance Expense | 26,652.88 |
| Interest Expense | 229,608.00 |
| Janitorial Expense | 75,043.99 |
| Landscaping and Groundskeeping | 11,198.18 |
| Legal Fees | 3,499.15 |
| Life and Safety | 5,817.74 |
| Maintenance Supplies | |
| Lighting | 85.25 |
| Maintenance Supplies - Other | 14,061.33 |
| **Total Maintenance Supplies** | 14,146.58 |
| Office Supplies | 605.24 |
| Permits | 546.73 |
| Pest Control | 1,539.32 |
| Professional Fees | 36,395.91 |
| Property Management Fees | 60,000.00 |
| Property Tax | 220,379.36 |
| Repairs and Maintenance | |
| Building Porter | 42,480.25 |
| Materials | 7,463.54 |
| Repairs and Maintenance - Other | 64,393.12 |
| **Total Repairs and Maintenance** | 114,336.91 |
| Telephone Expense | 3,986.18 |
| Utilities | |
| Electricity | 124,832.94 |
| Water | 25,967.70 |

Page 1

9:00 AM
08/02/17
Cash Basis

**2016 - Mokaram Latif West Loop, LTD**
**Profit & Loss**
January through December 2015

| | Jan - Dec 15 |
|---|---|
| Utilities - Other | 3,106.50 |
| **Total Utilities** | 153,907.14 |
| **Total Expense** | 1,252,323.95 |
| Net Ordinary Income | 261,681.75 |
| Other Income/Expense | |
| Other Expense | |
| Ask My Accountant | 700.00 |
| **Total Other Expense** | 700.00 |
| Net Other Income | -700.00 |
| Net Income | **260,981.75** |

Page 2

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

December 23, 1974
Job. No. 7184-013
Revised: Dec. 31, 1974

FIELD NOTES
COLDWELL BANKER BUILDING
WEST LOOP AT WESTHEIMER

Being 70,213 square feet of land out of and a part of the William White Survey, Abstract 836, Houston, Harris County, Texas and being more fully described by metes and bounds as follows:

BEGINNING at an iron rod for the Northeast corner of the herein described 70,213 square foot tract, said iron rod also being in the West R.O.W. line of the West Loop (I-610) Freeway, said iron rod also being the Southeast corner of a 112,547 square foot tract known as the 2400 West Loop Building,

THENCE South 10° 55' 17" West along the west R.O.W. line of said West Loop Freeway, 73.00 feet to an iron rod for a point for a corner at the beginning of a curve,

THENCE following a curve to the left along the west R.O.W. line of said West Loop Freeway, 145.05 feet to a point for a corner, said curve having a central angle of 01° 24' 27" and a Radius of 5,904.58 feet, said curve also having a long chord of 145.04 feet and bearing South 10° 13' 04" West,

THENCE following a curve to the right at the intersection of Westheimer Road (F. M. 1093) and the West Loop Freeway, 45.69 feet to a point for a corner at the end of said curve, said curve having a central angle of 74° 48' and a Radius of 35 feet, said curve also having a long chord of 42.52 feet and bearing South 46° 54' 50" West, said point also being in the north R.O.W. line of said Westheimer Road,

THENCE South 84° 18' 50" West along said north R.O.W. line of Westheimer Road, 189.55 feet to a point for a corner,

THENCE South 81° 47' 02" West along said north R.O.W. line of Westheimer Road, 45.24 feet to the Southwest corner of the herein described 70,213 square foot tract;

THENCE North 02° 09' 18" West, 255.04 feet to a point for the Northwest corner of the herein described 70,213 square foot tract, said corner also being the Southwest corner of said 112,547 square foot tract;

THENCE North 87° 28' 12" East, 313.90 feet to the POINT OF BEGINNING and containing 70,213 square feet of land.

RECORDER'S MEMORANDUM:
Some Or All Signature On This Page
Are Not Original Signature

THE MURRAY-McCORMICK ENVIRONMENTAL GROUP

Peter W. Blom, P. E.
Texas Registration Number 35637

2500

# PROFESSIONAL QUALIFICATIONS

## Jack W. Bass II, MAI

Jack W. Bass II, MAI
8606 Royal Cape Ct
Houston, TX 77095

T 713.502.5690
jack@bassval.com

### Experience

Mr. Bass has been involved in the appraisal and consultation of real estate and business properties for over 35 years. Mr. Bass has national appraisal experience with the appraisal of vacant land, retail, office, industrial, apartments, residential and hospitality properties. Mr. Bass has developed a specialty in the valuation of all types of Gulf Coast, waterfront properties including heavy industrial, port related, mixed use, condominiums and vacant land. Mr. Bass has extensive, national experience with all types of healthcare properties including acute care hospitals, specialty hospitals, LTACH's, nursing homes, independent living facilities, assisted living facilities and medical office buildings. Mr. Bass is HUD certified for the Senior Housing LEAN and MAP programs and is on the SBA Going Concern Registry.

### Professional Activities & Affiliations

Appraisal Institute, Member (MAI)

### Licenses

Alabama, Certified General Real Estate Appraiser, G00657, Expires September 2017
Arizona, Certified General Real Estate Appraiser, 31948, Expires April 2017
Arkansas, State Certified General Appraiser, CG 2524, Expires November 2018
Florida, Certified General Appraiser, RZ3802, Expires November 2018
Georgia, Certified General Real Property Appraiser, 367926, Expires November 2017
Louisiana, Certified General Appraiser License, G1021, Expires December 2017
Michigan, Certified General Appraiser License, 1989998, Expires July 2018
Mississippi, State Certified General Real Estate Appraiser, GA-782, Expires November 2017
Missouri, State Certified General Real Estate Appraiser, 2015044852, Expires June 2018
New Mexico, General Certified Appraiser, 0330-G, Expires April 2017
North Carolina, Certified General Real Estate Appraiser, A8026, Expires June 2018
Oklahoma, Certified General Real Estate Appraiser, 13167CGA, Expires December 2018
South Carolina, Certified General Appraiser, 7313, Expires June 2018
Tennessee, Certified General Real Estate Appraiser, 4378, Expires August 2018
Texas, Certified General Real Estate Appraiser, TX-1326152-G, Expires April 2018

### Education

BS – Louisiana Tech University
Major – Marketing/Management

Successfully completed numerous real estate valuation courses and seminars supported by the Appraisal Institute, accredited universities and various others. Currently certified by the Appraisal Institute's voluntary program of continuing education for its designated members.

### Qualified Before Courts & Administrative Bodies

County Courts: Harris County, Texas; Denton County, Texas; Suffolk County, Massachusetts, and Cameron Parish, Louisiana
Federal Courts: Houston, Texas; Galveston, Texas; Corpus Christi, Texas and Boston, Massachusetts

jack@bassval.com  -  713.502.5690

## Jack W. Bass II, MAI

10/27/2023 4:05 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 81085874
By: Alan Robledo
Filed: 10/27/2023 4:05 PM

CAUSE NO. 2012-27197D

| | | |
|---|---|---|
| MOKARAM LATIF WEST LOOP, LTD., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| ALI CHOUDHRI and ANGEL VALLE, | § | |
| | § | HARRIS COUNTY, T E X A S |
| Defendants, | § | |
| | § | |
| vs. | § | |
| | § | |
| ALI MOKARAM, | § | |
| | § | |
| Intervenor. | § | 333rd JUDICIAL DISTRICT |

*Pg - 6*
*DC*
*8A*
*EJUDX*
*MCAAX*
*ATFEX*

## FINAL JUDGMENT UPON AAA ARBITRATION AWARD

Pursuant to Ali Mokaram's ("Mokaram") Second Amended Motion for Entry of Judgment, the court hereby enters this Final Judgment Upon AAA Arbitration Award (the "Judgment") in favor of Mokaram and Erika Nemeti, Executrix of the Estate of Edi I. Nemeti ("Nemeti"), and against Defendants Ali Choudhri ("Choudhri"), Dalio Holdings I, LLC ("Dalio I"), and Dalio Holdings II, LLC ("Dalio II"), jointly and severally (Choudhri, Dalio I and Dalio II may jointly be referred to herein as "Defendants"), as follows:

The claims and causes of action asserted by Mokaram and Nemeti arising out of and relating to the wrongful and fraudulent foreclosure of Texas REIT, LLC's property in July 2018 were submitted to arbitration in the proceeding styled Case No. 01-19-0002-7577; *Claimant Ali Mokaram vs. Respondents Dalio Holdings I, LLC, Dalio Holdings II, LLC, and Ali Choudhri vs. Texas REIT, LLC (Nominal Party),* before the American Arbitration Association (the "Arbitration"). The three-member panel in the Arbitration issued its Final Arbitration Award on July 27, 2021 (the "Award"), which is attached as Exhibit 1 to Mokaram's Second Amended Motion for Entry of Judgment.

4861-0174-6805.2

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

On December 15, 2021, the Court entered an Order (the "December 15 Order") that, among other things, granted Mokaram's Amended Motion to Confirm Arbitration Award, found the Award should be in all things confirmed and enforced according to its terms, and denied the Joint Application of Texas REIT, LLC, Ali Choudhri, Dalio Holdings I, LLC and Dalio Holdings II, LLC (the "Choudhri Parties") to Vacate the Award.

On January 4, 2022, the Choudhri Parties filed a notice of appeal with respect to the rulings that were the subject of the December 15 Order as it relates to confirmation of the Award and denial of their request to vacate the Award.

On December 6, 2022, the Fourteenth Court of Appeals issued its Memorandum Opinion and Judgment, affirming the December 15 Order as it relates to confirmation of the Award and denial of the Choudhri Parties' motion to vacate the Award. On February 14, 2023, the Fourteenth Court of Appeals denied the Choudhri Parties' Motion for Rehearing.

On February 17, 2023, this Court entered an Order Severing AAA Claims which severed into this "D" case all claims, causes of action, motions or requests for relief to confirm and/or vacate the Award, as further described and defined in such Order.

On June 9, 2023, the Choudhri Parties' filed their Petition for Review in the Supreme Court of Texas. On July 21, 2023, the Supreme Court of Texas denied the Choudhri Parties' Petition for Review without requesting a response.

On October 13, 2023, the Supreme Court of Texas denied the Choudhri Parties' Motion for Rehearing without requesting a response.

On October 16, 2023, the Fourteenth Court of Appeals issued its Mandate to the 333rd District Court regarding affirmation and observance of the Order, in which the court also ordered the Choudhri Parties to pay all costs of the appeal.

4861-0174-6805.2

The Court finds it is now ripe to render a final judgment upon the Award. As such, it is hereby

ORDERED, ADJUDGED, AND DECREED that Mokaram's Second Amended Motion for Entry of Judgment is granted based upon the findings of fact, conclusions of law, and mixed findings of fact and/or conclusions of law in the Award, which are incorporated herein by reference. It is further

ORDERED, ADJUDGED, AND DECREED that Plaintiff Ali Mokaram shall have and recover judgment against Defendants Ali Choudhri, Dalio Holdings I, LLC and Dalio Holdings II, LLC, jointly and severally, in the amount of $3,467,217.70, which is comprised of the following:

1. $1,386,460.71 for actual damages as found in the Award.

2. $603,000.00 for attorneys' fees in the Arbitration through final hearing, as found in the Award.

3. $15,000.00 for attorneys' fees in the Arbitration for post-hearing briefing, as found in the Award.

4. $405,461.90 for AAA administrative fees and expenses in the Arbitration, as found in the Award.

5. $250,000.00 for exemplary damages as found in the Award.

6. $60,000.00 for attorneys' fees because Defendants did not prevail on their application to vacate the Award in the trial court.

7. $125,000.00 for attorneys' fees because Defendants did not prevail on their appeal of this Court's confirmation of the Award and denial of Defendants' motion to vacate the Award to the Fourteenth Court of Appeals.

8. $100,000.00 for attorneys' fees because Defendants did not prevail on their Petition for Review filed with the Supreme Court of Texas.

9. $172,028.59 for pre-judgment (pre-Award) interest on actual damages from December 11, 2018, until May 5, 2021, as found in the Award.

10. $17,719.67 for pre-judgment (pre-Award) interest on actual damages from May 6, 2021, until entry of the Award (July 27, 2021) (83 days * $213.49 per diem), as found in the Award.

11. $332,546.83 for pre-judgment (post-Award) interest calculated at the rate of 5% compounded annually on the amount of $2,849,670.87 (all amounts in the Award except for post-Award attorneys' fees) from July 27, 2021, until October 30, 2023.

It is further

ORDERED, ADJUDGED, AND DECREED that Plaintiff Erika Nemeti, Executrix of the Estate of Edi I. Nemeti, Deceased, shall have and recover judgment against Defendants Ali Choudhri, Dalio Holdings I, LLC and Dalio Holdings II, LLC, jointly and severally, in the amount of $294,151.85, which is comprised of the following:

1. $231,076.78 for actual damages as found in the Award.

2. $28,671.34 for pre-judgment (pre-Award) interest on actual damages from December 11, 2018, until May 5, 2021, as found in the Award.

3. $3,664.45 for pre-judgment (pre-Award) interest on actual damages from May 6, 2021, until entry of the Award (July 27, 2021) (83 days * $44.15 per diem), as found in the Award.

4.  $30,739.28 for pre-judgment (post-Award) interest calculated at the rate of 5% compounded annually on the amount of $231,076.78 (actual damages) from July 27, 2021, until August 21, 2023.

It is further

ORDERED, ADJUDGED, AND DECREED that Plaintiff Ali Mokaram shall also have and recover judgment for pre-judgment (post-award) interest against Defendants Ali Choudhri, Dalio Holdings I, LLC and Dalio Holdings II, LLC, jointly and severally, at the per diem rate of $430.38 for each day after October 30, 2023, until this judgment is entered.  It is further

ORDERED, ADJUDGED, AND DECREED that Plaintiff Ali Mokaram shall also have and recover judgment for post-judgment interest against Defendants Ali Choudhri, Dalio Holdings I, LLC and Dalio Holdings II, LLC, jointly and severally, at the rate of 5% compounded annually on all amounts awarded to Mokaram in this judgment from the date this judgment is entered until such amounts are paid ($3,437,951.97 plus any additional per diem interest), including without limitation, for actual damages, exemplary damages, attorneys' fees, costs, expenses, AAA costs, pre-award interest and pre-judgment interest.  It is further

ORDERED, ADJUDGED, AND DECREED that Plaintiff Erika Nemeti, Executrix of the Estate of Edi I. Nemeti, Deceased, shall also have and recover judgment for pre-judgment (post-award) interest against Defendants Ali Choudhri, Dalio Holdings I, LLC and Dalio Holdings II, LLC, jointly and severally, at the per diem rate of $39.78 for each day after October 30, 2023, until this judgment is entered.  It is further

ORDERED, ADJUDGED, AND DECREED that Plaintiff Erika Nemeti, Executrix of the Estate of Edi I. Nemeti, Deceased,  shall also have and recover judgment for post-judgment interest against Defendants Ali Choudhri, Dalio Holdings I, LLC and Dalio Holdings II, LLC, jointly and

severally, at the rate of 5% compounded annually on all amounts awarded to Nemeti in this judgment from the date this judgment is entered until such amounts are paid ($291,446.64 plus any additional per diem interest), including without limitation, for actual damages, pre-award interest and pre-judgment interest. It is further

ORDERED, ADJUDGED, AND DECREED that Plaintiff Ali Mokaram shall also have and recover judgment for all costs of court, including all costs of the trial court and all costs on appeal, against Defendants Ali Choudhri, Dalio Holdings I, LLC and Dalio Holdings II, LLC, jointly and severally. It is further

ORDERED, ADJUDGED, AND DECREED that all other relief requested by any party in the Arbitration or this cause number and not granted herein is DENIED, and that this Judgment disposes of all claims, counterclaims, defenses, and requests for relief in the Arbitration and in this case, and is final and appealable. All writs and processes necessary to execute and collect on this Judgment shall issue.

SIGNED on this 7th day of Nov. , 2023.

_____
Honorable Randy Wilson, Presiding Judge

**Choudhri Exhibit 4**

**FILED**
Marilyn Burgess
District Clerk

MAR - 7 2025

Time: _10:54 A.M._
Harris County, Texas
By _Jessica Pannell_
Deputy

eCause No. 2012-27197-A

PII
TJNOX

| | | |
|---|---|---|
| MOKARAM-LATIF WEST LOOP, LTD. | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| vs. | § | |
| | § | |
| ALI CHOUDHRI | § | HARRIS COUNTY, TEXAS |
| *Defendant,* | § | |
| | § | 333rd JUDICIAL DISTRICT |

~~Cause No. 2012-27197-D~~

| | | |
|---|---|---|
| MOKARAM-LATIF WEST LOOP, LTD. | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| vs. | § | |
| | § | |
| ALI CHOUDHRI and ANGEL VALLE | § | HARRIS COUNTY, TEXAS |
| *Defendants,* | § | |
| | § | |
| vs. | § | |
| | § | |
| ALI MOKARAM, | § | |
| *Intervenor* | § | 333rd JUDICIAL DISTRICT |

## ORDER

On March 3, 2025, the Court held a consolidated hearing in Cause No. 2012-27197-A (the "A Case") and in Cause No. 2012-27197-D (the "D Case") and considered Ali Mokaram's ("Mokaram") and Osama Abdullatif's ("Abdullatif") (jointly "Judgment Creditors") objections and contests to the Net Worth Affidavits of Ali Choudhri ("Choudhri" and along with Dalio Holdings I, LLC, and Dalio Holdings II, LLC, the "Judgment Debtors"), Judgment Creditors' Joint Brief Filed in Support of Contest to Defendants' Net Worth Affidavits, Judgment Creditors' Supplement to Judgment Creditors' Joint Brief Filed in Support of Contest to Defendants' Net Worth Affidavits, Mokaram and Abdullatif's Motions to Strike Net Worth Affidavit of Choudhri, Mokaram and Abdullatif's Motions for Sanctions for Bad Faith Net Worth Affidavits, Mokaram and Abdullatif's Motion to Require Proper Reporting By Defendants, and the request to set the

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

amount of a bond required to supersede the judgments in both cases, and the Court considered the evidence presented and arguments by counsel relating to same. It is hereby

ORDERED that the Court finds and/or orders as follows:

**Motions to Recuse/Disqualify**[1]

1.      The motion and amended motion to disqualify and/or recuse filed by Choudhri on February 19 and 26, 2025, respectively, are "tertiary recusal motions" under Texas Civil Practice & Remedies Code ("TRCP") Section 30.016, as there have been at least two prior such motions filed in both the A Case and the D Case.

2.      This court has signed an order declining to voluntarily recuse or disqualify and has referred the motion and amended motion of Choudhri to the Administrative and/or Presiding Judge for consideration.

3.      The court has authority to proceed with these hearings under TRCP Section 30.016.

**Net Worth Contests**

4.      The Court has set multiple hearings on Judgment Creditors' objections and contests to the net worth affidavits of Judgment Debtors as required by Texas Rules of Appellate Procedure ("TRAP") 24.2(c)(3). Judgment Debtors have caused the hearings to be continued and/or canceled multiple times for multiple reasons. The hearings were reset by Court order to 9:00 a.m. on March 3, 2025, and the objections and contests proceeded at that time and were heard, but Judgment Debtors failed to appear.

5.      The court sustains and grants the net worth contests of Mokaram and Abdullatif to Choudhri's net worth affidavits.

---

[1]      The headings are convenience only, and all findings and orders herein can and should be considered as to all motions, rulings and orders herein.

6.    TRAP 24.2(c)(1) requires a judgment debtor to file an affidavit that "states the debtor's net worth and states complete, detailed information concerning the debtor's assets and liabilities from which net worth can be ascertained." Judgment Debtors failed to do so.

7.    Judgment Creditors filed objections and contests to the Net Worth Affidavits filed by Judgment Debtors. Therefore, Judgment Debtors had the burden to prove net worth calculated as the difference between total assets and total liabilities as determined by generally accepted accounting principles ("GAAP"). See Tex. R. App. P. 24.2(c)(3); *see also, Texas Black Iron, Inc. v. North American Interpipe, Inc.*, 2020 WL 10231117, 1 (Houston [14th Dist.] 2020).

8.    Each of Judgment Debtors failed to file net worth affidavits in compliance with TRAP 24.2(c)(1). The net worth affidavits filed by Judgment Debtors do not state complete, detailed information concerning their assets and liabilities from which net worth can be ascertained.

9.    Each of Judgment Debtors failed to produce a substantial amount of information regarding their net worth as required by prior orders of this Court in furtherance of Judgment Creditors' rights to conduct and obtain reasonable discovery regarding Judgment Debtors' net worth pursuant to TRAP 24.2(c)(2). Judgment Debtors violated the Court's orders requiring such discovery.

10.    Each of the Judgment Debtors failed to present their net worth pursuant to GAAP.

11.    Each of Judgment Debtors failed to satisfy their burden to prove their net worth, including failing to offer sufficient admissible evidence concerning their assets and liabilities from which their net worth could be ascertained.

12.    Judgment Debtors produced and submitted incomplete, inaccurate, and misleading financial statements and information.

4928-0552-8611.1

13. From the admissible evidence presented, this Court is unable to determine the net worth of Judgment Debtors or to state with particularity any factual basis for such determination

**Motions to Strike Net Worth Affidavits**

14. Additionally, and alternatively, the Court grants Mokaram and Abdullatif's Motion to Strike Net Worth Affidavits.

15. Choudhri filed a negative net worth affidavit on or about January 4, 2024 (the "First Affidavit") in the A Case and the D Case.

16. The First Affidavit does not meet the requirements of TRAP. 24.2. It does not contain "complete, detailed information concerning the debtor's assets and liabilities from which net worth can be ascertained." Choudhri has also admitted the statements in the affidavit were not "true and correct," but were only based on information and belief.

17. Choudhri filed a second Supersedeas Bond and Net Worth Affidavit on or about November 26-27, 2024 (the "Second Affidavit") in this case indicating his Net Worth was $120,076,289. The Second Affidavit was not served on the parties despite the Certificate of Service signed by Ali Choudhri, and it fails to comply with TRAP 24.2 for the same reasons as does the First Affidavit. TRAP 24.2 requires a net worth affidavit to be filed "simultaneously" with the bond, which Choudhri filed on January 4, 2024. The Second Affidavit was not timely filed.

18. Choudhri filed a third net worth affidavit in this case on February 16, 2025 (the "Third Affidavit"). TRAP 24.2 requires a net worth affidavit to be filed "simultaneously" with the bond, which Choudhri filed on January 4, 2024. The Third Affidavit was not timely filed, and it also fails to comply with TRAP 24.2 for the same reasons as does the First Affidavit.

19.     As shown by the evidence submitted, Choudhri has violated this Court's orders to provide net worth discovery.

20.     Choudhri could not meet his burden to show his net worth even if he and his experts had appeared because there was insufficient documentation and insufficient reliable evidence to support the alleged assets and liabilities, and they were not and could not be presented in accordance with GAAP.

21.     There are numerous material assets missing from Debtors' purported net worth, not to mention the lack of production of bank statements and missing cash.

22.     Debtors failed to provide documents or any explanation for the dramatic difference in net worth reported in the last few years (hundreds of millions of dollars), the disappearance of assets, the material decrease in value of assets, and the material increase in liabilities.

23.     In short, the net worth of Choudhri was not prepared in accordance with GAAP and is completely unreliable.

**Security Required to Supersede the Judgments**

24.     If the trial court determines that the Judgment Debtor have not met their burden to limit the bond based on their alleged net worth, the trial court can make a finding of the amount necessary to supersede a judgment.  TRAP 24.2(c)(3).

25.     The amount of security necessary to supersede a money judgment must equal the sum of: (1) the amount of compensatory damages awarded in the judgment; (2) interest for the estimated duration of the appeal; and (3) costs awarded in the judgment.  TRAP. 24.2(a)(1); *see also, Texas Black Iron*, 2020 WL 10231117 at 1.

26.     The amount of security necessary for the Judgment Debtors to supersede the money judgments against them and in favor of Judgment Creditors in the A and D cases, as well for Erika Nemeti, Executrix of the Estate of Edi I. Nemeti ("Nemeti") in the D case is as follows:

### Cause No. 2012-27197-A (the "A Case") in favor of Abdullatif

| | |
|---|---|
| $1,975,000.00 | (Compensatory) |
| $3,041,886.53 | (Interest through October 31, 2028) |
| **$5,016,886.53** | **(Total Amount of Security Required to Supersede Judgment)** |

### Cause No. 2012-27197-D (the "D Case") in favor of Mokaram

| | |
|---|---|
| $1,386,460.71 | (Compensatory) |
| $1,217,317.04 | (Interest through October 31, 2028) |
| $ 405,461.90 | (Costs) |
| **$3,009,239.65** | **(Total Amount of Security Required to Supersede Judgment)** |

### D Case in favor of Nemeti

| | |
|---|---|
| $ 231,076.78 | (Compensatory) |
| $ 146,946.70 | (Interest through October 31, 2028) |
| **$ 378,023.48** | **(Total Amount of Security Required to Supersede Judgment)** |

### Motions to Require Proper Reporting

27.     Mokaram's and Abdullatif's Motions to Require Proper Reporting are also granted. Choudhri shall provide such additional reporting on or before March 15, 2025 as requested in the motions. This obligation shall not excuse the prior obligations of Choudhri to provide reporting, which have been ignored. Choudhri has failed and refused to comply with several orders of this court requiring such reporting.

**Motions for Sanctions**

28. The Motions for Sanctions for Bad Faith Net Worth Affidavits of Mokaram and Abdullatif, and their Response to Motion for Continuance and Supplement to Joint Motion for Sanctions, are granted.

29. Judgment Debtors filed negative net worth affidavits to delay and avoid posting a supersedeas bond pending appeal of the judgments and to delay and prevent Judgment Creditors from collecting on their respective judgments in both cases.

30. The attorney for Judgment Debtors opined that Judgment Debtors had zero percent chance of prevailing on an appeal of those judgments.

31. Judgment Debtors have done nothing to prosecute the appeals in this case, including failing to order the record required for the appeal.

32. The net worth affidavits filed by the Judgment Debtors were filed for an improper purpose, were groundless, were filed in bad faith, were filed for purposes of delay only, and/or were filed to harass and/or to cause unnecessary delay or needless increase in the cost of litigation.

33. As mentioned, the affidavits do not meet the requirements of TRAP P. 24.2. Additional reasons showing the net worth affidavits were filed in bad faith can be found in Judgment Creditors' Joint Brief in Support of Contest to Defendants' Net Worth Affidavits filed on or about April 8, 2024.

34. Judgment Debtors also engaged in numerous and repeated attempts to delay (and to actually delay) the hearing on the net worth contest for over a year, all of which were part of the same improper scheme to delay and avoid posting a bond, to delay and prevent collection improperly and in bad faith, and to needlessly increase the costs of litigation, including but not limited to, multiple "last minute" motions to recuse and wrongfully remove the cases to federal

court. The court has issued multiple orders addressing some of these delays and obstructions previously, which are incorporated herein. These delays include, but are not limited to:

    a.    Judgment Debtors sought delay of this hearing that was set over 10 times, never once agreeing to attend the first time it was set.

    b.    Filing motions for continuance on April 2, 2024, May 1, 2024, July 10, 2024, July 29, 2024, October 28, 2024, November 1, 2024, November 12, 2025, January 18, 2025, February 7, 2025, February 16, 2025,

    c.    In addition, sending multiple emails to Judge Randy Wilson directly seeking continuances.

    d.    Filing a motion to recuse and/or disqualify Judge Randy Wilson and Judge Susan Brown on April 7, 2024 (after motions for continuance were denied). These were overruled.

    e.    Filing another motion to recuse and/or disqualify Judge Randy Wilson and Judge Susan Brown on February 19, 2025, and an amended motion to recuse and/or disqualify Judge Randy Wilson and Judge Susan Brown on February 28, 2025. These have been declined and referred.

    f.    Wrongfully removing these cases, post-judgment, to federal court on July 29, 2024, and after the cases were both remanded back to state court, doing so a second time on November 4, 2024 (and the cases were remanded again).

    g.    Waiting until the "last minute" to file a motion to recuse or remove the case after Judge Randy Wilson and the parties were already at the courthouse for the hearing, in violation of and despite numerous orders of this Court requiring Judgment Debtors to immediately notify the Court of any event or occurrence that would form the

basis for delay or continuance.

35. : The net worth affidavits are woefully insufficient under TRAP 24.2, and the documents and evidence produced to support them were also woefully insufficient.

36. The court finds the attorneys' fees, costs, expenses and expert fees submitted and requested by Judgment Creditors (including Exhibits 110-114) to be reasonable, necessary and customary, and to be incurred in furtherance of contesting and objecting to the bad faith net worth affidavits of Judgment Debtors and to obtain a hearing thereon, including those incurred to defeat Judgment Debtors' efforts to delay the hearing, with the exception of the fees requested for McCathern.

37. The court awards reasonable attorneys' fees, costs and expenses to Mokaram in the D Case in the amount of $205,361.50 through January 31, 2025, and the additional amount of $20,400.00 after January 31, 2025, less the amount of $8975.00 previously paid by Choudhri as sanctions, for a total amount of $216,786.50 as sanctions against Judgment Debtors and in favor of Mokaram in the D Case.

38. The court awards reasonable attorneys' fees, costs and expenses to Abdullatif and against Choudhri in the A Case in the amount of $12,662.50 through January 31, 2025, and the additional amount of $4,000.00 after January 31, 2025, for a total amount of $16,662.50 as sanctions against Choudhri and in favor of Abdullatif in the Case.

39. The court awards the expert fees of JS Held to Mokaram and against Judgment Debtors in the D Case as sanctions in the amount of $33,687.80 through January 31, 2025, plus the additional amount of $5250 for after January 31, 2025, for a total amount of $38,937.80 as sanctions against Judgment Debtors and in favor of Mokaram in the D Case.

40. For reasons argued and based on the evidence submitted, the Court believes the

additional amount of $100,000.00 in sanctions should be and hereby are awarded against Judgment Debtors and in favor of Mokaram in the D Case for their bad faith and sanctionable conduct (a) to adjust the loadstar fees award upward based on applicable factors and evidence and/or (b) to punish and to deter Judgment Debtors for their conduct.

41.     In summary, this Order requires Judgment Debtors to pay sanctions to Mokaram in the D Case in the total amount of $355,721.30, and to do so on or before 30 days from the date this order is signed.

42.     In summary, this Order requires Choudhri to pay sanctions to Abdullatif in the A Case in the total amount of $16,662.50, and to do so on or before 30 days from the date this order is signed.

43.     As a further sanction, Judgment Debtors are hereby precluded from filing additional net worth affidavits in the A Case and/or the D Case except on leave of court, and any such affidavits and/or net worth statements will be void and of no force and/or effect to supersede the judgments. The Court finds the filing of the Second Affidavit, the Third Affidavit and/or any future affidavit would likely be for the same purpose to delay, obstruct and prevent collection of the judgments.

44.     If Judgment Debtors continue in efforts to delay, obstruct or pursue further rulings on the net worth affidavits, the Court reserves the right to consider additional requests for sanctions.

45.     There was an extraordinary amount of evidence submitted at these hearings that support this Order, and the Court could have made substantial additional findings based on the evidence and arguments submitted. The failure of the Court to set forth additional findings based on such evidence and arguments does not mean the Court did not, in fact, reach such findings in

support of its rulings.

Signed on this 6th day of March 2025.

Honorable Randy Wilson
Presiding Judge

Choudhri Exhibit 5

715 S.W.3d 747
Supreme Court of Texas.

IN RE Martin Lee KAY, Relator

No. 24-0149
|
OPINION DELIVERED: June 13, 2025

**Synopsis**

**Background:** Former wife brought action against former husband for breach of their divorce agreement and fiduciary duties. After a jury trial and award to wife of $54 million in actual damages, the 334th District Court, Harris County, Dawn Rogers J., found husband's net worth was $147 million and ordered him to submit a $25 million bond or cash deposit in order to supersede the judgment. Husband sought review of the supersedeas bond order by motion. The Houston Court of Appeals, Fourteenth District, affirmed. Husband filed a petition for writ of mandamus.

**Holdings:** The Supreme Court held that:

[1] trial court adopting wife's valuation of husband's shares of privately-held startup over husband's was not an abuse of discretion that could warrant mandamus relief;

[2] trial courts retain discretion to allow alternative security, under rule governing methods of suspension of enforcement of judgment, for judgment debtors with net worths of $10 million or more; and

[3] the Court of Appeals abused its discretion by making error of law concluding that the alternative-security option for suspending enforcement of judgment was categorically unavailable to husband, and thus mandamus relief was warranted.

Petition conditionally granted.

**Procedural Posture(s):** Petition for Writ of Mandamus; On Appeal.

West Headnotes (9)

[1] **Mandamus** Matters of discretion

Mandamus will issue only if a court has clearly abused its discretion.

[2] **Mandamus** Matters of discretion

The "abuse of discretion" requirement for mandamus to issue is fulfilled where a trial court acts without reference to guiding rules or principles or in an arbitrary or unreasonable manner.

[3] **Mandamus** Matters of discretion

For purposes of a mandamus petition, a court's error of law or erroneous application of law to fact is an "abuse of discretion."

[4] **Mandamus** Remedy by Appeal or Writ of Error

Generally, mandamus petitioner must demonstrate absence of adequate remedy by appeal.

[5]  **Mandamus**⚬Motions and orders in general

Because appellate rule governing review via motion provides express authorization for the Supreme Court's review of supersedeas bond orders by petition for writ of mandamus, no showing of an inadequate appellate remedy is required. Tex. R. App. P. 24.4(a).

[6]  **Mandamus**⚬Fixing amount and approval of bond

Trial court adopting former wife's valuation of former husband's shares of privately-held startup over husband's, in determining husband's net worth for purposes of determining security required to suspend enforcement of judgment, was not an abuse of discretion that could warrant mandamus relief, in proceedings following award to wife of $54 million in actual damages, in action against husband for breach of their divorce agreement and fiduciary duties, where trial court's calculation of husband's net worth depended entirely on its credibility determinations as to the value of husband's shares, each party's team of experts testified in support of their respective positions, and the trial court found that wife's team was more credible. Tex. Civ. Prac. & Rem. Code Ann. § 52.006; Tex. R. App. P. 24.1(a)(2)-(4), 24.2(c)(3), 24.4(a).

[7]  **Mandamus**⚬Scope of inquiry and powers of court

The Supreme Court may not resolve disputed factual matters in a mandamus proceeding.

[8]  **Appeal and Error**⚬Form and contents of bond or undertaking

Trial courts are not limited to the alternative security that rule governing security required to suspend enforcement of judgment requires in certain cases where judgment debtor has net worth of less that $10 million; they retain discretion to allow alternative security under rule governing methods of suspension of enforcement for judgment debtors with net worths of $10 million or more. Tex. R. App. P. 24.1(a)(4), 24.2(e).

[9]  **Mandamus**⚬Fixing amount and approval of bond

The Court of Appeals abused its discretion by making error of law concluding that the alternative-security option for suspending enforcement of judgment was categorically unavailable to former husband because he had a net worth of over $10 million, and thus mandamus relief was warranted, on appeal in proceedings on husband's request to suspend enforcement of judgment following award to wife of $54 million in actual damages, in action against husband for breach of their divorce agreement and fiduciary duties. Tex. R. App. P. 24.1(a)(4),

24.2(e), 24.4(a).

On Petition for Writ of Mandamus

**Attorneys and Law Firms**

John Francis Luman III, Daniels & Tredennick LLP, Houston, Brent C. Perry, Robert R. Burford, Zachary R. Carlson, Burford Perry, LLP, Houston, Shawn Johnson, SAJ Law PLLC, Houston, Jeffrey N. Diamant, Jeff Diamant P.C., Houston, for Real Party in Interest Yosowitz, Laura Elizabeth.

Robert M. Randy Roach Jr., Daniel W. Davis, Roach & Newton, LLP, Houston, Mark Fritsche, Hedrick Kring Bailey PLLC, Dallas, Joel B. Bailey, Trinity Industries, Inc., Dallas, Kevin G. Corcoran, Spencer Fane LLP, Houston, for Relator.

**Opinion**

PER CURIAM

**\*748** This mandamus petition arises out of an appeal from a $54 million judgment awarded to real party in interest Laura Yosowitz against her ex-husband, relator Martin Lee Kay. Kay argues the trial court abused its discretion by (1) requiring him to post judgment security in excess of statutory caps tied to net worth, and (2) refusing to accept his offer of alternative **\*749** security. Although we find no basis to disturb the trial court's finding of Kay's net worth, we hold the court of appeals abused its discretion in concluding alternative security was categorically unavailable to Kay. We therefore conditionally grant mandamus relief

and direct the court of appeals to consider in the first instance whether Kay conclusively established the adequacy of his alternative security.

**I.**

Yosowitz sued Kay for breach of their divorce agreement and fiduciary duties. Following a jury trial, the trial court awarded Yosowitz roughly $54 million in actual damages. Seeking to suspend enforcement of the judgment, Kay filed an affidavit of net worth, *see* Tex. R. App. P. 24.2(a)(1)(A), (c)(1), which Yosowitz opposed. Kay's affidavit asserted he has a net worth of $754,373. Kay also deposited two cashier's checks totaling half of his asserted net worth. *See* Tex. R. App. P. 24.1(c)(1)(B), 24.2(a)(1)(B).

The trial court held a multi-day bond hearing at which the parties principally contested Kay's net worth. Specifically, the parties disputed the value of Kay's 8,277,500 shares in his privately held startup, Entera Holdings, Inc.[1] Relying on Kay's accounts of unsuccessful attempts to sell his Entera shares to qualified investors or obtain a loan using the shares as collateral,[2] Kay's experts opined that neither the $46 million figure from a 2022 appraisal commissioned by Entera or the $182 million valuation offered by Yosowitz's experts were representative of the shares' value.[3] Kay's experts instead opined the shares should be valued at $0 due to legal restrictions on transferring the unregistered securities and consequent low marketability. Yosowitz's experts relied on similar data points as Kay's experts but opined that no liquidity discount

was necessary because it was already inherent in the underlying number. Yosowitz's experts also testified that they applied generally accepted accounting principles (GAAP) in calculating Kay's net worth.

Crediting the valuation opinion of Yosowitz's experts over Kay's[4] and impliedly rejecting Kay's offer to tender the stock certificate as alternative security,[5] the trial court found Kay's net worth was $147 million and ordered him to submit a $25 million bond or cash deposit in order to supersede the judgment.[6] Kay then sought **\*750** review of the trial court's supersedeas bond order by motion with the court of appeals. *See* Tex. R. App. P. 24.4(a).

The court of appeals affirmed. First, the court rejected Kay's contention that the trial court abused its discretion in finding that he had a net worth over $10 million. Relying on the trial court's role as the sole judge of credibility, the court of appeals upheld the trial court's discretion to accept Yosowitz's evidence that Kay might be able to sell the Entera shares under an applicable exemption. By extension, the court concluded, the trial court validly rejected Kay's evidence that the shares lacked any value due to his inability to sell them. Second, the court of appeals rejected Kay's contention that the trial court abused its discretion in declining to accept the stock certificate for his Entera shares in lieu of a deposit or bond. The court held that under Texas Rule of Appellate Procedure 24.2(e), that option is available only to judgment debtors "with a net worth of less than $10 million." Tex. R. App. P. 24.2(e)(1).

Kay then filed a mandamus petition in this Court. *See* Tex. R. App. P. 24.4(a). He argues that the court of appeals abused its discretion by (1) affirming the trial court's calculation of his net worth, and (2) holding that alternative security is available only to judgment debtors with net worths below $10 million.

## II.

[1] [2] [3] [4] [5] "Mandamus will issue only if a court has clearly abused its discretion ...." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135-36 (Tex. 2004). The abuse of discretion requirement "is fulfilled where a trial court acts without reference to guiding rules or principles or in an arbitrary or unreasonable manner. *In re Garza*, 544 S.W.3d 836,, 840 (Tex. 2018). An error of law or erroneous application of law to fact is an abuse of discretion. *In re Ill. Nat'l Ins. Co.*, 685 S.W.3d 826, 835 (Tex. 2024).[7]

## III.

[6] We first consider the parties' dispute regarding the valuation of Kay's Entera shares and his net worth. To suspend execution of a money judgment on appeal, a judgment debtor must post security as required by Sections 52.006 and 52.007 of the Texas Civil Practice and Remedies Code and Rule 24 of the Texas Rules of Appellate Procedure. The Rules of Appellate Procedure allow a judgment debtor to supersede a judgment by (1) filing a good and sufficient bond (or cash equivalent) with the trial court clerk, or (2) "providing alternate

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

security under Rule 24.2(e) or ordered by the court." Tex. R. App. P. 24.1(a)(2)-(4). For a bond or cash deposit, the amount of security necessary to supersede a money judgment must equal the sum of the amount of compensatory damages and costs awarded in the judgment, as well as interest for the estimated duration of the appeal. Tex. Civ. Prac. & Rem. Code § 52.006(a); *see also* Tex. R. App. P. 24.1(b)(1)(A), (c)(2), 24.2(a)(1). But the amount required must not exceed the lesser of: "(1) 50 percent of the judgment debtor's current net worth; or (2) $25 million." **\*751** Tex. Civ. Prac. & Rem. Code § 52.006(b); *see also* Tex. R. App. P. 24.2(a)(1).

Kay contends the trial court's unreasonably high valuation of his net worth allowed the court to require a bond of $25 million instead of the roughly $400,000 in cashier's checks he deposited. In particular, Kay emphasizes that buyers for his Entera shares must meet certain criteria, including access to detailed financial information about Entera that he is not privileged to disclose. Although Kay points to practical difficulties in finding a buyer who qualifies for one of the available exemptions, he concedes the sale of his Entera shares is not "an absolute impossibility." Instead, Kay argues that Yosowitz failed to identify a buyer who meets that qualification aside from the two he already approached. It is the "judgment debtor," however, who "has the burden of proving net worth." Tex. R. App. P. 24.2(c)(3).

[7] All parties agree the trial court's calculation of Kay's net worth depended entirely on its credibility determinations as to the value of Kay's Entera shares. Each party's team of experts testified in support of their respective positions, and the trial court found that Yosowitz's team was more credible. *Cf. City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) (explaining that the factfinder is "the sole judge[ ] of the credibility of the witnesses and the weight to give their testimony" and that "[r]eviewing courts cannot impose their own opinions to the contrary"). We may not resolve disputed factual matters in a mandamus proceeding. *In re Angelini*, 186 S.W.3d 558, 560 (Tex. 2006). Under these circumstances, the trial court did not abuse its discretion in adopting Yosowitz's valuation of the Entera shares over Kay's.

## IV.

Having found no basis to set aside the trial court's finding of Kay's net worth, we next determine whether the court of appeals erred in construing Rules 24.1 and 24.2 of the Rules of Appellate Procedure. Citing Rule 24.2(e)(1), the court of appeals determined that alternative security is available only to judgment debtors whose net worth is less than $10 million. We disagree.

Rule 24.2(e) was added in 2023 to address the availability of alternative security "in [c]ertain [c]ases." Tex. R. App. P. 24.2(e). The addition followed the Legislature's enactment of Section 52.007 of the Civil Practice and Remedies Code, which provides that if "a judgment debtor with a net worth of less than $10 million" makes a required showing, "the trial court shall allow the judgment debtor to post alternative security." Under Rule 24.2(e), the judge is likewise *required* to allow

alternative security for such debtors. *See* Tex. R. App. P. 24.2(e)(1)-(2).

[8] But Rule 24.2(e) is not the exclusive authority for alternative security. Instead, Rule 24.1(a) has long permitted a court to order alternative security, and this permission was preserved by the 2023 amendments. Rule 24.1(a) now contemplates supersedeas by, among other things, "providing alternate security under Rule 24.2(e) *or* ordered by the court." Tex. R. App. P. 24.1(a)(4) (emphasis added). Thus, trial courts are not limited to the alternative security that Rule 24.2(e) requires in certain cases; they retain discretion to allow alternative security under Rule 24.1(a)(4) for judgment debtors with net worths of $10 million or more.

[9] We therefore hold the court of appeals erred in concluding that the alternative-security option was categorically unavailable to Kay. Mandamus relief is appropriate in these circumstances. *See* Tex. R. App. P. 24.4(a); *see also* **\*752** *In re Corral-Lerma*, 451 S.W.3d 385, 388 (Tex. 2014) (granting mandamus relief in supersedeas case).

Given the court of appeals' incorrect conclusion that alternative security was not an option, that court did not reach the question whether the trial court abused its discretion in impliedly rejecting Kay's offer to tender the Entera stock certificate as alternative security. Because the parties dispute whether Kay provided sufficient proof of the adequacy of the stock certificate as alternative security, *see* Tex. R. App. P. 24.1(d), we direct the court of appeals to consider that question in the first instance. We express no view as to the

outcome on remand. But we note that if a court finds a judgment debtor's net worth to require a $25 million supersedeas bond only because of the valuation of particular personal property, an unrestricted tender of that very property into the registry of the court generally will constitute adequate alternative security unless the record demonstrates a particular need for different treatment.

## V.

Accordingly, without hearing oral argument, we conditionally grant mandamus relief and direct the court of appeals to determine whether the trial court abused its discretion in refusing to accept the Entera stock certificate as alternative security. *See* Tex. R. App. P. 52.8(c). We are confident the court of appeals will comply, and our writ will issue only if it does not.

## All Citations

715 S.W.3d 747, 68 Tex. Sup. Ct. J. 1193

In re Kay, 715 S.W.3d 747 (2025)

68 Tex. Sup. Ct. J. 1193

---

## Footnotes

1   Yosowitz did not dispute any other component of Kay's net-worth calculation.

2   Kay approached Entera's two institutional investors, Goldman Sachs and Bullpen Capital, but the investors refused to extend Kay a loan collateralized by his restricted shares or to purchase any of his shares. Kay also made unsuccessful inquiries with the Lovett Agency and Bernstein about seeking a loan or supersedeas bond with the shares as collateral.

3   Starting with the per-share price from Entera's Series A-1 Preferred round of equity financing, in which Entera issued 779,505 shares at $22.45 per share to investors, the Entera-commissioned study applied a 40% discount for lack of marketability, resulting in a per-share value of $5.39. The value also included a 27.15% discount to account "for market and Company-specific changes since the transaction."

4   The trial court found that the testimony of Yosowitz's experts was credible, supported by credible and consistent evidence, and based on sound methodology. The trial court also found that Kay's experts' calculations were neither credible nor consistent with the evidence and that their underlying methodology was not sound.

5   During the bond hearing, Kay offered to tender the stock certificate for his Entera shares instead of a bond. *See* Tex. R. App. P. 24.1(a)(4).

6   The trial court also denied Kay's related request to lower the required bond amount to $1,000 due to substantial hardship, which Kay has since abandoned.

7   Generally, a mandamus petitioner must also demonstrate the absence of an adequate remedy by appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 135-36. But a trial court's post-judgment order on the amount and type of security is not part of the final judgment and thus not subject to review on appeal from that judgment. *See* Tex. R. App. P. 24.4. Because Rule 24.4 provides express authorization for this Court's review of supersedeas bond orders by petition for writ of mandamus, no showing of an inadequate appellate remedy is required.

---

**End of Document**                                                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.