1

1          IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

3                    AUSTIN DIVISION

4

5   In re: 1001 WL LLC,

6           Debtor.

7                              CASE NO. 24-10119

8                                  CHAPTER 11

9

_____

10

11

12

13

14

15

16              REMOTE STREAMING DEPOSITION OF

17

18                   KYLE SYLVAN HIRSCH

19

20                              TAKEN ON

21                    THURSDAY, JULY 31, 2025

22                              3:04 P.M.

**EXHIBIT 11**
**Page 1 of 149**

23

24                                            PHOENIX, ARIZONA

25

                                                        2

1                    REMOTE APPEARANCES

2

3   Appearing on Behalf of the Creditor,

4   Jetall Capital:

5   ALI CHOUDHRI

6   Jetall Capital

7   1001 West Loop South, Suite 700

8   Houston, Texas  77027

9   (281) 630-6627

10  ali@jetallcapital.com

11

12  Appearing on Behalf of the Creditors,

13  TIG ROMSPEN US MASTER MORTGAGE LP:

14  BRIGID NDEGE, ESQUIRE

15  Bryan Cave Leighton Paisner

16  Two North Central Avenue, Suite 2100

**EXHIBIT 11**
**Page 2 of 149**

17   Phoenix, Arizona   85004

18   (602) 364-7000

19   brigid.ndege@bclplaw.com

20

21

22

23

24

25


                                                    3

1                    EXAMINATION INDEX

2                                              PAGE

3

4   EXAMINATION BY MR. CHOUDHRI               6

5

6

7

8

9

10

**EXHIBIT 11**
**Page 3 of 149**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    EXHIBIT INDEX

2   EXHIBIT                                        PAGE

3

4    1   DOC 843                                    11

5    2   Documents                                  65

**EXHIBIT 11**
**Page 4 of 149**

6    3   Trustee Deed and Bill of Sale              112

7

8                     Certified Question:

9            Page 27, line 25 to page 28, line 1

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

**EXHIBIT 11**
**Page 5 of 149**

1              REMOTE STREAMING DEPOSITION OF

2                  KYLE SYLVAN HIRSCH

3                       TAKEN ON

4              THURSDAY, JULY 31, 2025

5                      3:04 P.M.

6

7         THE REPORTER:  We are on the record, 3:04

8  p.m.

9         Will each attorney please state their name

10  and whom they represent.

11        MS. NDEGE:  This is Brigid Ndege.  I

12  represent Mr. Hirsch.

13        MR. CHOUDHRI:  Ali Choudhri, for Ali

14  Choudhri.

15        THE REPORTER:  All right.  Mr. Hirsch,

16  will you please raise your right hand.  Do you

17  affirm under penalty of perjury that the testimony

18  you're about to give will be the truth, the whole

19  truth, and nothing but the truth?

20        THE DEPONENT:  I do.

21        THE REPORTER:  Thank you.

22        Counsel, please proceed.

23        MS. NDEGE:  All right.  This is Brigid

24  Ndege.  Per the party's agreement, the scope of this

EXHIBIT 11
Page 6 of 149

25   deposition is limited to the pending application to

6

1   approve a compromise between the Chapter 11 trustee

2   and TIG -- and TIG Romspen, scheduled to be heard on

3   August 4th, 2025.  TIG Romspen reserves the right to

4   -- to instruct the witness not to answer questions

5   that are outside of this agreed scope.

6          This deposition is taken pursuant to

7   Federal Rule of Civil Procedure 30, applicable to

8   this contested matter, pursuant to Federal Rules of

9   Bankruptcy Procedure 9014(c)(1) and 7030.  Federal

10  Rule of Civil Procedure 30(b) requires reasonable

11  written notice to every other party and specifies

12  what is required in the notice.

13         Party taking this deposition hasn't

14  provided any notice to parties in this bankruptcy

15  case, other than the witness and his counsel.

16  Therefore, TIG Romspen objects to this deposition as

17  to lack of notice and reserves all other objections

18  relating thereto.

19  KYLE SYLVAN HIRSCH, having been first duly affirmed

**EXHIBIT 11**
**Page 7 of 149**

20  to tell the truth, was examined, and testified as

21  follows:

22  EXAMINATION

23  BY MR. CHOUDHRI:

24      Q.  Mr. Hirsch, good -- good afternoon.  Are

25  you ready to proceed?

7

1      A.  I am.

2      Q.  Mr. Hirsch, please spell your full name.

3      A.  My first name is Kyle, K-y-l-e.  My last

4  name is H-i-r-s-c-h, Hirsch.

5      Q.  Do you have a middle name, Mr. Hirsch?

6      A.  I do.

7      Q.  And what is that?

8      A.  Sylvan, S-y-l-v-a-n.

9      Q.  And, Mr. Hirsch, where are you located

10  right now?

11      A.  In my home.

12      Q.  What is the address?

13      A.  I'm not willing to disclose the address.

**EXHIBIT 11**
**Page 8 of 149**

14    I can tell you it is in Phoenix-Scottsdale, Arizona.

15        Q.   And what is your office address?

16        A.   I office both out of our firms:  Dallas

17    and our Phoenix office.  Our Phoenix office is 2

18    North Central Avenue, Suite 2100, Phoenix, Arizona

19    85004.  Our Dallas office address is 2200 Ross

20    Avenue, Suite 4200W, Dallas, Texas, 75201.

21        Q.   And, Mr. Hirsch, are you familiar with a

22    document that you filed yesterday or day before

23    yesterday?  I believe it is document 843 in the

24    bankruptcy case.

25        A.   I need a little more information than a

8

1    docket number.

2        Q.   Sure.  No problem.  How about I share my

3    screen?  Is that okay with y'all?

4            MS. NDEGE:  That's fine.

5            THE DEPONENT:  It's your deposition.

6            MR. CHOUDHRI:  Thank you.

7    BY MR. CHOUDHRI:

8        Q.   Mr. Hirsch, what is this -- this document

**EXHIBIT 11**
**Page 9 of 149**

9   -- what is the case number on top of this document,

10  and the document number?

11      A.   The case number is 24-10119-smr.  The

12  docket number is 843.

13      Q.   And what is this exactly document?

14      A.   It's titled "Notice of Hearing."

15      Q.   And -- and what is it for exactly?

16      A.   It's to provide notice of the hearing.

17      Q.   For what -- for -- for what -- so this is

18  a -- this is a notice of hearing that you filed, is

19  that correct?

20      A.   Yes.

21      Q.   And that's your signature?

22      A.   Yes.  It's my electronic signature.

23      Q.   Dated July the 29th, 2025.  Is that

24  correct?

25      A.   Yes.

                                          9

1       Q.   And it's got four items on there that

2  you've asked the court to set in here before the

**EXHIBIT 11**
**Page 10 of 149**

3   9019 hearing, which is on Monday, August the 4th.

4   And this is set for August the 4th at 8:45 a.m.  Is

5   that correct?

6        A.   Everything that you said in your question

7   is not correct.

8        Q.   Did you ask the court to set these

9   hearings -- these matters for a hearing, on an

10   expedited basis, that we're looking at?

11        A.   No.

12        Q.   So you did not file ECF 837, ECF 838, ECF

13   839, ECF 841, and ECF 840?

14        A.   They were filed.

15        Q.   Did you file them?

16        A.   And, yes, I did file them.  They do not

17   ask for an expedited hearing.

18        Q.   You did or did not?

19        A.   Those ECF numbers that you just referred

20   to do not ask for an expedited hearing.  They ask

21   for ex parte relief.

22        Q.   And describe to me what -- what you're

23   asking in ECF 840 and 841.

24        A.   We are asked -- well, 841 is an errata

25   that attaches an exhibit that should have been

**EXHIBIT 11**
**Page 11 of 149**

1  attached to 840, but was not.  So 841 is not asking

2  for anything.  It's notifying the court and the

3  parties of a mistake and attachment that should be

4  considered with 840.

5          840 is a request for the court to enter an

6  order that anyone other than Travis Vargo -- who is

7  a receiver appointed in the Harris County State

8  Court -- who wishes to contradict that Mr. Vargo has

9  authority to act in litigation matters on behalf of

10  you, Mr. Choudhri, should appear and show the

11  authority for their right to do so.

12     Q.   So is it your assertion, Mr. Hirsch, that

13  I, Ali Choudhri, cannot represent myself?

14     A.   The motion is asking the court to give

15  effect to the receivership order that's attached as

16  the exhibit to errata at 841, which as I read it,

17  authorizes Travis Vargo to have control over your

18  interests.  And as related to an earlier filing that

19  had been made in this case, appears to be a judicial

20  admission that Mr. Vargo controls all of your

21  interests.

22          MR. CHOUDHRI:  I would like to move to --

**EXHIBIT 11**
**Page 12 of 149**

23  Madam Court Reporter, I would ask that this be

24  Exhibit 1 of the deposition of Kyle Hirsch.

25          THE REPORTER:  Exhibit 1.

11

1          (WHEREUPON, Exhibit 1 was marked for

2  identification.)

3          MR. CHOUDHRI:  And let me -- let me do

4  this -- how's your day going, Brigid?

5          MS. NDEGE:  It's going pretty well.

6          MR. CHOUDHRI:  Good.  Good.

7          And how about you, Kyle?

8          THE DEPONENT:  I have a lot of work to do

9  and not enough time to do it.

10          MR. CHOUDHRI:  That is life.

11  BY MR. CHOUDHRI:

12     Q.  Okay.  Let's see.  And, Mr. Hirsch, have

13  you communicated with Travis Vargo?

14     A.  I have.

15     Q.  When's the first time you communicated

16  with Travis Vargo?

**EXHIBIT 11**
**Page 13 of 149**

17      A.   I -- I'm -- I'm not quite sure how my

18 communications with Travis Vargo have to do with the

19 approval of the 9019 motion, which is the limited

20 scope for my agreement to be here today.

21      Q.   Are you going to refuse to answer

22 questions about Travis Vargo, Mr. Hirsch?

23           MS. NDEGE:  Well, I'm going to object to

24 the question, unless you can provide an explanation

25 as to how that question relates to the settlement.

                                              12

1 BY MR. CHOUDHRI:

2      Q.   Mr. Hirsch, you can answer the question.

3           MS. NDEGE:  Well, I'm going to advise him

4 not to answer it until you provide an answer as to

5 how it relates to the settlement.  If the answer is

6 satisfactory, Mr. Hirsch, you can answer the

7 question.  If not, I'm going to advise him not to

8 answer the question.

9 BY MR. CHOUDHRI:

10     Q.   Mr. Hirsch, this is not a negotiation.

11 I'm here to ask you questions.  Your attorney can

**EXHIBIT 11**
**Page 14 of 149**

12 object or instruct you not to answer.  And my

13 question is, are you going to refuse to answer any

14 questions about Travis Vargo?

15      A.   I -- I -- I'm going to address each

16 question as it's asked.

17      Q.   When is the first time you had any

18 communication with Travis Vargo?

19           MS. NDEGE:  I'm going to object to the

20 question.  What's the relevance?  The question is

21 outside the scope of the deposition.  What's the

22 relevance to the settlement?

23           MR. CHOUDHRI:  You can answer, Mr. Hirsch.

24           MS. NDEGE:  Mr. Choudhri is not providing

25 an answer to the question.  I'm going to advise Mr.

                                                    13

1 Hirsch not to answer the question.

2           MR. CHOUDHRI:  Mr. Hirsch, you -- you can

3 answer my question.

4           THE DEPONENT:  I -- I'm -- I'm going to

5 accept the advice of counsel.  I find this is

**EXHIBIT 11**
**Page 15 of 149**

 6    outside the scope for why I agreed to sit for a

 7    deposition voluntarily.

 8    BY MR. CHOUDHRI:

 9         Q.   So, Mr. Hirsch, you're going to refuse to

10    answer any questions about Travis Vargo.  Is that

11    your -- is that your contention today?

12         A.   It is not.

13         Q.   Are you refusing to answer any questions

14    about Travis Vargo?

15         A.   I'm -- I'm refusing to answer questions

16    that are outside the limited scope for my

17    willingness to appear today.  And if you ask

18    questions about Mr. Vargo that relate to the limited

19    scope for which I agreed to appear, I'm happy to

20    answer them.  But if you're fishing for information

21    that is outside the scope of the pending motion to

22    approve a 9019 application, then I'm not inclined to

23    answer them.

24         Q.   Mr. Hirsch, have you -- have you

25    communicated with Mr. Vargo as it relates to this

                                                    14

EXHIBIT 11
Page 16 of 149

1   bankruptcy?

2       A.   Yes.

3       Q.   And when was the first time you did such?

4       A.   I believe it was either late -- probably

5   late June -- maybe around June 29th, maybe 28th.

6   Don't remember the exact day.

7       Q.   And, Mr. Hirsch, do you have all your

8   communications between Mr. Vargo and yourself?

9       A.   I don't understand your question.

10      Q.   Have you deleted any communications

11  between Mr. Vargo and yourself?

12      A.   I -- I don't understand your question.

13      Q.   Have you deleted any text messages or

14  email communications?

15      A.   Have I deleted any text messages or email

16  communications?  I'm sure I have.

17      Q.   Why?

18      A.   Well, I've had a telephone that takes text

19  messages for probably 18 years.  I'm sure I've

20  deleted text messages off my telephone in the last

21  18 years.  I've had email accounts for probably 25

22  years; I'm sure I've deleted emails from my email

23  accounts over the last 25 years.

24      Q.   Mr. Hirsch, have you deleted any text

25  messages or any emails since the inception of this

**EXHIBIT 11**
**Page 17 of 149**

15

1  bankruptcy filing that we're here on today?

2       A.   I'm sure I have.

3       Q.   Have you deleted any messages with any

4  party or witness related to this bankruptcy?

5       A.   Not to my knowledge.

6       Q.   Do you have text messages between you and

7  Mr. Vargo?

8       A.   I don't believe so.

9       Q.   Do you have email communications between

10 you and Mr. Vargo?

11      A.   I believe so.

12      Q.   And can you send me that communication?

13      A.   In response to properly served discovery

14 requests, sure.

15      Q.   And tell me what you communicated with Mr.

16 Vargo and what the communications and email

17 communications are between you and Mr. Vargo as it

18 relates to this debtor and this bankruptcy and the

19 matters here?

**EXHIBIT 11**
**Page 18 of 149**

20    A.   I don't know what you mean by the matters

21  here.

22    Q.   Have you asked Mr. Vargo what his position

23  is as it relates to the 9019?

24    A.   I don't know whether I've specifically

25  asked him that question.

                                                    16

1    Q.   Has he given you his position as it

2  relates to the 9019?

3    A.   I don't know that he's given me his

4  position specifically as it relates to the 9019.

5    Q.   Well, tell me --

6    A.   I don't know that he's seen the 9019.

7    Q.   So, to your knowledge, he has not seen the

8  9019?

9    A.   That's not what I said.  I don't know if

10  he's seen the 9019.

11    Q.   Have you deleted any communications you

12  have with Pat Lowe or Brian Cumings?

13    A.   No.

14    Q.   Who is Pat Lowe?

**EXHIBIT 11**
**Page 19 of 149**

15      A.      He is the Chapter 11 trustee.

16      Q.      Who is Brian Cumings?

17      A.      Trustee's counsel.

18      Q.      And walk me through how you came about to

19      the 9019.

20      A.      I'm not sure I understand your question.

21      Q.      Mr. Hirsch, who -- who was in charge, at

22      Bryan Cave's, regarding the foreclosure sales that

23      took place:  one being in La Vernia, Texas, Wilson

24      County, Feb 2024 -- February the 6th, 2024, and the

25      other one being October 1st, 2024, in Harris County

17

1      for 1001 West Loop?

2      A.      I'm a little confused.  You were just

3      asking me how the 9019 came about, which was a

4      confusing question.  And now you're asking about who

5      was in charge of foreclosure sales?  I'm -- I'm

6      confused.

7      Q.      Okay.  Mr. Hirsch, you were present when

8      the deposition of Wesley Roitman was taken, correct?

**EXHIBIT 11**
**Page 20 of 149**

9      A.   Are you talking about earlier today?

10     Q.   Yes.

11     A.   Yes.

12     Q.   And you heard Mr. Roitman saying that you

13  handled the foreclosure process.  Do you remember

14  that?

15     A.   I remember Mr. Roitman saying that he has

16  that handled by his legal counsel.

17     Q.   And when I asked --

18     A.   Well, I should say that -- that TIG

19  Romspen has it handled by its legal counsel.

20     Q.   And so what role, Mr. Hirsch, did you play

21  in relation to the February 6th, 2024 foreclosure

22  sale for the La Vernia property?

23     A.   How -- how does that have to do with the

24  9019 settlement?

25          MR. CHOUDHRI:  Objection, nonresponsive.

                                                    18

1  BY MR. CHOUDHRI:

2      Q.   Mr. Hirsch, were you --

3          MS. NDEGE:  Well, objection to your

**EXHIBIT 11**
**Page 21 of 149**

4  question, Mr. Choudhri.  Could you please explain

5  how that relates to the settlement?

6      MR. CHOUDHRI:  And, Mr. Hirsch, you have

7  to stop objecting to the questions.  You have an

8  attorney here.  Okay.  Can we --

9      THE DEPONENT:  I didn't object.  I asked

10  you a clarifying question.

11  BY MR. CHOUDHRI:

12      Q.  Mr. Hirsch, are claims as part of the 9019

13  -- let me back up.  Did you participate in drafting

14  this 9019 agreement?

15      A.  What do you mean by "this 9019 agreement"?

16      Q.  You're asking this court to approve a

17  compromise and settlement between the trustee and

18  Romspen, is that right?

19      A.  Yes.  No, actually, I'm not asking for

20  anything.  I think the trustee is asking for the

21  court to approve it.

22      Q.  And -- and you, on behalf of your client,

23  are seeking that approval from this court with the

24  trustee, is that correct?

25      A.  We support the application.  We haven't

**EXHIBIT 11**
**Page 22 of 149**

19

1  affirmatively asked the court anything.  It's the

2  trustee's application.

3      Q.   Did you or your firm -- strike that.  Mr.

4  Hirsch, who -- who is involved at your firm -- what

5  lawyers are involved with the TIG Romspen matter

6  that's in bankruptcy 1001 WL?

7      A.   I'm trying to understand your question.

8  What lawyers at my firm are involved with TIG

9  Romspen as it relates to the 1001 WL bankruptcy?

10  Was that the question?

11      Q.   Yes.

12      A.   Myself, Ms. Ndege.  We've had some other

13  attorneys handle some discreet research or limited

14  drafting issues.  My partner in Kansas City has an

15  overall relationship with the client for whom I may

16  have provided information regarding the bankruptcy

17  case.

18      Q.   Can you provide the names, Mr. Hirsch.

19  Who are the lawyers -- I need the names of the

20  lawyers -- at your firm that are involved with TIG

21  Romspen and did work for TIG Romspen in relation to

22  1001 WL?

**EXHIBIT 11**
**Page 23 of 149**

23      A.   I decline to provide you that information.

24      Q.   You're refusing to answer the question

25  about which lawyers at Cave -- let's back up.  Is it

20

1   Bryan Cave Leighton Paisner?  Is that right?

2       A.   That's the name of the law firm, yes.

3       Q.   And that's the law firm that represents

4   TIG Romspen, correct?

5       A.   In this matter, that's correct.

6       Q.   And do you represent RIC (Lavernia), the

7   debtor, in bankruptcy in Judge Parker's court?

8            MS. NDEGE:   I'm going to object to the

9   question.  What does that have to do with the

10  settlement agreement?

11           MR. CHOUDHRI:  I'm not here to answer your

12  questions, Ms. -- Ms. Ndege.  You can instruct your

13  client not to answer or object, and we can take it

14  up with the judge.

15           But when you have a credit bid, and a

16  debt, and claims that are being released as part of

17  this 9019, and the value of those claims, and the

**EXHIBIT 11**
**Page 24 of 149**

18  value of the controversy, and the veracity of what

19  is represented to this court, then I'm entitled to

20  get into that.

21          So if you want to instruct him not to

22  answer, that's fine.  That's your choice.  Okay?

23          MS. NDEGE:  Well, I'm going to instruct

24  Mr. Hirsch not to answer.  Thank you.

25  BY MR. CHOUDHRI:

                                        21

1      Q.   Are you going to refuse -- are you

2  refusing to answer the questions as it relates to

3  RIC (Lavernia), and the foreclosure for La Vernia,

4  and the credit bid, and the amended proof of claim,

5  and the claims that are being settled under the

6  9019?

7      A.   I -- I'm -- I'm refusing to ask (sic) the

8  question that you had asked, and I'm -- will

9  consider each question as you ask it.

10      Q.   Mr. Hirsch, do you represent the debtor,

11  RIC (Lavernia), LLC, that is a debtor in bankruptcy

**EXHIBIT 11**
**Page 25 of 149**

12    court in Judge Michael Parker's court in San

13    Antonio?

14        A.    Yes.   I have no idea how that has to do

15    with the settlement.

16            MR. CHOUDHRI:  Objection to after "yes."

17    BY MR. CHOUDHRI:

18        Q.    Mr. Hirsch, is -- did you participate --

19    did you make -- you or your firm make any edits or

20    red lines to the motion, the settlement agreement

21    that you or trustee are seeking to get approved by

22    Judge Robinson?

23            MS. NDEGE:   So I'm going to object to that

24    question --

25            THE DEPONENT:  Are you asking about the

22

1    motion or the settlement agreement?

2            THE REPORTER:  One at a time.

3    BY MR. CHOUDHRI:

4        Q.    I'm asking about the motion, and I'm also

5    asking about the settlement agreement.

6            MS. NDEGE:   And I'm just going to object

**EXHIBIT 11**
**Page 26 of 149**

```
 7   if -- Kyle, if any of your answers contain

 8   privileged information on the basis of privilege,

 9   I'm going to ask you not to answer anything that

10   might be privileged.

11           THE DEPONENT:  Can you re-ask your

12   question, Mr. Choudhri?

13   BY MR. CHOUDHRI:

14       Q.   Did you partake in any drafting or editing

15   of the 9019 motion and/or the settlement agreement?

16       A.   Yes.

17       Q.   And can I ask you why -- strike that.  Who

18   originated the original draft?

19       A.   Of what?

20       Q.   The 9019 settlement and compromise.

21       A.   The application, that was prepared by --

22   well, I -- I received a draft of it from Mr.

23   Cumings.  I don't know who prepared it.

24       Q.   And when was this?

25       A.   Sometime before it was filed.
```

23

**EXHIBIT 11**
**Page 27 of 149**

1    Q.   And when was the settlement agreement

2  drafted?

3    A.   Probably drafted maybe early May.

4    Q.   So the settlement agreement was drafted

5  after the 9019 motion was filed, true or false?

6    A.   That's correct.

7    Q.   So when the motion for 9019 was filed,

8  there was no settlement agreement?

9    A.   That's not true.  The parties had agreed

10  on the settlement.  It hadn't been put together in

11  an agreement for execution.  Romspen understood that

12  what was being submitted by the trustee, if

13  approved, would be the settlement that they would

14  adhere to.

15         And in response to the objection that was

16  filed saying there was no standalone settlement

17  agreement, the parties attempted to cure that

18  objection by memorializing what the parties had

19  already agreed to do.

20    Q.   And when was the first time that the

21  settlement agreement that is being sought to be

22  approved filed with this court?

23    A.   I don't understand your question.

24    Q.   When is the first time anybody besides

25  Kyle Hirsch, and Pat Lowe, and Brian Cumings saw the

**EXHIBIT 11**
**Page 28 of 149**

24

1  settlement agreement?

2      A.   You're referring to the settlement

3  agreement that was prepared after the 9019 motion

4  was filed?

5      Q.   Yes.

6      A.   I don't recall if one of my colleagues

7  prepared an initial draft or whether it was me.  So

8  if one of my colleagues prepared the initial draft,

9  then it would've been at that point in time.  And,

10  certainly, it -- there would've been a delivery of a

11  draft of the settlement agreement to our client

12  before it was executed.

13      Q.   When was the first time the settlement

14  agreement that is being sought to be approved filed

15  with this court?

16      A.   Is there more to your question?

17      Q.   It's very precise and very simple, Mr.

18  Hirsch.  When was the -- when was the first time the

19  settlement agreement was filed with this court?

20      A.   I -- I -- I think you're using terms that

**EXHIBIT 11**
**Page 29 of 149**

21 I'm not quite understanding.  The 9019 application

22 contains the terms of the settlement agreement.  I

23 believe that was filed in March of 2025.  Subsequent

24 to the filing of the application, when there was an

25 objection raised, criticizing the fact that there

25

1 was no memorialized agreement between the parties,

2 there was a subsequent effort to prepare an

3 agreement to memorialize the agreement of the

4 parties.

5          I don't know whether that settlement

6 agreement document, which is signed by Romspen and

7 not signed by the Chapter 11 trustee, has actually

8 been filed with the court.  I know that it's been

9 disclosed for months, to the parties that have an

10 interest in the agreement, as -- as a trial exhibit.

11          MR. CHOUDHRI:  Objection, nonresponsive.

12 BY MR. CHOUDHRI:

13     Q.   Mr. Hirsch, it's very simple.  Your client

14 --

**EXHIBIT 11**
**Page 30 of 149**

15      A.   It's only simple if your question is

16   simple, and your question is not simple, Mr.

17   Choudhri.

18          MR. CHOUDHRI:  Objection.  Argumentative

19   -- witness is being argumentative.

20   BY MR. CHOUDHRI:

21      Q.   Mr. Hirsch, your client signed a

22   settlement agreement and filed it with this court.

23   True or false?

24      A.   I don't know whether the settlement

25   agreement document is filed with the court or not.

26

1      Q.   Why is the settlement agreement not filed

2   with the court?

3      A.   I think I just said, I don't know whether

4   it's filed with the court or not.  So I can't answer

5   your question the way that it was asked.

6      Q.   So, Mr. Hirsch, what triggered you to file

7   -- you were seeking the court to disallow -- strike

8   that.  You were -- you were seeking the court to

9   disallow me from representing myself in this case,

**EXHIBIT 11**
**Page 31 of 149**

10  true or false?

11      A.  I -- I don't know that that's a question

12  that can be answered with a true or false answer.

13  Our motion asks for the court to recognize the state

14  court receivership order and the admissions made in

15  prior filings.

16      Q.  Did you speak to Mr. Vargo today?

17      A.  No.

18      Q.  Did you speak to Mr. Vargo yesterday?

19      A.  I -- I -- I don't recall.  I don't think

20  so.

21      Q.  Did you speak to Mr. Vargo day before

22  yesterday?

23      A.  I don't recall, but I don't believe so.

24      Q.  So, Mr. Hirsch, you said earlier in the

25  deposition that -- Mr. Hirsch, did you -- were you

                                                    27

1  able to watch the foreclosure videos in the

2  deposition of Wes Roitman?

3      A.  I watched videos that were played during

**EXHIBIT 11**
**Page 32 of 149**

4    Mr. Roitman's deposition.

5        Q.   And did you witness a trustee selling the

6    La Vernia property for $550,000 to Drew Dennett?

7        A.   I -- I -- I don't know what I witnessed.

8    It was a video that -- that was played.  It -- it is

9    what it is.  And I don't know how that has anything

10   to do with the pending 9019 motion.

11       Q.   So are you seeking a release -- is your

12   client seeking a release from the debtor for actions

13   from the foreclosure sale and the effects to the

14   amount of the debt to the borrower?

15       A.   I don't understand your question.

16           MR. CHOUDHRI:  No problem.  Let -- let's

17   -- let's take a two-minute break, if that's okay.

18   Thank you all.

19           THE REPORTER:  We'll go off the record,

20   3:39 p.m.

21           (WHEREUPON, a recess was taken.)

22           THE REPORTER:  We're back on the record,

23   3:42 p.m.

24   BY MR. CHOUDHRI:

25       Q.   Mr. Hirsch, who instructs you at TIG

**EXHIBIT 11**
**Page 33 of 149**

1   Romspen?  Who do you take your direction from?

2       A.   I -- I -- I don't think I'm at liberty to

3   disclose that information.  That invades the

4   attorney-client privilege.

5       Q.   Are you refusing to answer the question

6   about who you take your instructions from at TIG

7   Romspen?

8       A.   Yes.

9            MS. NDEGE:  So I'm going to object to the

10  question on the basis of privilege, and instruct Mr.

11  Hirsch not to respond.

12  BY MR. CHOUDHRI:

13      Q.   Mr. Hirsch, are you going to refuse to

14  answer the question about who you take instruction

15  from?

16      A.   Yes.

17           MR. CHOUDHRI:  Court Reporter, if you'd

18  certify that, please.

19           THE REPORTER:  Understood.

20  BY MR. CHOUDHRI:

21      Q.   Mr. Hirsch, what role did you play, or

22  your law firm played, in relation to the October

23  1st, 2024 foreclosure sale of 1001 West Loop?

**EXHIBIT 11**
**Page 34 of 149**

24     A.    In respect to the 9019 motion?  I'm not

25  sure I understand your question.


                                          29

1        Q.   Mr. Hirsch, have you -- you don't

2   understand my question.  Okay.  Mr. Hirsch, did your

3   law firm prepare a substitute trustee deed pursuant

4   to the October 1st, 2024 foreclosure sale for 1001?

5        A.   I -- I don't -- I don't recall that 2024

6   foreclosure sale being an element of the 9019 motion

7   with the trustee.  Can you explain how that's

8   relevant to the 9019 motion?

9             MR. CHOUDHRI:  Objection.  Mr. Hirsch,

10  this is --

11            MS. NDEGE:  I'm going to object to the

12  question, and ask Mr. Choudhri to please explain the

13  relationship to the 9019 application.

14  BY MR. CHOUDHRI:

15       Q.   Mr. Hirsch, are you refusing to answer my

16  question as it relates to your role or your law

17  firm's role in the foreclosure sale for the subject

**EXHIBIT 11**
**Page 35 of 149**

18    property on October 1st, 2024?

19        A.    In as much as it is outside the scope of

20    the testimony for which I agreed to sit today, yes.

21        Q.    So you're not going to provide me any

22    answers today, and you're refusing to answer any

23    questions as it relates to your role, or your law

24    firm's role, for the October 1st, 2024 foreclosure

25    sale?

                                                    30

1              MS. NDEGE:   I'm going to object to the

2    question.

3              THE DEPONENT:   I'll address questions as

4    --

5              MS. NDEGE:   You've already asked the

6    question.

7              THE DEPONENT:   I'll answer that question,

8    Brigid.

9              I'll address questions as they're asked.

10   I'm not going to blanket tell you whether I will or

11   will not ask (sic) a question that hasn't been

12   asked, but I am here voluntarily to answer questions

**EXHIBIT 11**
**Page 36 of 149**

13  on the limited scope of the 9019.  And so to the

14  extent a question is relevant material to the 9019,

15  I -- I -- I am here and available to answer it.

16  BY MR. CHOUDHRI:

17      Q.   Mr. Hirsch, if the property was struck

18  sold on October 1st, 2024, then how can you ask this

19  court to conduct a sale for the same property that

20  was already struck sold?

21      A.   So you're asking me to answer a

22  hypothetical?

23      Q.   Well, Mr. Hirsch, you're refusing to

24  answer the fact that your -- you and your law firm

25  handled and conducted a foreclosure sale, as Mr. Wes

                                                31

1  Roitman testified that you handled it.  You heard

2  him say that.  You remember?

3      A.   So now you're asking me questions about a

4  deposition rather than questions about the 9019

5  motion.

6          MR. CHOUDHRI:  Objection.  Nonresponsive.

**EXHIBIT 11**
**Page 37 of 149**

7   BY MR. CHOUDHRI:

8       Q.   Mr. Hirsch, did you or your firm

9   participate in the October 1st, 2024 foreclosure

10  sale?

11      A.   How does that have anything to do with the

12  9019 motion?

13          MR. CHOUDHRI:  Answer the question, Mr.

14  Hirsch.  Stop asking me --

15          MS. NDEGE:  I'm going to object -- I'm

16  going to object --

17          THE DEPONENT:  I'll answer the -- I'll

18  answer the question if it's a question that's within

19  the scope of the reason why I agreed to sit here for

20  this deposition.  If you're asking me questions that

21  are outside the scope, I refuse to answer because

22  that's not consistent with my agreement to be here

23  today.

24          This deposition was not properly noticed.

25  I was not subpoenaed.  I'm here on a voluntary

32

1   basis, based on the limitation of the scope of this

EXHIBIT 11
Page 38 of 149

2  deposition -- of this deposition.  When you go

3  outside it, I'm refusing to answer your questions.

4  BY MR. CHOUDHRI:

5      Q.   So, Mr. Hirsch, do you think that means

6  you can hijack my depo and not answer questions?

7      A.   You can ask whatever question you want.  I

8  will refuse to answer questions that are outside the

9  scope of the purpose for my being here today.

10     Q.   And, Mr. Hirsch, do you understand you

11  don't decide that, the judge does?  You understand

12  that, right?

13     A.   If -- if -- if you raise it with the

14  judge, and he says that I need to answer questions,

15  I'll answer questions.

16     Q.   Mr. Hirsch, you're not the judge in this

17  case, right?

18     A.   That's true.

19     Q.   So, Mr. Hirsch, do you understand I'm

20  trying to be reasonable, I'm trying to work through

21  this and understand the 9019 that you're asking this

22  court to seek is presuming that you and -- and --

23  wait, you're asking this court to sell a property,

24  correct?

25     A.   I'm not asking the court to do anything.

**EXHIBIT 11**
**Page 39 of 149**

33

1      Q.    Does the settlement agreement that your

2  client signed involve in the sale of 1001 West Loop?

3      A.    Does the settlement agreement that my

4  client signed involve the sale of the property at

5  1001 West Loop?  Yes.

6      Q.    And you're refusing to answer any

7  questions about the foreclosure sale that occurred

8  on October 1, 2024.

9      A.    The settlement doesn't involve the

10  foreclosure.

11      Q.    The property -- sold for 15 million --

12          THE REPORTER:  It's cutting in and out,

13  and please speak one at a time.

14  BY MR. CHOUDHRI:

15      Q.    Mr. Hirsch, was the property, 1001 West

16  Loop, struck sold by the trustee on October 1st,

17  2024?

18      A.    I was not at the sale.  There is no

19  trustee's deed transferring the property to anyone.

20          MR. CHOUDHRI:  Objection, nonresponsive.

**EXHIBIT 11**
**Page 40 of 149**

21  That's not my question.

22  BY MR. CHOUDHRI:

23      Q.   Mr. Hirsch, did your law firm receive

24  draft and obtain a trustee's deed for October 1st,

25  2024?

34

1      A.   There is no trustee's deed for a sale that

2  occurred in October of 2024.

3      Q.   Mr. Hirsch, did your law firm prepare or

4  draft a trustee's deed for October 1st, 2024?

5      A.   Now you're asking for me to disclose my

6  firm's work product, I'm not going to do that.

7      Q.   Are you in --

8           MS. NDEGE:  I'm going to object to the

9  question on the basis of privilege.

10 BY MR. CHOUDHRI:

11     Q.   So, Mr. Hirsch, do you understand when a

12 trustee strikes the property sold, it is sold?  That

13 the mere filing is ministerial.  Do you understand

14 that?

15     A.   If you're asking me a legal conclusion,

EXHIBIT 11
Page 41 of 149

16    that's not my understanding of -- of the law.

17         Q.   So what is your understanding of the law,

18    Mr. Hirsch?

19         A.   Well, I -- I -- I -- I don't know how my

20    understanding of the law, as it relates to trustee

21    sales, has anything to do with the trustee's

22    application to approve a 9019.  But I -- at this

23    point, there is no document of record or signed by a

24    substitute trustee, to my knowledge, that transfers

25    the property from 1001 WL, LLC to anybody else.

                                              35

1          Q.   Mr. Hirsch, to your knowledge -- strike

2     that.  Mr. Hirsch, have you spoken to Sandy

3     Dasigenis?

4          A.   I may have.

5          Q.   And did you email her or she emailed you?

6          A.   I'm sure we've emailed from time to time.

7          Q.   And you still have those emails, correct?

8          A.   If I was involved in email correspondence,

9     I probably would.

**EXHIBIT 11**
**Page 42 of 149**

10      Q.   So you wouldn't have deleted any of those

11 emails, right, between you and the trustee?

12      A.   Not unless they were part of the firm's

13 document retention and destruction policy.

14      Q.   And so is your firm -- does your firm have

15 a document destruction and a policy to destroy

16 communications with witnesses and trustees while

17 there's a pending litigation and bankruptcy pending?

18      A.   That is a very broad question.  My firm

19 does not have a policy of destroying communications

20 with witnesses when there is litigation pending.

21 No.

22      Q.   And, Mr. Hirsch, my question is very

23 simple:  You're aware there is litigation pending in

24 relation to Romspen in the bankruptcy court?

25          THE REPORTER:  Last two words.

36

1 BY MR. CHOUDHRI:

2      Q.   Mr. Hirsch, very simple:  Have you deleted

3 any communications between you, and your firm, and

4 Sandy Dasigenis?

EXHIBIT 11
Page 43 of 149

5    A.   Over what period of time are you asking

6  your question?  I've been practicing law in Texas

7  since 2019.

8    Q.   Mr. Hirsch --

9    A.   Actually, since -- since before that.

10  I've been licensed to practice in 2019, but I

11  practiced before that on a pro hac basis.

12        MR. CHOUDHRI:  Objection, nonresponsive.

13  BY MR. CHOUDHRI:

14    Q.   My -- and my question's very precise:  Do

15  you know who Sandy Dasigenis is?

16    A.   Hey, Mr. Choudhri, you saying your

17  question's simple or precise doesn't make it simple

18  or precise.  And the question that you just asked is

19  not the same question that you asked previously.  If

20  you're asking me to answer your question, "Do I know

21  who Sandy Dasigenis is?"  I am familiar with who

22  Sandy Dasigenis is.  Yes.

23    Q.   And who is she, and what is your

24  involvement and relationship with her?

25    A.   Sandy Dasigenis, to my understanding, is

**EXHIBIT 11**
**Page 44 of 149**

1  an independent contractor for a service that our

2  firm typically uses for posting and calling trustee

3  sales, among other things.

4      Q.   And how long have you known Sandy?

5      A.   Again, I'm not sure I know Sandy.  I know

6  who she is.  I was probably first introduced to her

7  name in 2019, 2020, something around that time.

8      Q.   And so, to be clear -- I just want to make

9  sure the record is clear -- you said you don't know

10 what your firm policy is on retention or document

11 destruction when I asked you the question about

12 Sandy and communications with Sandy, right?  Do you

13 recall that?  And we -- or, if not, I can go back

14 with the court reporter and ask her.

15     A.   You can go back to the court reporter if

16 you want, but I recall that your question had no

17 limitations on time, and that had no limitations on

18 engagement.  Your question simply was, "Have you

19 destroyed any emails with Sandy Dasigenis?"

20          If I've known her since 2020, there's a

21 good chance that emails that I received from her in

22 2020 that have nothing to do with this matter at

23 all, I would've deleted, and they would've gotten

EXHIBIT 11
Page 45 of 149

24  deleted through our -- our -- our -- our firm's

25  document retention and destruction policy.

38

1          That was the question that you asked.

2  That was the answer that I gave, is I don't know.

3  There would've -- there may have been emails that

4  were destroyed between me and Sandy Dasigenis.  As

5  it relates to this particular matter, I would not

6  expect any emails that I had with Ms. Dasigenis to

7  be put in a deleted file.

8          I would not expect any emails with Ms.

9  Dasigenis -- to the extent there are any, in

10  connection with this matter -- to have been

11  destroyed.

12     Q.   And so who handled the foreclosure sale

13  for La Vernia?

14     A.   What does that have to do with the 9019,

15  Mr. Choudhri?  That's why we're here.

16     Q.   You understand the debtor is compromising

17  with the lender, Romspen, and releasing Romspen of

18  bad acts.  You're aware of that, Mr. Hirsch, right?

**EXHIBIT 11**
**Page 46 of 149**

19      A.   Well, there are no bad acts.  The trustee

20   is releasing and the trustee is responsible for

21   analyzing what the trustee seeks to analyze in order

22   to determine whether or not to settle its claims

23   with Romspen.

24      Q.   It's really -- it's really simple, Mr.

25   Hirsch:  Are claims against Romspen being settled by

39

1    the trustee?  And do those claims include any

2    wrongful acts, if any, by Romspen, including, but

3    not limited to, the La Vernia foreclosure sale?

4       A.   Even though you said it's simple, it's a

5    very convoluted question.  So it's not simple.  The

6    settlement involves mutual releases.

7            MR. CHOUDHRI:  Objection --

8            THE DEPONENT:  I believe they're mutual.

9    Certainly releases in favor of Romspen.  Whether the

10   trustee believes that there are wrongful acts that

11   are being released is up to the trustee.  I don't

12   think there's any wrongful acts by Romspen that are

EXHIBIT 11
Page 47 of 149

13   being released.

14        In fact, I think Galleria Loop Note Holder

15   entered into releases of anything prior to July 4th,

16   2023, well before this bankruptcy case was even

17   filed.  So the only thing that the trustee would be

18   considering is any acts occurring after July 4th,

19   2023.

20   BY MR. CHOUDHRI:

21      Q.   And when was the La Vernia foreclosure,

22   Mr. Hirsch?

23      A.   February 6th, 2024.

24      Q.   And so is the trustee releasing Romspen as

25   it relates to the acts or issues related to the La

                                          40

1   Vernia foreclosure?

2      A.   I don't know.  Ask the trustee.

3      Q.   Mr. Hirsch, I'm asking you today, is

4   Romspen getting a release as it relates to the La

5   Vernia foreclosure?

6      A.   I don't know how 1001 WL, LLC's Chapter 11

7   trustee analyzes the release provision and what

**EXHIBIT 11**
**Page 48 of 149**

8   claims or acts it believes it's being released.

9          MR. CHOUDHRI:  Objection.  Nonresponsive,

10  Mr. Hirsch.

11  BY MR. CHOUDHRI:

12     Q.   I'm not talking about what other people

13  believe.  I'm asking you, Mr. Hirsch, is Romspen

14  getting a release as it relates to the actions that

15  took place on February the 6th, 2024?

16     A.   Romspen is receiving a release, yes, from

17  all -- from all actions that have occurred from the

18  date of the release prior.

19     Q.   And that would include the foreclosure

20  sale in La Vernia, Texas?

21     A.   I -- I don't know that the trustee has any

22  standing to challenge or dispute the foreclosure

23  sale in La Vernia, Texas.  I don't know.  It's up to

24  the trustee.

25     Q.   Mr. Hirsch, does the amount -- does the

                                                    41

1   sales price that the La Vernia property sells for

EXHIBIT 11
Page 49 of 149

2  affect the debtor, 1001 WL?

3      A.   I don't think so.

4      Q.   So if the La Vernia property sells for

5  100,000 or 3 million, your testimony is, it doesn't

6  affect 1001 WL, the debtor, at all?

7      A.   That's right.  Because the property that

8  secures it is worth well -- less than that amount.

9          MR. CHOUDHRI:  Objection, nonresponsive.

10  BY MR. CHOUDHRI:

11     Q.   Mr. Hirsch, are you aware of any

12  representations or promises made by Romspen to the

13  debtor, or myself, or Galleria, or other parties

14  when entering into the additional collateral that

15  was provided by Otisco?

16     A.   I'm aware of what's written in the

17  documentation, the amended and restated -- first

18  reinstatement agreement, I think it's called, and

19  the La Vernia deed of trust.  That's what I'm aware

20  of.

21     Q.   And so did Romspen fund additional monies

22  to the debtor when it received the collateral

23  securing the La Vernia property?

24     A.   Romspen didn't advance any money to the

25  debtor.

**EXHIBIT 11**
**Page 50 of 149**

42

1    Q.    Did Romspen advance any money to Otisco?

2    A.    No, not to my knowledge.  I wasn't -- I --

3  I wasn't involved at the time that the first

4  agreement was negotiated.

5         MR. CHOUDHRI:  Objection.  Nonresponsive.

6         THE DEPONENT:  As you know, that was Mr.

7  -- that -- that was Mr. Scannell.  So I was -- I --

8  I became involved in the relationship on around July

9  6th, 2023.

10        MR. CHOUDHRI:  Mr. Hirsch, objection.

11  Nonresponsive.  You're just going on and on and on.

12  There's no question on the table.  You're just

13  talking right now.  So you know how this works,

14  right?  I mean, I really -- you're much -- you know

15  this pretty well, so you -- you -- you know you

16  can't do that.

17  BY MR. CHOUDHRI:

18    Q.    All right.  Mr. Hirsch, you and I

19  negotiated the Otisco deed of trust, true or false?

20    A.    I don't recall that.  I believe it was

21  already negotiated by the time I was involved.

EXHIBIT 11
Page 51 of 149

22      Q.   Mr. Hirsch, what role does Scannell -- Mr.

23   Scannell, who's that?  You just brought his name up.

24   Who's that again?

25      A.   Tom Scannell is an attorney with Foley &

43

1   Lardner, Foley & Gardere -- I don't know what

2   they're called these days.  He was representing

3   Romspen before I got involved.

4      Q.   And when did you get involved representing

5   Romspen?

6      A.   In this particular engagement, July 6th,

7   2023, I believe.

8      Q.   So before July 6th, 2023, it was Foley

9   Gardere that was representing Romspen.  Is that

10   correct?

11      A.   That's my understanding.

12      Q.   And, Mr. Hirsch, you're aware of who Chris

13   Wyatt is?

14      A.   I'm familiar with the name.

15      Q.   Have you spoken to Mr. Chris Wyatt?

**EXHIBIT 11**
**Page 52 of 149**

16        A.    He may have called me once.

17        Q.    And what did he say?

18        A.    How does that have anything to do with the

19   9019, Mr. Choudhri?  That's why I'm here today.

20        Q.    Mr. Hirsch, why are you attaching

21   documents that have to do with Chris Wyatt?  What

22   does -- what does Judge Norman's orders have

23   anything to do with the 9019?

24        A.    I don't know what you're talking about.

25        Q.    Mr. Hirsch, what does Judge Jeffrey

                                          44

1    Norman's orders in a different case have anything to

2    do with the 9019 in Judge Robinson's court?

3              MS. NDEGE:  I'm going to object to the

4    question.  You've already asked it.  He's answered

5    it.

6              MR. CHOUDHRI:  Mr. Hirsch, answer the

7    question.

8              MS. NDEGE:  He's already answered it.

9              THE DEPONENT:  I -- I -- I -- I don't know

10   what you're talking about.  I -- I -- I -- I

**EXHIBIT 11**
**Page 53 of 149**

11  certainly could make a calculated guess why any

12  pleading filed in this case might refer to Judge

13  Norman's rulings.  But I don't know what particular

14  document you're referring to as it relates to the

15  9019.

16  BY MR. CHOUDHRI:

17      Q.  Why are you attaching documents from Judge

18  Norman's court in relation to exhibits in Judge

19  Robinson's court?

20          MS. NDEGE:  I'm going to object to the

21  question.

22          THE DEPONENT:  Can you help --

23          MS. NDEGE:  What's the relevance to the

24  9019 application?

25  BY MR. CHOUDHRI:

                                        45

1      Q.  Mr. Hirsch, you attached these exhibits to

2  the 9019?

3      A.  I'm sorry.  You -- were you finished with

4  your question?

**EXHIBIT 11**
**Page 54 of 149**

5      Q.   Yes.  Are you aware there are attachments

6  relating to Judge Norman, in references to Judge

7  Norman's rulings and orders, that you've attached in

8  this case and in relation to the 9019?  Can you tell

9  -- can you tell the court why you did that?

10     A.   Well, it -- it depends on which filings

11  they're attached to.  If you can show me which

12  filings they're attached to, I can try to explain.

13     Q.   Well, explain to me -- it's really simple

14  -- why are you attaching Judge Norman's orders in

15  other matters that have nothing to do with this

16  case?

17     A.   Again, it would help to have the context

18  for you to show me where in relationship to the 9019

19  motions I allegedly attached these orders.  Can you

20  show me where in the 9019 application materials I

21  allegedly attached these orders?

22          MR. CHOUDHRI:  Mr. Hirsch, objection.

23  Nonresponsive.  I'm not here to answer your

24  questions today.  And, Mr. Hirsch --

25          THE DEPONENT:  Well, without the context,

**EXHIBIT 11**
**Page 55 of 149**

1   I can't answer your question.

2        MR. CHOUDHRI:  Please -- please stop

3   looking at other things.

4   BY MR. CHOUDHRI:

5        Q.   Do you have anything else on your screen

6   besides the Zoom video, Mr. Hirsch?

7        A.   Yeah, I've got a photo that was sent to me

8   from a different client in an unrelated matter that

9   I was working on when I received your late

10  attachment of the link for today's Zoom hearing.

11  And it's still on my screen.

12       Q.   Anything else?

13       A.   I have my email open.

14       Q.   Could you turn your email off, Mr. Hirsch,

15  please?  Have you had your email open the whole time

16  we've been having the Zoom deposition?

17       A.   Yes.  No, I will not turn it off.

18       Q.   So you're refusing to turn your emails off

19  while I'm asking you questions under oath?

20       A.   Yes.  There's nothing in my emails that

21  has anything to do with your questions or my

22  answers.

23       Q.   Is anybody texting you, emailing you,

24  messaging you while you're sitting for this

EXHIBIT 11
Page 56 of 149

25  deposition?

47

1       A.    Yes.  But not having anything to do with

2  this deposition or this case.  And if it has to do

3  with this case, I'm not looking at it.

4       Q.    Well, Mr. Hirsch, I can't see what's on

5  your screen.  And if you have your --

6       A.    As you shouldn't.

7             MR. CHOUDHRI:  And, Mr. Hirsch, as you

8  shouldn't have your emails open when you are a

9  witness, you shouldn't have anything in front of

10  you, Mr. Hirsch, other than any exhibits that I'm

11  presenting to you.  So I would object that -- that

12  I'm just learning that throughout the deposition you

13  have been reviewing emails, looking at emails, and

14  who knows who you're communicating with, and you're

15  refusing to turn your emails off.  So I would

16  object, Mr. Hirsch.

17             THE DEPONENT:  I will close my email

18  windows, and I'll make it clear on the record that I

**EXHIBIT 11**
**Page 57 of 149**

19   have not had any communications during the course of

20   this deposition having anything to do with any of

21   the questions you've asked or the answers I've

22   given.

23          MR. CHOUDHRI:  Objection.

24   BY MR. CHOUDHRI:

25     Q.   Mr. Hirsch, you -- you've been practicing

                                             48

1   law how many years?

2     A.   Since 2005.

3     Q.   So that's almost 20 years, right, Mr.

4   Hirsch?

5     A.   Yes.  In fact, it is 20 years.

6     Q.   Congratulations.  And you're -- you're

7   aware that when you're in a deposition, you're not

8   supposed to look at other documents, other

9   communications, other than what's being provided to

10   you in the deposition.  You're -- you're aware those

11   are the rules?

12     A.   That's not a rule.

13     Q.   So --

**EXHIBIT 11**
**Page 58 of 149**

14      A.   It may be what people asking depositions

15   prefer; it may be how people are instructed; it may

16   be how people are advised, but there's no rule.  And

17   I will tell you, in the 20 years that I've been

18   practicing, I've never been deposed more than in

19   this case.

20      Q.   Who's deposed you in this case, Mr.

21   Hirsch?

22      A.   You have twice.  Either you or Mr. Taylor

23   has -- has deposed me once before, I believe.  I've

24   also been -- I've also been on the stand more in

25   this case than I -- in -- in -- in connections with

49

1   cases that you've been involved than in any other

2   litigation in which I've been involved.

3      Q.   Mr. Hirsch, you objected to Mark Taylor's

4   employment in this case, correct?

5           MS. NDEGE:  I'm going to object to the

6   question.

7           THE DEPONENT:  I don't --

**EXHIBIT 11**
**Page 59 of 149**

8          MS. NDEGE:  What does it have to do with

9     the application?

10          MR. CHOUDHRI:  Ms. Ndege, Mr. Hirsch was

11    the one who opened the door about these things about

12    Mr. Taylor, and his deposition, and other people.

13          So you opened the door, Mr. Hirsch.  I can

14    ask you questions about things you opened the door

15    on.

16          THE DEPONENT:  No.  Fine.  Ask your

17    questions; I'll refuse to answer them.  You were

18    asking me about email communications and how long

19    I've been practicing law, and I'm telling you that

20    in -- in all the years I've been practicing law,

21    nobody has had me testify under oath more than you

22    or your counsel.  So let's get back to the 9019

23    motion, which is why I'm here to testify.

24    BY MR. CHOUDHRI:

25        Q.   Have you reviewed the objection that Kell

                                                          50

1     Mercer filed?

2        A.   Yes.

**EXHIBIT 11**
**Page 60 of 149**

3      Q.   And did you see in the objection the issue

4   about ownership of the property?

5      A.   No.

6      Q.   Okay.  Well, let's take a look at it.

7   And, Mr. Hirsch, let's just make sure the record is

8   clear.  You have refused to answer who at your law

9   firm worked on this case, correct?

10      A.   No, I've told you that Ms. Ndege has

11   worked on the case.  And I've told you that we've

12   had various associates conduct various different

13   issues on the case.  And I've told you that I have a

14   partner in Kansas City who has a relationship with

15   the client that may or may not have had some

16   involvement in the case.  But I'm not going to give

17   you their names so you can harass them like you

18   harass me.

19      Q.   Mr. Hirsch, do you have any email

20   communications with Chris Wyatt?

21      A.    Not to my knowledge.  Is he involved in

22   the 9019?

23      Q.   Well, Mr. Hirsch, you've -- you've

24   attached orders that relate to Chris Wyatt in this

25   case.  And that's why I'm trying to understand why

**EXHIBIT 11**
**Page 61 of 149**

51

1    -- why you've done that.

2        A.   So my recollection of the 9019 application

3    refers to settlement of claims with Romspen, sale of

4    the property, retention of brokers, holdbacks for

5    non-insider general unsecured claims.  I don't

6    recall anything in the 9019 application that relates

7    to Mr. Wyatt or Judge Norman.  If I'm mistaken,

8    please show me where I'm mistaken.

9        Q.   Sure.  No problem.  Let me pull it up.

10   So, Mr. Hirsch, just so the record is clear, you

11   and/or your law firm, Bryan Cave Leighton Paisner,

12   was the law firm that handled both foreclosure sales

13   from October 2024, for 1001 West Loop, and Feb 6th,

14   2024, for the La Vernia property.  Is that correct?

15       A.   How does this relate to the 9019, Mr.

16   Choudhri?

17       Q.   Well, it has to --

18       A.   You're wasting a lot of time.

19       Q.   Mr. Hirsch.

20       A.   If you can just say how this -- how this

21   relates to the 9019, I'll answer your questions, but

**EXHIBIT 11**
**Page 62 of 149**

22   it's so far off base.  You're trying to get

23   information that relates to other litigation.

24        Q.   Sir -- Mr. Hirsch, that's incorrect.

25        A.   I'm not going to answer those questions.

52

1         Q.   Not going to answer the questions about

2    the foreclosure sales that your law firm handled for

3    1001 West Loop on October 1st, 2024.  And you're not

4    going to answer any questions as it relates to the

5    La Vernia foreclosure that relates to a offset to

6    the debt in the amended proof of claim that's one of

7    your exhibits in this case for the 9019.  Is that

8    true?  You're going to refuse to answer questions --

9         A.   I'll -- I'll -- I'll -- I'll -- I'll

10   answer each question that you pose that is relevant

11   to the 9019.  So far, you've not explained how

12   anything relating to an October foreclosure sale

13   relates to the 9019, and I've explained to you why

14   the La Vernia sale does not have anything to do with

15   the 9019.

16        Q.   Because irrespective of what the property

**EXHIBIT 11**
**Page 63 of 149**

17  sold for, it wouldn't have affected the debtor at

18  all.  That was your testimony earlier, right?

19      A.    I did not say irrespective of -- of what

20  the property sold for.  The claim that has been

21  asserted by Romspen is of a magnitude so much higher

22  than the value of the 1001 West Loop property that

23  even a $2 million reduction from the Romspen claim

24  amount would be far in excess of the value of the

25  1001 West Loop property.

53

1            In fact, it would be far -- even further

2  in excess of the agreed limited credit bid that is

3  part of the negotiated resolution.

4      Q.    And what is the agreed credit bid?

5      A.    It -- it's confidential.  I will disclose

6  it to the court.  I will tell you that it is less

7  than the low point of the value range that Judge

8  Robinson had determined at the stay relief hearing.

9            THE REPORTER:  What hearing?

10            THE DEPONENT:  Stay relief.

**EXHIBIT 11**
**Page 64 of 149**

11  BY MR. CHOUDHRI:

12      Q.   So, Mr. Hirsch, you're -- do you have

13  knowledge of who owns Otisco RDX, LLC?

14      A.   How does that have to do with the 9019

15  motion, Mr. Choudhri?

16      Q.   Mr. Hirsch, do you have any idea of what

17  the Otisco property is worth, and if it was sold

18  properly, what it would bring in value, and how that

19  could affect the debt as it relates to the debtor in

20  this case?

21      A.   It was already foreclosed.  The -- the

22  foreclosure amount would have reduced -- the

23  foreclosure amount, even at your incorrect disputed

24  value of $2 million, would not have brought the

25  value of the TIG Romspen claim anywhere close to the

54

1  value of the 1001 West Loop property.

2           MR. CHOUDHRI:  Objection --

3           THE DEPONENT:  That's why it doesn't

4  matter.

5  BY MR. CHOUDHRI:

**EXHIBIT 11**
**Page 65 of 149**

6     Q.   So -- so it -- would it be correct, the

7  higher the Otisco property sells for, the lesser the

8  debt that the debtor would have to pay to Romspen?

9  It's a yes or no --

10     A.   Sell for when?

11     Q.   I'm sorry?

12     A.   You said "sells for."  Sells for when?  At

13  foreclosure?  At a later date?  At some time in the

14  past?  What do you mean by "sells for"?

15     Q.   At any more -- at any point, Mr. Hirsch.

16  If the Otisco land sells -- whatever it sells for --

17  it affects the amount of the debt for the debtor in

18  this case.  True or false?

19     A.   False.

20     Q.   So any amount of money that the Otisco

21  land sells for -- does -- your testimony under oath

22  is that it does not affect the amount of the debt

23  for 1001 to Romspen?

24     A.   Your -- your question is unclear.  When

25  you say "sells for," are you talking about sells for

55

EXHIBIT 11
Page 66 of 149

1   at some point in the future?  Has already sold for?

2   What -- what are you referring to?  If we sell it in

3   a year for $17 million, does it impact the debt?  Is

4   that your question?

5       Q.   Sure.  Let's take your hypothetical.  If

6   it sells for $17 million, does it affect the debt to

7   Romspen?

8       A.   If the La Vernia property sells in a year

9   for $17 million, it has no impact on the claim that

10  TIG Romspen has against the 1001 West Loop Estate.

11      Q.   So can we agree that both properties are

12  cross-collateralized?

13      A.   No.  The La Vernia property is no longer

14  collateral.  It is owned by a different entity.

15      Q.   That's owned --

16      A.   The credit bid was applied.

17      Q.   Okay.  Credit bid was applied.  And how

18  much was the credit bid applied?

19      A.   $100,000.

20      Q.   And you told me that the property sold for

21  $100,000, in an email, true or false?

22      A.   That's true.

23      Q.   And where did you get that information

24  from, Mr. Hirsch?

EXHIBIT 11
Page 67 of 149

25     A.   From the substitute trustee service.

56

1      Q.   Who at the substitute trustee service gave

2  you that information?

3      A.   I think her name is Sasha.

4      Q.   Sasha what?

5      A.   If I could access my emails, I might be

6  able to tell you her last name, but I don't remember

7  her last name right now.  It's Sasha.

8      Q.   Let's make an exception.  Go ahead and

9  access your emails and tell me what her last name

10  is.

11     A.   Her last name is Garza.

12     Q.   Sasha Garza?

13     A.   Yes.

14     Q.   And what is the email that you see that

15  she has over there on your screen?

16     A.   Let me reopen it.  Sasha.garza@svclnk.com.

17     Q.   What's her phone number?

18     A.   The main line is (800) 683-2468.

19     Q.   And what is a transaction number for that

EXHIBIT 11
Page 68 of 149

20  transaction?  Do you have a account invoice number?

21  Transaction number?  Because I can represent --

22      A.   No.

23      Q.   You don't have a reference number for the

24  sale they conducted?

25      A.   I -- I -- I was looking for Sasha's name.

57

1  That's what I was looking for.

2      Q.   And who hired Sasha at ServiceLink?

3      A.   I don't know that anyone hired Sasha.

4  ServiceLink is the service that our firm retained.

5      Q.   And walk me through the process.  So when

6  your firm retains ServiceLink, is it true that

7  ServiceLink is also the same company that you hired

8  for the 1001 foreclosure for October 2024 as well?

9      A.   Yes.

10      Q.   And has your firm deleted any

11  communications between ServiceLink and yourself or

12  your firm and ServiceLink?

13      A.   Relating to what?

**EXHIBIT 11**
**Page 69 of 149**

14      Q.   Have y'all deleted any communications

15  whatsoever between you and ServiceLink?

16      A.   Okay.  This gets back to the timing issue

17  that I raised before.  Our firm has used ServiceLink

18  for many years even before me.  I'm sure there have

19  been emails deleted in the years that we've been

20  doing business with ServiceLink.

21      Q.   And why would emails be deleted with

22  ServiceLink?  When you say, "I'm sure emails were

23  deleted with ServiceLink," can you explain why

24  emails are deleted with ServiceLink?

25      A.   Yeah, because in 2012, a transaction

58

1   occurred with ServiceLink, and there's no reason to

2   keep that email around.

3       Q.   How do you know that?

4       A.   Because our document retention policy

5   includes deleting emails that are a certain year old

6   if they're not preserved in a non-deleted cabinet.

7       Q.   And who handles your retention and

8   deletion policy at the law firm?

**EXHIBIT 11**
**Page 70 of 149**

9      A.    Look -- look, Ali, there's been no

10  allegation of spoliation or destruction as to

11  material information relating to these sales.  If

12  you want to serve discovery as to what our policies

13  are, have at it.  I don't know what they are.

14          I work through my internal channels when

15  there's questions like this.  If you want to serve

16  something, please do.  I'm not answering questions

17  about our firm's policies, unless they relate to the

18  9019 motion.

19      Q.   Well, you said you are sure that there's

20  been deletions of emails between you and

21  ServiceLink, and I don't -- I want to understand why

22  and when, and if it happened, clearly when it

23  happened and why it happened.

24      A.   Why don't you ask the question that's

25  relevant?  Like have there been any emails deleted

59

1  as it relates to any of the sales involved in this

2  case?  Because that answer would be no, not to my

**EXHIBIT 11**
**Page 71 of 149**

3  knowledge.  So why does it matter what's been

4  deleted 15, 20 years ago?

5      Q.   Well, I'm talking about as it relates to

6  La Vernia or 1001, Mr. Hirsch.

7      A.   Thank you for getting that clarification,

8  which is what I asked you about before.  To my

9  knowledge, there has been no emails involving

10  ServiceLink that have been deleted from my firm.

11      Q.   So when you got -- do you know who that

12  individual is in that video doing the foreclosure

13  sale in La Vernia?

14      A.   There are several people in the video.

15      Q.   There's only one person reading and

16  selling the property, correct?

17      A.   Well, you didn't ask me if I know who the

18  person is reading and selling the property.  You

19  asked me if I knew who the person was in the video.

20      Q.   Do you know who is reading the sale in the

21  -- in the video for the La Vernia property that we

22  saw earlier?

23      A.   I -- I -- I probably can figure out her

24  name, but no, I don't know who she is.  I've never

25  met her, never talked to her.

**EXHIBIT 11**
**Page 72 of 149**

60

1     Q.   What's her name?

2     A.   I -- I -- I would have to research it.

3  It's probably on the substitute trustee deed.

4     Q.   And so the substitute trustee deed states

5  that the sale happened -- let me back up a little

6  bit.  It's true that you represent RIC (Lavernia),

7  LLC, and we've established that earlier.  Is that

8  correct?

9     A.   Yes.  What does that have to do with the

10  9019 motion?

11     Q.   Because RIC (Lavernia), according to you,

12  acquired the property at a foreclosure sale through

13  a credit bid of $100,000 on February the 6th, 2024,

14  correct?

15     A.   As TIG Romspen's assignee, yes.

16     Q.   Explain what you mean by that, "as TIG

17  Romspen assignee."

18     A.   TIG Romspen assigned its interest to RIC

19  (Lavernia).

20     Q.   When?

21     A.   That's what an assignee is.

22     Q.   When?

**EXHIBIT 11**
**Page 73 of 149**

23      A.   I don't know.  Around the time of the

24  foreclosure sale.

25          MR. CHOUDHRI:  And the -- let's take a

                                    61

1  five-minute break, please.

2          THE REPORTER:  We'll go off the record,

3  4:30 p.m.

4          (WHEREUPON, a recess was taken.)

5          THE REPORTER:  We're back on the record,

6  4:35 p.m.

7  BY MR. CHOUDHRI:

8      Q.   So Mr. Hirsch, you testified earlier that

9  RIC Lavernia acquired the Lavernia property through

10  a credit bid for 100,000 at the February 6, 2024,

11  foreclosure sale; is that correct?

12      A.   As the assignee of TIG Romspen, yes.

13      Q.   And what -- what consideration was

14  provided in that transfer?

15      A.   I'm not -- I'm not getting into the

16  internal workings on those matters.  They don't

**EXHIBIT 11**
**Page 74 of 149**

17   relate to the 9019.

18      Q.   And Mr. Hirsch, you stand behind all of

19   your filings in this bankruptcy court, right, as an

20   officer of the court?

21      A.   Yes.

22      Q.   You stand behind your filings that you

23   made, and they're all truthful and correct?

24      A.   To the best of my knowledge, yes.

25      Q.   And Mr. Hirsch, you reviewed the videos

                                   62

1   that Mr. Kell Mercer provided you as it relates to

2   the foreclosure sales, true?

3      A.   I don't recall Mr. Mercer providing me any

4   videos.

5      Q.   So Mr. Mercer never provided any videos

6   relating to the Lavernia foreclosure sale?

7      A.   Not to my recollection.  There were some

8   provided by Mr. Taylor back in April of 2024.  If

9   Mr. Mercer provided me any videos, they were

10  duplicates of what Mr. Taylor had provided.

11     Q.   Have you reviewed those videos, Mr.

**EXHIBIT 11**
**Page 75 of 149**

12  Hirsch?

13      A.   The ones from Mr. Taylor, yes.

14      Q.   Did you forward those to your client?

15      A.   I don't recall.

16      Q.   Do you recall your client testifying

17  earlier that he did not receive any videos from you,

18  nor he saw those videos?

19      A.   I recall Wes testifying to that.  Wes is

20  involved in TIG Romspen, but there's other people at

21  TIG Romspen.

22      Q.   And so who is -- who's Mary Gianfriddo?

23      A.   How does that have anything to do with the

24  9019, Mr. Choudhri?

25      Q.   Well, Mr. Hirsch, you've attached this as

63

1  an exhibit to the 9019.

2      A.   I don't know what you mean by, "As an

3  exhibit to the 9019," and all I see on your screen

4  is Exhibit A.

5      Q.   Okay.  Well, let's -- let's take a look at

EXHIBIT 11
Page 76 of 149

6   this.  Mr. Hirsch, do you see how many pages this is

7   here on the right?

8        A.   No, it's very small.

9        Q.   Let me make it bigger.  Mr. Hirsch, you're

10  aware that the compiled witness and exhibit list

11  that you've provided for this 9019 is 497 pages; is

12  that correct?

13       A.   I didn't count the pages.  That wouldn't

14  surprise me.

15       Q.   And so I'm looking at this.  Do you see

16  this as a proof of claim here?

17       A.   I see what's on the screen as an

18  attachment to the original proof of claim that was

19  filed.

20       Q.   I'm going to represent to you, Mr. Hirsch

21  -- and I can send this to you, and I'm sure you have

22  it --

23            MR. CHOUDHRI:  And Ms. Ndege, you may have

24  the exhibits for the August 4th hearing that you've

25  filed or sent over.  And you see that it's -- that

64

EXHIBIT 11
Page 77 of 149

1  your exhibit -- combined exhibits are 497 pages.  Do

2  you see that?

3          THE DEPONENT:  Who are you asking?

4          MR. CHOUDHRI:  I'm asking Ms. Ndege or Mr.

5  Hirsch.

6          THE DEPONENT:  Okay.  Well, Ms. Ndege

7  isn't the witness.  I am.  And as you asked, I took

8  everything off my screen other than this and the

9  number there is very small.

10  BY MR. CHOUDHRI:

11     Q.   Okay.  Well --

12     A.   As I testified, I wouldn't be surprised if

13  it was 497 pages.

14     Q.   Well, I'll represent to you that I have

15  your exhibit -- your exhibits that are 497 pages

16  that I'm looking at and I'm sharing the screen with

17  it.

18          MR. CHOUDHRI:  And I believe that is what

19  Exhibit, Madam Court Reporter?

20          THE REPORTER:  Would you like to mark this

21  as Exhibit 2?

22          MR. CHOUDHRI:  Sure.  Why don't we do

23  that?

24          And so refresh me, what exhibits do we

25  have in this -- in this depo so far?

EXHIBIT 11
Page 78 of 149

65

1        THE REPORTER:  Exhibit 1 was the notice of

2   hearing.

3        MR. CHOUDHRI:  Yeah.  Let's mark this as

4   Exhibit 2.

5        (WHEREUPON, Exhibit 2 was marked for

6   identification.)

7   BY MR. CHOUDHRI:

8        Q.   And Mr. Hirsch, do you communicate with

9   Blake Cassidy?

10       A.   Rarely.

11       Q.   Who do you mostly communicate with at

12   Romspen?

13       A.   I'm not going to disclose that.

14       Q.   And Mr. Hirsch, do you see this here on

15   the -- on the screen?  Do you see, "Amended proof of

16   claim"?  It says, "Case number 24-10119SMR, claim

17   number 1-2," filed 7/12/2024.  Do you see that?

18       A.   I see the -- I see the attachment to the

19   amended proof of claim, yes.

**EXHIBIT 11**
**Page 79 of 149**

20      Q.   And is everything on this amended proof of

21   claim true and correct?

22      A.   To the best of my knowledge.

23      Q.   Mr. Hirsch, have you spoken to Mr.

24   Balinses?  Do you know who Mr. Balinses is?

25      A.   The name does not sound familiar.



66


1       Q.   Okay.  What is Mr. Steve Dibert -- do you

2    know who Steven Dibert is?

3       A.   I'm familiar with the name.

4       Q.   And what does he have to do with Mr.

5    Roitman or TIG Romspen and the debtor in this case?

6       A.   I'll tell you, he has nothing to do with

7    the 9019 motion.

8       Q.   What does he have to do with the debtor?

9       A.   I don't think he has anything to do with

10   the debtor.

11      Q.   Have you communicated with Mr. Dibert

12   about me in any way, shape, or form directly or

13   indirectly?

14      A.   No.  And what does that have to do with

**EXHIBIT 11**
**Page 80 of 149**

15  the 9019?  I've never communicated with Mr. Dibert.

16       Q.  What about with his attorney?

17            MS. NDEGE:  I'm going to object to the

18  question.  I think we've already discussed that this

19  has nothing to do with the 9019 application, so I'm

20  not sure any further questions regarding that would

21  be appropriate.

22  BY MR. CHOUDHRI:

23       Q.  So Mr. Hirsch, just so we got the record

24  really clear here, I'm going to highlight this.

25            MR. CHOUDHRI:  And I would -- and I'm --

67

1  for the record, I'm on page 5 of 6 in claim number

2  1-2 in the bankruptcy case.  And this is one of your

3  exhibits, page 14 of 497.

4  BY MR. CHOUDHRI:

5       Q.  And would you just read what the

6  highlighted portion states?

7       A.  "On February 6, 2024, the Lavernia

8  property was sold to Romspen's assignee, RIC,

**EXHIBIT 11**
**Page 81 of 149**

9   "Lavernia" LLC for a successful bid in the amount of

10  $100,000."

11       Q.   Is that a true statement?

12       A.   To my knowledge.

13       Q.   And you got -- and your law firm handled

14  this foreclosure sale, correct?

15       A.   No, I don't know what you mean by

16  "handled."  We did not conduct the sale.

17       Q.   Did you instruct the sale and manage the

18  sale or have any participation in this sale?

19       A.   Those are all words that mean lots of

20  things.  We retained service to handle the notice

21  and posting and conduct of the sale.

22       Q.   And who communicate -- did you communicate

23  with the trustee when the sale is happening?  Who --

24  who at your law firm communicates with the trustee?

25       A.   I have no communication with the trustee.


                                    68


1        Q.   Who would have communication with the

2   trustee?

3        A.   Who would have or who -- I mean, are you

**EXHIBIT 11**
**Page 82 of 149**

4  asking a hypothetical?

5      Q.   I'm asking --

6      A.   I don't know what your question is.

7      Q.   You heard what Mr. Romspen -- Mr. Roitman

8  said earlier, right?  You were part -- you were here

9  in the deposition when Mr. Roitman said that he

10 handed it over to you guys, and you guys handled the

11 sale and did everything and he -- that's it.  That's

12 the end of it.  He doesn't know what happened.  Do

13 you remember that?

14     A.   That wasn't exactly his testimony, but he

15 said he lets his law firm handle it.

16     Q.   So my question is who at the law firm

17 handled it?

18     A.   I retained the service to provide the

19 posting, the notice, the recording, and the -- to

20 conduct the sale.

21     Q.   And who instructed and directed the

22 trustee?  Who gave instructions to the trustee for

23 the sale?  You?

24     A.   I presume it was the service.

25     Q.   Well, they got to get instructions from --

EXHIBIT 11
Page 83 of 149

69

1      A.   I never -- I never communicate with the

2   trustee.  I communicate with the service.

3          THE REPORTER:  One at a time.

4   BY MR. CHOUDHRI:

5      Q.   So who at the service do you communicate

6   with?  Is that Sasha?  Is that your sole -- that's

7   your exclusive communication?

8      A.   For this particular sale, yes.

9      Q.   So how does it work?  Do you send her an

10  email, sign, instruction, a bid -- bids, bid

11  requirements, bid instructions?  Walk me through the

12  whole process from beginning to end how you, Kyle

13  Hirsch, handled that?

14     A.   No, because this is outside the scope of

15  the 9019.

16     Q.   So Mr. Hirsch --

17     A.   I'm not answering your questions, Ali.

18     Q.   Mr. Hirsch, why don't you --

19     A.   That is outside the scope of the 9019.

20     Q.   Mr. Hirsch, you are representing to a

21  federal bankruptcy court about a sale that took

22  place that you handled and directed, and you made

**EXHIBIT 11**
**Page 84 of 149**

23  representations as an officer of the court to this

24  court on what that property sold for.  And so you --

25  you should be able to answer these questions, Mr.

70

1  Hirsch, because this goes to the liability, the

2  damages, the offset.  Was it a proper sale, not a

3  proper sale, and any fraud that was conducted as --

4  and who participated, if any fraud was conducted as

5  that sale.  And the 9019 is settling the fraud

6  claims, if there are any, right?

7       MS. NDEGE:  I'm going to object to the

8  question.  He's already answered and said he's --

9  what he's comfortable answering and not answering.

10  So that question has already been asked and

11  answered.

12  BY MR. CHOUDHRI:

13    Q.   Mr. Hirsch, so you're not comfortable --

14  comfortable answering questions as it relates to

15  this foreclosure sale for Lavernia that your client

16  said you handle; is that right?

17       MS. NDEGE:  I'm going to object again.

**EXHIBIT 11**
**Page 85 of 149**

18  I'm going to object again.  He said he's only going

19  to answer questions related to the 9019 application.

20  BY MR. CHOUDHRI:

21      Q.   Mr. Hirsch, are you refusing to answer my

22  question?

23      A.   I'll answer relevant questions.  Frankly,

24  the audio cut out while you're in the middle of your

25  speech, so I didn't even hear the question.

71

1      Q.   Okay.  So any fraud that was conducted is

2  being released as part of this 9019, correct?

3      A.   There was no fraud conducted.

4          MS. NDEGE:  I'm going to object.  You've

5  already asked that question.  He's already answered

6  earlier in the deposition.

7          THE DEPONENT:  There was no fraud

8  conducted.

9  BY MR. CHOUDHRI:

10      Q.   So any claims or wrongdoings from that

11  foreclosure sale for the October 24, 2024,

**EXHIBIT 11**
**Page 86 of 149**

12    foreclosure sale is being released under the 9019?

13        A.    There wasn't any wrongdoing.  The estate

14    or the trustee on behalf of the estate is providing

15    a release.

16        Q.    And so what I'm trying to determine is

17    what is the value of any claims and determine the

18    veracity of those claims, if any, because I need to

19    quantify those claims and what they're worth, right?

20    Because Romspen is getting a release in exchange for

21    providing something to the trustee, correct?

22        A.    There are -- there are multiple exchanges

23    happening in connection with this release -- I'm

24    sorry, in connection with the negotiated settlement.

25        Q.    But one of those components are is Romspen

                                                            72

1    is getting a release as it relates to any actions it

2    took from the February 6, 2024, sale by the trustee,

3    right?

4        A.    No, there is a -- there is a legal result

5    that will arise from the settlement.  There is a

6    release provision in the settlement agreement.

**EXHIBIT 11**
**Page 87 of 149**

7        Q.   And does Kyle Hirsch get released under

8    the settlement agreement?

9        A.   I don't know.  Probably because the way

10   that release provisions are typically written

11   include officers, attorneys, accountants, et cetera.

12   Parties typically don't want to enter into releases

13   just to have their attorneys, accountants, and

14   officers sued the next day --

15       Q.   Is RIC Lavernia -- RIC Lavernia, LLC,

16   getting a release?

17            THE REPORTER:  What was the end of your

18   sentence, Mr. Hirsch after --

19            THE DEPONENT:  I don't know.

20            THE REPORTER:  -- just to have the

21   officers -- after, just to have the officers sued

22   the next day, and then you said something.

23            THE DEPONENT:  It's pretty standard.

24   BY MR. CHOUDHRI:

25       Q.   Is RIC Lavernia, LLC, getting a release?

73

EXHIBIT 11
Page 88 of 149

1      A.    From the trustee?

2      Q.    Is RIC Lavernia, LLC, getting a release

3  from the trustee?

4      A.    I'd have to look at the language.  It may

5  include affiliates of TIG Romspen which may apply to

6  RIC Lavernia.  I don't know that this trustee has

7  any claims against RIC Lavernia.

8           But yeah, I would expect that the release

9  provision is drawn in such a way that once the

10  settlement agreement is approved and people conduct

11  themselves in accordance with the settlement

12  agreement, that at the end of the day, they're

13  walking away from each other.

14      Q.    So again, my question is simple.  Is RIC

15  Lavernia getting a release under this 9019?

16      A.    I'd have to review the language, but I

17  would presume, yes.

18      Q.    Have you spoken to Brian Cumings today?

19      A.    No.

20      Q.    Have you spoken to Brian Cumings

21  yesterday?

22      A.    Yes.

23      Q.    Have you deleted any communications with

24  Brian Cumings?

25      A.    No.

EXHIBIT 11
Page 89 of 149

74

1     Q.   How much money is the estate getting in

2  distributions from Romspen under this 9019?

3     A.   I don't know about your term

4  "distributions."  Right now, the estate is holding

5  cash collateral, and from that cash collateral,

6  Romspen is permitting the estate to carve out the

7  amount for Chapter 11 administrative expenses, which

8  includes U.S. trustee fees as well as 10 percent of

9  allowed non-insider general unsecured claims.

10    Q.   And is it a safe estimate or an

11 approximate estimate, Mr. Hirsch, to say the

12 unsecured creditors in that bucket, as you define

13 it, under this 9019 would get approximately $50,000?

14    A.   I don't know that the number has been

15 quantified.  Claims are not allowed at this point,

16 or some claims may not be allowed at this point.

17 Not everyone who's an insider has been determined to

18 be an insider.  I think we're using estimates and

19 general figures to try to calculate that.  I think

20 at one time the estimate was around 50,000.  It may

**EXHIBIT 11**
**Page 90 of 149**

21  be more, may be less.

22      Q.   Is it more than $10,000 that the

23  unsecureds are getting?

24      A.   I would expect it to be.

25      Q.   Is it going to be more than 100,000

75

1  dollars?

2      A.   I don't know.

3      Q.   Is it less than $30,000?

4      A.   I would not expect it to be.

5      Q.   Would it be more than $100,000?

6      A.   It's 10 percent of the allowed non-insider

7  general unsecured claims, whatever that number ends

8  up being.

9      Q.   And do you have an estimate of what that

10  number is?

11      A.   No, I think we -- again, I think we used

12  for discussion purposes 50,000, but there are some

13  claims that are still yet to be determined.

14      Q.   Which ones?

**EXHIBIT 11**
**Page 91 of 149**

15      A.   Sonder, for example.

16      Q.   Which one?

17           THE REPORTER: What was your answer?

18           THE DEPONENT:  Sonder, S-O-N-D-E-R.

19 BY MR. CHOUDHRI:

20      Q.   So explain that.  Who represents Sonder?

21 Mack -- is it Mack Brooks?

22      A.   I think his name is Mack -- there's a

23 gentleman named Mack Wilson who was representing

24 Sonder.  I don't think he's representing them

25 anymore.  Recently at hearings I've seen Eric

76

1 Lockridge.

2      Q.   Eric Lockridge?

3      A.   That's what I've seen.

4      Q.   And -- and what are the -- so is Mark

5 Taylor getting any money for his services under the

6 9019 that Romspen and the trustee are wanting the

7 court to approve?

8      A.   The 9019 does not include a carve-out for

9 pre -- for administrative expenses prior to the

**EXHIBIT 11**
**Page 92 of 149**

10   appointment of the Chapter 11 trustee.

11        Q.   So just so we're clear, Mr. Hirsch, so Mr.

12   Taylor and his firm, Holland & Knight, would not get

13   any money if your 9019 is approved, correct?

14        A.   Not from Romspen's cash collateral.  If

15   there's unencumbered proceeds or unencumbered cash,

16   then that's totally available to people.  We can't

17   control that.  We're not intending to control that.

18        Q.   Mr. Hirsch, can you explain why -- so

19   would it be you, Mr. Hirsch -- now, I asked you the

20   questions about Lavernia.  Now, I want to move over

21   to 1001 West Loop and the October 1, 2024, sale --

22   foreclosure sale.  You're familiar with the October

23   1, 2024, foreclosure sale, right?

24        A.   I'm familiar that there was a -- there was

25   an attempt to conduct a sale that day.

77

1        Q.   What do you mean "an attempt to conduct a

2   sale," and how are you aware that there was an

3   attempt to conduct a sale?

EXHIBIT 11
Page 93 of 149

4      A.   Well, as I testified earlier, we retained

5   service to handle the notice and posting and

6   recording and conduct of trustee sales, which we did

7   in that case after Judge Robinson granted stay

8   relief.

9           As you very well know, Galleria Loop Note

10  Holder filed an improper lawsuit that was timely

11  removed before there was a TRO signed by the state

12  court judge.  Then Kirklin Properties filed its

13  lawsuit, which has since been non-suited, and I

14  think was a frivolous and improper lawsuit.  They

15  sought an ex parte TRO, again, not notifying anybody

16  that they knew were representing TIG Romspen, and

17  they got a TRO.

18          And so the sale went forward, and my

19  understanding is when the TRO was evaluated and the

20  sale was considered, there was -- Romspen been

21  declined to accept the sale as a valid sale because

22  of the entry of the TRO.

23     Q.   Mr. Hirsch, have you taken a position that

24  the TRO was invalid, and Romspen proceeded forward

25  with the foreclosure?

EXHIBIT 11
Page 94 of 149

78

1      A.    Which TRO are you referring to?

2      Q.    The Galleria --

3      A.    The improper TRO obtained by Galleria, or

4   the improper TRO obtained by Kirklin?

5      Q.    Either TRO.

6      A.    Yeah, the improper TRO obtained by

7   Galleria Loop Note Holder was not effective because

8   it was signed after the case was removed to federal

9   court.

10          I don't think the Kirklin TRO was

11   effective at the time of the sale because it had not

12   yet been served.  In order to be cautious, Romspen

13   been declined to accept -- what's that?

14     Q.    You've just been rambling on.  I've asked

15   my question, and you stopped and keep going so --

16     A.    Well, you asked me for -- whether there's

17   a position as to the effectiveness of the TROs.  I

18   asked you which.  You said both, and I'm trying to

19   explain.

20     Q.    Sure.  I apologize.  Please proceed.  Talk

21   as much as you want.  Are you done, or do you want

22   to keep going?

23     A.    Yeah, I don't remember where you

**EXHIBIT 11**
**Page 95 of 149**

24    interrupted me, but it's fine.

25         Q.   So who was communicating with Sandy --

79

1    which attorney was at that foreclosure sale on

2    October 1, 2024, with Sandy Dasigenis?

3         A.   I'm not sure that we had an attorney on

4    site.

5         Q.   So you or your law firm -- no one from

6    your law firm was at that foreclosure sale on

7    October 1, 2024?

8         A.   I don't recall.

9         Q.   Who was directing --

10         A.   I mean we normally -- we normally don't

11    send attorneys to sales where we have retained

12    services to handle it, but I do recall that one was

13    a little bit unusual because we anticipated that

14    there would be some shenanigans.

15         Q.   What is the name of the attorney that was

16    at the sale from your law firm?

17         A.   I'm trying to remember if we have an

**EXHIBIT 11**
**Page 96 of 149**

18   attorney there.  I'll need to think about it.

19      Q.   It's a female attorney.  I'm sure you know

20   who it is.

21      A.   Well, we do have a female attorney in our

22   Dallas office.  I'm trying to remember if she was at

23   the sale.

24      Q.   And what is her name?

25      A.   I'm not going to disclose that.  I'm not

80

1   going to subject to her to your harassment.

2          MR. CHOUDHRI:  Objection, non-responsive.

3   BY MR. CHOUDHRI:

4      Q.   So Mr. Hirsch, you are going to refuse to

5   answer the question of which attorney from your law

6   firm was at the foreclosure sale on October 1, 2024,

7   for the subject property 1001 West Loop?

8      A.   You have not provided any explanation as

9   to how that's relevant to the 9019.  I've let this

10   questioning go on pretty extensively, and no, I'm

11   not going to disclose the identity of an attorney in

12   my office so you can harass them.

**EXHIBIT 11**
**Page 97 of 149**

13     Q.   And so you acknowledged that you had an

14   attorney at this auction for 1001 after Judge

15   Robinson lifted the stay, but you will -- you are

16   refusing to identify the identity of this attorney

17   with your firm, correct?

18     A.   Yeah, I don't -- I don't recall whether we

19   did or not.  If we did have an attorney there, I

20   know who it would've been, and I'm not going to

21   disclose that attorney's name.

22         MR. CHOUDHRI:  Court Reporter -- Madam

23   Court Reporter, would you certify that question?

24         THE REPORTER:  Understood.

25   BY MR. CHOUDHRI:

                                                    81

1     Q.   And so let me just share my screen, and I

2   am on page 69 of 497 of your exhibits for the 9019

3   for August the 4th.  And what does -- what does this

4   document say, Mr. Hirsch?

5     A.   You want me to read it?

6     Q.   Yeah.

**EXHIBIT 11**
**Page 98 of 149**

7     A.   The title is "Officer Certificate."  It's

8  identified as RIC Lavernia, LLC's, officer

9  certificate.  It's dated June 27, 2024.  And it is

10  the officer certificate that authorizes the

11  resolutions that are attached.

12     Q.   Was that the resolution to file a chapter

13  11 bankruptcy?

14     A.   You've now put it on the screen, so let me

15  look at it.

16          To file a voluntary petition, yes.

17     Q.   And what voluntary petition was this?

18     A.   Sorry, what do you mean?

19     Q.   What voluntary petition is this?  What

20  voluntary --

21     A.   Well, it says --

22     Q.   And I'm on page 71 of 497 of your exhibit

23  for the August 4th hearing, just for the record.

24     A.   Yeah, it says, "A voluntary petition for

25  relief under the bankruptcy code."

                                                    82

1     Q.   So what is this doing exactly?  This is --

**EXHIBIT 11**
**Page 99 of 149**

2   is this so RIC Lavernia can file bankruptcy in San

3   Antonio?  Is that what this is?

4        A.   It's the authorization to file the

5   petition for bankruptcy.

6        Q.   And so why is RIC Lavernia filing

7   bankruptcy?

8        A.   For protection.

9        Q.   Protection for whom or for what?

10       MS. NDEGE:  I'm going to object.  What's

11  the relevance of the 1919 application?

12       MR. CHOUDHRI:  9019.  The relevance is

13  this is one of your exhibits.  It has to do with

14  offset and collateral and failure of disclosure and

15  deceit and fraud on the court.  And --

16       MS. NDEGE:  Well, you're --

17       MR. CHOUDHRI:  Let me finish.  You asked

18  me, right?  So let me tell you.  Mr. Hirsch is

19  central to these foreclosures.  Your law firm is

20  central to these foreclosures, and now there is a

21  concerted effort to conceal information.  And RIC

22  Lavernia is in the heart of it, and RIC Lavernia is

23  in your amended proof of claim.  And it has to do

24  with the offsets and the amount of the debt, and the

25  valuation of the property is very relevant.

**EXHIBIT 11**
**Page 100 of 149**

83

1         And Mr. Hirsch is a witness, and he's the

2    one conducting, running this foreclosure.  And he's

3    also the debtor's counsel for RIC Lavernia that he's

4    filed in San Antonio in front of Judge Parker and

5    failed to make disclosures, misrepresenting --

6    misleading to the court there, misleading to the

7    court here.

8         And there's a sale that took place for

9    $550,000, and it was struck "sold," and there were

10   issues with that foreclosure sale, the validity of

11   it.  There are also issues gamesmanship with the

12   October 1, 2024, foreclosure sale that Mr. Hirsch is

13   in the middle of.

14        And now to quantify the valuation of the

15   damages and the fraud and the harm and how valuable

16   these claims are, that you guys want to cover

17   yourself and RIC Lavenia from the fraud and conceal

18   the fraud rather than valuing what the -- what is

19   being settled and what the value here is of what's

20   being settled.

**EXHIBIT 11**
**Page 101 of 149**

21          So I think it's very relevant, and it's

22   your exhibit, and it's in your witness list, and

23   it's your exhibit.  So I'm absolutely entitled to

24   get into it because when you're exchanging a

25   release, it's very important to evaluate how value

84

1   the claims -- how much value those claims hold and

2   the decedent, what was investigated or was

3   investigated.

4          So I'm absolutely entitled to get into

5   that.  And if you don't think so, then that's fine.

6   You can instruct him not to answer.  But you asked

7   me what's the relevance?  It's relevant because it's

8   right there, and you have Kyle Hirsch, who's the

9   debtor's counsel, filing for bankruptcy fraudulently

10   under bad faith on a fraudulent foreclosure with

11   misrepresentations to this very court.

12   BY MR. CHOUDHRI:

13     Q.  Mr. Hirsch, I really want to get through

14   this and ask you these questions so you can answer

15   them correctly.  I want to ask you, did RIC Lavernia

EXHIBIT 11
Page 102 of 149

16    file for bankruptcy to avoid a foreclosure by

17    Milestone?

18        A.   To stop an improper foreclosure, yes, but

19    that has nothing to do with the 9019 and your whole

20    speech about rationale is without merit.

21        Q.   So RIC Lavernia, LLC, Kyle Hirsch, counsel

22    for RIC Lavernia, the debtor, files bankruptcy to

23    stop what you claim is an improper foreclosure.  Is

24    that what I just heard you say?

25        A.   Yes.

                                                    85

1         Q.   And why is it improper -- why is that

2    foreclosure improper that RIC Lavernia sought to

3    stop?

4         A.   That has nothing to do with the 9019, Ali.

5    You're way out over your skis.  I'm not answering

6    your questions here.  This relates to an entirely

7    different case, an entirely different matter.

8         Q.   So why is RIC Lavernia getting released

9    under this 9019?

**EXHIBIT 11**
**Page 103 of 149**

10      A.   As an affiliate from the estate from

11 Chapter 11 trustee.  Just like other affiliates of

12 Romspen and officers, it's standard provision.

13 There's nothing unusual.  This is how releases are

14 drafted.

15      Q.   Do you have any knowledge of what the

16 value of the property in Lavernia is?

17      A.   I do.  I'm familiar with an appraisal that

18 was performed.

19      Q.   And how much is the value of the appraisal

20 you've seen that was performed?

21      A.   To my recollection, it was around 7

22 million, maybe seven and a half.

23      Q.   And so Romspen didn't provide any funding

24 to get that property.  They provided 100,000 credit

25 bid, right?

86

1      A.   I'm not sure I understand your question.

2      Q.   Romspen did not pay any money -- strike

3 that.

4           How much money did RIC Lavernia pay to

**EXHIBIT 11**
**Page 104 of 149**

```
5   obtain this Lavernia property that you claim is

6   worth $7 million or whatever?

7        A.   Yeah.  I told you before, I'm not going to

8   get into the inner workings of Romspen as to the

9   assignment from one affiliate to another.  You know,

10  the deed of trust that was given to TIG Romspen was

11  limited to the amount of 2,266,000.  As you know,

12  that amount approximated the property taxes paid by

13  TIG Romspen and interest on those property taxes on

14  the 1001 West Loop property.

15          When you asked for a forbearance, Romspen

16  asked what you could offer in order to secure the

17  forbearance.  You said that this Otisco property in

18  Lavernia was owned by your mother and some other

19  investors, and therefore, because there were also

20  investors in the West Loop property, it was valuable

21  to them to preserve the West Loop property.  And

22  they were willing to give this deed of trust

23  certainly on the limited basis of the $2,266,000.

24       Q.   Anything else, Mr. Hirsch?

25       A.   Anything else what?
```

**EXHIBIT 11**
**Page 105 of 149**

87

1     Q.   That you want to add?

2     A.   In response to your question, no.

3     Q.   So basically, your testimony is, is that

4 Romspen got this property that then it -- let me

5 just understand the timeline, okay?  I want to get

6 the timeline down right.

7        So you get on and become the lawyer for

8 Romspen in July of 2023, true?

9     A.   Yes.

10    Q.   Before that, it was Foley Gardere, true?

11    A.   Yes.

12    Q.   And why is Romspen suing Foley Gardere?

13    A.   It has nothing to do with the 9019.

14    Q.   Is Foley --

15    A.   It's none of your business.

16    Q.   It's none of my business.  Okay.

17       Did Foley Gardere have anything to do with

18 the Lavernia property and the Lavernia deal in

19 Romspen?

20    A.   Ali, this is so far outside the 9019.  I'm

21 not answering those questions.  Please move on to

22 something relevant.

23    Q.   You're refusing to answer my question?

**EXHIBIT 11**
**Page 106 of 149**

24     A.   That question, I'm refusing to answer.

25   It's not within the scope of why I'm agreed to be

88

1   here.

2        Q.   And so you said there was an improper

3   foreclosure.  That's why RIC Lavernia, your client

4   -- so let me just understand.  I want to make sure I

5   get this right, okay?

6            On the resolutions here, you have Mary

7   Gianfriddo, who is the authorized representative of

8   RIC Lavernia, who is also signing -- let's see, this

9   is page 60 of 497 -- the voluntary petition for RIC

10  Lavernia on June 27, 2024, correct?

11       A.   That's what it says.

12       Q.   And Kyle Hirsch is the signature of

13  attorney for the debtor on June 27, 2024; is that

14  correct?

15       A.   Yes.

16       Q.   And then you got -- and your firm also

17  represented RIC Lavernia in a temporary injunction

18  hearing against Milestone that it lost in June of

**EXHIBIT 11**
**Page 107 of 149**

19  2024, correct?

20      A.  Yes.

21      Q.  And so after the injunction was denied

22  stopping the foreclosure that Romspen was seeking,

23  Romspen then filed bankruptcy in Judge Parker's

24  court to stop what you call an "improper

25  foreclosure," right?

89

1      A.  I don't see how any of this has anything

2  to do with the 9019.  I'm not answering any more of

3  these questions.  You're getting into other matters,

4  other disputes.  There's pending litigation with

5  Milestone which you control.  There's pending

6  litigation with Otisco, which you're seeking to

7  reopen.  I'm not going to get into those on this --

8  on this deposition.

9      Q.  But Mr. Hirsch, RIC Lavernia is getting a

10  release from this very transaction under this 9019.

11  So the value of those claims are very relevant to my

12  questioning, sir, on the 9019, okay?

**EXHIBIT 11**
**Page 108 of 149**

13      A.    So go ahead and value them.  Go ahead and

14  present evidence of value when you get to the

15  hearing.

16      Q.    Well, the whole point is, you know,

17  there's no sandbagging.  That's why we're having a

18  deposition and we're supposed to get discovery and

19  not hide the ball, right, and not do things in the

20  dark of night, so --

21      A.    You mean like asking for depositions on

22  less than adequate notice?  That's right.  And this

23  was an accommodation to you.

24      Q.    So basically, I've seen and hear, Mr.

25  Hirsch, is that Otisco providing the additional

90

1  collateral to your client was an inducement for your

2  client to do the transaction; is that correct?

3      A.    Part of it.

4      Q.    And was there an inducement by TIG Romspen

5  to me in entering into any agreements as it -- was

6  the Maui property an inducement for me to entering

7  into any agreements into Otisco?

**EXHIBIT 11**
**Page 109 of 149**

8        A.   To my knowledge, no.  Maui is something

9   that you kept trying to include that has nothing to

10  do with this transaction, and it certainly has

11  nothing to do with the 9019.

12       Q.   And I'm looking at your exhibits, Mr.

13  Hirsch, so I understand kind of what's going on

14  here.  I'm looking at a lease here that you've

15  attached.  And what is the relevance -- just so I

16  understand it, what is the relevance of this lease

17  with Jetall Capital to your exhibits?

18       A.   It may not be relevant.  It depends on the

19  testimony that I elicit.

20       Q.   Well, please explain why you -- why --

21       A.   I'm not going to explain.

22       Q.   So you're refusing to tell me why you have

23  exhibits attached and the relevance of those

24  exhibits attached, correct?

25       A.   Well, yeah, you're asking for my trial

                                              91

1   strategy.  I'm not going to disclose my trial

**EXHIBIT 11**
**Page 110 of 149**

2   strategy.  And there's no -- this exhibit may not

3   even relate to the 9019.  There's many matters that

4   are set for hearing, but I'm not going to disclose

5   my trial strategy.

6       Q.   So what are the many matters that are set

7   for the hearing?

8       A.   You want to go to Exhibit 1 and we can go

9   over that?

10      Q.   Sure.  Hang on.

11      A.   How much longer do you have, Mr. Choudhri?

12      Q.   I have a lot to cover here, so --

13      A.   Well, I'm not going to stay here for a

14   long time.  At some point, I'm going to be

15   exhausted.  Again, this is -- this is an

16   accommodation to address 9019 discovery on numerous

17   occasions.  You've been well outside the scope.  I'm

18   here and available to answer relevant questions.

19      Q.   So Mr. Hirsch, I have not had the benefit

20   of reviewing the settlement agreement that you are

21   asking this court to approve, and I just don't

22   understand -- I still don't understand why it was

23   not filed to be approved and why it was not filed to

24   be approved.  So I'm trying to understand kind of

25   the mechanics of this 9019 because the 9019 was

**EXHIBIT 11**
**Page 111 of 149**

1  filed without an agreement.  And can you explain to

2  me why you filed a 9019 compromise without an

3  agreement?

4         A.   I didn't file a 9019 compromise.

5         Q.   Well, you drafted the settlement

6  agreement, right?  And you drafted it months after

7  you filed a -- true or false, settlement agreement

8  drafted months after the 9019 was filed with the

9  court?

10        A.   I don't think months is right, but it was

11  after the 9019 application was filed by the trustee.

12  You've already asked me that.  I've already answered

13  that.

14        Q.   And it's your testimony that your law firm

15  has not prepared, drafted a trustee deed as it

16  relates to 1001 West Loop?

17        A.   That isn't my testimony.  My testimony is

18  I'm not going to disclose my firm's work product.

19  Maybe we have, maybe we haven't, but that's my

20  firm's work product.

21        Q.   And is it your testimony -- so you're

**EXHIBIT 11**
**Page 112 of 149**

22  going to refuse to answer the question that you've

23  drafted or prepared or have a trustee deed for 1001

24  West Loop?

25          MS. NDEGE:  I'm going to object --

93

1          THE DEPONENT:  I'm not going to allow you

2  to invade the attorney work product.

3          THE REPORTER:  Please speak one at a time.

4  What was the objection?

5          MS. NDEGE:  Well, I was going to object

6  because it's privileged information and also because

7  he's already answered that question.

8          THE REPORTER:  And what was your answer,

9  Mr. Hirsch?

10          THE DEPONENT:  That I'm not going to

11  invade attorney work product.

12          MR. CHOUDHRI:  Certify that, Madam Court

13  Reporter, attorney work product and will not answer

14  due to privilege.

15  BY MR. CHOUDHRI:

**EXHIBIT 11**
**Page 113 of 149**

16     Q.   Is that correct, Mr. Hirsch?

17     A.   Yes.

18          THE REPORTER:  Understood.

19  BY MR. CHOUDHRI:

20     Q.   Mr. Hirsch, do you recall -- not recall.

21  Let me strike that.

22          Mr. Hirsch, why did you instruct Sandy

23  Dasigenis to not appear at a Zoom hearing in

24  November 2024 in front of Judge Robinson?

25     A.   I don't think I ever instructed Ms.

94

1  Dasigenis to do anything.

2     Q.   Did you communicate with her, a subpoena

3  she received to attend the November 2024 Zoom

4  hearing in front of Judge Robinson?

5     A.   I don't recall communicating with Ms.

6  Dasigenis at all in that time frame.

7     Q.   So is it your testimony under oath, Mr.

8  Hirsch, that you had no communications with Mr. --

9  strike that.

10          Mr. Hirsch, I want to make sure the record

**EXHIBIT 11**
**Page 114 of 149**

11    is clear.  It is your testimony today that you've

12    had no communications with Mr. -- sorry.

13           Mr. Hirsch, I just want to make sure the

14    record is clear.  You have had no communications in

15    the month of November 2024 with Sandy Dasigenis, who

16    is the substitute trustee for 1001 West Loop in the

17    month of November 2024 as it relates to a subpoena

18    for her to appear at a hearing in front of Judge

19    Robinson?

20        A.   That was not my testimony.  My testimony

21    is I don't recall ever having communications with

22    her on that topic.

23           MR. CHOUDHRI:  So Madam Court reporter, if

24    you would please read back my precise question so we

25    can have the record clear because this is very

                                                    95

1    important.

2           THE REPORTER:  Please stand by.

3           (WHEREUPON, the record was played back.)

4           THE DEPONENT:  If you are speaking, Mr.

**EXHIBIT 11**
**Page 115 of 149**

5   Choudhri, I can't hear you.

6   BY MR. CHOUDHRI:

7        Q.   Did you understand the question that the

8   court reporter replayed for you, and can you please

9   answer that question?

10       A.   Same answer.

11       Q.   And what is your answer?

12       A.   The same one that I gave.  That was not my

13  testimony.  My testimony was that I don't recall

14  ever speaking with Ms. Dasigenis in that time frame

15  on that topic.

16       Q.   When is the last time you spoke to Ms.

17  Dasigenis?

18       A.   I don't recall.  It's been months.  In

19  fact -- yeah, I don't -- I don't recall.  It's been

20  quite a long time.

21       Q.   Did you speak to her this week?

22       A.   No.

23       Q.   Did you speak to her last week?

24       A.   No.

25       Q.   Did you speak to her in the month of

**EXHIBIT 11**
**Page 116 of 149**

96

1    November when we were having hearings in Judge

2    Robinson's court?

3        A.   I don't think so, but I don't recall.  I

4    certainly don't recall ever having any discussions

5    with Ms. Dasigenis regarding a subpoena to testify.

6        Q.   So would it surprise you that if you had

7    conversations with her regarding a subpoena to

8    testify in front of Judge Robinson in relation to

9    the October --

10       A.   What was the--

11       Q.   Would it -- would it surprise you -- would

12   it surprise you that you had conversations with Ms.

13   Sandy Dasigenis regarding her testimony relating to

14   the October 2024 foreclosure sale?

15       A.   That's not anything that I recall.

16       Q.   Okay.  And so when was your last

17   communication with Ms. Sandy Dasigenis or

18   ServiceLink relating to 1001 West Loop?

19       A.   With Sandy Dasigenis or ServiceLink?  I

20   had conversations with the internal counsel for

21   ServiceLink in connection with the Galleria Loop

22   Note Holder lawsuit, an attempt for having her

23   subpoenaed to appear last week.

24       Q.   And who's this internal counsel that you

**EXHIBIT 11**
**Page 117 of 149**

25  spoke to at ServiceLink?

97

1      A.    No, this has nothing to do with the 9019

2  motion.  You are well outside the scope of why I'm

3  here today.

4      Q.    So Mr. Hirsch, you understand what

5  evidence suppression is and witness tampering?  Do

6  you know what that is?

7      A.    Of course.

8      Q.    And you spoke to somebody at ServiceLink

9  regarding testifying and avoiding a subpoena to

10  testify regarding the Galleria Loop Note Holder

11  foreclosure for October 2024 foreclosure sale.

12      A.    Are you telling me that I did, or are you

13  asking me a question because I don't recall that?

14      Q.    Okay.  So let's get the facts straight,

15  okay?

16      A.    Whose facts are these?  Yours or mine?

17      Q.    Well, I'm going to ask you.  That's how we

18  get facts, right?  Hopefully, you're telling the

**EXHIBIT 11**
**Page 118 of 149**

19   truth, facts come out.  If you're not, maybe other

20   facts come out that you're not.  So let's just go

21   down this.

22        Did you communicate --

23     A.   And how does any of this have to do with

24   the 9019?

25        MS. NDEGE:  Yeah.

98

1   BY MR. CHOUDHRI:

2     Q.   Mr. Hirsch, you are seeking releases for

3   yourself, your law firm, for RIC Lavernia.

4     A.   Okay.  This is -- this is ridiculous, Mr.

5   Choudhri.  You've gone over this several different

6   times.  You've had plenty of time to have your

7   depositions.  I'm giving you 20 minutes, and then

8   I'm terminating my appearance.  You've had plenty of

9   time.

10     Q.   Mr. Hirsch --

11     A.   Make your questions relevant.  Go ahead

12   and ask me about evidence suppression.  Go ahead and

13   ask me about evidence spoliation.  You're a king at

**EXHIBIT 11**
**Page 119 of 149**

14    doing those things, but go ahead and ask me the

15    questions.

16         Q.   So Mr. Hirsch, you spoke to counsel at

17    ServiceLink regarding a subpoena relating to

18    Galleria Loop Note Holder and/or 1001 West Loop.

19    True or false?

20         A.   What time frame are you referring to?

21         Q.   In the last week.

22         A.   Last week, yes, that's true.

23         Q.   And why did you do that?

24         A.   What does that have to do with the 9019

25    motion?

99

1         Q.   Mr. Hirsch, you are seeking releases for

2    your conduct -- your personal conduct and your law

3    firm's conduct under this 9019.  True or false?

4              MS. NDEGE:  Mr. Choudhri, we're going to

5    -- I'm going to object to this line of questioning.

6    We stated over and over you haven't provided a

7    sufficient basis, that this line of questioning is

**EXHIBIT 11**
**Page 120 of 149**

8    related to the 9019 application.  So I'm going to

9    instruct Mr. Hirsch not to respond.

10          THE DEPONENT:  And I'm not -- I'm not

11   answering your question.

12   BY MR. CHOUDHRI:

13      Q.   So Mr. Hirsch, we've established that you

14   and your law firm are getting releases under this

15   9019, and you're refusing to answer questions as it

16   relates to communications that you had relating to

17   the foreclosure sale and claims of the debtor

18   against Romspen, that you're seeking to release

19   Romspen and yourself and your law firm.  And you're

20   having --

21      A.   There are no claims of the debtor, Mr.

22   Choudhri.  There are no claims of the debtor.

23      Q.    You're getting releases, and the debtors

24   get -- Romspen is getting releases by the debtor,

25   and you're concealing the evidence, and you're

                                                    100

1    concealing the facts.  And I'm asking you --

2       A.   There's no evidence being concealed.

**EXHIBIT 11**
**Page 121 of 149**

3    There's no facts being concealed.  I'm here as an

4    accommodation to you to address material information

5    relating to the 9019.

6              You want to ask me about the terms of the

7    settlement?  Great.  You want to ask me about the

8    negotiation of the settlement?  Great.

9              But asking me about a state court action

10   from last week where your -- your entity is seeking

11   a temporary injunction without any basis to do so,

12   yeah, I'm not going to talk about that on this

13   deposition because that has nothing to do with the

14   debtor.  That has nothing to do with the settlement.

15   That has nothing to do with the matter set for

16   hearing on August 4th.

17   Q.   So let me get this straight.  So you're

18   telling me the state court action between Galleria

19   and Romspen have nothing to do with the debtor and

20   the 9019 that we're here on?

21   A.   Well, the only thing it has to do with the

22   debtor is that they're both -- Galleria Loop Note

23   Holder and the debtor are owned by you.

24   Q.   Besides that, it's got nothing to do with

25   one of the other?

**EXHIBIT 11**
**Page 122 of 149**

101

1      A.   I guess the other thing it has to do with

2   -- it's the same claims that were dismissed by Judge

3   Robinson as to 1001 are the same claims that are

4   being pursued by Galleria Loop Note Holder.  I guess

5   it does have to do with it because the amended

6   petition violated the automatic stay seeking in rem

7   relief.

8           So yeah, there is some connection, but not

9   as it relates to an attempt for temporary injunction

10  that was improperly sought that the judge continued.

11  No, that has nothing to do with the 9019.

12     Q.   So you attached -- so you just mentioned

13  in rem jurisdiction and injunction in state court,

14  correct?  Did I hear you correct?

15     A.   I did mention that, yes.  I'm not

16  testifying about that.  I'm here to testify about a

17  9019.

18     Q.   So just so the record is clear, the in rem

19  jurisdiction has nothing to do with the 9019?

20     A.   The request for in rem jurisdiction wasn't

21  even raised when the 9019 was negotiated or sought

**EXHIBIT 11**
**Page 123 of 149**

22  for approval.

23          MR. CHOUDHRI:  Objection, nonresponsive.

24          THE DEPONENT:  Okay.  So now you don't

25  want me to answer your questions?  Is that what

                                                    102

1  you're saying?  Does that mean the deposition is

2  over?

3  BY MR. CHOUDHRI:

4      Q.   Mr. Hirsch, you're being nonresponsive,

5  you're being argumentative, and I'm trying to get to

6  the facts.  You're concealing the facts.  I've asked

7  you the name of the attorney at ServiceLink that

8  handled and conducted the foreclosure for 1001 in

9  October 2024, and you refused to provide that

10  information, so --

11      A.   I don't see how that has anything to do

12  with the 9019, which is why I'm here today.

13      Q.   So does --

14      A.   Serve discovery.  Serve proper discovery.

15  No information will be concealed.  This is an

16  accommodation to you to try to get to a hearing on

**EXHIBIT 11**
**Page 124 of 149**

17  the 9019 on Monday.  You are well outside the scope.

18  I'm trying to be cooperative.  I'm trying to answer

19  your questions that are relevant to what's going to

20  be heard on Monday, and you continue to try to hash

21  unrelated materials.

22      Q.   So Mr. --

23      A.   I'm not going to answer your questions

24  that are unrelated.

25           MR. CHOUDHRI:  Objection, Mr. Hirsch.

                                          103

1  BY MR. CHOUDHRI:

2      Q.   This is a deposition, and it has to do

3  with what's being heard on Monday, August the 4th

4  and the fact that the -- that if Romspen foreclosed

5  in October 2024, if that foreclosure still took

6  place or didn't take place is very relevant.  And

7  you are running away from those answers or those

8  questions and refusing to answer those.

9      A.   I answered it directly.  I answered

10  directly that Romspen declined to accept the

**EXHIBIT 11**
**Page 125 of 149**

11    trustee's deed.  Romspen declined to even proceed.

12    I answered that very clearly.

13         Q.    So Mr. Hirsch --

14         A.    If you forgot, I'm sorry that your memory

15    isn't very good, but that was my testimony.

16         Q.    Mr. Hirsch, when I ask you for the name of

17    the attorney that represents the company that

18    conducted the foreclosure sale, you refused to

19    provide that information, and that is very relevant

20    information.  So you're concealing that information,

21    and you heard Mr. Roitman that you conducted and

22    handled and hired and processed and directed the

23    foreclosure sale.

24              So all of this is very relevant because

25    you are also a beneficiary of a release, and it's

                                                    104

1    very relevant on who owns the property.  Does

2    Romspen own the property, or does the debtor own the

3    property?  And you're just refusing to --

4         A.    Romspen does not take the position that

5    Romspen owns the property.

**EXHIBIT 11**
**Page 126 of 149**

6      Q.    So did the trustee -- strike -- strike

7  that.

8           Mr. Hirsch, did you -- did you recognize

9  the trustee in the video October 1, 2024, as Sandy

10  Dasigenis?

11     A.    I've never met Sandy Dasigenis.  I don't

12  know what she looks like.

13     Q.    Well, I'll represent to you that in that

14  video that you saw earlier is Sandy Dasigenis

15  conducting the foreclosure sale in striking the

16  property sold at 15 million to Romspen on October 1,

17  2024.

18     A.    Romspen doesn't acknowledge that it ever

19  acquired title to the property through a foreclosure

20  sale.

21     Q.    So whether Romspen acknowledges or doesn't

22  acknowledge, the property was struck sold.  Do you

23  understand that?  That's a legal issue, a law

24  question.  Do you understand that?

25     A.    I understand you're making it a law

105

**EXHIBIT 11**
**Page 127 of 149**

1  question.

2      Q.    So how is it not --

3      A.    It has nothing to do with the 9019.

4  Romspen believes that 1001 WL, the bankruptcy estate

5  owns the property.  Romspen's settlement is to

6  resolve that ownership issue and Romspen's lien.

7      Q.    Okay.

8      A.    Romspen has never taken the position that

9  it acquired title at a foreclosure sale in October

10  of 2024.

11      Q.    You're familiar with Fifth Circuit law and

12  Supreme Court Law and auction strikes.  Are you

13  familiar with that?

14      A.    Mr. Choudhri, I'm not going to get into a

15  legal debate with you.

16      Q.    So you just said that the 9019 resolves

17  ownership of the property.

18      A.    No, that's not what I said.

19      Q.    What did you say?

20      A.    I said -- I said Romspen recognizes that

21  the property is owned by the bankruptcy estate, and

22  the 9019 is to deal with the disposition of the

23  property and Romspen's lien.

24      Q.    So if Romspen foreclosed or the property

**EXHIBIT 11**
**Page 128 of 149**

25  was sold at a foreclosure sale, the fact that the

106

1  property sold at a foreclosure sale and was struck

2  sold, is it your position that Romspen can decide it

3  was sold or not sold after it was sold?

4        A.    It wasn't sold.

5        Q.    And what is your reason for that?

6        A.    It didn't happen.

7        Q.    And why didn't it happen?  What is the

8  basis --

9        A.    Ali, we've gone over and over and over and

10  over and over this before.  Get on to 9019 issues.

11  If you want to argue to the judge that Romspen owns

12  the property, great.  You can do that.  If you want

13  to argue to the judge that there was some flaw in an

14  October 2024 sale, great.  Argue that to the judge.

15  If you want to get me on the stand and have me

16  testify to those things, we will see if the judge

17  allows that.

18            But I don't think any of that is relevant

19  at all to whether or not the judge should be

**EXHIBIT 11**
**Page 129 of 149**

20  approving the sale when Romspen has not taken the

21  position that anyone other than 1001 WL, the debtor

22  in bankruptcy, owns the property.

23      Q.  Do you happen to have the settlement

24  agreement that you're asking --

25      A.  I'm sure I do.


                                                    107


1       Q.  And when was the first time that you

2   provided that -- so just so the record is clear, you

3   drafted the settlement agreement, correct?

4       A.  As I testified before, it may have been

5   other attorneys in my office that prepared the

6   initial draft, but it was our office.  I was

7   involved.

8       Q.  So if it is determined, what your belief

9   is, if the law is once the property strike -- struck

10  sold at an auction -- or back up.

11          Your position is, Mr. Hirsch, that Romspen

12  -- because Romspen did not file a trustee deed, that

13  the sale didn't happen?

**EXHIBIT 11**
**Page 130 of 149**

14      A.   Romspen did not accept the sale.

15      Q.   So Romspen did not accept the sale.  Mr.

16 Hirsch, you're looking at emails again or something

17 on your computer?

18      A.   I'm checking to see if the service station

19 at where my car is closes in a time that I can get

20 to pick up my vehicle today or whether I need to

21 request a 35-minute break so that I can go pick up

22 my car.

23      Q.   Why don't we take a 35-minute break, Mr.

24 Hirsch?  Why don't you go get your car so you're not

25 --

                                                    108

1      A.   No, I'm going to give you 15 minutes, then

2 I'm going to terminate the deposition.  I've been

3 sitting here since 3 o'clock.  The court reporter

4 has been extremely patient doing her job.  It's

5 almost 6 o'clock.

6           Three hours to take your testimony for a

7 9019 is far more than is necessary.  If you can't

8 get your questions out, I'm sorry.  I'm here

**EXHIBIT 11**
**Page 131 of 149**

9   voluntarily.  I'm not going to sit for longer than

10   15 more minutes.

11           MR. CHOUDHRI:  I would object to all your

12   statements.

13   BY MR. CHOUDHRI:

14       Q.   Mr. Hirsch, you're familiar with

15   foreclosures, right?  You've participated in a lot

16   of them and handled them; is that correct?

17       A.   Yes.

18       Q.   And when there is a credit bid, explain to

19   me what that means.  That means the lender is

20   bidding on its behalf?

21       A.   I'm not going to provide you a lesson on

22   foreclosures.  Ask questions about the 9019 please.

23       Q.   So Mr. Hirsch, you don't believe that the

24   ownership and the premise of the ownership -- Mr.

25   Hirsch, did you have -- you selected Partners Real

                                                     109

1   Estate Group, right?

2       A.   I didn't select anything.

**EXHIBIT 11**
**Page 132 of 149**

3      Q.   Did your client?

4      A.   I don't know that my client selected

5  anything.  I think the trustee selected.  My client

6  may have made recommendations, but it was the

7  trustee's selection.

8      Q.   Let me go to your witness and exhibit list

9  here.

10          So Mr. Hirsch, you are seeking a sanctions

11  motion on Monday or sanctions relief against myself,

12  correct?

13      A.   How does that have to do with the 9019

14  motion?

15      Q.   Are you telling me that's not -- has

16  nothing to do with the hearing on Monday?

17      A.   I'm asking how your question about a

18  sanctions motion has to do with the 9019.

19      Q.   What, if any, deficiency are you seeking

20  of any discovery that you claim you haven't gotten

21  or have gotten under the sanctions motion?

22      A.   I'm here to testify about the 9019 motion.

23      Q.   So you're refusing to answer questions

24  about the -- about your motions that you've set on

25  Monday.  Is that fair?

**EXHIBIT 11**
**Page 133 of 149**

110

1      A.   You've got 10 minutes.  If you want to

2  spend 10 minutes asking me about other matters, I'll

3  presume that you're done asking questions about the

4  9019, and I'll indulge you in the next 10 minutes in

5  answering questions about other matters to the

6  extent that they're relevant.  Is that how you

7  prefer to proceed?

8      Q.   Mr. Hirsch, please don't be argumentative.

9  So just so the record is clear, you are refusing to

10  answer any questions about the motions that you are

11  seeking that are set for Monday; is that correct?

12      A.   I'm here to answer questions about the

13  9019.  If you have no more questions about the 9019,

14  I'm happy to answer other questions to the extent

15  that I can answer them.  Are you finished asking

16  your questions about the 9019?

17      Q.   No, Mr. Hirsch, I'm not, and I --

18      A.   Okay.

19      Q.   -- have a lot to cover here, and you're

20  refusing to answer a lot of questions that are very

21  relevant when you're in the central to them.

22           Mr. Hirsch, do you have any -- outside of

**EXHIBIT 11**
**Page 134 of 149**

23  getting paid fees as a lawyer, hourly fees, is that

24  your exclusive compensation by Romspen from RIC

25  Lavernia and/or TIG Romspen?


111


1       A.   Do Romspen entities pay legal fees to my

2  firm and I recover my compensation from my firm?

3  It's a standard client/firm/lawyer relationship.

4       Q.   And there's no contingency.  It is

5  strictly hourly.  Is that correct, or is there some

6  contingency or equity component?

7       A.   The work that I do is hourly.

8       Q.   Exclusively?

9       A.   For Romspen, yes.

10       Q.   Just one second.  Let me -- I'm having

11  some internet issues here.  Let me -- Mr. Hirsch, do

12  you recall communications back and forth between you

13  and I relating to the amendment, Otisco deeds of --

14  the deed of trust, and the agreement with Milestone?

15       A.   So you're talking about two years ago, the

16  start of our relationship, right when I got involved

**EXHIBIT 11**
**Page 135 of 149**

17    in this matter?  I do recall having communications

18    with you.

19        Q.    And is it true that you and I negotiated

20    the Otisco deed and trust and modified the language,

21    specifically section 2.4, in that deed of trust?  Do

22    you recall that?

23        A.    I don't recall that.

24        Q.    Let me pull that up.  I'm going to --

25        A.    And what you're trying to pull up relates

                                                    112

1     to the 9019?

2         Q.    Well, it relates to the claims and the

3     offsets that are being resolved in the 9019 between

4     the debtor and Romspen, so yes.

5             THE REPORTER:  Would you like to mark this

6     as Exhibit 3?

7             MR. CHOUDHRI:  Yes.

8             (WHEREUPON, Exhibit 3 was marked for

9     identification.)

10            MR. CHOUDHRI:  What I'll do is I will mark

11    this Exhibit 3, and I will put on the record that

**EXHIBIT 11**
**Page 136 of 149**

12  this is document four.  It is a substitute trustee

13  deed and bill of sale, and it's --

14  BY MR. CHOUDHRI:

15      Q.   And who is Cassie Martin?  Do you know who

16  Cassie Martin is, Mr. Hirsch?

17      A.   According to this document, she's the

18  substitute trustee.

19      Q.   So she would be the substitute trustee

20  who's signing this bill of sale.  Does this document

21  look familiar to you, Mr. Hirsch?

22      A.   Yes.

23      Q.   Is this a document that you filed in court

24  pleadings recently?

25      A.   Could very well be.  It's the recorded

113

1  substitute trustee's deed relating to the Lavernia

2  property.

3      Q.   Okay.  And it's got substitute trustee's

4  address.  And what does that say?

5      A.   At Bryan, Cave, Leighton, Paisner, LLP,

**EXHIBIT 11**
**Page 137 of 149**

6  2200 Ross Avenue, Suite 4200, West Dallas, Texas

7  75201.

8      Q.   And it says "Holder," right?  It says,

9  "Holder, RIC Lavernia, LLC"?

10     A.   Yes.

11     Q.   So RIC Lavernia was the assignee of TIG

12  Romspen before the February 6, 2024, foreclosure

13  sale; is that correct?

14     A.   I'm not sure exactly when the assignment

15  took place, but it would have been sometime around

16  the foreclosure sale.

17     Q.   But it would have to take place before the

18  foreclosure sale.  Would you agree with me on that?

19     A.   Not necessarily.

20     Q.   Why not?

21     A.   Sometimes the assignment doesn't happen

22  until after the sale.  And what's assigned is the

23  trustee's deed and the credit bid right and the

24  successful credit bid.

25     Q.   And so basically, walk me through this.

114

EXHIBIT 11
Page 138 of 149

1  So this means that TIG Romspen -- so just so we're

2  clear, RIC Lavernia is getting a release under this

3  9019, and so is TIG Romspen, correct?

4      A.   Again, I would expect so.  I have not

5  studied recently the release provision, but normally

6  the release provision would include --

7      Q.   I got it.

8      A.   -- affiliates, subsidiaries, attorneys, et

9  cetera.

10     Q.   Under this 9019, RIC Lavernia is getting a

11  release.  Okay.  We've established that.  We don't

12  have to do the whole speech again, all right?  Let's

13  save time.

14          So RIC Lavernia is getting released and --

15  under this 9019 that we're here about.  And your law

16  firm -- we've established your law firm handled the

17  foreclosure sale, hired the substitute trustee,

18  directed, communicated, and managed the sale.  And

19  would it be fair to say also the filing of the

20  substitute trustee's deed and bill of sale that

21  we're looking at here?

22     A.   What do you mean by "filing"?

23     Q.   Would your -- would you have or your law

24  firm have directed and instructed this substitute

25  trustee's deed and bill of sale that we're looking

**EXHIBIT 11**
**Page 139 of 149**

115

1  at here, which is on the screen, which is the -- I

2  guess the substitute trustee bill of sale and deed

3  of trust -- I'm sorry, substitute trustees deed and

4  bill of sale.  This would've been prepared by your

5  law firm, and your law firm would've caused this

6  document to be filed in the real property records.

7  Is that fair?

8      A.   We would've provided it to the service,

9  and the service handles the execution by the

10  substitute trustee, the completion of the blanks,

11  like the date, and the recording.

12      Q.   So the only thing the substitute -- that

13  ServiceLink would've done is filled out the 22 where

14  it says March.  It says, March blank 2024.  And they

15  would've filled out the 22, and they would've signed

16  it, and they would've filed it.  Is that -- is that

17  right?

18      A.   I don't know what level of review they

19  make.  I know sometimes when we submit these to the

**EXHIBIT 11**
**Page 140 of 149**

20   services, they identify typos, corrections, et

21   cetera.  So I don't know how ServiceLink handles

22   their business, but if there's an error that they

23   identify, that's something that they normally

24   communicate to us.

25        Q.   Okay.  But you would've drafted this bill

116

1   of sale and deed of trust, correct?

2        A.   Somebody from my office.

3        Q.   Okay.

4        A.   It could have been me.  It could have been

5   another attorney.

6        Q.   You --

7        A.   It could have been a paralegal.

8        Q.   So you or somebody at Bryan, Cave,

9   Leighton, Paisner would've drafted this document and

10   then instructed the trustee to file it in the real

11   property records, correct?

12        A.   We would've delivered this to the service

13   for the service to provide to the substitute trustee

14   to make sure it's accurate and get it -- get it

**EXHIBIT 11**
**Page 141 of 149**

15  recorded.  Have the recording sent back to

16  ServiceLink, which is as set forth on the bottom

17  left corner of that first page, and after it's

18  recorded, returned back to us.

19      Q.   And this is a true representation of what

20  took place at that February 6, 2024, sale of the

21  Lavernia property, correct?

22      A.   As far as I know.

23      Q.   Okay.  And would you read into the record

24  the recorded-on number here?  What does it say?

25  "Loan agreement as amended."  If you would just read

117

1  what this says into the record.  If you would read

2  the --

3      A.   Sure.  This is the last question, and then

4  I have to go.

5           "Secures the loan agreement as amended,

6  restated, replaced, supplemented, reserved,

7  extended, or otherwise modified from time to time

8  the note dated May 31, 2019.  The original principal

**EXHIBIT 11**
**Page 142 of 149**

9    amount of 18,500,000, executed by borrower, payable

10   to the holder of lender and currently held by

11   holder."

12        Q.   And "Holder" is capital H, right?

13        A.   Yes.

14        Q.   And then read the next paragraph that says

15   "Recording."

16        A.   Recorded on August 22, 2023, as document

17   number 135641 in the official public records of

18   Wilson County, Texas, receipt number

19   20230822000016."

20        Q.   Okay.

21        A.   Okay.

22        Q.   So this says the holder is RIC Lavernia,

23   LLC, correct, on the substitute trustee's bill in

24   sale.

25             THE DEPONENT:  Mr. Choudhri, I've been

118

1    extremely patient with you today.  I've offered you

2    the opportunity to examine me as it relates to the

3    limited issues of the 9019 motion.  We started at

**EXHIBIT 11**
**Page 143 of 149**

4    approximately 3:00 p.m.  It's now 6:00 p.m.  I'm

5    unwilling to continue any further.

6             MR. CHOUDHRI:  Well, I would object to

7    that.  I still have more questions, and I want to

8    continue on and complete this deposition.  So I

9    would ask you to continue on and answer questions.

10   And I'm pulling up the objections, and you've

11   refused to answer the question on the holder.

12   BY MR. CHOUDHRI:

13       Q.   This reflects the holder of the debt is

14   RIC Lavernia.  You saw that, right?

15       A.   I'm declining to answer any further

16   questions.  I think I've provided ample opportunity

17   for you to ask your questions.  I'm here voluntarily

18   on the limited purpose of the 9019.  You've had

19   three hours to ask questions.  I am -- I am not

20   willing to sit voluntarily for any further

21   questions.

22       Q.   Mr. Hirsch, you are seeking the court on

23   Monday to not allow me to represent myself and be

24   defenseless in front of the bankruptcy court and not

25   have representation.  That is your -- that is your

**EXHIBIT 11**
**Page 144 of 149**

119

1   ultimate goal for Monday.  So that way, you won't

2   have any opposition to the 9019.  Is that a fair

3   assessment?

4       A.   This is the last time I'll say it, and

5   then I'm logging off of the Zoom.  I have provided

6   you now more than three hours of opportunity to

7   provide questions for me to answer related --

8   limited to the 9019 motion that's pending.  You've

9   had ample opportunity to ask your questions.

10           To the extent your questions related to

11  the 9019, I offered my truthful answers.  I am not

12  willing to continue voluntarily to sit for this

13  deposition.

14           Have a nice evening.

15           THE DEPONENT:  Thank you, Ms. Court

16  Reporter.  I am logging off.

17           MR. CHOUDHRI:  Mr. Hirsch, I would object.

18  We still need to continue on with this deposition.

19  It's not even been three hours.  It's been two hours

20  and change.

21           Madam Court reporter, how long have we

22  been on the record?

**EXHIBIT 11**
**Page 145 of 149**

23          THE REPORTER:  The actual time on the

24  record, two hours, 52 minutes.

25          MR. CHOUDHRI:  So under three hours, and

                                                    120

1  let the record reflect that Mr. Hirsch has left the

2  deposition.

3          Ms. Ndege, would you disagree with that?

4  Do you see Mr. Hirsch in this deposition anywhere?

5          MS. NDEGE:  I don't have any comment.  I'm

6  just waiting for us to get off the record so I can

7  order the transcript.

8          MR. CHOUDHRI:  Okay.  Let's get off the

9  record.

10          THE REPORTER:  Mr. Choudhri, would you

11  like to order the original?

12          MR. CHOUDHRI:  Yes.  If I can get this on

13  expedited basis, like maybe tomorrow.

14          THE REPORTER:  Okay.

15          MR. CHOUDHRI:  The first possible -- as

16  early as possible would be great for both of them,

17  please.

**EXHIBIT 11**
**Page 146 of 149**

18          THE REPORTER:  Okay.  And Ms. Ndege, would

19  you like to order a copy?

20          MS. NDEGE:  I will.  Yeah.  Same as the

21  one before this one.

22          THE REPORTER:  All right.  We're going off

23  the record, 6:05 p.m.

24          (WHEREUPON, the deposition of KYLE HIRSCH

25  was concluded at 6:05 p.m.)




                                                    121


1                    CERTIFICATE

2

3     I, Brittany Douglas, do hereby certify that I

4  reported all proceedings adduced in the foregoing

5  matter and that the foregoing transcript pages

6  constitutes a full, true and accurate record of said

7  proceedings to the best of my ability.

8

9     I further certify that I am neither related to

10  counsel or any party to the proceedings nor have any

11  interest in the outcome of the proceedings.

**EXHIBIT 11**
**Page 147 of 149**

12

13      IN WITNESS HEREOF, I have hereunto set my hand

14 this 1st day of August, 2025.

15

16

17

18

19   Brittany Douglas

20   Certificate No. 4235

21

22

23

24

25

                                                122

1                 CORRECTION SHEET

2 Deposition of: Kyle Hirsch          Date: 07/31/25

3 Regarding: In Re: 1001 WL LLC, Debtor

4 Reporter: Douglas/Fiedler/Breezee

5 _____

6 Please make all corrections, changes or

**EXHIBIT 11**
**Page 148 of 149**

```
 7   clarifications to your testimony on this sheet,

 8   showing page and line number.  If there are no

 9   changes, write "none" across the page.  Sign this

10   sheet and the line provided.

11   Page  Line  Reason for Change

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21   ____  ____  _____

22   ____  ____  _____

23   ____  ____  _____

24            Signature: _____

25                     Kyle Hirsch
```

**EXHIBIT 11**
**Page 149 of 149**