**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **RIC (LAVERNIA) LLC,** | § | **Case No. 24-51195-mmp** |
| | § | |
| **Debtor.** | § | **Chapter 11** |

# EXHIBIT D

Transcript, April 3, 2025 hearing, *In re Texas REIT, LLC*, No. 24-10120 (complete) (highlighting added)

*Movants' Rule 9024 Motion as to ECF Nos. 304 and 348 and the Judgments in Adv. Nos. 24-05043 and 25-05040*

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| WCW HOUSTON PROPERTIES, LLC, ET AL, Plaintiffs, vs. TEXAS REIT, LLC, ET AL, Defendants. | CASE NO: 24-01045-smr ADVERSARY<br>Austin, Texas<br>Thursday, April 3, 2025<br>10:09 a.m. to 12:51 p.m. |
| IN RE: TEXAS REIT, LLC, Debtor. | CASE NO: 24-10120-smr CHAPTER 11 |

**MOTIONS HEARING**

**BEFORE THE HONORABLE SHAD ROBINSON,**
**UNITED STATES BANKRUPTCY JUDGE**

CALENDARED MATTERS: SEE PAGE 2

APPEARANCES: SEE PAGES 2, 3, 4

Courtroom Deputy: Jennifer Lopez

Court Recorder [ECRO]: Ren Schoener

Transcribed by: Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**CALENDARED MOTIONS:**

**CASE NO: 24-01045-smr**

**1) MATTERS: STATUS HEARINGS RE:**

**MOTION TO DISMISS CASE [DKT.NO.86];**
**COMPLAINT [DKT.NO.1];**

**2) MATTER: UNOPPOSED MOTION TO WITHDRAW ATTORNEY [DKT.NO.95]**

**CASE NO: 24-10120-smr**

**1) MATTER: SUPPLEMENTAL MOTION TO USE CASH COLLATERAL [DKT.NO.522];**

**2) MATTER: AMENDED DISCLOSURE STATEMENT [DKT.NO.518];**

**3) MATTER: MOTION TO APPOINT TRUSTEE [DKT.NO.506];**

**4) MATTERS: STATUS HEARINGS RE:**

**APPLICATION TO EMPLOY [DKT.NO.554];**
**MOTION (GENERIC) [DKT.NO.556]**

**APPEARANCES:**

**For Plaintiffs:** KEVIN POWERS, ESQ.
Spencer Fane
3040 Post Oak Boulevard
Suite 1400
Houston, TX 77056
713-212-2638

ERIC TERRY, ESQ.
3511 Broadway
San Antonio, TX 78209
210-468-8274

**Wu Properties:** TAMI KIM, ESQ.

**APPEARANCES:** (CONTINUED)

| | |
|---|---|
| For Debtor: | STEPHEN W. SATHER, ESQ.<br>Barron & Newburger<br>7320 N. MoPac Expy.<br>Suite 400<br>Austin, TX 78731<br>512-476-9103 Ext. 220 |
| | MARK C. TAYLOR, ESQ.<br>Kane Russell Coleman Logan<br>401 Congress Ave.<br>Suite 2100<br>Austin, TX 78701<br>512-487-6560 |
| Also present: | ALI CHOUDHRI |
| For Dalio Holdings I, et al.: | KELL C. MERCER, ESQ.<br>901 S. MoPac Expy.<br>Building 1, Suite 300<br>Austin, TX 78746<br>512-627-3512 |
| Also present: | TRAVIS VARGO, ESQ. |
| For George Lee: | ZACHARY CLARK, ESQ.<br>Sponsel Miller<br>520 Post Oak Boulevard<br>Suite 310<br>Houston, TX 77027<br>713-892-5400 |
| For Tax Lender: | HOWARD M. SPECTOR, ESQ.<br>Spector & Cox<br>12770 Coit Rd.<br>Suite 850<br>Dallas, TX 75251<br>214-365-5377 |
| For Ali Mokaram: | LYDIA R. WEBB, ESQ.<br>D. SCOTT FUNK, ESQ.<br>Gray Reed & McGraw<br>1601 Elm Street<br>Suite 4600<br>Dallas, TX 75201<br>214-954-4135 |

**APPEARANCES**: (CONTINUED)

For U.S. Trustee: SHANE P. TOBIN, ESQ.
U.S. Trustee's Office
903 San Jacinto Boulevard
Room 230
Austin, TX 78701
512-916-5348

**INDEX**

| DEBTOR'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ANGELO DECARO | 61 | 65 | 72 | 73 |

| DEBTOR'S EXHIBIT | RECEIVED |
|---|---|
| 3 | 65 |

**Austin, Texas; Thursday, April 3, 2025; 10:09 a.m.**

**--oOo--**

**THE COURT:** All right. Good morning everyone. This is Thursday, April 3rd, 2025, Austin docket. We have two matters on the docket, an adversary proceeding and a main bankruptcy case. It's -- let me grab my notes, please. It's adversary proceeding 24-01045, WCW Houston Properties, et al. v. Texas REIT, LLC, et al.

We have three matters in the adversary proceeding. Docket 1 is a status hearing generally on the adversary. Docket 86 is a motion to dismiss, filed in the adversary. That's a status hearing as well. And then we have the unopposed motion to withdraw that was filed by Mr. Choslovsky in the adversary proceeding.

In the main bankruptcy case, we have five matters set on the docket. At 506, we have a motion to appoint trustee that was originally commenced -- a hearing on that was commenced last week and then reset to today. At 518, we have an amended disclosure statement that was also set last week and set for today. At 522, we have a supplemental motion to use cash collateral that was set on an expedited basis for last week. And then two recent motions filed by the Debtor, 554 and 556. 554 is an application to employ. 556 is a motion to set bid procedures or sale procedures. Those -- 554 and 556 are set for status hearing only.

I will call roll, top to bottom, left to right. I think that'll go quicker. I'm going to start with Mr. Mercer since he's in the courtroom. I'll start with you, Mr. Mercer.

**MR. MERCER:** Good morning, Your Honor. Kell Mercer on behalf of Dalio Holdings I LLC and Dalio Holdings II LLC.

**THE COURT:** All right. Mr. Sather?

**MR. SATHER:** Stephen Sather and Mark Taylor on behalf of the debtor.

**THE COURT:** All right. All right. I see Mr. Taylor. Very good. Mr. DeCaro is your witness, right, Mr. Sather? Mr. Sather, is Mr. DeCaro your witness?

**MR. SATHER:** Yes, Your Honor.

**THE COURT:** Okay. I see you, Mr. DeCaro. Mr. Powers?

**MR. POWERS:** Good morning, Your Honor. Kevin Powers for WCW. Eric Terry is with me. I believe Tami Kim is also on the line, I think via telephone. I'm not sure if she has somebody -- we had an intern last time. She may be here as well.

**THE COURT:** All right. And I do see --

**MR. TERRY:** Your Honor, Eric --

**THE COURT:** Oh, go ahead, Mr. Terry.

**MR. TERRY:** I apologize. Eric Terry for WCW Houston Properties. Tami Kim in-house counsel for intern at Wu Properties, and then my paralegal, Ellen Rodriguez, is at the

phone number with 6087 as the last four.

**THE COURT:** All right. 713-6087, Mr. Terry's paralegal. And Wu Properties listed, you said, was the intern?

**MR. TERRY:** Correct, Your Honor.

**THE COURT:** Okay. I see Wu Properties. I see Ms. Kim. I see the 713-6087 as well. Okay.

Mr. Vargo?

**MR. VARGO:** Yes, Judge, present.

**THE COURT:** I need your name for the record and who you represent or who you are.

**MR. VARGO:** Yes, Judge. Travis Vargo, in my capacity as State Court Receiver over Dalio Holdings I and II. For clarity, that is Mr. Mercer's clients. The note was for Dalio. That's the senior secured lender. It was given to me in a turnover order by state court.

**THE COURT:** Okay. Mr. Clark?

**MR. CLARK:** Zachary Clark for adversary complainant in George M. Lee.

**THE COURT:** Mr. Tobin?

**MR. TOBIN:** Good morning, Your Honor. Shane Tobin from the Department of Justice here on behalf of the United States Trustee.

**THE COURT:** Ms. Webb?

**MS. WEBB:** Good morning, Your Honor. Lydia Webb and Scott Funk on behalf of Ali Mokarum. Apologies for not being

on video today. I'm having some issues getting my video working from the hotel room here at Benchbar (phonetic).

**THE COURT:** Okay. I do see you, Ms. Webb and Mr. Funk as well. I've got a number 214 ending in 67. 214 ending in 67.

**MR. SPECTOR:** Your Honor, that's Howard Mark Spector here on behalf of the tax lender. I do not intend to participate. I'm just listening.

**THE COURT:** All right. Thank you, Mr. Spector. Noted.

Did I miss anyone?

**MR. CHOUDHRI:** Ali Choudhri, Your Honor.

**THE COURT:** Okay. Yeah. I did miss you, Mr. Choudhri.

**MR. CHOUDHRI:** It's okay.

**THE COURT:** Anyone else? All right. I'm going to start with you, Mr. Vargo.

**MR. VARGO:** Yes, Judge.

**THE COURT:** I guess maybe it's my old age or I'm one of those judges who's -- I don't know what the right word here is. When I review these things, maybe I review them too close. I read all your pleadings at 3 o'clock this morning. Actually, from about 2:30 to 4:00 this morning is when I read all of your pleadings, and I don't believe them to be -- I'm just going to be blunt with you, Mr. Vargo. And I think you

got yourself in quite a pickle here. And my gut reaction is you're in violation of a bankruptcy court order.

But let's discuss that. You reached out to my law clerks yesterday afternoon. Let me make sure I have it right. And I'm going to go somewhat slow here because I didn't have time to prepare all my notes like I typically do. You emailed my law clerks at Wednesday, April 2nd, 2025 at 4:50 p.m. Is that your first communication with my chambers?

**MR. VARGO:** I believe that's my only communication with your chambers, Judge.

**THE COURT:** Okay. And you say in that email, you're a state court receiver, see attached order appointment signed yesterday, 4/1/2025. I reviewed the order that you sent. Where does it say -- it said the way I'm reading this order, it was certified on April 2nd, 2025. It's been a few years since I've been in state court. It was signed by the judge on March 31st. Where does it say it was entered on April 1st?

**MR. VARGO:** Perhaps that was a typo, Judge. I'm sorry.

**THE COURT:** Well, I don't think it's a typo. A typo from March 31st to April 1st? Did you read the order?

**MR. VARGO:** Yes, Judge, I've read the order. I think that --

**THE COURT:** You filed a pleading -- or you attempted

to file a pleading because your pleading says notice of receivership. On March 31st, it recited -- so you said it right in this notice of receiverships and appearance. But then in the email to the law clerk, you said April 1st. I'm just trying to figure out why you said that.

**MR. VARGO:** Certainly. I believe the confusion arises out of the fact that there are two state court orders of turnover. One is against Mr. Chaudhry individually and the other one is against the Dalio entities. And I believe the dates were transposed based on the existence of two orders. There's an A case and a D case.

**THE COURT:** Okay, let me move on. You say I'm -- and this is the email to my law clerks. And after the hearing today, I'll put the email on the docket sheet so it's a record. I'm licensed in the southern and northern districts of Texas. I'm not licensed in the western district. Since I'm appearing for myself, non-attorney representing a client, I applied to get an ECF login so that I can e-file, but have not received one yet because the request was made around 2:00 to 3:00 p.m. today.

Do you do receivership frequently, Mr. Vargo?

**MR. VARGO:** Yes, Judge.

**THE COURT:** Okay. I did receivership action before I became a judge, and I've taught it at Baylor Law School for 21 years, so I consider myself somewhat well-versed in

receiverships. This underlying state court case was filed in 2012 originally, so it's been around a long time, right?

**MR. VARGO:** Yes, Judge.

**THE COURT:** I don't have evidence in this, so I'm going to take you on your word. You're a licensed attorney in the state of Texas, although you admit you're not licensed in the western district, I'm exercising jurisdiction over you because you're appearing in my court and attempting to file pleadings. When was the application for receiver filed in the state court action?

**MR. VARGO:** I would need to look at the docket, Judge.

**THE COURT:** Okay. Well, look at the docket. I'll wait.

**MR. VARGO:** All right. Mr. --

**THE COURT:** Let me -- maybe this is quicker. When did you know you, somebody -- because every time I sought a receivership in state court, it's filed by a creditor in the post-judgment context. The creditor proposes the receiver, or one or more receivers in its pleadings at some point. It's not where you apply for a receiver typically, and the state court judge just randomly picks someone. Is that how it happened in this case, or how did it happen?

**MR. VARGO:** Certainly. Scott Funk is the lawyer for the creditor, my appointing creditors, and he's on the Zoom

call. But to answer, and he can provide additional details, Judge, but I believe you were asking when did I receive notice that I was appointed?

**THE COURT:** I want to know when you knew you might be the receiver in the state court lawsuit.

**MR. VARGO:** That I might be the receiver?

**THE COURT:** Yeah. Months ago? Three days ago? I'll tell you what it was at least on, I'm guessing. Let's see. It was at least March 20th, because in the order you uploaded, the order was originally filed with the clerk in Harris County on March 20th, '25 at 8:49 a.m. Your name's listed in it.

**MR. VARGO:** May I elaborate on my communications relating to my appointment?

**THE COURT:** Sure.

**MR. VARGO:** Okay. I think the first time --

**THE COURT:** I'm taking everything as you're saying right now under oath, so you're subjecting yourself to perjury and referral to the United States Attorney for any type of misstatement or misrepresentation, just so you're aware of that.

**MR. VARGO:** Yes, Judge. I think the first time that I talked to Mr. Funk about a potential appointment would have been in passing in 2024 sometime. But I've talked to many creditors' lawyers about potentially serving or having a nomination for their matters. So I don't believe that was of

any consequence because we didn't have any discussion of any assets or any appointments that were --

**THE COURT:** When did you have a better idea that it was likely or highly probable that you would be appointed as the receiver in this case number 2012-27197D?

**MR. VARGO:** Uh, highly probable?

**THE COURT:** Whatever word. Here's where I'm getting at. I got receivers appointed all this time in state court. They generally knew two to three weeks in advance. And if I had a scenario, I wanted them to know when the hearing dates were, when we were going forward, wanted to make sure they were getting their ducks in a row just in case the state court judge wanted a bond. I wanted to make sure they were running a conflict check. I wanted to make sure in my own due diligence in choosing amongst receivers that they were qualified, that they were familiar with cases of this type. I could keep going on.

If they weren't admitted, as it applies to your case in the Western District of Texas, that may be in -- I would have made sure in this case that they had knowledge of the bankruptcy case, that they had knowledge of the bankruptcy court order entered March 20th, 2025, at ECF 524 to say, hey, this one's slightly different. There's a bankruptcy case. You might want to be aware of that. Oh, you're not admitted in the Western District of Texas? Oh, hey, you might want to get

admitted in the Western District of Texas. And I think all that's pertinent because it looks like to me that Mr. Mokarum and you sat around and did nothing until yesterday and I don't understand that. That is -- it's not appropriate and I'm not happy about it.

And on top of that, I'm going to walk you through -- we're going to take the first hour to walk through this receivership order and I'm going to ask you how that doesn't violate my order entered at ECF 524 and that I shouldn't show cause you for sanctions in front of this court.

So walk me through when you knew everything. On this bankruptcy, you knew you were going to be the receiver. When did it all happen, Mr. Vargo?

**MR. VARGO:** Certainly. So I had distributed forms that I use in conjunction with receiverships several months back, but I believe it might've been in conjunction with even another matter, not necessarily this one, to Mr. Funk's firm. Mr. Funk, I believe, communicated to me verbally that he was going to ask to have me appointed over Mr. Choudhri individually in the Dalio entities approximately two to three weeks ago. I don't believe that I had any details about when a hearing was set, if any. I know that I did not receive any notices of the hearing. I certainly didn't attend any hearings.

I believe I became aware of the orders being

signed. Let me look at my -- let me look at a calendar. I believe I became of orders being signed in one of the court orders, which I did not have a copy of, I don't believe, on March 31st. And then obviously the one that signed on the 1st, I would not have known about because it didn't occur, and then I had a medical procedure and I was not in the office or working on April 1st.

I had a conversation with Mr. Funk for less than an hour on April 2nd, which -- excuse me, let me -- let me look at my -- you're wanting exact, so let me look --

**THE COURT:** Let me ask you a different question. I may come back to that. Are you aware of this Court's order modifying the automatic stay on limited grounds?

**MR. VARGO:** No.

**THE COURT:** Okay. Did you accept the appointment? So typically I have receivers file a notice of acceptance of appointment in the state court lawsuit once I appointed a receiver. Did you file any type of acceptance of appointment?

**MR. VARGO:** I filed an oath.

**THE COURT:** Oath, okay. Let me read some orders. Let me read some language to you in my order.

**MR. VARGO:** Yes, Judge.

**THE COURT:** I'm at ECF 524, page 2. The judgment creditors are only permitted to pursue Ali Choudhri

individually for his personal assets. Judgment creditors is defined as Ali Mokarum and Osama Abdul Latif. And maybe I'm in the wrong state court lawsuit. So let me make sure, as it could be that they didn't even have permission to go forward. Oops. 27197. 27197-A. Well, this is 2007-917-D. So maybe my conversation needs to be with Mr. Funk. Well, I'm going to go on and read my language in this order in any event. Let me see. I've got a footnote one. Maybe they're the same. Oh, yes, they are the same.

It is therefore ordered that regarding the cases 2012-27197-A and 2012-27197-D, which are referred to collectively as the state court actions, the automatic stay does not apply to actions asserted by judgment creditors against Ali Choudhri personally and his personal assets. It's further ordered the automatic stay regarding the debt or the bankruptcy estate is not limited and that would be the Texas REIT case. The judgment creditors are not permitted to and shall not seek any relief in the state court actions against the debtor, the debtor's real or personal property and/or any property of the bankruptcy estate. The judgment creditors are only permitted to pursue Ali Choudhri individually for his personal assets. However, the judgment creditors may not pursue any interest Ali Choudhri holds in the debtor, any assets of the debtor, or any property of the bankruptcy estate without further order of this court. And I will represent to

you there's no further order of this court.

I'm going to go on. The judgment creditors are not permitted to seek any relief in the state court actions that would interfere with the bankruptcy process, the debtor's plan confirmation, and/or the liquidation of the debtor's real or personal property or any property of the bankruptcy estate.

I'm going to move on to page 3 of the order. It's further ordered that collection or enforcement of any judgment, remedy, constructive trust, sanctions, or penalties against the debtor or property of the bankruptcy estate remains under the exclusive jurisdiction of this court. I'm going to move on. It's further ordered that any state court receiver appointed in the state court actions, including the actions that you're appearing in this court on, shall not seek to exercise control over the debtor and/or property of the estate, shall not pursue any interest Ali Choudhri holds in the debtor or any assets of the debtor without further order of this court, which there is none. I've added that part. And shall not interfere with the bankruptcy process, the debtor's plan of confirmation, and/or the liquidation of the debtor's or the bankruptcy estate's real or personal property.

Let me read that again for you, Mr. Vargo. That any state court receiver appointed in the state court actions, that's you, right?

**MR. VARGO:** Yes.

**THE COURT:** Shall not -- you know what shall not means, don't you?

**MR. VARGO:** Yes.

**THE COURT:** Seek to exercise control over the debtor and/or property of the estate, shall not pursue any interest Ali Choudhri holds in the debtor. Mr. Choudhri holds an interest in the debtor vis-a-vis his LLC interest, doesn't he?

**MR. VARGO:** Yes. Derivatively, yes, it appears so.

**THE COURT:** What does derivatively mean? Does he own the LLC interest or not?

**MR. VARGO:** I believe that Mr. Choudhri, based on what I've been told so far, I have not reviewed the documents. I believe Mr. Choudhri owns the interest in Dalio and I believe Dalio has the secured note against Texas REIT.

**THE COURT:** That doesn't answer my question. Who owns the debtor? Who owns Texas REIT? Texas REIT's an LLC. Who's the membership interest holder?

**MR. VARGO:** My understanding is Mr. Choudhri.

**THE COURT:** Okay. Are you seeking to exercise control over those LLC interests?

**MR. VARGO:** No.

**THE COURT:** Okay. So your testimony under oath is you're not seeking to control those LLC interests. All right. You have a state or court order granting a turnover?

**MR. VARGO:** May I clarify, Judge?

**THE COURT:** What I want you to do is tell me the correct answer the first time. What's your clarification?

**MR. VARGO:** Certainly. I believe that the promissory notes and security interests that Dalio holds were turned over to me pursuant to the turnover order. That's my understanding.

**THE COURT:** Okay. I understand that. That's not my question right now. My question is, aren't you seeking, pursuant to the receivership order, to exercise control over Mr. Choudhri's LLC interest in Texas REIT?

**MR. VARGO:** I don't believe so, Judge.

**THE COURT:** Okay. Maybe I misread it. So do you have the receivership order in front of you? The receivership order that you sent to my law clerks?

**MR. VARGO:** Yes, Judge. I have it pulled up here.

**THE COURT:** Okay. Let's see. Now I've got to pull up my notes. Again, it's not a perfect answer or notes like it typically would be because -- all right, I want to start on the receivership order, the definition at number 12 on page 2 of the state court receivership order.

**MR. VARGO:** The definition on PDF page 12?

**THE COURT:** Page 2, number 12, Choudhri.

**MR. VARGO:** Yes.

**THE COURT:** It says, Choudhri's LLC shall mean each limited liability company in which Choudhri owns a membership interest, including but not limited to the following and then

it's blank. So we have -- I don't know what that means, other than if I stop at that first comma, it shall mean limited liability company which Choudhri owns a membership interest. So you see that definition. He owns a membership interest in Texas REIT, correct?

**MR. VARGO:** He does.

**THE COURT:** Okay. And then, let's scroll down. Paragraph 15, next page.

**MR. VARGO:** Yes.

**THE COURT:** Pursuant to this order, the receiver, that's you, will have a judicial lien on all non-exempt assets of the debtors. The debtors is defined as Choudhri, Dalio I, and Dalio II, correct?

**MR. VARGO:** Yes.

**THE COURT:** And the non-exempt asset of Choudhri then would be the LLC interest in Texas REIT.

**MR. VARGO:** I believe that -- the answer to that is no, Judge. This order does not turn over his LLC interest to me.

**THE COURT:** Okay. Maybe it does, maybe it doesn't. Okay.

**MR. VARGO:** Well, may I speak, Judge?

**THE COURT:** Sure.

**MR. VARGO:** Or at least direct you. Paragraph 18 makes --

**THE COURT:** Okay. Paragraph 18 is on my list. We'll get to that one next.

**MR. VARGO:** Okay.

**THE COURT:** Regardless, no one, not even a lien holder with a prior file of deed of trust can sell property held in custodial legis by a duly appointed receiver without first obtaining approval from the court in which the receivership is pending.

So what is -- what are you holding in custodial legis? The notes? Is that it? So what is the court? The court holds property in custodial legis. You're a receiver appointed by the court. You're an extension of the state court. So what's the property held in custodial legis?

**MR. VARGO:** Well, indisputably under the order, I believe it's the items listed in paragraph 10.

**THE COURT:** Okay. The Dalio receivership assets, which is a defined term.

**MR. VARGO:** Yes.

**THE COURT:** Okay. So you're not taking the position that this order allows you to take possession of Mr. Choudhri's LLC interest in Texas REIT, this, right?

**MR. VARGO:** Correct.

**THE COURT:** Okay. Paragraph 18. Pursuant to the Texas Business Organizations Code, Section 101, the court hereby issues a charging order against all membership interests

owned by Choudhri. He's got a membership interest in Texas REIT LLC, right?

**MR. VARGO:** Yes.

**THE COURT:** Okay. You got a charging order against his interest in Texas REIT LLC then, correct?

**MR. VARGO:** Yes.

**THE COURT:** Okay. Now let me go back to my order, page 3. Any state court receiver appointed in the state court actions shall not exercise control over the debtor property of the estate, shall not pursue any interest Ali Choudhri holds in the debtor.

So let me, Ali Choudhri holds an LLC interest in Texas REIT LLC, correct?

**MR. VARGO:** Yes.

**THE COURT:** And paragraph 18 says you have a charging order on that interest held in Texas REIT LLC, correct?

**MR. VARGO:** Yes, Judge, that's what it says.

**THE COURT:** So that violates my order, doesn't it, Mr. Vargo?

**MR. VARGO:** Well, if you're attempting to -- if you're attempting to state that I have violated your order, I didn't draft the order nor have I --

**THE COURT:** Are you the receiver?

**MR. VARGO:** Yes.

**THE COURT:** Did you post a bond?

**MR. VARGO:** No, it's the post-judgment --

**THE COURT:** Excuse me, it's no bond. That's right, it's post-judgment. Did you sign an oath?

**MR. VARGO:** Yes.

**THE COURT:** You accepted the appointment and attempted to initiate proceedings and told my law clerks you were appearing in this court as the receiver.

**MR. VARGO:** Yes.

**THE COURT:** Then you're in violation of my order. I don't care if you drafted the order, sir. You accepted this order. You should have been involved on drafting the order. You said you sent Mr. Funk forms. Is this your form?

**MR. VARGO:** I believe this is part of a form, yes. I believe that --

**THE COURT:** Did you read the order before you moved forward? Did you go, hey, Mr. Funk, or hey, state court judge, I'm not going to do that because that's in violation of a bankruptcy court order. If you didn't, that's your own negligence, Mr. Vargo. It's nobody else's issue but you. You shouldn't have accepted the appointment. You should have said, hey, I'm not going to do this because the bankruptcy court said I can't. You didn't do that, did you, sir?

**MR. VARGO:** No, Judge, because I was not aware of your order that you were reciting.

**THE COURT:** Lack of knowledge is not an excuse. You

accepted the appointment. You're the receiver. I don't understand. You had knowledge of the bankruptcy.

**MR. VARGO:** With my limited discussions with Mr. Funk this week, yes. I believe it was Tuesday.

**THE COURT:** Okay, Mr. Funk's not your attorney. What else did Mr. Funk tell you?

**MR. VARGO:** He gave me an overview of the parties. We discussed the names of persons and entities, who their lawyers were in multiple lawsuits, including an underlying WCW lawsuit. We covered some brief background relating to a dispute between WCW and Dalio relating to subordination. We discussed the existence of this hearing that was coming up. We discussed --

**THE COURT:** So you knew there was a bankruptcy court hearing and it never occurred to you -- how long have you been a receiver, Mr. Vargo?

**MR. VARGO:** I believe my first appointment was in 2017.

**THE COURT:** I'm trying to think back on my experience, and generally when people hear the word bankruptcy, they go, whoa, hey, I need to -- either I'm not a bankruptcy lawyer, I need to get someone else involved, and I need to learn a whole heck of a lot more about bankruptcy and what the status of that is before I go forward. You didn't ask any of those questions?

**MR. VARGO:** Can you be more specific about which question?

**THE COURT:** You didn't ask any further questions about the bankruptcy or dive into it further before you agreed to accept this appointment?

**MR. VARGO:** I've known Mr. Funk for many years, and he's an exceptional lawyer in my opinion, and I don't believe that he would have had me appointed in a case that would have knowingly violated bankruptcy court orders, so no, I did not ask that question.

**THE COURT:** Okay, so Mr. Funk's in violation and Mr. Mokarum's in violation of the order, and the other applicants in the state court receivership. Are you pointing the finger back at them?

**MR. VARGO:** I'm not attempting to point fingers. You're asking questions. I'm trying to provide answers.

**THE COURT:** Let me move -- well, you were going to cite me to paragraph 18, so before I got there, I've got four or five more provisions I'm going to walk you through. So what in paragraph 18 were you going to bring my attention to that helped your situation?

**MR. VARGO:** I'm not certain that I was -- well, I don't believe that I was trying to say that it was helping my situation. I think it was relevant to what we were discussing

at the time, and the relevance of paragraph 18 is that I'm not taking the position that I have a turnover of the membership units of any LLC that Mr. Choudhri owns, that there's only a charging order against that, and I'm entitled to distributions from his LLC interests to the extent that they're made. That's the point of paragraph 18.

**THE COURT:** Isn't a charging order, by definition, a post-judgment collection remedy against the person you seek a charging order against?

**MR. VARGO:** Yes.

**THE COURT:** I can appreciate the word manipulation, but shall not -- and I'm going back to my order. Any state court receiver, which is you, appointed in the state court actions, which is this action, shall not seek to exercise control over the debtor and/or property of the estate, shall not pursue any interest Ali Choudhri holds in the debtor, or any assets of the debtor, without further order of this court. You don't have a further order from me, do you?

**MR. VARGO:** No, Judge.

**THE COURT:** And a charging order is pursuing an interest, and a charging order against Mr. Choudhri's interest in Texas REIT is you pursuing an interest that he holds in Texas REIT. Is it not? I've done lots of charging orders.

**MR. VARGO:** I don't -- obviously, we're slicing this pretty thin, but I'm not seeking an interest in the LLC. If

Mr. Choudhri individually is obtaining distributions, that's all I'm entitled to under the state court order.

**THE COURT:** Is that an interest he holds in Texas REIT?

**MR. VARGO:** No. Hold on, excuse me. It's an interest in so far as it's his entitlement to distributions. So, yes.

**THE COURT:** And it goes on in paragraph 18 of the state court receivership order. And these companies, Texas REIT would be one of those companies, and Choudhri shall be required to pay to the receiver any distributions or proceeds that would otherwise do from each company to Choudhri until satisfaction of the judgment is made in full.

Mr. Choudhri's -- I haven't made a decision yet. I believe Mr. Choudhri is also a creditor in Texas REIT. So if he got paid as a creditor in Texas REIT, this is ordering me to pay that to you, right?

**MR. VARGO:** Yes. That's my understanding.

**THE COURT:** Okay. I'm going to get back to my order. State court receiver shall not seek to exercise control over, excuse me, shall not pursue any interest Ali Choudhri holds in the debtor or any assets of the debtor without further order of this court. This says he has to do it, I guess. And I'm the one that makes that decision. So if he's due a distribution as a creditor, if he's due a distribution on his

LLC interest, Section 18 says that's paid to you. If I say no, is the state court judge going to haul me in for being in contempt of this order?

**MR. VARGO:** I wouldn't speculate on that, but I don't think so.

**THE COURT:** Let me go on. Choudhri may not receive any payment from any of the Choudhri LLCs directly or indirectly until the judgment is paid in full or without written consent from this court. Well, that's quite a pickle because my order says you can't do it without further order of this court. State court says those monies, nobody gets paid -- Mr. Choudhri can't get paid as a creditor in the bankruptcy and he can't receive the distribution on his LLC interest without written consent from that court.

Well, who are you going to follow, Mr. Vargo? You're the receiver.

**MR. VARGO:** Well, to the extent that I can --

**THE COURT:** What if I ordered today that Mr. Choudhri can have a distribution of $200,000? Do I have to pay that to you? That's what this order says.

**MR. VARGO:** Well, I would bring this court order to your attention and then we would have a discussion about your court order and this court order --

**THE COURT:** That discussion would be very brief. The discussion would be, Mr. Vargo, you're in violation of this

court's order as the receiver at ECF 3524 and I'm going to find you in contempt of court and issue a monetary sanction in some amount that I haven't determined yet. That would be a very short hearing.

Let me move on. Okay. Paragraph 19A, debtor's responsibilities. Debtors including -- I'm on paragraph 19 of the state court receivership order. Are you with me?

**MR. VARGO:** 19, yes.

**THE COURT:** Debtor's responsibilities. Debtors, which is Dalio I and Dalio II, correct?

**MR. VARGO:** Yes, Judge.

**THE COURT:** And then it says including Choudhri as owner and authorized agent of debtors are ordered to A, let me make sure, deliver receivership assets. What's the term receivership assets mean? Again, I was reading it very early. I couldn't find that defined definition anywhere in there. So what does receivership assets mean? You're the receiver. The debtors, including Choudhri, are directed to deliver receivership assets to you. What are the receivership assets?

**MR. VARGO:** I believe that term is left over from the forms that I had given to Mr. Funk once upon a time. And it appears, and I'm speculating, that Mr. -- that someone at Mr. Funk's firm, in the edits started using the term Dalio receivership assets, because I don't recognize anything in that section.

**THE COURT:** Okay. And I will represent to you that I read this entire thing multiple times, and I found no definition of receivership assets. So how can they comply with doing something that's undefined?

It's not my order. I'm just curious. Because it may impact me. I mean, this order, the way I read it is interfering with this bankruptcy case and is in violation of my state court, or excuse me, my order at 554. But we'll continue on. How are they supposed to comply with something that has no definition? I mean, you're the one that's going to enforce this as the receiver to say, Judge, they violated this order because they didn't deliver receivership assets.

**MR. VARGO:** Well, in the instance that you're referring to, Judge, I don't believe that I could file that motion because there is no definition. So then they can't be in violation of it.

**THE COURT:** All right. Let me move on. 22(a). Receivership assets are in custodial legis. What does that mean? There's no definition of receivership assets. So nothing's in custodial legis? Because there's no definition of receivership.

Again, I'm trying to figure out how this order applies to me as a bankruptcy judge and in this bankruptcy case and how it plays together nicely or not nicely with my order at 524. So you tell me as the receiver what receivership assets,

which appears to me to be a defined term, are in custodial legis.

**MR. VARGO:** I'm sorry, Judge. What was your question again?

**THE COURT:** 22(a).

**MR. VARGO:** Yes, Judge.

**THE COURT:** What are the receivership assets that are in custodial legis? It's a very specific term. It's capitalized. So either there's receivership assets that are in custodial legis or there are none. It appears to me there are none because receivership assets is not defined. So nothing's in custodial legis.

**MR. VARGO:** The grammar that you're referring to is correct.

**THE COURT:** Let me move on. No other court or forum has jurisdiction to adjudicate rights relating to the receivership assets because this court maintains exclusive sole authority for assets held in custodial legis by that. No other court or forum has jurisdiction to adjudicate rights relating to the receivership assets.

Let's assume receivership assets means what it says up above is defined in subsection 10 as Dalio receivership assets, right? The notes. Let's assume it means that, okay?

**MR. VARGO:** Yes, sir.

**THE COURT:** So we have the notes. You said that

earlier, that it's the notes. We also know that in subsection 10(e) -- go back to 10(e) with me.

**MR. VARGO:** Yes.

**THE COURT:** We know that Dalio receivership assets 10(e) says all claims and causes of action against WC properties. See that?

**MR. VARGO:** I do.

**THE COURT:** All right. You understand that WC properties and Dalio and the debtor are parties to at least one lawsuit adversary proceeding in my court. Are you aware of that?

**MR. VARGO:** I wasn't aware of the jurisdiction, but I'm aware of the subordination dispute.

**THE COURT:** Okay. You're not aware of a lawsuit pending between Dalio I and II and the debtor in this case, and, excuse me, an adversary proceeding in front of this court?

**MR. VARGO:** I'm aware that a lawsuit exists. I was not aware until you said that exactly where the jurisdiction in the case was pending.

**THE COURT:** All right. It's adversary proceeding 24-0104, let's make sure I have the right one. Yeah, 01045. It was originally a state court lawsuit. It was originally -- let me make sure I got it, tied together. That original petition is in the case pending before me. I'm pulling it up. It's Case No. 2017-3532. This turnover order says 2017-35320. That

case was removed to this court on or about July 5th, 2024. You were not familiar with any of that?

**MR. VARGO:** No.

**THE COURT:** And you didn't take it upon yourself when you knew there was a bankruptcy filing to do any type of due diligence or investigation, right? Other than talk to Mr. Funk.

**MR. VARGO:** I read as many documents as I could relating to this bankruptcy.

**THE COURT:** Okay. Let me go back to 10(e) and continue to walk through that. So your receivership assets include the notes. They include claims and causes of action against WCW, which if you didn't know before, you now know that lawsuit's pending in my court, right?

**MR. VARGO:** I do now.

**THE COURT:** That was a defined asset, okay? I'm just going to refer to that as the WCW Dalio lawsuit for my purposes. F, the defenses and all claims and cause of actions asserted by WCW. So E and F are basically if there's any claims between WCW and Dalio, that's your asset.

**MR. VARGO:** Yes, Judge.

**THE COURT:** Okay. And then we've already talked about this, number 11 and 12. Choudhri receivership assets includes all assets owned by Choudhri, except his ownership interest in any limited liability company. But it says,

Choudhri's LLC's show me each limited liability company in which he owns a membership interest. So again, I don't know the difference between 11 and 12, but it looks like to me that you have a right to exercise rights over Mr. Choudhri's membership interest in Texas REIT, correct?

**MR. VARGO:** I have a right to his distributions only.

**THE COURT:** Okay. Well, then what's the charging order? That's pursuant to 18. You exercise the charge. You have the rights to the charging order. You have rights to his interest. Paragraph 18 of the state court receivership order also says that he may not receive any payment from any of the Choudhri LLC's, directly or indirectly.

Choudhri may not receive any payment from any of the Choudhri LLC's. So if he were to get payment as a creditor in this case, that wouldn't be vis-a-vis a charging order. That would be something different, right? And this says, he may not receive any payment. The two preceding paragraphs in 18, or sentences in 18, talk about the charging order. But then this paragraph 18 goes further and says, he may not receive any payment from Texas REIT because that's one of his LLC's until the judgment's paid in full or it's written consent of this court.

So separate and apart from the charging order, if there's any other entitlement that Mr. Choudhri has a right to payment, if he's -- I mean, do you read it differently, I

guess? Let me ask. How do you read that differently? The last sentence of paragraph 18.

**MR. VARGO:** I don't read it differently.

**THE COURT:** Okay. So if Mr. Choudhri has some type of claim that says, hey, I've been providing management services, so I'm entitled to $2,000 a month, he doesn't get that under this order. Yeah, it gets paid to you, correct?

**MR. VARGO:** If it was W-2 wages, that's exempt, and it would not be paid pursuant to this order, but if you're --

**THE COURT:** I'm not talking about W-2 wages, first of all. I'm going to come back to that one next. It's just a management fee because we've had discussions about management fees before in this case. If he were entitled to a management fee as a vendor to Texas REIT, those funds get paid to you.

**MR. VARGO:** They're supposed to under this order, yes.

**THE COURT:** Okay. Where's the exemption for W-2 wages? I must have missed that.

**MR. VARGO:** It's a reference to non-exempt assets. And so an exempt asset would be wages.

**THE COURT:** Okay. Once the wages are put into a bank account, they're no longer exempt though, are they? Arguably?

**MR. VARGO:** That's correct. Well, I don't think that's arguable. I think the case law says what you just said. They become a receivable of the account holder.

**THE COURT:** Correct. Right. You can't garnish his wages. You generally can't garnish wages under Texas law.

**MR. VARGO:** We agree.

**THE COURT:** Effectively, that's what you'd be doing around about that prohibition. I don't disagree with that. Okay, let me move on.

Again, there's a lot to tie together here. Okay, I'm back to 22(a). So now I want to get back to 22. 22(a), receivership assets are in custodial legis. Receivership assets is not a defined term. But we at least agreed here that the notes, the lawsuit, WCW lawsuit that's pending before me, you've taken possession or you're taking possession of the notes. You're taking possession in the lawsuits of receivership asset. Choudhri's membership interest in Texas REIT is an asset of the receivership. Correct? Those three items.

**MR. VARGO:** Yes.

**THE COURT:** Okay. No other court or forum has jurisdiction to adjudicate rights related to the receivership assets. So that says no other court or forum. I'm another court or forum, right?

**MR. VARGO:** You are.

**THE COURT:** No other court or forum. So that means this bankruptcy court does not have jurisdiction to adjudicate rights relating to the receivership assets. So I can't

adjudicate rights related to the notes. I can't adjudicate rights related to the WCW Dalio lawsuit. And I can't adjudicate rights related to Choudhri's membership interest or other payments to Choudhri. That's what this says, doesn't it?

So let me finish the sentence. Because this court, the state court, maintains exclusive sole authority for assets held in custodial legis by it. Paragraph 22(a) says, I can't do anything on the notes. I can't do anything on the WCW Dalio lawsuit. And I can't do anything on payments to Mr. Choudhri, either vis-a-vis his membership interest or any other type of payment as a creditor in this case. Is that what 22(a) says?

**MR. VARGO:** Well, I think you're asking for my position of what it says. I mean, obviously, it says --

**THE COURT:** I'm not asking for your position. It says what it says, right? That the state court has jurisdiction and it's exclusive jurisdiction.

Okay, let's compare that to my order. Let's see. I clicked out of it. I apologize. I'm going to read you two paragraphs on page 3 of 3 of my order. You're the receiver. Any state court receiver appointed in a state court action shall not seek to exercise control over the debtor or property of the estate, shall not pursue any interest Ali Choudhri holds in the debtor or assets of the debtor without further order of this court, shall not interfere with the

bankruptcy process, the debtor's plan confirmation, and/or the liquidation of the debtors or the bankruptcy estate's real or personal property.

It's further ordered that collection or enforcement of any judgment, remedy, constructive sanctions or penalties against the debtor and/or property of the bankruptcy estate remains under the exclusive jurisdiction of this court.

I'm just trying to figure out how you're not in violation of my order, Mr. Vargo. That's what I keep coming back to. Because it looks like to me that Mr. Funk and Mr. Mokarum and you are all in violation of my order. Let me move on. I want to make sure I hear all the evidence.

22(b), this court, which is the state court, retains the exclusive jurisdiction to the exclusion of any other court over the receiver for the purposes of determining whether the receiver is immune for any action taken by the receiver. Did I read that correctly?

**MR. VARGO:** Yes.

**THE COURT:** So in order for me to find you and contempt and sanction you in federal court, do I have to go back to the state court and ask him or her and say, hey, Mr. Vargo violated my court order, state court judge. Is it okay if I sanction him or find him in contempt? What does that mean? I don't even know what that means. That's not a permissible clause. What's it mean?

**MR. VARGO:** I mean, I'm a lawyer. I'm going to observe court orders.

**THE COURT:** Well, you haven't observed the court order because you're the receiver and you've done some of these things. Well, I'm going to object to my own question. So you feel like you've complied with this bankruptcy court's order at ECF 524? You're in compliance with my order. You have not interfered with any interest Ali Choudhri holds in Texas REIT. You've not pursued any interest that Ali Choudhri holds in Texas REIT. You're not seeking to take possession of the lawsuit that the state court told you to take possession of. I'm just trying to figure out, again, how you're in compliance or not with my order.

**MR. VARGO:** Well, even as of now, Judge, I haven't physically put my eyes on the order and obviously we're discussing it. I'm trying to answer questions about my behavior. As I stated before --

**THE COURT:** Okay. In all fairness, I'm not going to sanction you or hold you in contempt today. You're going to get fair notice of that, but you will be show caused, sir. Just so you're aware. You're going to be show caused for violation of this court's order at 524. Mr. Funk's going to be show caused. And the Mokarums are going to be show caused. And, I mean, I know what my court order says.

All right. Let me move on. I'm not done. I'm not

even close to done. 22(b). I've already talked about that. You can go on and read the rest of it. Any suit or claim against the receiver must be brought in this appointing court or transferred to this court for adjudication. I have exclusive jurisdiction over lawyers who appear in my court, and I have exclusive jurisdiction, statutory and constitutionally, to sanction and hold lawyers in contempt in my court, and I'm not going back to the state court to do any of that.

Receivers and persons engaged in or employed are not liable for loss or damage incurred by any person or entity by reason of anything. This whole clause is comical to me. That anyone would seek a receivership with this scope, given my order at 524, my prior statements in this case. That's the way I feel right now. Maybe you can convince me otherwise later.

22(d). This court, I'm reading the state court receivership order. You're the state court receiver, Mr. Vargo. This court shall maintain exclusive jurisdiction over fraudulent transfer lawsuits brought by the receiver or the creditor. Don't care about that one.

The court shall further maintain exclusive jurisdiction over any litigation pertaining to the ownership interest disputed during the receiver's actions involving a third party. Third party is not defined that I recall in this order. But -- so the state court and you as the receiver have exclusive jurisdiction over any litigation pertaining to the

ownership or the interest disputed during the receivership's actions involving a third party.

So if there's any disputes over the notes, which is already pending before me, it's been removed from state court to this court, any dispute with, it says third party, so I assume any dispute with WCW or any other party -- any dispute over Mr. Choudhri's membership interest in the debtor in my case and any dispute over payment of Mr. Choudhri's claims, if any, those all have to be decided in the state court, even though they're -- I have exclusive jurisdiction under the United States -- under the Bankruptcy Code and United States Supreme Court precedent over those type of matters. How do you reconcile that with the bankruptcy court jurisdiction, Mr. Vargo?

**MR. VARGO:** Well, theoretically, I think this is referring to issues and items that are not in bankruptcy and that have not been removed or are not in an adversary proceeding.

**THE COURT:** Let me tell you what I've done when I had these before I became a judge. If I knew there was a bankruptcy case, and I don't know who's to blame you, Mr. Funk, it's not the clients, they're not lawyers. If I knew there was a bankruptcy, I would have made dang sure that there was some order or -- excuse me, some clause or paragraph in this order that addressed the bankruptcy case and in this situation would

have specifically addressed 524 that was entered by me almost two weeks before this order. That seems like that would have been a pretty good idea, Mr. Vargo, doesn't it?

**MR. VARGO:** Yes.

**THE COURT:** Let me move on in this order, what you're bound by as the receiver.

Third party responsibilities to receiver in this court. I don't know what third parties means. I don't recall that it's defined, but I'm a third party. So WCW is a third party. All the lawyers on this call presumably are third parties. Every person, I'm a person, with actual notice of this order, I have notice of this order, is ordered, I don't see a bankruptcy carve out anywhere in this order, so I guess the state court judge is ordering me as a third party with actual notice of this order, is ordered not to interfere with property in the receiver's control or subject to this order. So I can't interfere with your rights to those notes. I can't interfere with the WCW Dalio lawsuit that's been pending in front of me for nine months, and I can't interfere with your right to a charging order against Mr. Choudhri's membership interest or your turnover, if you want to call it a turnover, of any claim he may have right to payment in this bankruptcy case, even though I had this bankruptcy case for over a year, and even though my order was entered two weeks before this order. So what am I to do?

I certainly don't want to be in trouble with the state court judge, Mr. Vargo. What does that mean? What does that first sentence mean in 23?

**MR. VARGO:** I think it's -- as a lawyer, I think it's clear that a state court judge is not ordering you around. But if you're looking at a literal reading of the document, a third party would be someone besides the debtor and the creditor, and so a literal reading could yield that result, but obviously I would never take that position.

**THE COURT:** 22(b), excuse me, 23(b). All third parties who owe money or things of value to debtors, and again, this was a little ambiguous. It doesn't necessarily say Choudhri, so maybe it's just Dalio. But in any event, all third parties who owe money or other things of value to the debtors, the debtors are Dalio I and Dalio II, right?

**MR. VARGO:** Yes.

**THE COURT:** And Texas REIT would be a third party, right?

**MR. VARGO:** Yes.

**THE COURT:** So I'm just going to read that into this. Texas REIT, who owes money or things of value to Dalio I and Dalio II, shall promptly pay or deliver the same to the receiver. So this orders Texas REIT, who's in bankruptcy, to pay you on those notes, doesn't it?

**MR. VARGO:** I believe that's the case.

**THE COURT:** Doesn't that violate my court order? And doesn't that violate the automatic stay generally? Are you familiar with the automatic stay generally in bankruptcy?

**MR. VARGO:** Yes.

**THE COURT:** Can't take any act to collect a debt, enforce a debt, et cetera, et cetera, under 362(a) of the bankruptcy code without seeking relief from the automatic stay. You sought relief from the automatic stay, or you didn't, but Dalio I and Dalio II did. Excuse me. Mr. Mokarum and his entities did, and I granted it very limited, but I didn't grant it to the extent that you could seek payment and get an order directing payment by Texas REIT to Dalio I and Dalio II. I'm just trying to figure out how that doesn't violate the automatic stay in my court order. I mean, that's a slam dunk the way I read that.

I mean, I don't even think I have to give you notice of that. I think I can find you and Mr. Funk and Mokarum in violation of this court's order, in violation of 362 today, and impose a $10,000 sanction on all three of you if I wanted to. And I'm confident that would get affirmed on appeal.

How do you get around that, Mr. Vargo?

**MR. VARGO:** Well, the actions that I was attempting to take were to submit to the jurisdiction of the bankruptcy court. I did not make any demands upon Texas REIT. The action that I took was to alert the court to my existence in the court

order, and that I was attempting to support WCW's motion for a trustee so that it would continue to go through the bankruptcy process. I was not attempting to circumvent the bankruptcy process at all.

**THE COURT:** I appreciate your statement. I just don't read 23 that way. To me, 23 is self-executing. Every person with actual notice of this order is ordered not to interfere with the property in receiver's control, and is ordered not to interfere with the receiver and the performance of the receiver's duties. Third parties are notified that the receiver is the party entitled to possess, sell, or liquidate.

Subsection B, it doesn't say, subject to the receiver. I mean, it's self-executing. There's some argument at the last part of the first paragraph of 23 that says the third party may be subject to liability if the third party releases property unless directed by a receiver of this court. So I suppose you could direct, but I really don't like receivers directing me what to do because you don't have jurisdiction or authority to do that.

So, okay, let's see. 22(b), excuse me, that was (b). Some of these are just, it's just funny because I don't -- it's not funny, but it is. E, anyone resisting receiver's order, which is this order, or request, based on legal or other advice is ordered to give the full name, address, fax number, cell phone number. I'm not giving you my cell phone number,

and direct telephone number, giving advice that instructs those persons to immediately contact the receiver. I'm just telling you, I'm resisting this order. I don't think this order is enforceable against me. You know -- have all my contact information. I'm not going to disclose my email or cell phone number. So you have that information.

29, documents from third parties. Receiver may request -- this is 29 of the state court receivership order. Receiver may request documents and records from third parties in writing without a subpoena and set a reasonable deadline for responses within his reasonable discretion given the circumstances surrounding the request.

A written request from the receiver has the same effect in subpoena and third parties are hereby directed to comply. The receiver may issue subpoenas with the following language. Please do not disclose or notify user of issuance of this subpoena. Disclosure to the user could impede an investigation or obstruct justice. Third parties shall follow and refrain from informing the debtor.

That is just comical to me. So that if I'm reading that again and I'm taking an extreme position today. I'm a third party. WCW is a third party. Texas REIT's a third party. So you can ask and request documents from Texas REIT and put all these disclosures in contravention of the bankruptcy code and the bankruptcy rules? Is that what that

says? It doesn't say that specifically but it says shall and that you can do it.

So if you send a request for documents to Mr. Sather today as the receiver, Texas REIT's a third party, and you put all of that in there, you would be violating the automatic stay period because we have rules in bankruptcy court to follow if you want to request documents. But this says you can do it any time you want and they have to comply. I just -- I don't understand. I'm at a loss. Or me, I suppose.

Do you know if the state court judge is aware of the bankruptcy case in my order at ECF 524, Mr. Vargo.

**MR. VARGO:** I'm unaware. I haven't had any communications with Mr. Wilson in probably 10 years.

**THE COURT:** Are you going to bring it to their attention?

**MR. VARGO:** Well --

**THE COURT:** You're the receiver. You're the extension of the court. Don't you think the state court judge would want to know about this?

**MR. VARGO:** I would assume that after this hearing, we're going to have some sort of report or status to the judge.

**THE COURT:** Because you have an obligation to file status reports under this order, don't you?

**MR. VARGO:** I believe so.

**THE COURT:** Okay. All right. Let me see. I think I

just have one more. Number 35, Mr. Vargo. Paragraph 35. And I'm at paragraph 35 on page 7 of 12 of the state court receivership order. Very vague, poorly worded paragraph. Real property sale. All real property sales must be individually ordered after notice and hearing. What does that mean? What is 35? What real property sales?

So if I'm going to sell the real property of Texas REIT that Dalio I and II either have some type of lien on, I don't know sitting here today whether it's first or second or subordinated or what. That's to be determined. But that's pretty damn broad language. So I suppose even though I have exclusive jurisdiction over the real estate in front of me, which includes these tracts, if I'm going to do a 363 sale which is under the exclusive jurisdiction of this bankruptcy court, somebody has to go back and get the state court order -- state court to approve that real property sale, I suppose, is what 35 means.

I can tell you right now that ain't going to happen, Mr. Vargo. If I'm selling this property, I'm selling it. I don't care whether you like it or not or the state court judge does. So what does 35 mean to you?

**MR. VARGO:** 35 would relate to only the real property of the debtor or the debtors that are defined in this court -- in this court order.

**THE COURT:** But it doesn't say that. 35 doesn't say

that though, does it?

**MR. VARGO:** No, it does not.

**THE COURT:** Okay. So your position is it would mean real property of the debtors, which is Mr. Choudhri, Dalio I or Dalio II.

**MR. VARGO:** The defined debtors in this order. Yes.

**THE COURT:** Yes. But it doesn't say all real property sales of property of the debtors must be individually ordered after notice and hearing. So there's some vague and ambiguity to that paragraph 35. Would you agree with me on that? You don't have to agree.

**MR. VARGO:** It's definitely vague. We're going to agree there.

**THE COURT:** Okay. Exhibit A. I think this is my last one. These are just the highlights, Mr. Vargo. I've got ten other things I'm not even going to address. Probably not quite that many, 5 or 10. But Exhibit A.

So Exhibit A, deadline to comply. The debtor or debtors shall deliver the following documents in hard copy or electronic form to the receiver within 10 days. So that's self-executing, right? Whatever this Exhibit A says, the debtor and the debtors have to comply. We know the debtors up above is defined as Choudhri, Dalio I, and Dalio II. So Choudhri, Dalio I, and Dalio II have to comply with Exhibit A, I think is what that means, right?

**MR. VARGO:** We agree.

**THE COURT:** Okay. Well, I can't remember what got my attention this morning on this. What I was concerned about in here, I can tell you generally what my concern was, the self-executing nature of this as it relates to the pending lawsuit in front of me. It seems to be a run around the discovery rules in federal court where you could get documents from Mr. Choudhri, and some of this alludes to Paragraph 19 of Exhibit A, for example. A whole lot of information regarding Choudhri's LLCs. So that would be information regarding Texas REIT. But you don't read this -- I didn't read it this broad, but my concern was that somehow this was some type of self-executing requirement to produce all of these documents.

And I'm just going to point out to the extent it applies to Texas REIT, because Texas REIT is one of Mr. Choudhri's LLCs under Paragraph 19, Texas REIT doesn't have an obligation to comply with that. That would be a run around the discovery rules and the rules in bankruptcy court. But if all you're doing is trying to get documents from Mr. Choudhri, it's close, but I'm not sure sitting here today that violates my order, but it at least got my attention. So I don't have any specific question. I just wanted to bring you that -- let you know that I looked at that as well.

Mr. Funk, do you wish to be heard at all, briefly?

**MR. FUNK:** Yes, Judge. I'm happy to be heard.

**THE COURT:** All right. And you're a licensed attorney admitted to practice in the Western District of Texas?

**MR. FUNK:** Yes, I am, Judge.

**THE COURT:** All right. I'm not going to swear you in. You know what your ethical obligations are, and you're subjecting yourself to sanctions and contempt and other consequences. So you're well aware of that?

**MR. FUNK:** Yes, Judge.

**THE COURT:** All right. I'm just happy to hear from you in narrative fashion.

**MR. FUNK:** I'll be brief, Judge. I've listened to all your questions. I've listened to all of Mr. Vargo's answers. I agree with your reading of this order. It was -- I just will tell you, Judge, to the extent there's any blame to be found, it's on me, number one. Number two, it was unintentional. There was never any intention for this language to apply to your jurisdictional issues in such a fashion that it would circumvent you. It was a mistake. It'll be corrected immediately. I can assure Your Honor that we'll submit an amended order to Judge Wilson that makes it clear that the order that he signs, if he signs it, will not -- it'll address all of the issues that you addressed. Let me put it that way. And I can't apologize enough.

Just so that Your Honor knows, part of this order goes back to January of '24 for the initial application for

receiver before some of these matters were in bankruptcy, including the WCW dispute. And again, by oversight, they should have been corrected in work by me. They will be corrected immediately. But there's never any intention to circumvent your orders in this court.

**THE COURT:** All right. Well, I'm not going to make any substantive decisions today. Number one, to the extent, Mr. Vargo, I don't think you've been in my court. I preach procedural due process. You're certainly on notice now of what my concerns are, both you and Mr. Funk. So I'm not making any decisions today, number one, because I haven't given you notice and I recognize that you're shooting from the hip today on some of this, and some of this may be news to you. So I'm sensitive to that.

Number two, judges are humans too, and I don't want to make an emotional decision. I'm obviously not happy with this order. In the late hour yesterday afternoon that I got it, and I get ready for all hearings, and this kept me up very late last night, getting ready for today. So I'm not going to make a decision today for that reason as well.

But I'm going to send a show cause order and a contempt order. It's going to go against you, Mr. Vargo, and you, Mr. Funk. I'll take into consideration any subsequent pleadings that are filed or clarification. I will say I do appreciate your statement, Mr. Funk. I am not at the bench bar

conference, but I will be tomorrow. I had this hearing today. I knew that. But I appreciate lawyers who are forthright with the court and just own up to it. That goes a long way with me.

In fact, I was asked, to the extent it relates to this, there was an event that was put on at the state bench bar last night that I could not attend, but one of the things they asked me to do as one of the judges is to give a comment to younger lawyers. And this was what I told them to put on the sheet. It's always better to be honest and forthright with the court. Remember the saying, author unknown because I didn't take the time to Google it. Trust and credibility takes years to build, seconds to break, and forever to repair. So that, I think, has some applicability today, perhaps.

So that's what I'm going to do. You're the state court receiver, Mr. Vargo, so I'm going to allow you to remain on the line for today's hearing. You need to jump through the hoops in the Western District to get admitted in any event. I recognize you're the receiver representing yourself, but I still think it's appropriate to file a pro hac application, since you are an attorney because you kind of wear multiple hats when you're a receiver. You're the receiver, but you also kind of act as an attorney for yourself so it's kind of this hybrid role and, of course, as the receiver, generally you have the right to hire counsel if you want to too, but generally

when I got receivers appointed, the reason I wanted the lawyers is because they could do both.

But in any event, I'll let you remain on the call for today's hearing and I probably won't get the show cause or contempt hearing set until Monday since I will be in Houston tonight and tomorrow and then we'll take that up at a later date.

**THE COURT:** Okay. Let's get back to the motion to appoint trustee. Well, in all fairness, I suppose the other two parties in interest, so to speak, Mr. Sather, did you wish to be heard briefly at all on that matter?

**MR. SATHER:** No, Your Honor, I was just getting ready to question my witness.

**THE COURT:** Okay. And, Mr. Powers or Mr. Terry, anything from you?

**MR. POWERS:** Nothing from me, Your Honor.

**THE COURT:** All right. Mr. Mercer, anything from you? Briefly.

**MR. MERCER:** Very briefly, Your Honor. I will say that I think that I have an issue here, which is that I'm a person with actual notice of this order now. And I don't fully understand what the receiver intends to do with respect to Dalio Holdings I, my client, Dalio Holdings II, my client and I did hear him say that he was going to lend his support to the motion to appoint a trustee.

The last thing I want to do is be in contempt of this order. And so I haven't heard anything from the receiver, he hasn't called me, he hasn't talked to me, but I'm not going to find myself in a Harris County District Court next week for violating this order if I do something that violates it. And I'm not sure that -- where this order stands because it I think clearly has provisions in it that this Court has a problem with.

To the extent it violated the stay, it would be void or voidable, I'm not sure which as I stand here today. And so I'm just being candid with the Court that I don't know what I can do the rest of the morning.

**THE COURT:** I understand. I understand your position and I can't -- I don't think I can give you a free pass --

**MR. MERCER:** Sure.

**THE COURT:** -- vis a vis the state court order, Mr. Mercer, if that's what you're asking.

**MR. MERCER:** Well, no, I'm not. I'm just pointing out that I am not going to be, and have no intention of violating any Court's order.

**THE COURT:** Understood.

**MR. MERCER:** Thank you, Your Honor.

**THE COURT:** Thank you.

**MR. CHOUDHRI:** Your Honor, may I be heard briefly? I want to bring something to the Court's attention?

**THE COURT:** No, you're adequately represented. You own Texas -- you're Texas REIT and Texas REIT has a lawyer, Mr. Choudhri, and Dalio I and II has a lawyer which is Mr. Mercer, although again he's in an awkward position vis a vis Vargo. Mr. Vargo's the receiver. So --

**MR. CHOUDHRI:** Your Honor, I'm pro se and I did file a response -- joined in the response with Mr. Sather on Texas REIT, but I just briefly wanted to bring to your Court's -- Your Honor's attention. There is another order that affects Texas REIT and other debtors in your court, Sal and Mia Jay (phonetic) and 1001 --

**THE COURT:** All right. Mr. Choudhri, I don't want -- bring it to my attention in a motion. I'm not going to let you talk about something that it's -- I don't have the evidence, I don't have the documents. If there's an order and you want to bring it to my attention, then file some motion. Motion to enforce, motion for violation, whatever it is, that's the process you can follow. All right.

**MR. CHOUDHRI:** And, Your --

**THE COURT:** So your request to speak on that is denied, file a motion, I'll look at it.

**MR. CHOUDHRI:** Sure.

**THE COURT:** I'll assure you I'll look at it.

**MR. CHOUDHRI:** Okay, Your Honor, I just wanted to inform Your Honor I was just -- and if it's okay with Your

Honor, I was just here pro se and in the response, the objection to the trustee motion --

**THE COURT:** We haven't even gotten to that, Mr. Choudhri.

**MR. CHOUDHRI:** Yes. I just wanted to mention, Your Honor, that I was joined -- I joined in with the objection as individually pro se to that as a creditor. That was all I wanted to bring to your attention, Your Honor.

It's in the objection that was filed, along with the witness and exhibit list that I --

**THE COURT:** Yeah, and I'll rule on that. I was prepared for that, Mr. Choudhri, and when we get to that time, I'll tell you why I'm not going to let you testify under the Rules of Evidence, in accordance with Fifth Circuit precedent, primarily because it's duplicative. It's a waste of judicial time and resources and you are adequately -- your interests are adequately represented vis a vis Dalio I and II and Texas REIT.

I mean, effectively what that does, and I've been a little -- exercised some discretion and did more flexible previously, and what you do is you get up and ramble, and you address a lot of things that are irrelevant and just waste this Court's time. I mean, it's duplicative or off the record and way outside the record on issues that aren't relevant, so I actually spent more than several hours, as did my law clerks in researching that issue. And I'll address under the Rules of

Evidence that I do have flexibility to disallow evidence and testimony when it's duplicative, unnecessarily duplicative and in your -- excuse me, your interests are adequately represented, vis a vis your role. And you are the sole owner of Texas REIT or excuse me, sole membership interest owner. Well, no, you're the majority and membership interest owner of Texas REIT, LLC, correct?

**MR. CHOUDHRI:** Yes, Your Honor.

**THE COURT:** Okay. So anything that you would raise, that Texas REIT would raise would be in your best interests as well then, wouldn't it?

**MR. CHOUDHRI:** I'm not sure, Your Honor, I have my independent position.

**THE COURT:** You have different -- Texas REIT wants to sell real estate and you don't want to sell real estate individually or something along those lines? If there's something you disagree with what Texas REIT is doing, I'll hear that at that time.

**MR. CHOUDHRI:** No, sir.

**THE COURT:** Because that'll be different.

**MR. CHOUDHRI:** Yes, Your Honor, I apologize. I'm not saying that, Your Honor, I just wanted the fact that Mr. Vargo, there's a --

**THE COURT:** Mr. -- I'm done with Mr. Vargo. Mr. Vargo's done. I'm going to enter a show cause order and I

don't want to talk about that anymore.

**MR. CHOUDHRI:** Yes, Your Honor. Sorry, thank you, Your Honor. Sorry.

**THE COURT:** All right. Let's see, Mr. Sather, let me get back to my notes here. Let's see, Mr. Choudhri was the last witness we had. He was excused, everybody was finished with their examination of Mr. Choudhri. And then you were getting ready to call Mr. DeCaro as a witness. Is that -- hopefully my notes are accurate.

**MR. SATHER:** That is correct, Your Honor.

**THE COURT:** Okay. All right. So this is, as I said earlier, is a continuation of a hearing that was commenced last week. The last witness will be Mr. DeCaro. Mr. DeCaro, can you hear me, sir?

**MR. DECARO:** Yes, sir, I can.

**THE COURT:** All right. If you'll raise your right hand, please, Ms. Lopez will swear you in.

**ANGELO DECARO, DEBTOR'S WITNESS, SWORN**

**THE CLERK:** And for the record, please state your full name and spell your last name.

**THE WITNESS:** Angelo DeCaro, D-E-C-A-R-O.

**THE CLERK:** Thank you.

**THE COURT:** All right. Mr. Sather, you may proceed with your direct examination.

**MR. SATHER:** Thank you. If I may show my screen,

Your Honor.

**THE COURT:** All right. Yeah, give Mr. Sather sharing privileges, please.

**THE CLERK:** He has it.

**MR. SATHER:** And I apologize, I'm not finding the document I needed. One moment, Your Honor.

**THE COURT:** You had all that time to get ready, Mr. Sather.

**MR. SATHER:** I had it teed up and it disappeared on the -- but I will get there. Let me start my questioning while I continue to fumble about here.

**DIRECT EXAMINATION**

**BY MR. SATHER:**

Q Mr. DeCaro, can you tell me what you do for a living, sir?

A I am a certified turnaround professional. I have done various turnarounds, both in court and out of court. Actually right now, we're working on one with Ali and then the second, there's two or three owners that I'm working more out of court. Much of my background was manufacturing and bankruptcy trustee and chief restructuring officer activity over the last 10 or 15 years.

Q And, Mr. DeCaro, what is your position with the turnaround management association?

A I was the president in 2021 and 2024. I had been on the board for about seven years and there's a limit to how long you

can be on the board. So when the new president took over in January, I stepped off the board but he asked me to come back in as the administrator of the process for the board. So I attend every board meeting, I just can't vote anymore, because I'm technically not a member of the board.

Q All right. And have you served in the past as a Chapter 11 trustee?

A Yes, I have, three times.

Q And have you served as a plan trustee?

A I was a trustee for those three specific cases.

Q Okay. And have you also served as a chief restructuring officer?

A Yes. I had one that was a court assigned, which was Jet Oil up in Shreveport, Louisiana and have done probably three or four out of court chief restructuring officer, works with companies and also was a receiver of a lawsuit between two owners of a car wash. I basically ran a car wash for a year, keeping it out of the hands of the two owners until they settled their lawsuit.

Q And, Mr. DeCaro, did I ask you to serve as plan trustee under the debtor's plan in this case?

A Yes, you did.

Q And you understand that if you serve as plan trustee, that you will be operating as a fiduciary to implement the plan?

A Yes, I do.

Q And do you understand that if you are appointed as plan trustee, that you would be exercising your own independent judgment rather than looking to Mr. Choudhri for direction?
A Yes. Honestly, I do that now for the various things I'm doing for Ali, I will tell him what I see as opposed to just what may be running around for -- in the system at a particular point in time. But I do send reports Ali has required.
Q Okay. And can you tell me how you and I met before?
A Yes. You had been given my name as a referral and you asked me to be the chief restructuring officer of a bankruptcy case up in Louisiana for Jet Oil where -- they had to file bankruptcy because of some stock issues with one of the stockholders.
Q All right. And was that a case where there were allegations of insider mismanagement?
A Yes.
Q And were you able to assist that debtor in reaching a successful reorganization, notwithstanding the issues that were raised at the beginning of the case?
A Yes, we were able to do that. The issues that were raised at the beginning of the case, were basically removed from that particular situation with that company. The one stockholder who initiated all of that was released out of the company, so the original stockholders, three of the four are still there and managers of the company and they are proceeding very fine.

Q All right.

**MR. SATHER:** I'll pass the witness, Your Honor.

**THE COURT:** All right. That's the type of direct I like, Mr. Sather. You didn't have any exhibits then?

**MR. SATHER:** Your Honor, I had Debtor's Exhibit 4 which is Mr. DeCaro's resume and I was -- that got disconnected on my system and I wasn't able to bring it back up again, but I would offer Debtor 4.

**MR. POWERS:** No objection, Your Honor, that's fine.

**THE COURT:** Okay. Let me look at Debtor's Exhibit 4.

**MR. SATHER:** Actually, I apologize, Debtor 3. I do have -- I did bring my physical copy of the exhibits with me for just this reason.

**THE COURT:** Okay. Hold on please. Yeah, 4 was an e-mail, Exhibit 3 Angelo DeCaro biography. I'm not going to object, Mr. Powers, I just want to see what it is, see if I have any questions. I don't think I do. Yeah, I've seen that before.

Okay. All right. Debtor's Exhibit 3 is admitted. All right. Mr. Powers, do you have cross?

**(Debtor's Exhibit Number 3 received in evidence)**

**MR. POWERS:** Yes, I do, Your Honor.

**THE COURT:** All right. You may proceed.

**MR. POWERS:** Thank you, Judge.

//

**CROSS EXAMINATION**

**BY MR. POWERS:**

Q Mr. DeCaro, good morning. My name is Kevin Powers. I represent a company called WCW Houston Properties LLC. How are you this morning?

A Very good, sir. How are you?

Q I'm fine. Let's talk a little bit about your experience if we might. I heard you say that you are or you had been a Chapter 11 trustee or plan trustee three times.

A Yes, sir.

Q And I was looking at your CV, it looks like one was Zetel (phonetic).

A Yes, sir.

Q Another one was Leggett Corp (phonetic).

A That's correct.

Q And the third was a company called Extreme Power I think.

A That's correct. Those are the three.

Q I looked them all up yesterday and the most recent one I saw would have been closed in 2016; is that right?

A I believe that's correct.

Q Okay. So we're coming up on, close to a decade, since you served in the role you're being asked to serve in by Mr. Sather?

A In a formal Court appointed situation, that's correct.

Q Right. And to be clear, you are being asked to be in a

formal Court appointed situation here, right?
A That's correct.
Q And in any of those three companies, I mean, were those real estate companies?
A No, they were not.
Q Is that something that you in your own experience before you were a turnaround management professional before you were serving in those roles, did you -- were you in the real estate industry?
A No, not at that time, no.
Q Do you have any experience with real estate in Houston?
A I have worked with a couple of people down in Houston. I spent a lot of time with Ali over the last year and a half helping him with his financials and evaluations of certain things he's asked me to do.
Q But in the sense of being someone with experience of buying, selling real estate, is that something that you've spent a considerable amount of your time in your career involving?
A No.
Q I was -- okay. So also in regards to avoidance actions, are you familiar with the term avoidance action?
A Slightly. If you can explain --
Q As in your role as a trustee, whether it was a plan trustee or a Chapter 11 trustee, have you ever been in a

circumstance where you were required to investigate what are known as avoidance actions?

A No, those three particular cases were relatively straight forward. My job was basically to shut them down.

Q Okay. So if you haven't investigated them, it would be fair to say then, wouldn't it, that you have not prosecuted avoidance actions in a role as a trustee at any time?

A No.

Q All right. And I wanted to ask you, when we start talking about just implementation of the plan, did you understand that your basic job would be to sell the real estate that Texas REIT owns and pay creditors pursuant to the plan, more or less?

A Yes, I would work with somebody who knew how to sell real estate, make sure that that value was proper, given the knowledge I would get from people in that industry. And, yes, once it's sold, I would distribute the money as required.

Q Okay. And is it your understanding this is kind of what's known as a liquidation 11 -- a liquidating 11 in the sense there won't be much of Texas REIT when the sales are completed?

A Yes, I understand.

Q Okay. Now, just generally speaking, I don't know what you know about the plan or not, but did you understand that the proposed plan, the plan by the debtor there's a Section 8 called implementation of the plan. And in Section 8, you would be given the authority to, among other things, sell the

property and retain professionals. Are you aware of that?
A Yes.
Q So I just want to ask you, is there anything that -- would you have been able to do this in May of last year?
A In May of last year?
Q Yeah. Or I think the plan was filed in June, let's go there, June of 2024. Would you have been able to do all of the roles that are assigned to you by the plan back then?
A I believe so.
**MR. SATHER:** Objection, calls for a legal conclusion.
**MR. POWERS:** I just want to know is he capable.
**THE COURT:** Yeah, that's overruled. He can testify if he's capable. It's not specific to this case, so it's overruled.
**BY MR. POWERS:**
Q Do you think you would have been capable of all of those tasks last year?
A Yes, I believe so.
Q Okay. And are you aware that as of today, the debtor is seeking to appoint a real estate broker?
A I understand that.
Q And that would -- if you were to become plan trustee, you would be dealing with a professional that you did not choose. Are you aware of that?
A Understand.

Q And so are you also aware that they're seeking a set bidding procedures as of I guess yesterday?
A To some degree. I mean, this is obviously I'm just getting started on this with Ali and with Steve, yes, I was slightly aware of that.
Q Okay. So again, when it starts talking about, you know, you coming up with your business judgment of selling these properties, of your business judgment of hiring professionals, you're aware that the debtor's current management has taken steps to put those in place, irrespective of what your business judgment might be later.
A I understood that, yes. I heard a little bit about that from Steve.
Q Are you aware of anything other than the debtor's delay that would have kept you from being able to do this last year?
A No.
Q Okay. I wanted to talk to you about -- you've testified about this earlier, about your ongoing work with, you mentioned Ali Choudhri. What is it that you're doing?
A He asked me to file the MORs for Texas REIT for the last couple of months.
Q Okay.
A Which I did. And he asked me to continue doing that, as required.
Q Okay. And so you have already, over the course of going

back to February of last year to this year, you've had the opportunity to work with Mr. Choudhri?
A I did work at the beginning of last year with him and then we re-engaged back about a month ago to get caught up on the December, January, February reports.
Q All right. So he's not a stranger to you at this point?
A No.
Q Okay. And so if there's a circumstance where there are avoidance causes of action that need to be investigated in your role as a plan trustee of Mr. Choudhri or another entity that he knows, you would, in fact, be investigating someone you already know, fair?
A Yes.
Q Okay. And when it comes down to how you would be compensated, how -- I don't remember Mr. Sather going over it, maybe he did, if he did, I apologize, how would you be paid for your work?
A It would depend on the particular situation. If it's -- if I'm employed directly by Ali, he would pay me. But if I am appointed by the Court into one other particular cases, it would come out of that case.
Q Okay. And what's the compensation charge?
A I'm sorry, sir?
Q What is it that you would be charging the estate or sorry, the Chapter 11 debtor for your services as plan trustee?

A I mean, it would depend on how much time it would take. In some cases, I would charge by the hour, in other cases, just a daily fee. I would say the maximum that would occur would probably be a $1,000 on a day.
Q Am I understand you right, that you don't, as of today as of the day of this test, where we don't have a type of lock step plan for your compensation?
A No, I have an agreement with Ali to help him on his personal stuff. And -- but once if there is a Court appointment, then I would file a compensation plan.
Q Okay. And but just as of today, for the work that you're being -- you just were examined on by Mr. Sather, the work that you do as a plan trustee, if I asked you what specifically are you going to charge the estate, are you saying that that's going to be figured out later?
A Well, I mean, I would just say most -- the closest number I would give you right now until I completely understand what would be required, would be in and around $1,000 the most charge in a day plus if there's any travel expenses.
Q Okay. And I certainly -- we talked about Section 8 of the plan, giving you the opportunity to employ professionals. Would you be employing any other professionals from Quadrus?
A No.
Q Okay. So it'd just be, potentially $1,000 a day.
A That's correct.

**MR. POWERS:** Okay. Thank you. Your Honor, that's -- I'll pass the witness.

**THE COURT:** Mr. Vargo, are you still with us?

Mr. Vargo, the state court receiver?

**MR. VARGO:** Yes, Judge, I'm here.

**THE COURT:** All right. I did allow Mr. Mercer at the last hearing -- the hearing last week that this was commenced to have limited questioning on behalf of Dalio I and Dalio II, although I think their interests were aligned at the time and perhaps it's different now, based on my reading of your draft pleading. So I'm happy to give you just a few minutes if you have any questions, sir.

**MR. VARGO:** I do appreciate the Court indulging my questions. Obviously, you're inviting my questions. I'm hesitant and I was not prepared to ask additional questions --

**THE COURT:** All right.

**MR. VARGO:** -- particularly given this hearing.

**THE COURT:** All right. Fair enough, I understand. Okay. Redirect, Mr. Sather?

**MR. SATHER:** Yes, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. SATHER:**

Q Mr. DeCaro, Mr. Powers asked you about pursuing avoidance actions. Would you seek counsel to advise you on any avoidance actions that should proceed for the benefit of the estate?

A Yes.

Q And you wouldn't be relying on your own legal expertise, because you're not a lawyer, correct?

A That is correct, sir.

**MR. SATHER:** All right. Pass the witness.

**THE COURT:** Recross, limited to the scope of the redirect, Mr. Powers.

**MR. POWERS:** Well, I believe it's limited to the scope. It's very close.

**RECROSS EXAMINATION**

**BY MR. POWERS:**

Q So in regards to avoidance actions, if there are avoidance actions against Mr. Choudhri that need to be filed, did you testify earlier that you are doing personal work for him?

A No, he is paying me personally to file the MORs. It's not personal work on his personal finances, it's on Texas REIT.

Q Okay. But you have received money directly from Mr. Choudhri; is that fair?

A Yes, sir.

**MR. POWERS:** All right. That's all I have, Your Honor, pass the witness.

**THE COURT:** Okay. And that's a good clarification because I -- I think your testimony was, it suggested to me, Mr. DeCaro, that you were working for Mr. Choudhri personally, but the clarification is that you're doing work for Texas REIT,

but that Mr. Choudhri is paying you personally for that work.

**THE WITNESS:** Yes, that's correct. I didn't mean to state that I was working on his personal stuff. I am working on Texas REIT and he is paying me directly. I apologize for that confusion.

**THE COURT:** Okay. Anything further, Mr. Sather?

**MR. SATHER:** No, Your Honor.

**THE COURT:** All right. Can Mr. DeCaro, be excused?

**MR. SATHER:** He may.

**THE COURT:** All right. Sir, thank you, Mr. DeCaro, you're excused or you're welcome to stay on if you want to observe. I don't have a problem with that either.

**THE WITNESS:** Okay.

**THE COURT:** But thank you for being present.

**THE WITNESS:** All right. Thank you.

**THE COURT:** All right. You've got a variety of other witnesses listed here, Mr. Sather. So I don't know if you're done or you have other witnesses.

**MR. SATHER:** Debtor rests, Your Honor.

**THE COURT:** Okay. It's your motion, Mr. Powers, do you have any rebuttal?

**MR. POWERS:** No, Your Honor.

**THE COURT:** Okay. Well that was an hour. If I wouldn't have taken the first hour, you guys announced it correctly last week, so I appreciate that.

Okay. Sum it up, give me a five minute closing. I'll hear from you, Mr. Powers, for five minutes or less. Again, I've read everything, I've got a pretty good handle on it and then I'll hear from Mr. Sather for five minutes and I'll tell you all, I'm not going to decide it from the bench, but I am going to decide it in the next -- I'll give you my oral ruling date which is going to likely be next Friday. But I'm happy to hear from both of you all. And then I'm going to give a brief narrative and then we'll be done for today.

**MR. POWERS:** Yes, Your Honor.

**THE COURT:** All right. Good ahead.

* **MR. POWERS:** Your Honor, in regards to the decision whether or not to appoint a trustee, I think we've got two different standards. We have 1104(a)(1) which deals with, you know, conflicts gross mismanagement, it's a clear and convincing evidence standard. We also have --

**THE COURT:** Let me ask you. Let me ask you about that.

**MR. POWERS:** Yes.

**THE COURT:** Or wait, you're on the (a)(1) right now, right? Okay. Sorry. All right. I'll hear your (a)(1), I've got a question when you come to (a)(2), but go ahead.

**MR. POWERS:** Okay. Fair enough, Your Honor. In regards to, you know, appointment of a trustee, we do believe that the evidence suggests there was gross mismanagement of the

affairs of the debtor by Mr. Choudhri that would justify appointment of a trustee.

And certainly, you know, all mismanagement of the estate affairs is not mismanagement, or gross mismanagement. What we have here, and the evidence shows, is 14 months of just an utter failure. And we have Mr. Choudhri attempting to sell his property. We have, I think, four different buyers, none of which materialized and the evidence suggests Mr. Choudhri was every bit as responsible for that happening, as any of the purported buyers.

And the reason why I would suggest to the Court that this goes beyond just regular mismanagement, I think mismanagement of, you know, not filing your MORs on time, those types of things wouldn't suggest, you know, the appointment of a trustee under (a)(1). But we are in a circumstance where we've had 14 months of delay and this is not a consequence -- or situation. We have first priority tax liens. I think the evidence is pretty clear, we only talked about one of them, we didn't talk about the other two, that Mr. Choudhri's inactions or Mr. Choudhri's mis-actions I guess would be a better word have cost the creditors or creditors down the line over $300,000.

We are in a circumstance where creditors are not going to receive money that they otherwise would have because of Mr. Choudhri's actions. And what we see -- you know, we've

seen a flurry of activity of filing to seek appoint a broker, seeking to appoint bidding procedures, those all the things that Mr. Choudhri should have done last year. And if you don't want to do it, that's fine, but then you need to get it done. Mr. Choudhri has not gotten it done and we are no closer to selling this property in April of 2025 than we were in February of 2024.

Now whether that rises to the level of gross mismanagement, I think is for the Court to determine, but if you want to ask your (a)(2) question now, I'm about to get into it, which is, you know, all of those facts we get into as granular as the Court wants, suggests that there are also, appointing a trustee would be in the best interest of the estate.

So if you want to ask your question now, I'll --

**THE COURT:** I will ask my question now. The Fifth Circuit hasn't spoken on this issue. There's conflicting case law around the country on (a)(2). A lot of cases, including some of the Fifth Circuit didn't say this in the Cajun Power case, but I think Judge Rodriguez out of the Southern District has an opinion. Judge Jergen has an opinion in Pattman Drilling. Judge Laticia Poe, who's now retired, has an opinion in the Millenium Management case. Judge Evans was cited in your -- or excuse me, In Re Evans was cited in your brief, which is a case from the Western District way back in 1985.

And some other cases that I looked at in my preparation, I've looked at a lot of cases that highlight, there's a case out of New Jersey from 2019, 2019 Westlaw 6337875 and I'll come back to some others. In any event, a lot of cases when they look at 1104(a)(1) and (a)(2) say well they're different statutes, but they're basically the same. And if you have cause under (a)(1) then that probably directly provides that it's in the best interests of the estate under (a)(2) and creditors.

And under (a)(2) if you find that an appointment of a trustee is in the best interest of creditors and probably satisfies (a)(1). And then there's some cases that might gut tells me sitting here today that they get it right, that (a)(1) and (a)(2) are actually different standards. And (a)(2) is a much more strenuous standard.

And the reason being, unlike 1112(b) which is dismissal or conversion, which says what's in the best interests of the estate and the creditors, 1104(a)(2) says, if such appointment is in the best interests of creditors, any equity security holders and other interests of the estate, it's got to be all three under 1104(a)(2), doesn't it?

**MR. POWERS:** I think I'm going to have to defer to Mr. Terry on this. I have not read those cases that you're talking about.

**THE COURT:** Well, what about -- we're just reading

the statute. You can still defer to Mr. Terry. I've read all the cases and there's cases that -- I'm just reading the statute. But, Mr. Terry, Mr. Powers is deferring to you on the hard question.

* **MR. TERRY:** Okay. Let me take a shot. Eric Terry, WCW Houston Property. Well, first of all I agree that, you know, it is in the disjunctive from (a)(1) to (a)(2) so they're different. I think the case law does say that (a)(2) is a different standard. And I think what you're doing is you're looking at the literal language, just the Court like the flexible approach and why those factors have been developed. And I agree that there's a conjunctive there that says, right, it says, and other interests of the estate. And I think that's what the evidence has shown.

I mean, I don't think that means that it has to be supportive of equity interest. You take into consideration the interest of creditors, equity security holders and other interests of the estate. It doesn't mean that --

**THE COURT:** It doesn't mean that it has to be in the best interests of each of those three, I just have to consider it.

**MR. TERRY:** I think that's the true reading of that, that's what that says. I mean, you're considering those factors and if the appointment is in the best interests of all of those constituencies, then you can make the appointment.

And the factors that are developed under the case law, and I think, you know, Mr. Powers is going to go into it, I'll be happy to go into it with them and show -- certainly all four factors.

**THE COURT:** Okay. And in all fairness, that's what some of the cases say, Mr. Terry, that you've read, that it's consideration and there's some other cases that say you have to check the box, so to speak, on each of those three interests. You have to make a finding that's in the best interests of creditors. You have to make a finding that's in the best interests of equity security holders. And you have to make findings in the best interests of the estate.

So I haven't ruled on that issue yet. The Fifth Circuit hasn't ruled on that issue. And my colleagues in Texas have not necessarily ruled on that issue, although I will say that -- let me get back to my notes here --

**MR. TERRY:** And, Your Honor, if I may, I get both of those positions. Even if you have to do a check the box, I don't think that just because Mr. Choudhri in his equity position wants a certain things or doesn't want a certain thing means that the appointment is in the interests of the equity security holder, according to you.

**THE COURT:** Yeah.

**MR. TERRY:** Because then, the best interest of the equity security holder, in our position, is that a trustee

should be appointed for all of those constituencies. So even if you had to check off each box, I think you have plenty of justification.

**THE COURT:** Right. And I will say Judge Rodriguez in the In Re Ford Steel case at 629 B.R. 871, Bankr. Southern District of Texas of 2021 says, notwithstanding the articulation of some of the factors under 1104(a)(2), the standard remains flexible. The Court should consider the practice realities, necessities of the case and the totality of the circumstances in determining whether to appoint a trustee.

And in those cases that don't make it a draconian check the box, so to speak, they -- one of the factors they look at under 1104(a)(2) that may support your position, I'm not deciding that yet, I want to look at it closer is when you have a situation where equity is controlling the debtor and seems to be acting in their own self-interest. Which I think is what you were getting at, Mr. Terry.

**MR. TERRY:** Yes, Your Honor, and I believe Cajun Electric II, Part 2 that withdraws Part 4 of the initial decision actually supports that, even though I guess technically in the (a)(1) position, you know, Judge Jernigan held that both (a)(1) and (a)(2) were warranted and they -- I'm sorry, that was in Patman (phonetic), but she cites the Cajun Electric talking about conflicts. And if you look, I think it was Emilio Garza --

**THE COURT:** Dissent.

**MR. TERRY:** -- you know, Cajun Part 2, his dissent is pretty useful for what you're saying. Because he says the conflicts have made that impossible for the management because the management was looking to their own interest.

**THE COURT:** Yeah. And then, of course, one of the complexities of Cajun is literally in the Cajun 2 we get a two sentence order that -- without much explanation that says, we basically adopt Judge Garza's dissent, period. So, yeah, okay.

**MR. TERRY:** I understand.

**THE COURT:** All right.

**MR. TERRY:** So there was some more behind the scenes on that one.

**THE COURT:** I'm sure there was. It was an en banc opinion, so okay. Mr. Powers, you may proceed.

* **MR. POWERS:** Your Honor, I will say just generally, if you look at 1104(a)(2) and just look at those categories of what's in their best interests and I can't speak of all cases, but on this case where we have a liquidating 11 and the goal is to sell this property, all of the interest holders are going to be served by getting this case in a position where the property can be sold, just objectively, irrespective of what Mr. Choudhri may want, in a sense of whatever ulterior motives he might have or his own self-interest. If you just look at the categories of these people, of these different interest

holders, the only thing to do in this case, even from the debtor's own plan, is to liquidate, turn it into money and get a payment as far down the line of these interest holders as possible.

And if we're in a circumstance where the management can't or won't do that, then none of those interest holders are served. And so all of those interest holders objectively are going to be served by a circumstance where we get this management in the hands of someone who will actually sell this property, and the reason that we filed the motion in the first place is that hasn't happened in 14 months and we're not closer to it really objectively than we were at the time this case was started.

Now, if we get into the factors that have been identified under 1104(a)(2), just going through them quickly because I know Your Honor's heard everything, you know, the first is trustworthiness of the debtor's management. We have a circumstance where I think that is absolutely missing here.

We have Mr. Choudhri who has, by the debtor's own evidence, been found to have breached his fiduciary duties in prepetition situations in the Appellate Court opinion that they brought in front of Your Honor was found to have breached his fiduciary duty to Texas REIT. I would submit if he's willing to breach the fiduciary duty to the company while he owner control it, he would definitely it to the debtor's creditors,

since he's done it to the debtor himself.

He has been found -- he has been removed as a bankruptcy Chapter 11 management before. He has been referred to the United States Attorney for investigation for bankruptcy fraud. I mean, if you talk about a circumstance where you have a lack of trustworthiness, and that's irrespective of just the inability to do the job for 14 months, so that factor would weigh in favor of a trustee.

Past and present performance that again, you know, we're obviously in Chapter 11. The prior performance must not have been great, but this current performance in Chapter 11 has been, I guess colloquially nothing but a dumpster fire. We have multiple buyers, none of them have happened. I think the conduct of the debtor in the last couple of days kind of shows you what should have happened last year.

They want to appoint a broker, they want to set procedures, all of these things could have been done and if Mr. Choudhri believes he's got a better way to build the mouse trap that's fine, but you need to do it. And if you don't do it, then I think you should be held to account for the fact that you didn't do normally accepted procedures and what you chose to do doesn't work and there's really no good reason why we can't have two pieces of property on a major street in Houston sold in 14 months.

And I don't want to get too much into the weeds on

some of these sales, other than to say, that we had four and a half, maybe five hours of testimony from Mr. Choudhri where he didn't accept responsibility for anything. Not part of it, not a little bit of it, everything was someone else's fault, according to Mr. Choudhri and some of those explanations were just downright bizarre, that somehow my client was preventing him from selling this property while in bankruptcy. I mean, it just defied all explanation.

But if you were to listen to Mr. Choudhri he didn't do anything wrong. And I would submit to Your Honor that the best way to get more of what Mr. Choudhri -- the only way he's going to change is for him to admit he did something wrong in the first place.

And so what that means from a question of past performance looking to future performance is that Your Honor's going to get a bunch more of what he's done in the past because he thinks what he's done is perfectly fine.

We get into his reputation within the business community, I would point your attention to the testimony of Joan Cole. That was the debtor's witness. That was not my witness. I'm sure she probably didn't like to have to testify truthfully when she was asking for business from the debtor, but she did and she said that Mr. Choudhri's reputation is for being difficult, unresponsive and dishonest.

And then there's again, just kind of the objective

information that's in the record that any business person would fine; i.e., the referral to the U.S. Attorney, these other appellate opinions that are just simply not kind to his reputation. And that leads to the question of how is Mr. Choudhri going to -- and again, and I know there are issues with the receivership order, but for purposes of his reputation in the community, he's been placed into personal receivership and that cannot help his personal reputation, right or wrong, in the text of a court order.

Finally, the cost and benefits, Your Honor. If this keeps going, you're going to continue to see hundreds of thousands of dollars going to the first priority tax liens. And so, yeah, there is a cost to a trustee and there's no doubt about it. But there's also a cost to delay, there's also a cost to wait, and if the whole idea is let's get Mr. DeCaro, Mr. DeCaro is not free. Mr. DeCaro says he might charge $1,000 a day. I don't think there's any reason to believe that that is going to be less than what a Chapter 11 trustee who's truly independent, who did not work for -- or did not do work and get paid by Mr. Choudhri who's not already familiar with Mr. Choudhri, when we start talking about potential investigations and things that might not happen.

But I think the point is, we have to stanch the blood loss. And there will be a cost to appointing a trustee, but I have every reason to believe and I know Your Honor talked about

half measures of, you know, drop dead deadlines and whatever, I would request or I would suggest that that is a particularly bad idea here.

Because there are, I'm sure, companies where management needs to kind of be called to the carpet, slapped on the wrist, and told to get on with it and once that happens they will do so.

But here again, to get back to the point, Mr. Choudhri doesn't believe he's done anything wrong. He spent, you know, four and a half hours not answering questions and when he did he blamed everyone but himself. And I think you're going to get more of that. And if you give him deadlines, drop down deadlines, we're just going to be back here in two, three, four, however many months you're going to give him asking for a trustee to be appointed.

And obviously, the two motions that they just filed, just go and show why they're not really serious, even today, because we had an application to employ a broker, a Mr. Snodgrass, who doesn't sell retail space. I know we're going a little bit beyond the record, but just looking at what they've filed, as a man who does capital raises and investment banking for real estate companies, he doesn't sell retail property.

And you have a --

**THE COURT:** All right. Mr. Powers, finish up.

**MR. POWERS:** All right. Last thing, Your Honor.

In regards to the bidding procedures, you have a buyer who is a stalking horse, who's own contract has a $5 walk away. So we're in a circumstance where even now they are doing what is window dressing instead of really trying to get this thing done and I think we will back here, if the Court does not appoint a trustee, we will be back here very shortly doing that again. Thank you, Judge.

**THE COURT:** All right. Mr. Sather.

* **MR. SATHER:** Thank you, Your Honor. We don't have evidence of gross mismanagement. The debtor has brought contracts to this Court. We've spent the most time on the Amena contract and Your Honor heard testimony from Amena's broker that they were ready, willing and able to close the contract. And when we were within one day ready to close that contract, they withdrew. So the debtor got played.

With respect to employing a broker, you heard the evidence that the debtor started with CBRE in January, got to the point of drafting an application to employ. They withdrew. We investigated Partners who was promoted by Mr. Powers. Their terms were not as good and so the debtor sought out a contract from Transwestern, which has now been presented to the Court.

And under (a)(2), best interests of the Court (sic), we have to ask ourselves what is, you know, best interest of the creditors is based on where we go from here. What is a

Chapter 11 Trustee going to do? They're going to hire a lawyer, they're going to hire a broker, they're going to start from square one and there's not going to be any efficiency gaming.

The debtor has filed the motion to appoint a broker and put in place the procedures, that is what the debtor needs to do. And a trustee is not going to get it done any faster. Mr. Powers suggests a Chapter 11 Trustee would not be as expensive as a plan trustee, but a Chapter 11 Trustee gets paid based on a percentage commission. And a 3 percent commission of $15 million is going to be $450,000. And whereas Mr. DeCaro's daily rate is $1,000, you know, if he's working all day, it's not going to take 450 days.

And so a Chapter 11 Trustee -- I would also ask the Court to consider the fact that what the U.S. Trustee tends to do is to appoint one of the Chapter 7 Trustees and a 7 trustee is good at selling real estate, which we're already in the process of doing, but they're not particularly good at pursuing litigation.

And that really gets us to the question of why does WCW want a trustee. And the answer is there in litigation with the debtor and Dalio and they clearly hope that a trustee would not object to their claims and would go easy on them. And that's really the other piece of this case, is bringing the litigation. And one of the factors that Mr. Powers raised in

his motion that he did not discuss here was the debtor's divided loyalties, but the debtor's ability to sell the property does not conflict with his interests in Dalio preserving its position.

We have remedied any conflict that would raise from willingness to pursue other Choudhri entities by putting in an independent plan trustee. And Mr. Powers asked why couldn't have Mr. DeCaro have done that last year. And the last year, is we don't have a confirmed plan.

We put forward our plan within 90 days and, you know, the Court has wanted to wait and see what happened before letting us go forward with our plan. And so we could've had a confirmed plan a long time ago but that's not the debtor's doing. And, you know, I'm not second guessing the Court's decision to take a wait and see approach, but that is where we are.

Now, with respect to all of this testimony about, you know, Mr. Choudhri is a bad person, Mr. Choudhri was referred to the U.S. Attorney, how does that relate to this case? How does Mr. Choudhri benefit from not selling the property? The answer is he doesn't. He's not been drawing a management fee. He's not getting any benefits from this case. And to suggest that there is something nefarious out there is not supposed by the record.

And so the fact that Mr. Choudhri has been in

litigation with this pack of creditors, which includes WCW, George Lee, Osama Abdul Latiff, Mr. Ali Mokaram, yes, they are a litigious bunch and they do throw sharp elbows at each other, but that is not directly related to this case, other than the fact that the estate has claims against number one, WCW and these other creditors that need to be investigated and pursued.

We have taken the steps necessary to get the case moving faster than a trustee would be able to do and I believe that we should allow the process to play out. The Court wants to set deadlines for the debtor, we're willing to comply with moving the case forward.

**THE COURT:** Okay. Thank you, Mr. Sather.

I don't need to hear anything else on rebuttal, Mr. Powers, you were very thorough in your original closing. I do want to -- the only other person I want to hear from, if anything, is Mr. Tobin. Are you still with us, Mr. Tobin, on behalf of the U.S. Trustee? Put the jacket on, very formal of camera here.

**MR. TOBIN:** Good morning, Your Honor, Shane Tobin on behalf of the U.S. Trustee. Can you hear me?

**THE COURT:** Yes. And you don't have to say anything, but I'm just -- I always -- in these situations I think it's important to at least give the U.S. Trustee an opportunity to weigh in.

**MR. TOBIN:** Understood, Your Honor, thank you. The

U.S. Trustee is not taking a position on the motion at this time. We have observed everything, but we are not taking a position.

**THE COURT:** All right. Very good, thank you.

All right. I'm not going to rule on this today first of all. I'll address some initial comments. I hadn't looked at the appointment of a trustee in some time. On this particular issue it's somewhat surprising, because there's really not a whole lot of case law in 1104 when you start looking at it, whether it's in Texas or around the country.

As I mentioned earlier and had the short discussion with Mr. Powers and Mr. Terry, the Fifth Circuit in the Cajun Power case, original opinion at 74 -- excuse me, 69 F3d 746 did address 1104(a)(1). And then on an en banc hearing at 74 F3d 599 they withdrew that opinion and essentially said we adopt the dissent's opinion and there wasn't much discussion, so it's some guidance, but not a whole lot.

With regard to bankruptcy court cases in Texas, you've got -- Judge Bohm's got an opinion in In Re Marijuvi, Inc. (phonetic) at 2015 Westlaw 2226344, which has a case involving fraud and embezzlement, so probably factually distinguishable, but does have some discussion of the law.

Judge Paul in the Southern District has a discussion in the Millenium Management case at 2014 Westlaw 792115 where there was evidence of self-dealing, MORs that were materially

inaccurate. And she also found the debtor was not serious about completing a Chapter 11 case.

You've got Patman Drilling and again Judge Bohm, Judge Paul they discuss the cases, but not really in depth and I'll say I'd love to write an opinion on this, more in depth than some of these other cases, but I don't want you all to wait on that.

We've got Patman Drilling that me and Mr. Terry discussed, Judge Jernigan. And again, in the Patman Drilling case, Judge Jernigan, it's a short discussion on the actual 1104(a) analysis, she goes through some factual findings and findings of facts and conclusions of law and then has a short discussion.

One thing that she does get right in the Patman Drilling case, and I'll go ahead and say that now, because there is some conflicting case law that talks about this -- the burden of proof. Some cases, the minority say it's preponderance of the evidence. I find that the burden of proof to show appointment of a trustee is by clear and convincing evidence, that's the better application of that particular standard.

The other thing that I have to start with is Judge Jernigan just makes two short statements, but other cases discuss this in a little more detail that in her opinion at paragraph 41, she points out that appointment of a Chapter 11

trustee is a draconian remedy and a strong presumption exists that a Chapter 11 debtor should be permitted to remain in possession. The movants have the burden of showing by clear and convincing evidence that the appointment of a trustee is justified.

So I'm going to adopt that position in my ruling regardless of which way I go, so when I give you my oral ruling I'll start with that. And I think that's the controlling law under 1104(a). So Judge Pittman or excuse me, Judge Jernigan certainly got that right.

And then there's the older case from 1985 in the Western District at 48 B.R. 46 and that's really it in the Fifth Circuit in Texas. There's not a whole lot. So what I did in my preparation is I went out, there is -- there are more cases out there amongst the districts.

Three that -- the three that I or two I guess really that I looked at, and the one that has probably the best discussion is the Marvel Entertainment case, Third Circuit case from 1998 at 140 F3d 463. In that particular case, something that has not been addressed by either side, but I found interesting in that case and there's subsequent cases, mostly in the Third Circuit at the district court and bankruptcy court level that really focus on this, and this is at page 474 of the Marvel case. Again 140 F3d 463 at 474 in the Marvel case.

Something that hasn't been addressed by either of the

movants or the debtor in this case, under the 1104(a)(1) and (a)(2) analysis, the Marvel court looks at -- just to give you some general statements, in the context of cause and in the context of what's in the best interests of the creditors and estate, the Court got into and found that the -- ultimately affirmed the district court and focused on the -- what they called the intensive and high stakes bickering between the interests of the equity holders and the lenders does not instill confidence that Icon's interest, the equity holders, could fairly negotiate with the creditors to whom they owed fiduciary duties, nor that a reorganization would occur timely and effectively.

And then pointed out that, you know, citing to another bankruptcy court case, the willingness of Congress to leave a debtor in possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor defaults in this respect, 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an independent trustee.

Here the district court acted within proper bounds of discretion in appointing a trustee under 1104(a)(1) because of the icon's interest, contribution to the acrimony with Marvel's creditors. And then they turn to it under 1104(a)(2) and said, unlike 1104(a)(1), (a)(2) provides for mandatory appointment

upon a specific finding -- or excuse me, 1104(a)(2) envisions a flexible standard, it gives the district court discretion to appoint a trustee, when to do so, it'd serve parties and estate's interests.

Here the district court found that deep seated conflict and animosity between the debtor and its creditors is at the heart of this bankruptcy case. Thus, the section of the plan, whatever its details, is in the best interests of all parties and the best way to achieve that result is to appoint a trustee. And there's further discussion, you can all go read about the friction that's eluded to and the tangled history and the degree of antagonism and animosity between everyone.

And one of the things I really am going to focus on is, I mean, we've got and I've got evidence in the record and I can take judicial notice of other proceedings in this bankruptcy, a lot of this testimony that I've heard from Mr. Choudhri and others relates to all these allegations that Mr. Lee did this or Choudhri did this or Mokaram did this and did this lawsuit's been pending since 2012 and this lawsuit's been pending since 2017 and WCW and Dalio and Texas REIT are crossways with each other and at each other's necks and that's been pending for five and six years and went up on appeal.

So one of the things that wasn't addressed in the opening or closing directly was it's -- what I'm struggling with, with all due respect to Mr. Sather's argument that a

trustee would step in and that WCW only wants that because it would affect all of this other litigation, hopefully favorable to them, the fact of the matter is, the Marvel court and other cases subsequent to Marvel suggests that's exactly the situation that requires the appointment of a trustee.

Because it takes, as was eluded to in the discussion with Mr. DeCaro, it puts a third party, neutral third party in place of the debtor in this particular case to make an analysis of all that litigation, make an analysis of preference claims without any pressures or without the inherent conflict. Of course, Mr. Choudhri wants to do X. He's the principal of the company and he's -- not that there's anything wrong with this necessarily, of course he's acting in his self-interest. He owns Texas REIT. But that's a factor I have to take into consideration is Mr. Choudhri's own self-interest clouding what he's done in this case to the detriment of the creditors and the parties in interest in case. And in doing so, does he have a hurdle that he can't overcome as a fiduciary essentially to all of those different parties, including himself. That's an important factor I think. And I think that gives rise to cause if that's where I end up in this case.

But what I want to do, counsel, I've got, believe it or not, you probably believe this, I've got about 16 pages of written notes. I have not conferred with my law clerks, I can only imagine how many pages of notes they have. And I'm going

to go back and listen to the testimony again.

The debtor's recent pleadings, I'm going to take judicial notice of those. We haven't discussed those that are before me, I'm going to take judicial notice of the debtor's pleadings that were filed here in the last few days.

I'm not making a decision on those but I think it's appropriate to take judicial notice in my decision to look at the application to employ and motion to approve bid procedures. I don't know what weight I'm going to give those, for the reasons that were eluded to by Mr. Powers, which is, this case has been on file since February 6th, the end result may be those pleadings are a day late and a dollar short. I'm not sure sitting here right now, but.

And it may be that those pleadings are enough for me to go well, I'm going to deny the appointment of a trustee and set some drop-deads, which is what that's something I eluded to early on, even if Mr. Sather had not brought it up was something that was in the back of my mind. So I want to take a look at all of this and make a -- of course, what I think is a right decision and that means somebody's going to disagree with me, I recognize that.

So that's what I'm going to do is take, and shoot, I just logged out of it, of course. Hold on please.

And then under the federal government security, when you log out of something, it takes a minute here. So what I'm

going to do on 506, the motion to appoint a trustee, I'm going to take that under advisement. I'm not going to make you wait very long.

I will say Mr. Mercer's in the courtroom, I owe him an order on one of his cases. That has my first priority. And I know, oh, Mr. Sather and his opponents an order in another case, so those two have priority, but this goes straight to the top at number three.

So what I'm going to do is take the motion to appoint a trustee under advisement and I'm going to set it for an oral ruling on -- we're on the record, so it's not an ex parte contact, I'm going to put Mr. Sather under pressure, Structure One next Friday, Mr. Sather, is that going forward as far as you know?

**MR. SATHER:** Yes.

**THE COURT:** Okay. I see it now. Two hours. And we gave you a special setting. Okay.

What I'm going to do -- and that's live in the courtroom by the way.

**MR. SATHER:** Correct.

**THE COURT:** Okay. I'm going to set --

**MR. TERRY:** For what it's worth, Your Honor, I'll be at that one also.

**THE COURT:** Okay. Well, we've got two hours, so we'll finish that up around lunch time. I'm going to set my

oral ruling in on the motion to appoint a trustee for 1:30 next Friday, April 11th. And again, for you all's benefit, when I do an oral ruling I don't take appearances. I'm going to log in at 1:30 and then I don't turn on my camera, because honestly I'm -- you don't wear a robe, I'm usually sitting in my office, but if Mr. Terry and Mr. Sather happen to be there, I guess I'll throw a coat on or my robe on and go in the courtroom. But that'll be my oral ruling on the motion to appoint a trustee. Friday, April 11th, at 1:30 Central via Zoom. And the log in number and everything will be on line.

So that's what I'm going to do with 506. So let's move on to -- I think what we end up doing then is 518 and 522, the amended disclosure statement and the supplemental motion can be carried as a status conference because my ruling on the appointment of the trustee would affect 518 and 522. Do you agree, Mr. Sather?

**MR. SATHER:** Yes, Your Honor, although I do believe that the debtor not in possession still has standing to pursue a plan.

**THE COURT:** That's correct. It's just lose their right to exclusivity.

**MR. SATHER:** Correct.

**THE COURT:** Okay. But still if there's a trustee and whether he wants to use cash collateral or object to the disclosure statement or submit a competing disclosure

statement, I think we should wait on that.

**MR. SATHER:** I agree, Your Honor.

**THE COURT:** And similarly, on the application to employ a broker at 554 and the motion for bid procedures or sale procedures, I think we can carry that as a status conference as well, same reason. If I appoint a trustee, they need to look at that. If I don't appoint a trustee, then we'll find a date shortly after next Friday to go forward on all of those motions.

**MR. SATHER:** Very good.

**THE COURT:** All right. Do you agree, Mr. Terry, I'm deferring to you as the bankruptcy lawyer.

**MR. TERRY:** Eric Terry for WCW Houston Properties, yeah, I believe all of those should wait until after a decision on the appointment of a trustee.

**THE COURT:** So --

**MR. TERRY:** May I make --

**THE COURT:** Go ahead.

**MR. TERRY:** At the risk of -- Mr. Sather made a misstatement of the law, all I want to say is 326 rather than 330, because this is near and dear to my heart, again it goes to cost here. A Chapter 11 trustee is paid on a cap commission basis, meaning they have to detail their time and they also look to the commission cap. Whichever is less, is what the Chapter 11 trustee gets.

So my point is, that this Chapter 11 trustee will automatically get 3 percent or 5 percent of a sale, it's not presumptively like a Chapter 7 trustee. A Chapter 11 trustee has to deal with a cap. So it'll be actually more economical because a Chapter 11 trustee will have to record his or her time and therefore -- it goes to the cost element and it was misstated as a matter of law by Mr. Sather.

**THE COURT:** Yeah, I know what the standard is, so I'm good.

**MR. TERRY:** Sorry, Judge, I should have presumed that too.

**THE COURT:** So here's what I'm going to do on -- in Case No. 24-10120 the main bankruptcy case, I want to tweak it slightly because I should have realized we need to carry those motions, so what I'm going to do on 506, motion to appoint trustee, I will go on the record at 1:30 on Friday, April 11th to give my ruling on 506. That'll be an oral ruling.

And then immediately after my oral ruling I will log in and have an actual hearing on the other motions. So what I'm going to do for purposes of the docket entry, that'll be my oral ruling on 506 at 1:30. At 5 -- excuse me, at 1:45 on April -- Friday, April 11th at 1:45 I'm going to reset ECF 518, 522, 554 and 556 all for a status conference.

So I will go on the record and take appearances on the status conference after my oral ruling on 506 and we need

that for docket purposes with the clerk's office. So oral ruling on 506 in Case 24-10120, 1:30, April 11th and then status conference on 518 and 522, 554 and 546 at 1:45 Central.

And then we have the adversary proceeding. In my view, the adversary proceeding also is conditioned upon what I do with the trustee. So right now we have status hearings generally in Adversary Proceeding 24-01045, we have a status hearing on the motion to dismiss that adversary proceeding and then we have an unopposed motion to withdraw by Mr. Choslovsky.

What I'm going to do on the adversary proceeding is I'm going to reset all of those matters to April 11th at 2 o'clock Central time, 2 o'clock Central time, again because some of those are related to -- depends on what I do with the trustee.

The other thing that -- since I started it, this hearing with that today, it gives Mr. Vargo and Mr. Funk a chance to go back to state court quickly and expeditiously between now and next Friday as well. And what I'm also going to do, I'm going to enter a show cause order and contempt order, be directed to Mr. Vargo as the receiver and Mr. Funk as counsel for -- it looks like we may have lost Mr. Funk. Let's see.

**MS. WEBB:** Your Honor, Lydia Webb of Gray Reed, I'm still here and I can advise Mr. Funk of the same.

**THE COURT:** Okay. Well, he'll get a copy of the show

cause and contempt order anyways. I am going to issue that and I'm going to set that for a preliminary hearing next Friday, April 11th at 2 o'clock as well.

It's not going to be an evidentiary hearing. I want to make that clear. It's just going to be a preliminary hearing next week at 2 o'clock and then I will discuss scheduling an evidentiary hearing on that at some point thereafter. So that's what I'm going to do with that and I think the receiver needs to figure out what his role and position is going to be in all these matters before next week.

**MR. VARGO:** Judge?

**THE COURT:** Yes.

**MR. VARGO:** I wanted to apprise the Court that I have -- I'm on vacation next Friday so I've got a conflict. I have a very open calendar, other than four days in April obviously. I'm not exactly sure where I'm at 2 p.m. on Friday the 11th.

**THE COURT:** Are you married?

**MR. VARGO:** Yes.

**THE COURT:** Well, you'll be wherever your wife tells you to be then probably, right?

**MR. VARGO:** Yes.

**THE COURT:** My wife's not here in this proceeding so I can say stuff like that now unless she gets a copy of the record.

Okay. I'll pick another date then.

**MR. VARGO:** Okay.

**THE COURT:** I don't know what that date's going to be. It'll probably be -- gets very busy for me after that. We had a Tuesday, Ms. Lopez, what was that Tuesday?

The next date is probably going to be the afternoon of the 22nd. That's how busy my calendar is. Does the afternoon of the 22nd work?

**MR. VARGO:** I believe so. But I need to check on my flight time because I'm supposed to be traveling on the morning of the 22nd.

**THE COURT:** It's a Zoom hearing, so I can go late in the day.

**MR. VARGO:** I'm supposed to be traveling back from Atlanta.

**MR. POWERS:** Your Honor, I hate to interrupt. I have to be downtown at the courthouse at 1:30. Would you mind excusing me early?

**THE COURT:** Yes, you're excused. I've said everything. I'm focused now, the only remaining issue to find a date for the show cause contempt. So you're excused, Mr. Powers.

**MR. POWERS:** Thank you, Your Honor.

**MR. VARGO:** My conflicts are on the 11th, the 18th, the 21st and the 22nd, otherwise I can pretty much schedule around or through anything else.

**THE COURT:** I don't want to wait that -- I'll wait that long, but then I'm going to make it an evidentiary hearing instead of a preliminary. Okay. April 24th, Thursday, April 24th. The morning of the 24th.

**MR. VARGO:** Yes, I'm available.

**THE COURT:** Okay. Let me look at that. It'll likely be the morning of April 24th, Thursday, April 24th, and it's going to be -- I'm going to get with my courtroom deputy to make sure. That day I've got kept open right now for Chapter 11 kind of emergency matters. We're going to start that, give you -- I think you're in Houston, right?

**MR. VARGO:** Yes, Judge.

**THE COURT:** And, Ms. Webb, are you all in Houston or Dallas?

**MS. WEBB:** Mr. Funk is in Houston, sir.

**THE COURT:** Okay. I'm going to start -- I'll do the hearing, the show cause hearing and contempt hearing at -- so I'll just -- I'll set out in my order, it'll be very specific and detailed as required to Circuit case law, we'll do that hearing at 10:30 live in person in the courtroom in Austin.

**MS. WEBB:** And, Your Honor, I'm sorry to cause another wrinkle in that. I've been Teams'ing with Mr. Funk and he says he's out of state April 23rd and 25th for a family wedding, so he cannot be there in person on the 24th.

**THE COURT:** Someday I'll be like my predecessor Judge

Davis and my colleague Judge Mott who's recently retired and not be so nice. And then just the hearings and say you all are going to have to figure it out then, your schedule is not my problem. But I'm not quite there yet, I'm still too nice I guess.

**MS. WEBB:** We appreciate your accommodation, Your Honor.

**THE COURT:** And I have some compassion, given my health situation and when I have to take days at the last minute and reschedule lawyers, so that plays into my considerations.

Well, here's what I'm going to do. This doesn't concern the other lawyers necessarily, I'm going to confer with my law clerks. My law clerks will send an e-mail to, since I know they're listening, Mr. Sather, Mr. Terry, Mr. Powers, Mr. Vargo, Mr. Funk and Ms. Webb and they'll give three or four dates in the next 30 days or so where I will have an hour to address this. So we'll try to coordinate schedules.

The hearing will be living in the courtroom in Austin though, so we'll come up with some dates that work rather than sit here and try to do it on Zoom, because I don't want to jack with it on Zoom. You all can coordinate with my law clerks. So that's what I'm going to do. Fair enough?

**MR. VARGO:** Yes.

**THE COURT:** Okay. I think, Mr. Sather, I keep coming

back to you, I think that addresses everything on the docket. Anything further from a housekeeping standpoint either from Mr. Sather or anyone else?

**MR. SATHER:** I'm not aware of anything else, Your Honor.

**THE COURT:** Okay. That's the ruling of the Court on all of the matters I've outlined. I'm looking at my calendar. All of those will be reset and carried by docket entry only. There's no further notice and I think Ms. Lopez has done that, because they're already off my calendar.

The only further notice will be the actual show cause order and contempt order that will come from my -- from me personally separately. So that addresses all the matters for today. You all are free to log off. Have a good day, everyone, thank you. We'll be adjourned.

**(Proceedings concluded at 12:51 p.m.)**

*** * * * ***

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Toni Hudson (signature) April 4, 2025

Signed Dated

**TONI HUDSON, TRANSCRIBER**