**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 24-10264-cgb** |
| | § | |
| **RIC (AUSTIN), LLC,** | § | **CHAPTER 11** |
| | § | |
| **DEBTOR.** | § | **SUBCHAPTER V** |

| | | |
|---|---|---|
| | § | |
| **Panache Development** | § | |
| **& Construction, Inc., *et al.*,** | § | |
| ***Plaintiffs*,** | § | |
| | § | |
| **v.** | § | **ADV. NO. 24-_____-cgb** |
| | § | |
| **Romspen Mortgage Limited Partnership,** | § | |
| **and Romspen (Reomaster) Holdings Inc.,** | § | |
| ***Defendants.*** | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**
**FOR DECLARATORY RELIEF AND COMBINED CLAIM OBJECTION**

**TO THE HONORABLE CHRISTOPHER G. BRADLEY,**
**UNITED STATES BANKRUPTCY JUDGE:**

Plaintiffs Panache Development & Construction, Inc. ("Panache"), AFMN Investments, LLC ("AFMN"), and Vesta Texas, LLC ("Vesta Texas"), file this Original Complaint for Declaratory Relief and Combined Claim Objection as follows:

## I. PARTIES

1. Plaintiff Panache is a creditor and party in interest in the above styled and numbered bankruptcy case.

2. Plaintiff AFMN is a creditor and party in interest in the above styled and numbered bankruptcy case.

3. Plaintiff Vesta Texas is an interest holder in the Debtor and a party in interest in the above styled and numbered bankruptcy case.

4. Defendant Romspen Mortgage Limited Partnership ("Romspen") is a Cayman Islands based limited partnership with its principal office located in Toronto, Ontario. Romspen may be served with summons and complaint through its general partner, Romspen Mortgage Investment Fund, 162 Cumberland Street, Suite 300, Toronto, Ontario M5R 3N5, with a courtesy copy to Kyle Hirsch, Bryan Cave Leighton Paisner LLP, Dallas Arts Tower, 2200 Ross Avenue, Suite 4200W, Dallas, Texas 75201-7965.

5. Defendant Romspen (Reomaster) Holdings Inc. ("Romspen Reomaster") is a Delaware corporation with its principal office located in Toronto, Ontario. Romspen may be served with summons and complaint through its officer Romspen (Reomaster) Holdings, Inc., c/o Peter Oelbaum, 162 Cumberland Street, Suite 300, Toronto, Ontario M5R 3N5.

## II. JURISDICTION AND VENUE

6. This is a request for declaratory relief including a determination regarding equitable subordination of the alleged claims of Romspen (defined below) under 11 U.S.C. § 510(c), and other, related relief, including relief pursuant to 11 U.S.C. §§ 363(k) and 1129(b)(2)(A)(ii), prohibiting or limiting Romspen's rights to credit bid at any sale authorized pursuant to 11 U.S.C. §§ 363(b) or 1129(b)(2)(A)(ii).

7. This is also a claim objection pursuant to 11 U.S.C. §§ 502 and 506 and Bankruptcy Rule 3007 to the scheduled claims of Romspen (Scheduled Claims D2.6, D2.7 in Docket No. 43, and any amendment thereto or proof of claim filed in connection with such claims) (the "Romspen Claims").

8. This is a request for declaratory relief including a determination regarding equitable subordination of the interests of Romspen Reomaster under 11 U.S.C. § 510(c).

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334(b). Each of the claims and causes of action herein are core proceedings under 28 U.S.C. § 157(b)(2). To the extent this Court determines that any of the matters described herein are not core, but "related to" proceedings, Plaintiffs agree to the entry of final orders by the Bankruptcy Court.

10. Venue is proper in this Court pursuant to 28 U.S.C. §1409(a).

## III. SUMMARY OF RELIEF REQUESTED

11. Plaintiffs Panache and AFMN request equitable subordination of the Romspen Claims pursuant to 11 U.S.C. § 510(c) to all other claims in the Bankruptcy Case.

12. Plaintiff Vesta Texas requests equitable subordination of the Romspen Reomaster interests in the Debtor pursuant to 11 U.S.C. § 510(c) to the interests of Vesta Texas.

13. Additionally, pursuant to 11 U.S.C. §§ 502 and 506 and Bankruptcy Rule 3007, Plaintiffs Panache, AFMN, and Vesta Texas object to the Romspen Claims and request that such claims be disallowed. Alternatively, Plaintiffs Panache, AFMN, and Vesta Texas object to the Romspen Claims and request that they be allowed only in such amounts as properly established to be due and owning, properly calculated, subject to all offsets and credits, and secured only to the extent properly perfected as to any and all purported collateral, and, in any event, equitably subordinated pursuant to 11 U.S.C. § 510(c) to all other claims in the Bankruptcy Case.

14. Plaintiffs Panache, AFMN, and Vesta Texas request that Romspen be prohibited or limited from credit bidding on any sale of assets of the Debtor pursuant to 11 U.S.C. §§ 363(b) or 1129(b)(2)(A)(ii).

## IV. FACTS

### A. The Debtor, the Bankruptcy Case, and the Romspen Claims

15. RIC (Austin), LLC ("RIC (Austin)" or the "Debtor") is a Texas limited liability company. According to the Debtor's filings at the Texas Secretary of State, it is managed by Wes Roitman, an individual identified below. However, this filing is a Freudian slip, and the Debtor is actually managed by Romspen Reomaster. The Debtor is the owner and developer of a portion of the former Motorola property near the intersection of Ed Bluestein and East Martin Luther King Boulevards (the "Project").

16. The members of the Debtor are Plaintiff Vesta Texas and Defendant Romspen Reomaster.

17. The above styled and numbered bankruptcy case (the "Bankruptcy Case") began as an involuntary proceeding commenced by Panache on March 12, 2024 (the "Petition Date") pursuant to section 303 of the Bankruptcy Code. On September 9, 2024, with the consent of the Debtor, Romspen, Panache, AFMN, and Vesta Texas, an order for relief under subchapter V of chapter 11 of the Bankruptcy Code was entered.

18. The Debtor scheduled Romspen with an undisputed secured claim (D2.6) in the amount of $87,171,533.77. Claim No. D2.6 is asserted to be secured by a "Deed of Trust" creating a lien on "all assets." *See* Bankruptcy Case Docket No. 43. Plaintiffs wholly dispute this alleged secured claim.

19. The Debtor also scheduled Romspen with an undisputed secured claim (D2.7) in the amount of $51,444,027.44. Claim No. D2.7 is asserted be secured by a "Deed of Trust" creating a lien on "all assets." *See* Bankruptcy Case Docket No. 43. Plaintiffs wholly dispute this alleged secured claim.

20. Based upon Plaintiffs' review of the filings as the Texas Secretary of State, Romspen has not filed a UCC-1 identifying a collateral interest in any personal property of the Debtor. Nevertheless, the Debtor has apparently negotiated two stipulations regarding use of cash collateral since the order for relief was entered in the Bankruptcy Case.

21. In addition to the equitable relief requested herein pursuant to 11 U.S.C. § 510(c), Plaintiffs dispute the amount, calculation, and purported secured status of the Romspen Claims as scheduled by the Debtor. Plaintiffs deny that the amounts stated by the Debtor are based upon advanced amounts, and Plaintiffs deny that all offsets and credits have been applied to the Romspen Claims as scheduled by the Debtor.

**B. Introduction**

22. Understanding the history of the Project, RIC (Austin) and its ownership structure, and Romspen and its ownership structure, is crucial to understanding the relief requested in this Complaint.

23. Since 2016, Romspen has been the controlling force behind every phase of the development of the Project, from its acquisition by MOS8 Partners, Ltd., to the period in which the Project was owned by 3443 Zen Garden LP, through Romspen Mortgage's credit bid in the 3443 Zen Garden LP bankruptcy case, and now to its current status within RIC (Austin). As this current Bankruptcy Case begins, Romspen once again is maneuvering to position itself optically as a *mere* lender before this Court while continuing to control every aspect of the Project.

24. Although the Debtor's restructuring plan has yet to be presented, its underlying intent will be unmistakable. With the same management team overseeing both the Debtor and Romspen, Romspen's plan is to continue its pattern of obscuring the Project's true value. Romspen will present itself as the only entity capable of "rescuing" the Project, but this narrative is merely

a strategic façade. After presiding over three engineered failures, Romspen now appears positioned to assert that the Project's value falls below the alleged Romspen Claims, setting the stage for a restructuring that eliminates other stakeholders. This approach is not designed for a legitimate reorganization, but rather to formalize Romspen's total control over the Project while systematically stripping other creditors and stakeholders of their rights and interests.

25. Romspen's involvement with RIC (Austin) reveals a deliberate pattern of conduct designed not to develop the Project genuinely, but to destabilize its financial foundation for Romspen's exclusive gain. After acquiring the property for $45 million through a credit bid in the 3443 Zen Garden, LP bankruptcy case, Romspen purportedly advanced an additional $35 million. However, this funding was never intended to complete the Project; rather, it was strategically deployed to engage contractors and consultants just enough to move the Project forward—while ensuring Romspen could benefit from their work without allowing its full value to materialize. At critical stages of development, Romspen has repeatedly shut down the Project, blocking the recognition of substantial value created by contractors and stakeholders and artificially suppressing the Project's true worth. By halting progress precisely at these pivotal points, Romspen creates an appearance of underperformance. This calculated approach enables Romspen to inflate the property's debt to a claimed $138 million, reinforcing its control while concealing the Project's true potential from other creditors and stakeholders. Romspen's actions are not the product of mismanagement or oversight; they reflect a strategic abuse of its position to consolidate power at the direct expense of transparency, fairness, and the rights of those who have invested in the Project's

Project's

26. The current and historical Romspen loan documents were never intended to support the development of the Project in good faith. Instead, the loan documents are meticulously crafted

instruments of illusion, masquerading as legitimate agreements while concealing a more sinister design. In reality, those who signed on behalf of RIC (Austin) were not acting as independent fiduciaries of the borrower's interests. They are individuals with deep financial ties and allegiances with Romspen. With scrutiny of the facts, the setup collapses the supposed lender-borrower dichotomy into a single entity, operating under the guise of a legitimate arm's length participants.

27. By imposing excessive fees and interest rates, Romspen has once again orchestrated a financial quagmire that ensures RIC (Austin) remains trapped in a cycle of debt, unable to achieve its true potential. This is Romspen's design.

## C. The Origins of the Project: From Motorola High-Tech Hub Success to a Series of Failures

28. The origins of the Project begin in the early 1970s, when Motorola chose Austin, Texas, for its semiconductor manufacturing headquarters. This decision was not merely a business expansion but a catalyst that transformed Austin into a major hub for technological innovation, laying the groundwork for Austin's reputation as a leading tech center.

29. Motorola's construction of the semiconductor research lab and wafer fabrication plant was a significant investment in both technology and the Austin community. The facility, costing over $1 billion, was designed with state-of-the-art cleanroom environments and advanced fabrication technology. These investments made the campus at 3443 Ed Bluestein Boulevard a linchpin in the production of cutting-edge semiconductor technologies, including microprocessors and memory chips that powered the global electronics industry.

30. At its peak, the Motorola campus employed over 11,000 individuals, making it one of Austin's largest employers and a cornerstone of the local economy. The influx of high-skilled jobs and the presence of a major tech company attracted ancillary businesses and fostered a burgeoning tech ecosystem in Austin, driving economic growth and innovation.

31. In 2004, Motorola's decision to spin off its semiconductor division led to the creation of Freescale Semiconductor, marking a pivotal transition in the ownership and management of the Austin facilities. Despite this change, the site retained its critical role in semiconductor production, continuing to contribute valuable advancements to the field and maintaining its high-standing reputation within the industry.

32. The acquisition of Freescale Semiconductor through merger by NXP Semiconductors in 2015 brought renewed investment and continuity to the campus, particularly on a 42-acre portion dedicated to semiconductor manufacturing. NXP's commitment to expanding production capabilities underscored the site's lasting importance, linking Austin's facilities to the global semiconductor supply chain and ensuring its position as a valuable asset in a rapidly advancing field.

33. In the late 1990s and early 2000s, the Motorola campus was reconfigured into three distinct sections, each reflecting the site's adaptability while honoring its high-tech legacy under a unified site plan approved by the City of Austin.

34. **NXP Semiconductor (42 Acres):** This section remains a thriving center for semiconductor manufacturing, carrying forward the legacy of technological innovation that began under Motorola and continuing to contribute to the advancements that define the global electronics industry.

35. **Hewlett Packard Enterprise/Data Center (38 Acres):** Another portion of the campus was transformed into a modern data center, now operated by SDC - Austin, LLC, exemplifying the site's adaptability to new technological demands and evolving market needs.

36. **Core Campus (109 Acres):** The heart of the original Motorola site, this 109-acre tract includes interconnected buildings—F, H, J, B, C, D, L. and M—covering approximately

1,000,000 square feet. These buildings were initially designed for single-tenant occupancy, featuring shared infrastructure such as a tunnel system for efficient movement between facilities.

**D. Buildings F, H, and J: Centers of Semiconductor Innovation**

37. Buildings FHJ: This testing and research complex contained high-tech labs to rigorously assess the performance and reliability of semiconductor components, safeguarding Motorola's quality standards.

38. After the decline of semiconductor operations, these buildings were identified as part of the so-called "Tech 3443 project," which aimed to repurpose them into modern office and research spaces. The robust design and infrastructure of these buildings make them suitable for a variety of high-tech uses, preserving their value and utility.

**E. Building C: A Hub for Research and Development**

39. Building C: The campus's administrative hub, Building C provided essential support with a cafeteria, cooling systems, and a dedicated dock for supplies, ensuring smooth daily operations and employee welfare.

40. The infrastructure of Building C remains highly valuable for technological innovation. Its design allows for adaptation to various research and development activities, ensuring its ongoing utility in high-tech applications.

**F. Building B: The Semiconductor Fabrication Heartbeat**

41. Building B: The heart of semiconductor manufacturing, Building B housed state-of-the-art cleanrooms that controlled temperature, humidity, and particulates to enable flawless production of sensitive semiconductor components.

**G. Building D: Supporting the Semiconductor Ecosystem**

42. Building D: Designed by GSC Architects, Building D was an advanced R&D

center. Its suspended floors allowed quick access to complex infrastructure, supporting Motorola's cutting-edge semiconductor research. Building D's advanced infrastructure contributed to Motorola's leadership in the semiconductor industry and helped solidify Austin's status as a high-tech hub.

43. The capabilities embedded in Building D highlight the strategic importance of the Project. The building's historical role and potential for future use in high-tech industries make it a valuable asset.

**H. Building LM: A Key Facility in Semiconductor Manufacturing**

44. Buildings LM: These versatile fabrication centers housed CNC machines and essential equipment, enabling Motorola to adapt its production capabilities to meet evolving manufacturing demands.

**I. Central Plant: The Operational Backbone**

45. CP1 (Central Plant 1): As the campus's powerhouse, CP1 distributed vital electricity through its extensive breakers and transformers, ensuring uninterrupted power for manufacturing, cleanrooms, and R&D facilities.

**J. Restrictive Covenants: Preserving the Development's Value**

46. The 109-acre tract is governed by restrictive covenants that impose specific limitations and obligations that are essential for maintaining the site's high-tech and industrial focus. These covenants ensure that the property remains aligned with its historical uses and preserves its value for future high-tech developments. The restrictive covenant in place, as established by Freescale, serve to control and limit specific uses of the property in Austin, Texas, for the protection and enhancement of its value and suitability for particular purposes. These restrictions are designed to prevent uses that may compromise the property's intended operational

integrity or that could disrupt the surrounding area's character and safety. The covenant prohibits a range of activities and facilities that could introduce incompatible environmental, social, or safety risks, thereby preserving the property's use and appeal for future owners and occupants

47. The restrictive covenants governing this 109-acre tract were originally designed to protect the operational environment of the semiconductor manufacturing processes. These covenants impose specific limitations to mitigate risks associated with chemical exposure, environmental quality, and security, which are essential to semiconductor operations. However, with Austin's significant eastward expansion and increasing demand for mixed-use facilities, this property's unique infrastructure now presents substantial opportunities for expanded, compatible uses. Modifying these covenants would allow the site to align with contemporary market realities while retaining critical safeguards for NXP's existing activities.

48. **Covenant A** restricts the types of businesses and activities permitted on the property to ensure compatibility with high-tech and industrial applications. This limitation was intended to prevent any interference with the controlled environment required by semiconductor manufacturing. However, Austin's growth and shifting market dynamics now favor diversified technology and life sciences uses that demand similar environmental standards. Comparable cases demonstrate that restrictive covenants can evolve to accommodate new, compatible uses, particularly when such adjustments preserve the integrity of existing high-tech functions. Updating this covenant to permit selectively controlled uses would respect NXP's operational needs while allowing the property to reach its full economic potential.

49. **Covenant C** requires the maintenance of shared infrastructure, including the tunnel system and utilities provided by the Central Plant, ensuring seamless operation across interconnected buildings. This infrastructure, essential for NXP's operations, also positions the

property favorably for other high-tech and life sciences tenants that rely on stable and high-quality utilities. Courts often recognize the importance of shared infrastructure in entitlement frameworks, allowing expanded use that respects original service obligations. Modifying this covenant to permit shared use within a controlled framework would support the property's appeal to additional tenants, enhancing its development potential without compromising existing operational standards**.**

50. **Covenant D** enforces strict environmental protection measures critical to maintaining cleanroom standards for semiconductor manufacturing. This covenant addresses key issues of air quality, waste management, and water contamination. However, advancements in environmental technology offer opportunities to meet or exceed the initial standards, potentially broadening the site's application for compatible uses. Courts have supported updating environmental restrictions when modern safeguards provide equivalent or enhanced protection, balancing operational integrity with flexibility. Adjusting this covenant to incorporate advanced environmental controls would uphold NXP's needs while expanding the property's potential within high-tech and life sciences sectors.

51. **Covenant E** establishes stringent security protocols to protect the high-tech operations and intellectual property essential to NXP. This covenant originally provided a secure operational environment suited to semiconductor manufacturing. With Austin's technology and life sciences industries expanding, updating security entitlements within this covenant would allow the property to meet modern security standards while attracting a broader range of high-security tenants. Courts have recognized the necessity of adapting security entitlements to evolving industry standards, balancing the need for strict operational security with the potential for broader site utilization. Revising this covenant to incorporate advanced, sector-specific security measures

would continue to protect NXP's operations while enhancing the property's appeal to a wider range of high-tech industries.

52. The restrictive covenants governing this property are not mere constraints; they are foundational safeguards, crafted to ensure the operational integrity essential for NXP's semiconductor activities. As Austin has evolved into a leading center for technology and innovation, these covenants now present an opportunity—not an obstacle—to align the property's usage with the city's expanding high-tech and life sciences landscape. Thoughtful amendments and targeted supplements to these covenants are not only warranted but essential, allowing the property to fully realize its role as a dynamic, adaptive asset in Austin's future. By refining these covenants, the property stands to preserve its value for current high-tech operations while unlocking its capacity to attract emerging industries, reinforcing its position as a pivotal contributor to Austin's economic and technological growth.

**K. The Project as a Catalyst for Innovation**

53. The historical significance, strategic importance, and future potential of the Project cannot be overstated. This site's legacy began with Motorola's substantial investment, transforming it into a pioneering center for semiconductor manufacturing and positioning Austin as a major hub of technological innovation. Motorola's commitment laid a foundation that catalyzed decades of economic growth and established East Austin as a focal point for high-tech development.

54. The Project retains this inherent value, supported by specialized infrastructure and robust utilities, ideally suited for high-tech, mixed-use, and commercial developments. Further enhancing its strategic advantage, the recent completion of the 12-lane expansion of Highway 183 amplifies accessibility, visibility, and traffic flow to the area. This major infrastructure upgrade

positions East Austin's commercial and life science developments at a competitive advantage, attracting businesses, research facilities, and innovation hubs. The enhanced connectivity is anticipated to draw higher-value tenants and significant investment, ultimately elevating the property's long-term commercial value and solidifying its role as a catalyst for Austin's next phase of growth.

55. The restrictive covenants that govern the property are generally not limitations but safeguards that ensure its continued relevance and attractiveness for high-tech developments. However, they need to be amended and supplemented to apply to the future development of the Project. By understanding the true history and potential of the Project, it becomes clear that the property is worth the investment. The site's ongoing importance within Austin's high-tech ecosystem and its potential for future development make it a cornerstone of innovation, capable of contributing significantly to the technological and economic landscape of the region.

56. The Project is a highly valuable and strategic asset. The property's legacy and Project's potential make it a vital part of Austin's future, deserving of investment and preservation.

**L. Romspen**

57. At the core of Romspen's ownership structure lies a collection of Canadian and Caymanian entities:

Romspen Fund GP Inc.

Romspen Investment Corporation

Romspen Mortgage Investment Fund

Romspen Mortgage Limited Partnership

These entities, all based in Ontario, Canada, function as Romspen's operational and financial backbone. Despite appearing as separate organizations, they act in concert to execute Romspen's

strategic objectives. By compartmentalizing its interests across these entities, Romspen manufactures a false sense of independence, allowing it to present itself as a passive investment and financing fund rather than a controlling entity. This is far from incidental; it is a deliberate design to fragment legal responsibility while retaining the benefits of full control over, in this matter, RIC (Austin) LLC.

58. Romspen Mortgage Investment Fund, a Canadian entity domiciled in the Cayman Islands, has established a network of subsidiary and related entities, all of which share the same managers and principals, suggesting a coordinated effort to present these entities as independent when in fact they are closely controlled and centrally managed. This corporate web includes the following key entities:

**Romspen Mortgage Investment Fund (Ontario)** - This fund is the core entity, ostensibly serving as the primary investment vehicle. However, the establishment of additional entities under its umbrella suggest an intent to manipulate financial outcomes and obscure financial health.

**Romspen Fund GP Inc. (Ontario)** - This entity acts as the general partner, which is a common feature in limited partnerships to manage and control the operations of the fund. By placing this entity in Ontario, it operates under Canadian jurisdiction, yet its financial activities are designed to benefit from the Cayman Islands' favorable tax and secrecy laws.

**Romspen Investment Corporation (Ontario)** - Serving as a central investment arm, this corporation channels funds and investments through the various Romspen subsidiaries, further complicating the financial trail and making it difficult to trace the true flow of funds.

**Romspen Mortgage Limited Partnership (Ontario)** - As a limited partnership, this entity plays a crucial role in distributing profits or losses in a manner that may not be fully transparent to investors or regulators.

**Romspen (Reomaster) Holdings Inc. (Delaware)** - By incorporating in Delaware, Romspen Reomaster takes advantage of the state's favorable corporate laws, which allow for a degree of secrecy and flexibility in corporate governance. This entity holds a 75% interest in RIC (Austin) LLC.

**RIC (Austin) LLC (Texas)**[1] - This U.S.-based entity is directly linked to Romspen's operations and investments in Austin, Texas. It is structured to appear as a standalone entity, yet it is entirely controlled by Romspen through Romspen Reomaster.

[1] Plaintiffs believe that the "RIC" in RIC (Austin) refers to Romspen Investment Corporation.

59. The presentation of these entities as independent players is an attempt to shield Romspen from legal and financial consequences, while still enabling it to dictate the course of RIC (Austin)'s operations.

**Cayman Islands: A Calculated Shield for Concealment & Control**

60. Romspen Mortgage Investment Fund's registration in the Cayman Islands adds a crucial layer of opacity. The Cayman Islands, known for their corporate secrecy and favorable tax regime, provide Romspen with a shield from public oversight. This offshore registration allows Romspen to shift funds and execute financial maneuvers without leaving a discernible trail in the United States, thus ensuring that its financial manipulations, including those within RIC (Austin), remain untraceable.

61. This use of the Cayman Islands is not simply a tax strategy—it is an integral part of Romspen's effort to obscure its financial and operational dominance. By leveraging the Cayman Islands' lenient disclosure requirements, Romspen ensures that its control remains obfuscated allowing it to manipulate its assets without triggering the obligations that come with overt ownership.

**Romspen's Leadership: Orchestrating Control, Financial Manipulation, and Strategic Devaluation**

62. Romspen's leadership exercises full control over RIC (Austin) and every critical decision affecting the Project. The executives at Romspen possess deep expertise in development, construction, finance, and litigation—not used here to protect or advance the Project, but to serve Romspen's own financial interests. Romspen openly describes itself as "patient" and "deliberate," using its scale and resources to "outlast" and wear down its counterparts. This patience is not

passive; it is a core element of Romspen's calculated strategy to pressure stakeholders until conditions tip in Romspen's favor.

63. Recognizing the long-term potential of the RIC (Austin) property—with its prime location and unique features—Romspen has manufactured temporary crises to suppress the asset's value, creating an environment ripe for acquisition at a discount. This deliberate tactic undermines the expectations and rights of contractors, vendors, and suppliers who have invested in the Project, clearing the way for Romspen to consolidate control at the expense of these legitimate third-party creditors. The individuals controlling Romspen are the very same ones making every critical decision for RIC (Austin). This alignment allows Romspen to leverage its extensive expertise in development, construction, finance, and litigation, not to protect or advance the Project, but to manipulate it to serve its own financial interests.

64. This is not a case of mere negligent oversight or unfortunate financial missteps. Romspen's actions are deliberate, calculated, and orchestrated by a team that has perfected the art of creating and profiting from chaos. The following are the key figures of Romspen's leadership, whose expertise has been deployed with precision to achieve this calculated outcome.

**Wesley Roitman** ("Roitman") – Roitman is the principal architect and strategic leader of Romspen. As Managing General Partner of Romspen Investment Corporation, he oversees both the operational and strategic direction of the Romspen Mortgage Investment Fund. Roitman's role extends beyond traditional management duties, as he is directly responsible for Romspen's litigation strategies, ensuring control over distressed assets and key financial decisions. With extensive expertise in finance and law, Roitman's leadership is central to Romspen's business practices, playing a crucial role in maintaining its market dominance. Roitman's authority is far-reaching, and his influence is evident in every major decision made. Regardless of the titles he

holds, they all underscore one defining characteristic: Roitman's absolute control over Romspen's operations, with each decision reflecting his singular vision and authority.

**Peter Oelbaum** ("Oelbaum") – Managing Partner - Oelbaum, a Managing Partner at Romspen, leads Romspen's development group, overseeing real estate development projects across North America. His responsibilities include managing Romspen's high-profile investments and development strategies, including the RIC (Austin) project. Oelbaum's involvement with RIC (Austin) reflects Romspen's focused management of distressed assets, and in 2023, he transitioned into a leadership role, replacing Richard Weldon. An experienced real estate attorney licensed in Canada, Oelbaum plays a key role in guiding Romspen's legal and strategic decisions concerning RIC (Austin). He directly supervises key team members, including Aber and Elliot Steiner, and reports to Romspen's senior leadership, including Wesley Roitman. In 2023, Oelbaum made his first site visit to RIC (Austin) and assumed leadership over the project, including overseeing critical legal matters, such as the eminent domain case with CTRMA and the SDC lawsuit, further solidifying his control over the development. His legal experience and strategic oversight are central to Romspen's management of the Project, and he continues to lead the efforts of Mark Aber and Elliot Steiner in managing RIC (Austin)'s operational and financial trajectory.

**Mark Aber** ("Aber") – Asset Manager - Aber serves as the Asset Manager at Romspen, with a primary focus on managing the RIC (Austin) property. His role is pivotal in overseeing the asset's financial and operational strategies, ensuring its alignment with Romspen's broader objectives. Aber is responsible for RIC (Austin)'s financial forecasting and cash flow management, including a role in the approval of draw requests submitted to Romspen. His duties also encompass capital management, cash reserve oversight, reporting, and contingency planning for the property. Aber played a critical role in shaping RIC (Austin)'s financial framework,

including revising costs to complete and implementing a new accounting format. He provided detailed guidance to Panache on coding financial line items and maintained close oversight of the project's financial controls. Aber frequently traveled to Austin, where he held meetings with key stakeholders, including RIC (Austin)'s entitlement attorney, Terry Irion, and representatives from Simmons Bank.

**Blake Cassidy** ("Cassidy") – Managing Partner - Cassidy serves as a Managing Partner at Romspen, with direct responsibility for loan origination and the structuring of complex financial transactions. Since joining the company in 1998, he has played a pivotal role in cultivating relationships within the brokerage and lending communities, which have significantly contributed to Romspen's growth. Cassidy's purported expertise in real estate finance has been instrumental in the firm's portfolio expansion, which is alleged to exceed billions in financing. His influence extends into corporate governance, evidenced by his signing of RIC (Austin)'s Operating Agreement as the Authorized Officer for RIC (Austin) and as Vice President of Romspen (Reomaster). Moreover, Cassidy's management of the 3443 Zen Garden, LP file and his involvement in critical decisions, including as a signatory on key agreements, further highlight his integral role in ensuring that Romspen's financial operations align with the company's long-term objectives of control of the Project.

**Richard Weldon** ("Weldon") – Managing Partner - Weldon, a Managing Partner at Romspen, specializes in restructuring development strategies and asset enhancement, with a focus on managing distressed properties. His expertise was particularly crucial in Romspen's control over RIC (Austin), where he played a central role in shaping the project's financial and operational direction. Weldon's leadership in development and construction was evident as he served as the *de facto* manager of RIC (Austin) until approximately February 28, 2023, before his influence

within Romspen was diminished by other partners and key personnel. During his tenure, Weldon was actively involved in negotiations with major stakeholders, including Nuveen and Simmons Bank, and was responsible for critical exchanges of documents with both entities. His pivotal role dates back to Romspen's control over the Project in 2016. However, by April 2023, Weldon was removed from his managerial duties, marking a shift in Romspen's internal dynamics concerning the management of RIC (Austin).

**Joel Mickelson** ("Mickelson") – General Counsel & Chief Compliance Officer - Mickelson serves as Romspen's General Counsel and Chief Compliance Officer, where he is charged with overseeing the firm's legal and regulatory compliance. A graduate of the University of Toronto's law program, Mickelson brings experience in structuring transactions that prioritize Romspen's interests. His role is critical in navigating the firm's strategic legal maneuvers. Mickelson played a key role in Romspen's involvement with RIC (Austin), acting as the authorized signing officer on both the RIC (Austin) mortgage and the assumption of the 3443 Zen Garden, LP loan. Additionally, he was responsible for overseeing the formation of critical documents related to RIC (Austin), ensuring Romspen maintained its control over the Project's legal and financial framework.

**Elliot Steiner** ("Steiner") serves as Head of Construction for Romspen through his role within Romspen Development Group ("RDG"), overseeing construction activities across the company's portfolio. Operating from Ontario, Canada, Steiner lacks a dedicated team in Austin and instead retained a Panache consultant at over $80,000 annually – a rate significantly above market value – Illustrating both his limited direct engagement with U.S. operations and his reliance on third-party support. More than a project manager, Steiner functions as a proxy for Romspen,

driven by a lucrative consulting arrangement and a longstanding relationship with the company that extends beyond formal duties.

Steiner's role in the Project aligns closely with Romspen's financial objectives, not for genuine development, but to keep RIC (Austin) in financial distress and positioned for forced devaluation. His substantial ties to Romspen go beyond employment; he is financially and personally aligned with Romspen's leadership, positioning him to advance Romspen's interests at the expense of the Project's potential success. In addition to his position with RDG, Steiner is President of O&L LP, also known as Elm Developments—a company managing assets where Romspen or its partners are the true, albeit undisclosed, owners. Through Elm Developments, Steiner serves as a "straw owner," concealing Romspen's direct ownership in select properties from public disclosure. Since early 2023, Steiner has managed RIC (Austin) remotely, moving its operations from Romspen's offices to his office at Elm Developments in Ontario. Despite his absence from Texas, Steiner has assumed a central role, working closely with Romspen's leadership to preserve their control over RIC (Austin) and other assets. His dual role as an external "partner" and internal representative within RDG reinforces Romspen's influence, allowing him to advance its concealed financial interests while creating an appearance of separation between Romspen and RIC (Austin).

**Brent Forrester** ("Forrester") – Forrester holds a key leadership position within Romspen's real estate development RDG, leveraging decades of experience in finance and development to oversee the firm's growth and strategic management of its projects. Forrester ensures comprehensive oversight of capital management and project execution, playing a vital role in Romspen's continued expansion in the industry. Forrester's involvement extended to RIC (Austin), where he participated in negotiations with key stakeholders, including Nuveen and

Simmons Bank. He was instrumental in document exchanges with both entities and held multiple meetings regarding the project. During his 2023 visit to the Project, Forrester further solidified Romspen's relationship with Simmons Bank, underscoring his active engagement in Romspen's strategic partnerships.

**Romspen's Control Mechanisms: Exercising Unilateral Dominance**

65. Romspen's claim of being a mere passive lender is contradicted by its actions, which demonstrate total financial and operational control over RIC (Austin) LLC. By wielding its 75% stake through Romspen (Reomaster), Romspen exerts unchecked dominance, making key decisions while sidelining other stakeholders. This control is exercised through oppressive lender practices, allowing Romspen to avoid the fiduciary responsibilities that would normally accompany such influence.

**Marginalization of Vesta Texas, LLC**

66. Vesta Texas, LLC, which holds a 25% ownership interest, is systematically marginalized within Romspen's structure. Despite being a significant minority owner, Vesta Texas has no meaningful influence over the direction of RIC (Austin) LLC. Romspen's dominance ensures that Vesta Texas's role is reduced to that of a passive observer, with Romspen dictating every significant operational and financial decision.

67. Romspen's ability to suppress Vesta Texas's influence further reveals its role as the *de facto* owner. This systematic marginalization of minority stakeholders is a core part of Romspen's strategy to eliminate any challenge to its unilateral control, ensuring that all decisions are made to benefit Romspen alone.

**Exploitation of AFMN's Mortgagee Position**

68. In addition to sidelining minority stakeholders, Romspen manipulates the position of AFMN, a creditor holding a mortgage on the Austin property. Romspen's control over RIC (Austin) LLC allows it to influence the financial condition of the property, to the detriment of AFMN's security interest. By controlling the flow of funds and determining the project's financial trajectory, Romspen can pressure creditors like AFMN, ensuring that competing financial claims are weakened or neutralized.

69. This manipulation is not coincidental but a deliberate effort to exert pressure on financial stakeholders, creating a scenario where Romspen alone controls the project's fate while minimizing the leverage of others.

**Structural Design to Mask Control and Maximize Exploitation**

70. Romspen's use of multi-jurisdictional corporate entities is designed to create a facade of independence, effectively masking its true role as the de facto owner. By spreading ownership across Ontario, Delaware, and the Cayman Islands, Romspen creates a complex legal labyrinth that complicates efforts to trace its direct control over RIC (Austin) LLC.

**M. Holding Romspen Accountable**

71. Romspen's conduct towards the Project constitutes a profound breach of fiduciary duty. Romspen, through Romspen Reomaster, owes a duty of loyalty and care to RIC (Austin) and its stakeholder Vesta Texas. However, Romspen has steadfastly pursued a strategy of self-interest, exploiting its position to impose terms that were neither fair nor designed to benefit the Project. Despite having access to more favorable, outside financing options—options that would have provided substantially lower interest rates and fewer burdens on the Project—Romspen chose a different path. It deliberately over-burdened RIC (Austin) with onerous fees and interest, designed

to perpetuate financial distress and carve a path toward full ownership. Since the property's acquisition in 2016, the majority of its financial encumbrances have been fees and interest, tailored to serve Romspen's agenda rather than reflecting genuine development costs. This is not the behavior of a lender seeking to manage risk or recover its investment; it is the calculated behavior of a party manipulating financial instruments to secure an asset while systematically excluding others.

72. The illusion of the loan documents becomes even more apparent when examing the conspicuous absence of typical records within RIC (Austin) — minutes, meeting notes, or correspondence that would reflect genuine negotiation or due diligence. There is no documentation to show that RIC (Austin) received independent representation, no records of discussions weighing the terms and implications, and no exchanges that would typically underpin a legitimate lending relationship. This absence is not an oversight; it is a deliberate omission, designed to conceal the premeditated nature of Romspen's actions. The loan documents were not created as bona fide financial agreements; they were strategic tools, weaponized to construct a narrative of financial distress and fabricate a pretext for evading obligations.

73. Internal communications, particularly those of Wes Roitman, provide a glimpse into Romspen's underlying intentions. His declaration, "You would have to kill me if Adam [Zarafshani of Panache, AFMN, and Vesta Texas] got anything," exposes a strategy centered on systematically excluding other stakeholders and concentrating power within Romspen's hands. The Romspen loan documents were designed not to reflect a lending relationship but to manipulate the financial landscape, eliminate legitimate claims, and create artificial offsets that served Romspen's singular goals.

74. Romspen employed these loan documents as part of a broader scheme to orchestrate failure. Those who signed on behalf of RIC (Austin) were not independent actors safeguarding the Project's interests; they were Romspen's agents, executing a plan to consolidate control while circumventing its obligations. Romspen's strategy becomes even more insidious when viewed in the context of its own liquidity crisis. Faced with the closure of the Romspen Investment Fund to halt a potential run on investors, Romspen identified RIC (Austin) as a vehicle to further its interests. Romspen actively sabotaged external financing efforts, transferring Romspen's financial strain onto RIC (Austin) and creating an illusion of distress that concealed its true intentions.

75. Further revealing its methodology is Romspen's manipulation of financial transparency. While Romspen presents itself to investors through polished, publicly audited financial reports, these reports are crafted to project an illusion of stability and success. Critical details about the true state of its properties, including RIC (Austin), are conspicuously absent.

76. When stakeholders like Vesta Texas sought access to RIC (Austin)'s financials as allowed under the company operating agreement, Romspen's response was obstructionist. Instead of providing meaningful financial documentation, they directed Vesta Texas to visit the BCLP Law firm in Kansas City on March 04, 2024—despite this firm having offices in Dallas and Houston—clearly intending to obscure access to crucial information and deter a thorough investigation. Previously, RIC (Austin)'s address was in Toronto, Canada at Romspen's headquarters at 162 Cumberland Toronto CA. In approximately May 2024, the address was moved to Elm Developments at 1931 Hwy 7, Concord Ontario, L4K 1V5 CAN. This was another calculated move to give the appearance of separation between Romspen and RIC (Austin). This maneuvering is emblematic of Romspen's broader strategy: to control the narrative, obscure

reality, and systematically exploit its position to achieve full ownership while cloaking its actions in a thin patina of legality.

77. As Plaintiffs proceed through the legal process and obtain access to Romspen's internal records and communications, the full extent of its calculated maneuvers will become clear. Plaintiffs believe that discovery in this case will confirm how Romspen systematically manipulated the financial framework of RIC (Austin) for its own gain, carefully dismantling the interests of others under the guise of financial distress. This Adversary Proceeding and the underlying bankruptcy case is not simply a result of lending gone wrong; it is a calculated campaign of financial manipulation. This Adversary Proceeding is crucial to unraveling Romspen's constructed narrative, ensuring that its actions are brought to light and its machinations held to account.

78. The challenges facing the Project today are not a consequence of random financial setbacks or unavoidable difficulties. Instead, they are the direct result of Romspen's calculated actions over the past several years. As a foreign entity operating in the U.S., Romspen entered this project not to support its development but to profit from its struggles. By exploiting its financial leverage, Romspen has consistently placed other stakeholders at a disadvantage, ensuring that while the project falters, Romspen continues to benefit.

79. Rather than driving the project toward completion, these financial burdens create a cycle of dependency, keeping RIC (Austin) in a state of perpetual strain. This model allows Romspen to continuously extract profit through fees and interest while the development stagnates. The deliberate nature of this strategy suggests Romspen's goal is not to see the project succeed, but to ensure its prolonged financial distress, thereby securing its own financial returns.

80. Romspen's involvement in RIC (Austin) reveals a deliberate and sustained effort

to undermine the position of other stakeholders while maximizing its own control. Romspen has not merely provided financing but has actively obstructed critical avenues for the project's progress, such as its calculated blocking of PACE financing, which was crucial for the redevelopment of 3443 Zen Garden, LP. Romspen fully understood the importance of this financing but deliberately chose to impede it, ensuring that the project remained financially weakened.

81. This was not an innocent mistake or oversight; it was a strategic decision designed to prevent the project from moving forward in a way that would benefit others. By obstructing development and imposing further financial strain, Romspen was able to solidify its influence while driving other stakeholders into increasingly compromised positions. Romspen's approach has been to maintain the project in a state of dependence on its financing, leaving other parties with little room to maneuver.

82. By keeping RIC (Austin) and other projects in a state of financial crisis, Romspen has shielded itself from accountability. Romspen's actions—carefully calculated to extract value from distressed properties without ever fostering true development—reveal a systematic approach to avoiding responsibility while profiting from the hardships of others. Romspen's tactics operate to inequitably allows it to profit at the expense of the very projects they claim to support.

83. What has unfolded at the Project is not an isolated case. Romspen's history across numerous projects reveals the same strategy of leveraging financial power to weaken stakeholders and impose unsustainable fees and interest. Time and again, Romspen has engaged in a predictable cycle: projects fall into financial distress, other stakeholders are pushed aside, and Romspen walks away with substantial profits while the development fails to progress.

84. This is not the behavior of a typical lender seeking loan repayment. Romspen's

business model has consistently undermined the financial stability of developments, allowing it to capitalize on the very crises it created. Romspen's conduct leaves behind projects in worse condition than when it arrived, with only Romspen emerging financially unscathed. This pattern reflects a deliberate strategy—Romspen does not simply profit from development but from the financial distress that it actively perpetuates.

85. Understanding the history of Romspen's involvement is critical to explaining why the Project is where it is today. The current situation is not the result of poor management or unavoidable circumstances, but a calculated strategy crafted to exploit the vulnerabilities of creditors, partners, and stakeholders. Romspen's actions speak volumes about its intent to undermine other stakeholders while securing its own financial gain.

**The Beginning - Purchase through MOS8**

86. The initial Contract of Sale between MFPB Ed Bluestein, LLC (the Seller) and MotoMOS-8 Partners LLC (the Purchaser) marked the formal beginning of the MOS8 project and Romspen's involvement. This agreement outlined the sale of the property located at 3443 Ed Bluestein Blvd., Austin, Texas. The First Amendment to Contract of Sale (August 2015) introduced modifications, signaling that additional assurances were necessary to satisfy lender concerns, suggesting an underlying influence from Romspen. These amendments indicate that Romspen was shaping the transaction terms early on, reflecting its intention to influence the project's trajectory from the outset.

87. That Romspen was not merely a lender but acting as an owner-manager with substantial control over MOS8 Partners Ltd. Romspen's role in shaping the project's financial and operational outcomes is contained in key documents establishing its involvement as a *de facto* equity holder and active participant. Richard Weldon, a Managing Partner at Romspen, played a

critical role in managing and executing these transactions, which directly link Romspen to the decision-making and management of MOS8.

A. **Assignment and Assumption of Contract (September 2015)**: This document formalized the transfer of all rights and obligations from MotoMOS-8 Partners LLC to MOS8 Partners Ltd., positioning MOS8 as the key entity involved in the property acquisition. Richard Weldon's influence, considering his dual roles at Romspen and MOS8, underscores Romspen's interest in establishing MOS8 as a controlled subsidiary, through which Romspen would exert its will and effectively manage the property acquisition and development.

B. **Second Amendment to Contract of Sale (September 2015)**: This amendment further aligned the terms of sale with Romspen's strategic needs by ensuring compliance with financing requirements. The specificity of these contractual adjustments reflects Romspen's influence, ensuring that all elements of the deal complied with the conditions necessary for Romspen's control and financial interests.

C. **Special Warranty Deed (September 30, 2015)**: This deed transferred the property to MOS8 Partners Ltd., formally recording MOS8 as the owner. However, this ownership was nominal; Romspen's involvement, through the individuals managing MOS8, indicates that Romspen was the true entity controlling the property. This transition highlights Romspen's strategy of using MOS8 as a vehicle to exercise control over the property.

D. **Bill of Sale, Assignment, and Assumption of Contracts (September 30, 2015)**: This document, signed by Richard Weldon, assigned key contractual rights from the original purchaser to MOS8 Partners Ltd.. Weldon's role in signing this agreement underlines Romspen's deep involvement in managing these critical transitions. This assignment was not a mere formality but a strategic move to consolidate control under MOS8, which was effectively under Romspen's direction. It demonstrates Romspen's operational involvement from the very start, managing both assets and liabilities to align with its strategic goals.

E. **Loan Agreement (September 10, 2015)**: The **Loan Agreement** between MOS8 Partners Ltd. and Service Lloyds Insurance Company for $6,500,000 was critical for the acquisition. This agreement included interest payments and profit participation provisions, illustrating Romspen's role beyond that of a traditional lender. The loan was structured to ensure Romspen would benefit from the project's profits, indicating an equity-like position. Richard Weldon's involvement in this financial arrangement provides clear evidence of Romspen's intent to control MOS8's financial operations and reap direct benefits from the project's success.

F. **Promissory Note by MOS8 (September 2015)**: This promissory note detailed MOS8 Partners Ltd.'s obligations under the $6,500,000 loan, highlighting Romspen's control over MOS8's financial commitments. The inclusion of performance-based payment terms

reinforces Romspen's role as more than a lender; these terms are indicative of an equity stake, linking Romspen's returns to the project's performance. This structure further demonstrates that Romspen's involvement was deeply tied to the financial success of MOS8, aligning Romspen's incentives with ownership interests.

G. **Deed of Trust (September 2015)**: The **Deed of Trust** secured the $6,500,000 loan, naming MOS8 Partners Ltd. as the borrower and Service Lloyds Insurance Company as the beneficiary. By holding a security interest in the property, Romspen, through Service Lloyds, effectively controlled the property's fate. This security position provided Romspen with significant leverage over MOS8's operations and decisions, underscoring Romspen's role in controlling the project's direction.

H. **Purchaser's Statement (September 2015)**: This statement, signed by representatives of MOS8 Partners Ltd., detailed the financial obligations associated with the acquisition, confirming Romspen's influence over MOS8's financial decisions. The document's terms reflect Romspen's control over financial arrangements, ensuring that all obligations aligned with Romspen's strategic interests.

I. **Borrower's Affidavit (September 2015)**: Signed by Richard Weldon, this affidavit confirmed MOS8 Partners Ltd.'s role as the borrower under the $6,500,000 loan. Weldon's dual role as a Romspen Managing Partner and a signatory for MOS8 directly ties Romspen to MOS8's financial structure. This affidavit is not merely a procedural formality but a clear demonstration of Romspen's embedded involvement in the financial operations of MOS8, indicative of an ownership role.

J. **Notice Regarding Commercial Loan (September 2015)**: This notice designated the loan as a "Qualified commercial loan" under Texas law, allowing Romspen to benefit from profit participation. The structure of this loan, including profit-sharing, is evidence that Romspen's financial role was crafted to ensure direct financial returns from the project's success. Such a structure is inconsistent with the role of a traditional lender and is more akin to that of an equity stakeholder, whose returns are tied to the success of the underlying project.

K. **Collateral Assignment of Rights (September 2015)**: This document assigned all rights related to utilities, water, and development from MOS8 Partners Ltd. to Service Lloyds Insurance Company. By securing these operational rights, Romspen ensured its control over critical aspects of the project, effectively positioning itself as a co-owner. The assignment demonstrates Romspen's comprehensive involvement in the project's operational framework, beyond mere financial investment.

L. **Co-Development Agreement (August 31, 2015)**: The Co-Development Agreement names Romspen as a co-developer alongside IDM, giving Romspen direct control over critical development activities. Romspen's responsibilities included managing construction schedules, overseeing project planning, and coordinating with government officials for necessary approvals. These responsibilities indicate Romspen's direct involvement in the development process, exercising control typically reserved for property developers and

owners. Romspen's authority to select and manage contractors further reinforces its role in the operational management of the project, establishing Romspen as a central figure in the project's execution.

M. **Co-Management Agreement (August 2015)**: This agreement delineates Romspen's role in managing the day-to-day operations of the project. It includes oversight of budgets, financial expenditures, and operational decisions. The authority granted to Romspen in this agreement illustrates its direct involvement in the project's management, showing that Romspen was not just providing oversight but actively managing MOS8's operations, further proving its role as an owner-manager.

N. **Co-Financing and Co-Sales Agreement (August 15, 2015)**: This agreement positioned Romspen as responsible for arranging project financing and overseeing sales efforts. Romspen's role in these activities demonstrates its control over the financial and commercial aspects of the project. The agreement's profit-sharing terms further underscore Romspen's financial interest in the project's success, reinforcing the argument that Romspen's involvement was aligned with that of an equity stakeholder, focused on maximizing returns from the project's economic activities.

O. **Co-Leasing Agreement (August 2015)**: The Co-Leasing Agreement granted Romspen exclusive control over leasing activities, including negotiating lease agreements, setting rental rates, and managing tenant relationships. This level of control over leasing operations proves that Romspen was not acting as a passive lender. By managing the property's leasing strategy, Romspen influenced its revenue generation and long-term commercial success, behavior characteristic of property owners.

P. **Environmental Indemnification Agreement (September 2015)**: Signed by Richard Weldon, this agreement provided indemnification for Service Lloyds Insurance Company against environmental liabilities. The execution of this agreement shows Romspen's proactive approach to managing potential risks, behavior indicative of an owner concerned with liability management. The focus on risk mitigation highlights Romspen's comprehensive management involvement, securing its interests across all facets of the project.

Q. **Disclosure as to Legal Representation (September 2015)**: This disclosure, signed by Weldon, clarified that legal representation was provided solely for Service Lloyds Insurance Company. This strategic arrangement ensured that all legal matters aligned with Romspen's interests, demonstrating its control over the legal framework of the project. By managing legal representation, Romspen protected its interests while maintaining operational control, further proving its role as an owner-manager.

R. **Notice of Final Agreement (September 2015)**: This notice, signed by Weldon, formalized all terms of the loan agreement, emphasizing the absence of unwritten agreements. The formalization of these terms highlights Romspen's structured approach to ensuring all financial and operational terms were documented, protecting Romspen's strategic and

financial interests. This notice serves as evidence of Romspen's meticulous management and control over MOS8's operations.

88. From the beginning of the MOS8 project, Romspen's involvement was integral to all key decisions and operations. The strategic use of financial, operational, and legal agreements ensured that Romspen had control over every aspect of the project, from acquisition to development, management, and sales. Richard Weldon's dual roles as a Managing Partner at Romspen and a key figure in MOS8's management underscore the direct link between Romspen and the operational decisions of MOS8. The evidence clearly shows that Romspen acted as an owner-manager, guiding the project's trajectory to align with its financial objectives, not merely as a lender but as a controlling force with equity-like interests.

89. The depth of Romspen's involvement in MOS8, as evidenced by the reviewed documents, reveals that Romspen's role extended far beyond that of a lender. By exerting control over development, management, financial arrangements, and legal strategy, Romspen acted as a *de facto* owner and equity stakeholder. Romspen's extensive control over MOS8's operations and decision-making processes is consistent with the behavior of an owner-manager, not a traditional lender.

90. The organizational format demonstrates that Romspen Mortgage Investment Fund, through its network of subsidiaries and related entities, is engaging in a coordinated effort to manipulate financial reporting. The identical management and shared principals across these entities strongly indicate that they are not independent as presented but rather part of a deliberate strategy to obscure the true financial dealings and intent of Romspen.

91. Romspen's involvement in the Project while owned by 3443 Zen Garden, LP ("Zen Garden") illustrates a continued pattern of deceit and strategic manipulation aimed at gaining control of distressed assets. The cornerstone of Romspen's scheme was a Loan Agreement

executed on April 27, 2018 between Romspen and the 3443 Zen Garden, LP. Alongside the Loan Agreement, Romspen secured its position through a Promissory Note for $125 million, a Deed of Trust, and a Security Agreement filed under Travis County record 2018064160, along with a UCC-1 Financing Statement filed on April 30, 2018, document number 18-0015101986.

92. While these documents appeared to establish Romspen as a secured lender, the truth reveals Romspen's predatory motives from the outset. The loan was not a mechanism to support development but a weapon to facilitate sabotage. Critical provisions, such as Section 5.13(c)(iii) of the Loan Agreement, clearly identified that a PACE Loan was a "Permitted Encumbrance," yet Romspen systematically undermined Zen Garden's efforts to obtain this crucial financing. Its interference was a premeditated breach of contractual obligations designed to cripple Zen Garden financially.

93. On October 9, 2018, Zen Garden notified Romspen that it was in default under the Zen Garden loan documents. Romspen's defaults were numerous and included (without limitation):

A. Withholding funding of pending draw requests, disrupting the construction of the Project, adding costs to the Project, causing loss of supply contracts at favorable prices, and loss of rental opportunities.

B. Withholding funding based upon an unsupportable allegation that Zen Garden was misapplying funds.

C. Refusing to deliver consents to PACE financing, delaying and interfering with PACE financing.

D. Refusing to deliver its Joinder to a second amended to Declaration of Condominium, a requirement of the PACE lender.

E. Refusing to disburse funds in accordance with the Zen Garden loan documents.

94. On October 11, 2019, Romspen in turn alleged that 3443 Zen Garden LP ("Zen Garden") had defaulted on the Zen Garden loan agreement. Romspen claimed that Zen Garden failed to make payments, misapplied funds, and allowed the project to deteriorate, labeling these conditions as "waste" and accelerating the loan to $96,495,021.72. However, these accusations were a complete fabrication, part of a broader narrative that Romspen concocted to justify seizing control of the project.

95. The supposed default was not the result of Zen Garden's mismanagement but of Romspen's deliberate obstruction of critical financing. Key evidence shows that Romspen's refusal to approve the $30 million PACE loan—financing vital to the sustainability of the project—was the primary cause of Zen Garden's financial distress. Romspen's own cost consultants and construction experts, BTY, who structured the loan and monitored Zen Gardens' cost to complete, repeatedly stated in its reports that without the PACE funds, the project could not be completed. Romspen required a term sheet from a PACE lender as a condition before closing the construction loan, making the PACE loan an essential part of the capital stack. This requirement was clearly reflected in the construction cost to complete when Romspen closed the loan with Zen Garden.

96. Romspen's bad faith refusal to consent, despite its obligation under Section 5.13(c)(iii) of the Loan Agreement, demonstrates that Romspen never intended to act as a responsible lender. Romspen's refusal to execute the consent for the PACE loan was no mere oversight—it was a calculated act of sabotage. The PACE loan, essential to Zen Garden's environmental and financial viability, was described in the Loan Agreement as a "Permitted Encumbrance." The agreement, Section 5.13(c)(iii), stated that Romspen was required to consent to the loan, provided Zen Garden was not in default.

97. Nevertheless, Romspen not only refused to consent but also coerced Zen Garden into considering alternate financing options tied to Romspen. After Zen Garden complied, Romspen continued to obstruct the process. This deliberate coercion and obstruction was a clear abuse of its power as a lender, aimed at keeping Zen Garden in a state of financial dependence, ensuring that the project would ultimately default. This refusal directly caused the loss of $30 million in financing and left Zen Garden without the resources needed to complete critical sustainable energy upgrades.

98. Romspen's obstruction of the PACE loan and manipulation of the Loan Agreement cannot be viewed as isolated incidents—they were key elements in a broader strategy of predatory lending. Romspen engaged in a loan-to-own scheme, where it intentionally creates conditions for default to acquire distressed properties at a fraction of their value. This strategy is evident in Romspen's actions: manipulating loan terms, inflating loan amounts, and withholding critical reserves, all designed to induce a default.

99. Romspen initially set the loan at $101 million, later inflating it to $125 million without adequate justification. At the same time, it withheld necessary reserves that would have allowed Zen Garden to navigate financial difficulties. This deliberate act of financial manipulation was not poor planning—it was a premeditated strategy designed to ensure that Zen Garden would default, allowing Romspen to seize control of the property through foreclosure.

100. Romspen's refusal to approve the PACE loan and its broader obstruction of financing efforts go beyond breach of contract—they represent a breach of fiduciary duty. As a secured lender with substantial control over the Zen Garden project, Romspen was bound by a duty of good faith and fair dealing. However, instead of acting in good faith, Romspen manipulated the project's financial position, ensuring that it would default.

101. By acting with deliberate disregard for its contractual obligations, Romspen violated not only the Loan Agreement but also its duty to act in the best interest of Zen Garden. This breach of fiduciary duty is compounded by Romspen’s pattern of obstruction, financial manipulation, and self-serving conduct, all aimed at driving the project into insolvency for its own benefit.

102. Romspen’s strategy involved profiting from the continuous imposition of management fees and the structuring of loans to require frequent extensions. By ensuring that loans needed to be renewed regularly, Romspen guaranteed a steady stream of income from fees, regardless of the project's success. This focus on fee generation over the development’s success indicates that Romspen’s true motive was financial exploitation rather than fostering a successful project.

103. On information and belief, Romspen misused funds advanced for the Zen Garden development. Funds that were supposed to be used for project development were instead diverted to other entities associated with Dan White, including El Option in Canada. This diversion of funds was not accidental but part of Romspen’s broader strategy to ensure that the Zen Garden project would remain financially unstable, allowing Romspen to maintain control and eventually repossess the property.

104. Romspen’s failure to conduct proper underwriting or establish a legitimate cost to complete for the Zen Garden project further indicates its intent to undermine the development. A genuine lender concerned with the project’s success would ensure thorough financial planning and oversight. Romspen’s negligence in this area shows that its primary interest was not in supporting a viable development but in exploiting financial gaps and weaknesses to its advantage.

105. Romspen's ultimate goal was to repossess the property, using its lender status to engineer the failure of Zen Garden. By controlling the flow of funds and setting up the project for failure, Romspen positioned itself to acquire the property through a credit bid. When Zen Garden was pushed into involuntary bankruptcy by its creditors, Romspen capitalized on the situation, purchasing the only significant asset— the property— through a credit bid of $45 million. This amount was less than half of the funds Romspen had allegedly provided to Zen Garden, highlighting the calculated nature of Romspen's strategy to regain the property at a discounted price while still profiting from the fees and interest accrued during the project's life.

106. Romspen's conduct in the Zen Garden phase of the project exemplifies its predatory lending practices, and Romspen's actions should be recognized for what they are: a scheme to manipulate distressed borrowers, force defaults, and seize valuable properties at reduced costs. This action is brought to hold Romspen accountable for its reckless, intentional, inequitable, and self-serving actions.

107. After acquiring the Project via its credit bid in the Zen Garden Bankruptcy, and after confirmation of the plan in the Zen Garden Bankruptcy, Romspen and Panache entered into a term sheet for the continued development of the Project. The term sheet unequivocally states that Romspen would negotiate a new construction contract directly with Panache, confirming its hands-on involvement in defining the terms:

> A new general contract, budget, and schedule for the construction and development of the Construction Project ('New General Contract') will be negotiated, documented and entered into between the New Owner and Panache, in its capacity as the general contractor… In negotiating, documenting and executing a new general contract for the Construction Project, due consideration will be given to the terms of the original construction contract between Panache and the Debtor ('Original General Contract').

108. This agreement leaves no room for doubt: Romspen was not merely informed about the construction contract but was actively shaping it. Its insistence that the new contract must "give due consideration to the terms of the original construction contract" confirms that it was fully aware of the original terms and sought to impose its own conditions on the new agreement.

109. Romspen's continued influence over the project extended far beyond the usual boundaries of a lender-borrower relationship. The term sheet granted Romspen "exclusive" operational control over the project, a role that involves managing both financial and contractual aspects: "For the sake of clarity, the operational control and decision-making authority for the New Owner and the Construction Project will be held and owned exclusively by the Lender."

110. By demanding this level of control, Romspen continued to position itself as the *de facto* project manager, not a lender. Its direct involvement in "operational control and decision-making" illustrates that it was deeply embedded in the project's inner workings, including the construction contract. This overreach underscores Romspen's intimate knowledge and direct influence over every aspect of the Project and its contracts.

111. Romspen did not stop at high-level decisions. It extended its control to the minutiae of the construction project by dictating terms related to subcontractors and ensuring that key contracts were retained or renegotiated in line with its objectives:

> Panache and Romspen - to the extent applicable vis-a-vis their respective interests in the New Owner and Panache's capacity as the new general contractor will endeavor to work in good faith to retain and/or continue the existing terms of the subcontracts… between Panache and the subcontractors deemed critical and commercially unviable to replace for the cost-effective continued development and construction of the Construction Project.

This language decisively shows that Romspen was not just overseeing the project; it was actively involved in crafting the detailed contractual terms, ensuring that its preferences were embedded in the project's framework. By dictating how subcontractor agreements should be managed,

Romspen took on a role typically reserved for a developer or contractor, further proving its direct negotiation and control over the construction contract.

112. Beyond contractual terms, Romspen also took an active role in controlling the financial aspects of the construction project, including the cost to complete and funding mechanisms:

113. "Romspen, Zarafshani, and Panache shall globally, generally and specifically work together in good faith and with the utmost commercially reasonable best efforts to consider, decide and implement any specific issues and/or requests that arise in connection with the construction and development of the Construction Project…"

114. This clause positions Romspen as a key player in every facet of the project's execution, including its finances. Its directive to "implement specific issues" indicates a direct involvement in financial decision-making, tying back to its direct negotiation and influence over the construction contract's terms and costs.

115. Ultimately, the acts and conduct led to the instant bankruptcy case of the Debtor.

## V. SPECIFIC ACTS AND CONDUCT OF ROMSPEN AND ROMSPEN REOMASTER SUPPORTING EQUITABLE SUBORDINATION

116. **Romspen's Embedded Control and Direct Oversight at RIC (Austin):** Although Romspen initially considered hiring BTY—a cost-monitoring firm previously engaged for Zen Garden—they ultimately dismissed this option, citing cost concerns and instead prioritizing hands-on supervision. To that end, Romspen appointed Russell Collins as a full-time consultant with a Romspen email, Russell.Collins@Romspen.com, specifically to monitor and direct daily construction activities on their behalf. Collins was tasked with conducting site inspections, preparing costs to complete, reviewing draw requests, and coordinating with contractors—all functions under Romspen's explicit directive to oversee Panache's work as general contractor.

Collins operated as a direct line of oversight for Romspen's senior management, including asset manager Aber, further reinforcing Romspen's command over the project. Critically, throughout Panache's work under Romspen's direction, Romspen raised no formal objections to any of the work performed, reflecting their continuous awareness and approval of each decision and development. Any attempt by Romspen to now distance themselves from their active role is a post hoc revision of the project's history, inconsistent with their established, continuous oversight. This approach aligns with Romspen's prior practices at Zen Garden, where Dan Richardson—another on-site consultant reporting solely to Romspen—was similarly tasked with daily inspections and financial monitoring. Together, the roles of Collins and Richardson demonstrate Romspen's active, informed management across all project phases, dismantling any portrayal of a passive lender role. This ongoing, hands-on management model substantiates the need for equitable relief to recognize Romspen's true involvement and direction at RIC (Austin).

117. **Execution of Loan Documents for Its Own Benefit**: Romspen manipulated loan agreements for self-gain: Romspen required Romspen Reomaster to execute loan documents that served Romspen's own financial interests, all while being detrimental to the other creditors and parties in interest.

118. **Sabotage of Financing to Retain Control**: Romspen sabotaged financing options of the Debtor to maintain its grip on control. Romspen's refusal to pursue external financing options was a deliberate act of sabotage. By killing financing efforts that could have benefited the development, Romspen ensured it retained absolute control over the project. The Binding Term Sheet required Romspen to work with Panache and Zarafshani to secure new capital, stating "Romspen and Panache will work together in good faith to obtain and/or provide new capital to finance the acquisition and development of the Construction Project." Instead, Romspen

undermined all financing efforts to tighten its grip on the project, prioritizing control over the success of the development—a classic act of bad faith.

119. **Sabotage of Secured Outside Financing**: Romspen actively destroyed secured financing efforts: Panache and Zarafshani had successfully secured outside financing, yet Romspen sabotaged these efforts, ensuring the project would remain under its control. Despite obtaining a term sheet from a reputable PACE lender, Naveen, Romspen's actions effectively scuttled this opportunity. The Binding Term Sheet required Romspen to explore all viable financing options, but instead of doing so, it obstructed and misled everyone involved. Its deliberate sabotage of a secured financing deal is a blatant demonstration of bad faith.

120. **Sabotage of PACE Financing and Misrepresentation**: Romspen misled and obstructed PACE financing: Panache and Zarafshani took significant steps to secure PACE financing, including obtaining a term sheet from Naveen, but Romspen's actions deliberately undermined this effort. Romspen falsely represented its intentions to pursue PACE financing, only to sabotage it when the time came. The Binding Term Sheet clearly required Romspen to work in good faith to explore "PACE financing (subject to availability on acceptable terms)." Romspen's bad faith is evident in its pattern of misrepresentation, leading everyone to believe it was pursuing financing, only to back out at the last moment to maintain control and continue its mismanagement of the project.

121. **Failure to Provide Financial Transparency**: Romspen withheld crucial financial records and transparency. Despite being obligated under the Binding Term Sheet to provide full access to financial records, Romspen withheld essential documents and controlled when and how financial information was released. According to the agreement, "The corporate governance documents of New Owner and Managing Entity will provide Zarafshani with full access to the

financial information, books, and records." Instead, Romspen inserted language into the operating agreement that gave it absolute control over the production of financial documents, forcing Panache and Zarafshani to rely on Romspen's discretion for access. This deliberate lack of transparency is not only a breach of the term sheet but also a gross act of bad faith, reaffirmed in the RIC (Austin) company agreement where Romspen continued to limit financial transparency.

122. **Obstruction in Litigation**: Romspen deliberately obstructed cooperation in litigation with A-1 Engineering, LLC and North American Contractors, Inc. The Binding Term Sheet obligated Romspen to collaborate with Panache and Zarafshani during any litigation related to the project, stating "Romspen, Zarafshani and Panache agree to fully cooperate with each other in any litigation." Instead, Romspen obstructed the process, delaying the release of key financial documents and refusing to engage in good faith. Its actions during litigation were not only obstructive but calculated, ensuring that Panache and Zarafshani faced significant disadvantages in pursuing its legal rights.

123. **Romspen's Alleged Liquidity Problems as a Pretext for Further Control**: Throughout the project, Romspen claimed liquidity problems as a justification for withholding funds. However, Romspen's alleged liquidity issues were a pretext used to avoid fully supporting the project while maintaining control over its financing and operations.

124. **Using Liquidity Issues to Manipulate the Project**: Despite having the financial resources to move the Project forward, Romspen chose to selectively and strategically withhold funds. By controlling both the financing and operations, Romspen kept the project in a state of financial imbalance and crisis. Romspen's alleged liquidity problems were used as an excuse to justify this manipulation, allowing it to continue collecting interest and fees without committing to the success of the Project.

125. **Choosing Winners and Losers Based on Self-Interest**: Romspen's decisions were based solely on self-interest. It allocated resources selectively, funding only those parts of the project that furthered its strategic objectives. By choosing winners and losers in this manner, Romspen ensured that the project remained dependent on it, giving Romspen the power to decide when and if the project would move forward.

126. **Unprecedented Freeze Damage and Insurance Proceeds**: In the wake of an unprecedented freeze in 2021 that caused extensive damage to Buildings FHJ, Building C, and the Central Plant, the project's insurance carrier, CNA, paid out $1,744,342.75 million to cover repairs. However, Romspen chose not to apply the insurance proceeds to the necessary repairs. Instead, Romspen diverted these funds to pay property taxes and fund draws, leaving key areas of the development—such as the Central Plant and Building C—unrepaired and vulnerable to further damage.

127. **Failure to Repair the Central Plant and Building C:** The Central Plant, housing millions of dollars in equipment vital to the development, sustained severe roof damage. Despite some temporary remediation, Romspen has refused to fully replace the roof, allowing ongoing leaks to continue damaging critical systems. Similarly, Building C remains in a state of disrepair, as Romspen has chosen to withhold funds needed for the repairs. These deliberate decisions demonstrate Romspen's self-serving behavior and reckless disregard for the project's stability and future.

128. **Escalating Costs and Increased Financial Burden:** Romspen's refusal to maintain the necessary insurance and refusal to fund critical repairs has now escalated the financial burden on the project. The cost of reinstating adequate insurance and conducting the delayed repairs is now significantly higher than it would have been had Romspen acted responsibly from

the beginning. Its decision to withhold essential resources has led to unnecessary financial strain on the project, jeopardizing its future and undermining the interests of other stakeholders.

129. Romspen's handling of insurance proceeds for the RIC (Austin) project demonstrates its self-interest and disregard for the development and its stakeholders. Under the terms it negotiated, Romspen granted itself the right to control how the insurance proceeds were applied, diverting funds intended for essential repairs to meet its own financial priorities. These actions clearly illustrate how Romspen structured the loan agreements to prioritize its financial interests, allowing it to manipulate funds at the expense of the development's long-term stability.

130. **Halt on Permitting and Repairs:** Romspen's decision to halt repairs on Semiconductor Drive played a pivotal role in the decline of the RIC (Austin) development. Despite the roadway's importance for access, marketing and operational logistics, Romspen allowed it to fall into significant disrepair. This neglect persisted throughout Romspen's involvement, with no effort made to restore the road, leaving it in a state of ruin.

131. **Impact on Marketability:**-The deteriorated condition of Semiconductor Drive had an immediate and damaging effect on the marketability of the property. Potential investors, tenants, and partners were discouraged by the visible state of disrepair, which signaled poor upkeep and lack of commitment to the site's future. First impressions are critical in high-stakes real estate projects, and the sight of a neglected main access road cast doubt on the entire project's viability. This caused hesitation and ultimately prevented key stakeholders from engaging with the development.

132. **Aesthetic and Planning Setbacks:** Romspen's neglect also undermined the aesthetic vision that had been carefully planned for the site. Detailed engineering and redevelopment plans had been submitted to the City of Austin, which included modern upgrades

and an enhanced visual appeal. However, these plans were at odds with the decaying condition of Semiconductor Drive. The contrast between the proposed high-tech redevelopment and the reality of a dilapidated roadway delayed city approvals and further progress, as it became clear that the basic infrastructure was not being maintained to support the intended transformation.

133. **Impact on Property Valuation**:The neglect of Semiconductor Drive significantly diminished the property's valuation. Anyone unfamiliar with the intricate details of the development—such as appraisers, potential buyers, or city officials—would naturally factor in the state of the road when assessing the property's value. Throughout Romspen's involvement, the road has been deteriorating with its full knowledge, creating the impression of deferred maintenance and a lack of investment. This directly affected the perceived worth of the property, leading to lower appraisals and reduced interest from serious investors.

134. **Strategic Neglect to Control Development:** Romspen's inaction regarding Semiconductor Drive was not merely negligent but strategic. By allowing this critical piece of infrastructure to deteriorate, Romspen effectively stifled the development's progress. The poor condition of the road depressed the property's value and limited interest from outside investors, ensuring that Romspen could maintain control over the development without committing to the necessary repairs or improvements. This strategy kept the property in a state of decline, allowing Romspen to manipulate the development's trajectory to serve its own interests.

135. Romspen's failure to repair and maintain Semiconductor Drive has caused widespread and lasting harm to the Project. The marketability of the property was severely compromised, as potential investors and tenants were deterred by the road's condition. The aesthetic vision for the property, which had been carefully crafted and submitted to the City of Austin, was delayed as the deteriorating infrastructure stood in stark contrast to the proposed

upgrades. Most significantly, the valuation of the property was negatively impacted, as anyone assessing the development would factor in the years of neglect. This reduced the property's worth, limited its potential for investment, and placed a financial burden on all stakeholders involved. Romspen's deliberate neglect of Semiconductor Drive was a key factor in the development's stagnation and must be recognized as a central issue in this case.

136. **Selective Insurance Enforcement**: **A Double Standard** Romspen's decision to let critical insurance lapse at RIC (Austin) starkly contrasts with its approach on other projects, where it insists on comprehensive coverage to protect its loans. For a project it claims is saddled with $145 million in debt, Romspen's refusal to secure proper insurance makes one thing clear: it is not acting as a lender. No responsible lender would leave a valuable asset unprotected. Romspen has instead selectively abandoned these standards, revealing its true motive: minimizing its own financial exposure while passing the risk to the development and its stakeholders.

137. **Intentional Failure to Maintain Builders Risk Insurance**: When Romspen assumed control of RIC (Austin), the Builders Risk Insurance that had been in place—covering vital risks like fire, theft, vandalism, and natural disasters—was allowed to lapse under its watch. The cost to reinstate this insurance is now estimated at $1.2 million, a significant increase over what it would have cost to simply maintain the coverage from the outset. Romspen's failure to maintain this insurance was not an oversight. It was a deliberate choice—a clear act of bad faith designed to minimize its short-term costs at the expense of long-term security for the project.

138. **Unknown Adequacy of Liability Insurance:** While Romspen may claim to have some form of liability insurance in place, the exact adequacy of this coverage remains unclear. What is evident, however, is that any such coverage is grossly inadequate for a project of this magnitude. Romspen's failure to secure comprehensive coverage has left millions of dollars in

assets exposed to catastrophic risk. In short, Romspen has gambled with the future of RIC (Austin), placing it at the mercy of potential disasters with insufficient protection.

139. **The Escalating Financial Burden: Romspen's Legacy of Risk:** Romspen's refusal to maintain insurance has not only exposed the project to physical risks but has also drastically increased the financial burden of the Project. The cost to reinstate adequate insurance is believed to be over a million dollars—a burden the Project should not have to bear. These inflated costs could have been avoided had Romspen acted responsibly. Instead, by neglecting its duty to secure coverage when it was affordable, Romspen has pushed these unnecessary costs onto the development and delayed the project's completion.

140. **Deliberate Bad Faith: Imposing Unnecessary Costs** Romspen's conduct is not just negligent; it is calculated and rooted in bad faith. By refusing to cover a relatively small cost of insurance when it was manageable, it has now created a situation where the project faces significantly higher costs and greater risks. Romspen's decision to offload these unnecessary expenses onto the development—burdens that should never have existed—shows a flagrant disregard for the interests of the project and its stakeholders. This is not the behavior of a prudent owner or lender but rather a self-serving act that has only deepened the project's financial vulnerability.

141. **The Catastrophic Consequences of Underinsurance**: The most alarming outcome of Romspen's bad faith is the very real risk of a catastrophe. Without the necessary insurance in place, the development is critically exposed. If a fire, natural disaster, or any other form of significant damage were to strike the property, the resulting losses could be catastrophic—far beyond any minimal coverage Romspen may have maintained. In this event, the financial fallout would devastate the project, leaving stakeholders, including RIC (Austin), to suffer massive

uninsured losses. Romspen's refusal to secure comprehensive insurance is a reckless gamble with the fate of the entire development.

142. **Romspen's Self-Interest Over the Project's Survival:** Time and time again, Romspen has demonstrated that it acts only in its own self-interest, disregarding its obligations to protect the project. It has left RIC (Austin) vulnerable, while pushing increased costs and heightened risks onto the stakeholders. Romspen's refusal to pay for insurance, despite its relatively low original cost, reveals a deliberate strategy: avoid financial responsibility at any cost, even if it means leaving the project exposed to disaster.

143. By halting funding at a critical phase of construction, Romspen orchestrated the perfect storm of delays, cost escalations, structural damage, and legal maneuvering designed to weaken the project and enrich itself.

144. Romspen's funding halt came when the project was 65% complete, a point where construction was most vulnerable. The absence of key protective installations, such as roofing and waterproofing, left major structural components exposed, leading to immediate and devastating damage.

145. Romspen's timing was not coincidental. By halting funding during a crucial phase, Romspen left critical systems like structural steel and mechanical, electrical, and plumbing (MEP) installations exposed to environmental damage. Without external protection, rain and moisture corroded structural elements, leading to irreparable harm.

146. Romspen left the project vulnerable when it was most exposed—right before roofing and enclosure. Structural steel rusted, foundations began to crack, and critical systems deteriorated. Delays compounded risks, multiplying repair costs and further destabilizing the project.

147. The shutdown caused material costs to skyrocket by 30-55%% as the result of environmental exposure and inflation.

148. Romspen's funding halt triggered massive increases in steel and MEP material costs, driven not only by time delays but also by the necessity of replacing irreparably damaged systems that had been left vulnerable to the elements.

149. The extended exposure due to Romspen's abrupt funding cutoff resulted in long-term structural and environmental degradation, creating a cascade of costly repairs.

150. Notwithstanding the funding halt, Romspen continued to charge interest and other charges, increasing its alleged claim amounts.

151. Exposed rebar and structural steel suffered severe corrosion, weakening the integrity of the entire building. Cracks formed in the foundation as water penetrated exposed concrete, leading to shifts in the building's alignment.

152. Moisture seeping into the foundation led to destabilization and required emergency intervention to avoid catastrophic structural failure.

153. With incomplete roofing and inadequate weatherproofing, water infiltration damaged the interior systems.

154. Electrical failures, mold growth, and compromised insulation and framing became widespread. The damage was severe enough to warrant replacement of entire electrical systems and emergency mold remediation efforts.

155. The resulting damage required unplanned emergency remediation, such as mold removal and stabilization of the building's foundation.

156. Romspen's deliberate decision to expose the project to these risks significantly increased unplanned emergency repair costs, stretching financial resources and further delaying project completion.

157. Romspen'' calculated delays resulted in the expiration and invalidation of critical warranties, leading to catastrophic financial consequences for the project.

158. Warranties on structural steel, HVAC units, and MEP systems were voided due to improper storage and prolonged exposure. Romspen's deliberate failure to proceed with installation on time rendered these warranties worthless, exposing the project to immense replacement costs.

159. By pushing the project beyond agreed timelines, Romspen caused the expiration of contractor workmanship guarantees, eliminating any recourse for defects or system failures.

160. Romspen's sabotage has damaged the Project's marketability, driving away potential investors and tenants. The Project's financial viability has been destroyed, and its marketability severely undermined.

161. Due to the extensive damage, the project cannot be leased or marketed until full repairs are completed. Potential revenue streams have been completely frozen, plunging the development into deep financial jeopardy.

162. The visible damage and ongoing repair needs have driven away prospective tenants and investors, further complicating recovery.

163. The escalating costs of repairs and remobilization, driven by Romspen's delays, are eating away at the project's cost to complete. Unforeseen environmental damage and structural degradation continue to erode profitability.

164. Romspen's actions were not incidental miscalculations—they were deliberate. The calculated decision to halt funding during this crucial period allowed Romspen to manipulate the project's timeline, shifting liabilities onto contractors while positioning itself to control the outcome.

165. Romspen used the construction delays to shift liability for cost overruns and project defects onto contractors, insulating itself from financial exposure. By delaying funding, Romspen ensured that contractors bore the brunt of financial penalties while Romspen maintained control of key decisions.

166. Romspen's ultimate goal was clear: force the project into financial distress to later seize control at a discounted value. By causing extensive damage and halting progress, Romspen positioned itself to take advantage of the development's declining value and eventually leverage it for a greater financial return.

167. The true genius of Romspen's strategy lies in its ability to externalize the costs of its own sabotage. Contractors and creditors are left dealing with the immediate expenses of repairs and delays, while Romspen reaps the long-term benefits of controlling a distressed but valuable asset.

168. Romspen's ultimate goal was always to wipe out other stakeholders and secure full ownership of the development. Its actions demonstrate a clear preconceived plan to manipulate the financial situation and force RIC (Austin) into default, setting the stage for Romspen to consolidate ownership. Every financial decision it made, from delaying necessary payments to misallocating funds, was part of this strategy to undermine RIC (Austin) and other minority stakeholders, leaving Romspen in a stronger position to take control of the property.

169. To carry out this plan, Romspen misled stakeholders, including RIC (Austin), by creating the appearance of a liquidity crisis. Romspen repeatedly indicated that it was seeking third-party financing to resolve these issues, encouraging RIC (Austin) and others to operate under the assumption that Romspen was acting in good faith. However, it has since become clear that Romspen never intended to secure financing. Instead, it used this fabricated liquidity crisis as a tool to manipulate the financial situation, stalling necessary actions and setting the stage for a manufactured default.

170. Romspen's misallocation of funds, failure to pursue financing, and deliberate delays in fulfilling critical financial obligations were all part of its effort to push RIC (Austin) into default. This default was not caused by RIC (Austin)'s actions—it was a direct result of Romspen's financial mismanagement and bad faith conduct. By intentionally withholding funds for necessary repairs and delaying important payments, Romspen created an environment where RIC (Austin) had no choice but to default, allowing Romspen to take advantage of the situation.

171. Romspen's actions caused significant harm to RIC (Austin) and other minority stakeholders in the development. By creating the appearance of financial instability and forcing a default, Romspen not only pushed RIC (Austin) into a precarious financial position but also damaged the interests of other stakeholders. These stakeholders relied on Romspen's representations and operated in good faith, believing that Romspen was seeking solutions to stabilize the development. Instead, Romspen's bad faith tactics led to financial losses for RIC (Austin) and the minority members, further destabilizing the project.

172. The ultimate result of Romspen's actions was to create a scenario in which RIC (Austin) and other minority stakeholders are forced out of the project, allowing Romspen to regain full ownership. Its strategy, from fabricating liquidity issues to forcing a default, was designed to

consolidate its control and eliminate any remaining obstacles to its complete takeover of the development. By maintaining 100% control over management and holding 75% ownership, Romspen has placed itself in a position where it can dictate the future of the project while pushing out the stakeholders who could challenge its authority.

173. Romspen's actions, from the misallocation of funds to the manipulation of the financial situation, were part of a preconceived strategy to force RIC (Austin) into default and eliminate other stakeholders. By creating the appearance of a liquidity crisis, failing to secure third-party financing as promised, and using its 100% control over the project's finances to push RIC (Austin) into default, Romspen ensured it could hold full ownership of the development.

174. In commercial real estate, marketing and leasing are pivotal to a project's financial viability. The ability to secure tenants not only drives revenue but also determines a property's long-term value and success. For a development like RIC (Austin), attracting life sciences tenants requires a robust marketing strategy, competitive leasing terms, and a commitment to building out infrastructure and amenities. Without these components, no matter how promising a project appears on paper, it cannot thrive.

175. Despite the fact that marketing and leasing efforts were not Panache's contractual responsibility, Panache went above and beyond to promote RIC (Austin). Its initiatives, including hosting a life sciences networking event during SXSW that attracted over 60 potential tenants, were designed to position the campus as a leading life sciences hub. However, Romspen's refusal to support these marketing and leasing efforts demonstrated bad faith and directly sabotaged the project.

176. The RCLCO report, commissioned by Romspen, unequivocally validated the market demand for life sciences space in Austin. It stated: "The local demand for life sciences

facilities is robust, and RIC (Austin) is ideally positioned to capitalize on this demand with the right infrastructure investments". RCLCO identified RIC (Austin) as a prime opportunity to attract tenants from the growing life sciences sector, projecting that the campus could capture up to 627,000 square feet of life sciences demand through 2030.

177. Yet, despite having this third-party confirmation from a highly respected market analysis firm, Romspen chose to remain silent and inactive. It provided no marketing cost to complete, no leasing support, and no follow-up to capitalize on the tenant interest generated by Panache's efforts. The RCLCO report clearly outlined the opportunity, but Romspen's deliberate refusal to engage in marketing and leasing initiatives reveals a calculated effort to undermine the project's success.

178. Romspen's actions—or rather, its strategic inaction—amounted to nothing less than marketing sabotage. By failing to allocate any cost to complete or resources to leasing and marketing, Romspen effectively ensured that RIC (Austin) could not compete in the highly competitive Austin market. The RCLCO report specifically noted that the campus needed to distinguish itself from other developments by delivering critical amenities and infrastructure, yet Romspen refused to fund any of these initiatives.

179. This sabotage was deliberate. Romspen understood the market demand and the project's potential, yet it willfully chose to starve the project of the necessary funds at key moments. By withholding marketing support, Romspen ensured that no tenant commitments could materialize, despite the clear market opportunities outlined by RCLCO. This tactic allowed Romspen to keep the property in a state of financial distress, positioning itself to wipe out other stakeholders while maintaining control.

180. The RCLCO report underscored several areas where Romspen's failure to act directly harmed the marketing and leasing potential of RIC (Austin):

181. **Infrastructure Failures**: The report explicitly stated, "The existing chilled water and HVAC systems are inadequate for life sciences use, necessitating substantial upgrades to meet industry standards". These upgrades were critical for attracting life sciences tenants, yet Romspen refused to fund them. Without the necessary infrastructure improvements, the campus was unfit for tenant occupancy, making it impossible to lease.

182. **Amenity Deficits**: The report emphasized that delivering amenities such as wellness centers and food and beverage facilities early in the development was essential for marketing the campus. These amenities were key to establishing a sense of place and making RIC (Austin) competitive. Yet, Romspen did nothing to support these efforts, ensuring that the campus remained unattractive to potential tenants.

183. **Market Positioning Ignored**: RCLCO identified the competitive advantages of RIC (Austin)'s location and projected that the campus could capture significant demand from the burgeoning life sciences industry in Austin. The report noted that with the right investments, the campus could achieve pricing at the top of the market. Romspen's refusal to engage in marketing efforts directly negated this potential, leaving the property under-leveraged and under-marketed.

**Romspen's Manufactured Crisis as a Cover for Leasing Sabotage**

184. Romspen's manufactured liquidity crisis was another key element of its bad faith strategy to sabotage leasing efforts. By halting construction and refusing to fund critical infrastructure improvements, Romspen ensured that the property could not be properly marketed or leased. Without functional infrastructure, potential tenants were driven away, further deepening the project's financial distress.

185. Romspen's tactics were clear: by pretending that it lacked the financial capacity to invest in the project, it created an environment where RIC (Austin) could not succeed. The RCLCO report projected that a $50 million investment in infrastructure and tenant improvements was necessary to reposition the property as a life sciences campus, yet Romspen deliberately withheld these funds. This refusal was a calculated decision to prevent tenant commitments, keeping the property in financial limbo and allowing Romspen to retain control without making any meaningful investments.

186. Romspen's withholding of essential development funds was not about gaining control—it already had it. The agreements it drafted and negotiated gave it unilateral discretion to fund or withhold at its will, with no obligation to act in RIC (Austin)'s or the project's best interest. This was not the behavior of a conventional lender but a deliberate strategy to force the development into financial distress.

187. Romspen knew from the outset that by withholding critical funds at key stages, it could create an environment of financial instability, ultimately forcing the project into default. This was not a matter of circumstance or mismanagement; it was a calculated effort to eliminate investors, stakeholders, and creditors. Romspen's intention was clear: to trigger a default that would allow it to seize full control of the development, consolidating its ownership at the expense of all other parties involved.

188. By strategically withholding funds at pivotal points, Romspen ensured the project's financial collapse, positioning itself to wipe out competing claims and assert complete dominance over the asset. This premeditated conduct highlights a deliberate manipulation of its control, designed not to support the development's success, but to engineer a financial crisis it could exploit for its own gain.

189. Romspen, through its management team at Rumman Development Group (RDG)—Mark Aber, Peter Olebaum, and Elliott Steiner—deliberately failed to pay property taxes for RIC (Austin). These individuals, who held dual roles within Romspen and RIC (Austin), knowingly allowed taxes to go unpaid, burdening the property with late fees, penalties, and additional financial distress.

**Romspen's Reputation and Its Impact on Leasing**

190. In the world of commercial real estate, a lender's reputation can greatly affect tenant confidence. Romspen's reputation as an aggressive lender who stalls projects to its advantage had a profound impact on the market's perception of RIC (Austin). Potential tenants and brokers were hesitant to commit to a property backed by Romspen, given its history of manufacturing financial crises and strategically withholding support at critical junctures.

191. This negative perception, compounded by Romspen's refusal to engage in marketing, made it nearly impossible to secure long-term tenants. Romspen's bad faith actions were not just financial but reputational—its well-known tactics in the industry discouraged potential tenants from associating with the project, further undermining leasing efforts.

192. The restrictive covenants governing the Ed Bluestein property were implemented to protect the specific needs of semiconductor manufacturing. However, as the industrial landscape evolves, these covenants have become barriers to the property's redevelopment. Failing to actively pursue modifications to these restrictions would not only be a missed opportunity but would also constitute gross mismanagement, compromising the property's economic potential and alignment with modern development trends. Modifying these restrictions is a strategic necessity to unlock the property's full potential, meet current market demands, and ensure sustainable economic growth.

193. Modifying the restrictive covenants is critical to unlocking the full development potential of the Ed Bluestein property. The existing restrictions were originally put in place to protect the specialized needs of semiconductor manufacturing, but they now hinder the property's ability to adapt to modern development opportunities and market demands. The key reasons for modifying these restrictions are outlined below:

194. **Unlocking Development Potential**: The current restrictions severely limit the types of developments that can take place on the property. By prohibiting residential, recreational, and certain commercial uses, these covenants prevent the site from being transformed into a mixed-use development that could enhance its economic viability. Modifying these restrictions would allow the property to attract a wider range of tenants and investors, fostering a dynamic and diverse business environment.

195. **Aligning with Market Demand**: The restrictive covenants, as they stand, do not reflect current market demands or the evolving needs of the community. Modern development trends favor mixed-use properties that combine residential, commercial, and recreational spaces. To make the Ed Bluestein property economically competitive and responsive to market needs, it is imperative to update these deed restrictions to allow for more versatile use.

196. **Facilitating Stakeholder Collaboration**: The unanimous consent requirement for modifying these restrictions ensures that all stakeholders have a say in the property's future. However, this requirement also presents a challenge, as it enables any single dissenting owner to block changes. Overcoming this hurdle through cooperation among current parties—NXP Semiconductors, RIC (Austin) LLC, and SDC Data Center (SDC - Austin, LLC)—is crucial to adapting the property to its highest and best use.

197. **Promoting Economic Growth and Revitalization**: Modifying the restrictive covenants will enable the development of facilities and amenities that can drive economic growth. Allowing more flexible use of the property will not only attract businesses and residents but also create jobs and generate tax revenues, contributing to the overall economic health of the area.

198. The failure to devote adequate resources and efforts to modifying the restrictive covenants constitutes gross mismanagement of the Project. The restrictive covenants currently in place were appropriate for the site's historical use, but they no longer serve the best interests of maximizing the property's value or aligning with contemporary development needs. The following points underscore the critical nature of addressing these covenants:

199. **Stagnation of Development Opportunities**: By not pursuing modifications, the property will remain constrained by outdated limitations, preventing it from evolving into a more economically viable and productive asset. This stagnation would hinder the potential for mixed-use development that could otherwise capitalize on current market trends and demands.

200. **Missed Economic Benefits**: Failing to modify the restrictions will result in missed opportunities for significant economic benefits, including increased property values, job creation, and tax revenue generation. The inability to attract a broader range of tenants and businesses due to the existing restrictions would directly impact the economic growth potential of the site.

201. **Reputational Damage and Legal Liabilities**: Persistent failure to modernize the property in line with market expectations could damage the reputations of the parties involved. Moreover, neglecting to address the restrictive covenants could expose stakeholders to potential legal liabilities from investors and partners who expect proactive management and development strategies.

202. **Inability to Maximize Return on Investment (ROI)**: The current restrictive covenants significantly limit the types of profitable uses the property can support. By failing to pursue modifications, the involved parties would not be maximizing the ROI potential, thereby not fulfilling its fiduciary responsibilities to investors and stakeholders.

203. **Long-Term Sustainability**: Modifying the restrictive covenants is essential for the long-term sustainability of the property. As the semiconductor industry evolves and market dynamics shift, the flexibility to repurpose the property to accommodate new industries and uses is critical. Failure to adapt could render the property obsolete and economically nonviable.

## VI. CAUSES OF ACTION & REIELF REQUESTED

### COUNT ONE – EQUITABLE SUBORDINATION

204. Plaintiffs incorporate by reference and re-allege each allegation set forth above as if fully set forth herein.

205. Plaintiffs Panache and AFMN request that the Court equitably subordinate the Romspen Claims to those of all other holders of allowed claims pursuant to 11 U.S.C. § 510(c).

206. Plaintiff Vesta Texas requests that the Court equitably subordinate the Romspen Reomaster interests to this of Vesta Texas pursuant to 11 U.S.C. § 510(c).

207. The elements of equitable subordination include: (1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage to the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *Wooley v. Faulkner (In re: SI Restructuring, Inc.),* 532 F.3d 355, 360 (5th Cir. 2008).

208. Romspen and Romspen Reomaster's acts and conduct outlined above caused the Debtor and its creditors to sustain damages, damaging Plaintiffs and all other holders of allowed

claims against the Debtor, and support a finding of inequitable conduct sufficient to satisfy the first element of an equitable subordination claim in this case. As set forth above, Romspen and Romspen Reomaster actively interfered at every level with the Debtor's operations. This inequitable conduct has resulted in harm to the Plaintiffs and the Debtor and is a direct cause of all allowed unpaid claims against the Debtor. This inequitable conduct has resulted in an unfair advantage to Romspen to Romspen and Romspen Reomaster. Equitable subordination as to the allowed claims of all other creditors and interest holders is not inconsistent with the Bankruptcy Code. Accordingly, the Plaintiffs requests that the Romspen Claims be equitably subordinated to the allowed claims of the holders of all other claims and the Romspen Reomaster interests be subordinated to the interests of Vesta Texas.

**COUNT TWO – CLAIM OBJECTION & DETERMINATION OF SECURED STATUS**

209. Plaintiffs incorporate by reference and re-allege each allegation set forth above as if fully set forth herein.

210. The statutory predicates for the relief requested herein are Bankruptcy Code sections 502, 506, Bankruptcy Rule 3007, Local Rule 3007-1, and the Standing Order Regarding Objections to Proofs of Claim entered by the United States Bankruptcy Court for the Western District of Texas. Plaintiffs have reviewed the Romspen Claims and find them objectionable. The Plaintiffs dispute the amount, calculation, priority, perfection, and secured status of the Romspen Claims. The Plaintiffs request that the Court sustain its objections as set forth herein, deny the Romspen Claims. Alternatively, Plaintiffs object to the Romspen Claims and request that they be allowed only in such amounts as properly established to be due and owning, properly calculated, subject to all offsets and credits, and secured only to the extent properly perfected as to any and

all purported collateral, and, in any event, equitably subordinated pursuant to 11 U.S.C. § 510(c) to all other claims in the Bankruptcy Case.

**COUNT THREE – REQUEST FOR DETERMINATION THAT CAUSE EXISTS TO RESTRICT CREDIT BIDDING**

211. Plaintiffs incorporate by reference and re-allege each allegation set forth above as if fully set forth herein.

212. The Plaintiffs request that this Court determine that cause exists under 11 U.S.C. §§ 363(k) and 1129(b)(2)(A)(ii) to limit credit bidding by Romspen at any sale of the Debtor's assets. As an alleged secured creditor, unless the Court for cause orders otherwise, Romspen would be entitled to credit bid. Cause exists in this case because, as set forth above, there are *bona fide* disputes as to the existence, amount, validity, and priority of Romspen's liens and claims. *See, e.g., In re Antaeus Tech. Servs.*, 345 B.R. 556 (Bankr. W.D. Va. 2005) (disallowing a credit bid where secured creditors' conduct was viewed as not merely protecting the value of its collateral but enhancing its position); *In re Aloha Airlines, Inc.*, 2009 WL 1371950 (Bankr. D. Haw., May 14, 2009) (disallowing a credit bid because the party making it had entered into an agreement with a third party that had engaged in misconduct with respect to the debtors); *Nat'l Bank of Comm. v. L.D. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that a secured creditor could not credit bid "because the validity of its liens and security interests are unresolved"); *Morgan Stanley Dean Witter Mortgage Capital, Inc. v. Alon USA L.P. (In re Akard St. Fuels, L.P.)*, 2001 WL 1568332, at *3 (N.D. Tex. Dec. 4, 2001) (refusing a request to credit bid where the secured creditor's lien was subject to a bona fide dispute that could not be resolved before the sale).

213. As set forth above, Plaintiffs believe there is a substantial likelihood that they will prevail on the merits of this case. The facts outlined above establish that there is a strong

probability, and thus, substantial likelihood, that the Plaintiffs will prevail on their claims for lien priority, disallowance, and equitable subordination of Romspen's claims. As such, cause exists to limit Romspen's credit bidding rights.

## VII. PRAYER

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants Romspen Mortgage Limited Partnership and Romspen (Reomaster) Holdings, Inc. in the following respects:

(a) Equitably subordinating Romspen's Claims to the claims of all creditors holding allowed claims;

(b) Equitably subordinating Romspen Reomaster's interests to the interests of Vesta Texas;

(c) Sustaining Plaintiffs objections to the Romspen Claims;

(d) Alternatively, determining the amount, secured status, and perfection, of Romspen's liens and claims;

(e) Prohibiting Romspen from credit bidding on any sale of assets of the Debtor pursuant to 11 U.S.C. §§ 363(b) or 1129(b)(2)(A)(ii); and

(f) Granting such other and further relief as Plaintiffs may show themselves to be justly entitled.

24-61005-mmp Doc#1-3 Filed 10/30/24 Entered 10/30/24 12:09:55 Exhibit 20 Pg 64 of 64

Respectfully submitted,

KELL C. MERCER, P.C.
901 S Mopac Expy Bldg 1 Ste 300
Austin, TX 78746
(512) 627-3512
kell.mercer@mercer-law-pc.com

By: */s/ Kell C. Mercer*
Kell C. Mercer
State Bar No. 24007668

COUNSEL FOR PANACHE DEVELOPMENT & CONSTRUCTION, INC

-AND-

*/s/ B. Russell Horton*
B. Russell Horton
State Bar No. 10014450
George Brothers Kincaid & Horton, L.L.P.
114 W 7th St., Suite 1100
Austin, Texas 78701
Phone: (512) 495-1400
Fax: (512) 499-0094
Email: rhorton@gbkh.com

COUNSEL FOR AFMN INVESTMENTS, LLC

-AND-

ROSS, SMITH & BINFORD, PC

By: /s/ *J. Casey Roy*
J. Casey Roy
State Bar No. 00791578
2901 Via Fortuna
Bldg. 6, Suite 450
Austin, TX 78746
Telephone: 512-798-3298
Facsimile: 214-377-9409
Email: casey.roy@rsbfirm.com

COUNSEL FOR VESTA TEXAS, LLC